No. ____

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS, STATE OF LOUISIANA, STATE OF UTAH, AND STATE OF WEST VIRGINIA,

*Petitioners,*

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

## PETITION FOR REVIEW

In accordance with 15 U.S.C. § 78y(b)(1) and Federal Rule of Civil Procedure 15, the State of Texas, the State of Louisiana, the State of Utah, and the State of West Virginia petition the Court to review and set aside the Securities and Exchange Commission's Final Rule entitled "Enhanced Reporting of Proxy Votes by Registered Management Investment Companies; Reporting of Executive Compensation Votes by Institutional Investment Managers," 87 Fed. Reg. 78770 (Dec. 22, 2022), a copy of which is enclosed with this filing.

Jurisdiction and venue for this petition are proper in this Court under 15 U.S.C. § 78y(b) because the petitioners are "adversely affected" by the rule and this Circuit is the location where one or more petitioners "reside[]" or have their "principal place of business." The petition is timely because it was filed on February 21, 2023,

a date that is "within 60 days after the promulgation of the rule[.]" Joinder of the

parties is practicable under Fed. R. App. P. 15(a)(1).

Respectfully submitted.

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

Jeff Landry
Attorney General
Elizabeth B. Murrill
Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
murrille@ag.louisiana.gov

*Counsel for the State of Louisiana*

Judd E. Stone II
Solicitor General

/s/ Leif A. Olson
Leif A. Olson
Chief, Special Litigation Division
leif.olson@oag.texas.gov

Joseph Mazzara
Assistant Solicitor General
joseph.mazzara@oag.texas.gov

*Counsel for the State of Texas*

Sean Reyes
Attorney General
Melissa Holyoak
Solicitor General
Utah Attorney General's Office
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801) 538-9600
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

Patrick Morrisey
Attorney General
Lindsay See
Solicitor General
Michael R. Williams
Senior Deputy Solicitor General
West Virginia Attorney General's
Office
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

## Certificate of Service

On February 21, 2023, this petition for review was served by certified mail,

return receipt requested, on:

Gary Gensler, Chairman
Gurbir S. Grewal, Director, Division of Enforcement
William A. Birdthistle, Director, Division of Investment Management
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549

Merrick B. Garland
Attorney General
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

/s/ Leif A. Olson

## Certificate of Compliance

This petition complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 164 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Leif A. Olson

## SECURITIES AND EXCHANGE COMMISSION

**17 CFR Parts 200, 232, 240, 249, 270, and 274**

[Release Nos. 33–11131; 34–96206; IC–34745; File No. S7–11–21]

RIN 3235–AK67

**Enhanced Reporting of Proxy Votes by Registered Management Investment Companies; Reporting of Executive Compensation Votes by Institutional Investment Managers**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Final rule.

**SUMMARY:** The Securities and Exchange Commission ("Commission") is adopting amendments to Form N–PX under the Investment Company Act of 1940 ("Investment Company Act") to enhance the information mutual funds, exchange-traded funds ("ETFs"), and certain other funds currently report about their proxy votes and to make that information easier to analyze. The Commission also is adopting rule and form amendments under the Securities Exchange Act of 1934 ("Exchange Act") that would require an institutional investment manager subject to the Exchange Act to report on Form N–PX how it voted proxies relating to executive compensation matters, as required by the Exchange Act. The reporting requirements for institutional investment managers complete implementation of those requirements added by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act").

**DATES:** *Effective date:* This rule is effective July 1, 2024.

**FOR FURTHER INFORMATION CONTACT:** Christian Corkery, David Driscoll, or Nathan R. Schuur, Senior Counsels; Bradley Gude and Angela Mokodean, Branch Chiefs; or Brian M. Johnson, Assistant Director at (202) 551–6792, Investment Company Regulation Office, Division of Investment Management, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–8549.

**SUPPLEMENTARY INFORMATION:** The Commission is adopting new 17 CFR 240.14Ad–1 ("rule 14Ad–1") under the Exchange Act and amendments to 17 CFR 200.30–5 ("rule 30–5"); 17 CFR 240.24b–2 ("rule 24b–2") under the Exchange Act; 17 CFR 270.30b1–4 ("rule 30b1–4") under the Investment Company Act; Form N–1A [referenced in 17 CFR 239.15A and 17 CFR 274.11A], Form N–2 [referenced in 17

CFR 239.14 and 17 CFR 274.11a–1], and Form N–3 [referenced in 17 CFR 239.17a and 17 CFR 274.11b] under the Securities Act of 1933 ("Securities Act") and Investment Company Act; Form N–PX [referenced in 17 CFR 249.326 and 17 CFR 274.129] under the Exchange Act and Investment Company Act; and 17 CFR 232.101 of Regulation S–T ("rule 101 of Regulation S–T").

### Table of Contents

I. Introduction and Background
II. Discussion
  A. Scope of Funds' Form N–PX Reporting Obligations
  B. Scope of Managers' Form N–PX Reporting Obligations
  1. Managers Subject to Form N–PX and Categories of Votes They Must Report
  2. Managers' Exercise of Voting Power
  3. Additional Scoping Matters for Manager Reporting of Say-on-Pay Votes
  C. Proxy Voting Information Reported on Form N–PX
  1. Identification of Proxy Voting Matters
  2. Identification of Proxy Voting Categories
  3. Quantitative Disclosures
  4. Additional Amendments to Form N–PX
  D. Joint Reporting Provisions
  E. The Cover Page
  F. The Summary Page
  G. Form N–PX Reporting Data Language
  H. Time of Reporting
  I. Requests for Confidential Treatment
  J. Website Availability of Fund Proxy Voting Records
  K. Effective Date
  L. Transition Rules for Managers
  M. Technical and Conforming Amendments
  N. Delegation of Commission Authority
III. Other Matters
IV. Economic Analysis
  A. Introduction
  B. Economic Baseline
  1. Funds' Reporting of Proxy Voting Records
  2. Managers' Reporting of Say-on-Pay Votes
  3. Other Affected Parties
  C. Benefits and Costs
  1. Amendments to Funds' Reporting of Proxy Votes
  2. Amendments To Require Manager Reporting of Say-on-Pay Votes
  D. Effects on Efficiency, Competition, and Capital Formation
  1. Amendments to Funds' Reporting of Proxy Votes
  2. Amendments To Require Manager Reporting of Say-on-Pay Votes
  E. Reasonable Alternatives
  1. Scope of Managers' Say-on-Pay Reporting Obligations
  2. Amendments to Proxy Voting Information Reported on Form N–PX
  3. Amendments to the Time of Reporting on Form N–PX or Placement of Funds' Voting Records
V. Paperwork Reduction Act Analysis
VI. Regulatory Flexibility Act Certification for Managers and Final Regulatory Flexibility Analysis for Funds
  A. Regulatory Flexibility Act Certification for Managers
  B. Final Regulatory Flexibility Act Analysis for Funds
  1. Need for and Objectives of the Final Fund Rules
  2. Significant Issues Raised by Public Comment
  3. Small Entities Subject to the New Rule and Amendments
  4. Projected Reporting, Recordkeeping, and Other Compliance Requirements
  5. Agency Action To Minimize Effect on Small Entities Statutory Authority

## I. Introduction and Background

Mutual funds, ETFs, and other registered management investment companies (collectively, "funds") in the aggregate hold substantial institutional voting power that they exercise on behalf of millions of fund investors.[1] Funds own around 32% of the market capitalization of all U.S.-issued equities outstanding and in some cases funds hold a larger percent of a single company's stock.[2] As a result, funds can influence the outcome of a wide variety of matters that companies submit to a shareholder vote, including matters related to governance, corporate actions, and shareholder proposals. Funds' proxy voting decisions also can play an important role in maximizing the value of their investments, affecting the more than 45% of U.S. households that own funds, as well as other investors in U.S. equity markets.[3] Due to funds' significant voting power and the effects of funds' proxy voting practices on the actions of corporate issuers and the value of these issuers' securities, investors have an interest in how funds vote.

In 2003, the Commission adopted Form N–PX, which requires funds to report publicly their proxy voting

---

[1] Mutual funds and most ETFs are open-end management investment companies registered on Form N–1A. An open-end management investment company is an investment company, other than a unit investment trust or face-amount certificate company, that offers for sale or has outstanding any redeemable security of which it is the issuer. *See* sections 4 and 5(a)(1) of the Investment Company Act [15 U.S.C. 80a–4 and 80a–5(a)(1)]. The amendments also will apply to registered closed-end management investment companies (which register on Form N–2) and insurance company separate accounts organized as management investment companies that offer variable annuity contracts (which register on Form N–3). Small business investment companies (which register on Form N–5) are not required to file Form N–PX and are not subject to these amendments or included in the defined term "fund" used throughout this release.

[2] Investment Company Institute ("ICI"), 2022 Investment Company Fact Book (2022), at Figure 2.7, *available at https://icifactbook.org/pdf/2022_factbook.pdf* ("ICI 2022 Fact Book") (stating that mutual funds and other registered investment companies held 32 percent of U.S. corporate equities as of year-end 2021).

[3] *See* ICI 2022 Fact Book, *supra* footnote 2, at Figure 7.1.

records on an annual basis.[4] To improve the utility of Form N–PX information for investors, in September 2021 the Commission proposed amendments to enhance the information funds currently report about their proxy votes on Form N–PX and to make that information easier to analyze ("proposed amendments").[5] Specifically, the Commission proposed to require funds to tie the description of the voting matter on Form N–PX to the issuer's form of proxy and categorize voting matters by type. In addition, the proposed amendments would have required disclosure of the number of shares that were voted (or, if not known, the number of shares that were instructed to be cast) and the number of shares that were loaned and not recalled. To enhance investors' access to funds' proxy voting records, the proposed amendments would have required funds to report information on Form N–PX in a structured data language and to provide their voting record on (or through) their websites.[6]

Institutional investment managers [7] subject to the reporting requirements of section 13(f) of the Exchange Act (each a "manager" and collectively with funds, "reporting persons") also have substantial voting power.[8] In addition to

proposing to amend Form N–PX to enhance disclosure of funds' proxy voting records, the Commission also proposed to require a manager to report annually on Form N–PX how it voted proxies relating to shareholder advisory votes on executive compensation (or "say-on-pay") matters.[9] Specifically, the proposed amendments would have required a manager to report say-on-pay votes when it exercised voting power over the securities—meaning the manager both has the ability to vote, or direct the voting of, a security and influences the voting decision. To reduce the potential for duplicative reporting when more than one manager exercises voting power or when a manager exercises voting power on behalf of a fund, the Commission proposed to allow managers to rely on joint reporting provisions. The proposed amendments also addressed confidential treatment requests and provided transition rules based upon when managers begin or cease to be obligated to file Form 13F reports.

The proposed amendments to require manager reporting of say-on-pay votes were aimed at completing implementation of section 951 of the Dodd-Frank Act.[10] The Commission first proposed rule and form changes in October 2010 to implement this provision of the Dodd-Frank Act and the proposed amendments in 2021 took into account the comments received in response to that earlier proposal.[11]

The Commission received a number of comment letters on the 2021 proposal.[12] Many commenters believed the proposed amendments would improve the proxy information available to investors, such as by making it easier and more efficient for investors to get this information or by addressing information asymmetries that exist between investors and fund managers.[13]

Some of these commenters highlighted the difficulties in using current fund proxy information.[14] Many other commenters supported enhancing the proxy voting record disclosure on Form N–PX, but raised concerns about some of the specific elements of the proposal.[15] For example, some of these commenters suggested changes to the proposed requirements to categorize voting matters and use the language from the issuer's form of proxy due, in part, to concerns about the scope of the proposed requirements.[16] Some commenters also expressed concern about the operational costs and effects of the requirement to provide information about the number of securities a fund or manager did not vote because the securities were out on loan.[17] To reduce burdens of the manager reporting requirements, some commenters supported using a different standard to determine when a manager should report a say-on-pay vote on Form N–PX and suggested that managers have certain exceptions from Form N–PX reporting requirements, including exceptions for managers with a disclosed policy of not voting.[18] Some commenters suggested that funds and managers should be required to report their votes more frequently than annually to provide investors with more current information.[19] Some commenters generally were supportive of the other specific elements of the proposed amendments, such as the requirement to report in structured data

[4] *See* Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companies, Investment Company Act Release No. 25922 (Jan. 31, 2003) [68 FR 6563 (Feb. 7, 2003)] ("2003 Adopting Release").

[5] *See* Enhanced Reporting of Proxy Votes by Registered Management Investment Companies; Reporting of Executive Compensation Votes by Investment Managers; Investment Company Act Release No. 34389 (Sept. 29, 2021) [86 FR 57478 (Oct. 15, 2021)] ("Proposing Release"). For a discussion of difficulties investors may face using Form N–PX reports today, *see id.* at paragraphs accompanying nn.16 and 20.

[6] *Cf.* Recommendations of the Investor Advisory Committee Regarding the SEC and the Need for the Cost Effective Retrieval of Information by Investors (adopted July 25, 2013), at 5, *available at https://www.sec.gov/spotlight/investor-advisory-committee-2012/data-tagging-resolution-72513.pdf* (recommending amendments to Form N–PX to provide for the tagging of data).

[7] The term "institutional investment manager" includes any person, other than a natural person, investing in or buying and selling securities for its own account, and any person exercising investment discretion with respect to the account of any other person. *See* section 13(f)(6)(A) of the Exchange Act [15 U.S.C. 78m(f)(6)]. The term "person" includes any natural person, company, government, or political subdivision, agency, or instrumentality of a government. *See* section 3(a)(9) of the Exchange Act [15 U.S.C. 78c(a)(9)]. Entities serving as managers could include, for example: banks, insurance companies, and broker-dealers that invest in, or buy and sell, securities for their own accounts; corporations and pension funds that manage their own investment portfolios; or investment advisers that manage private accounts, mutual fund assets, or pension plan assets.

[8] *See* Proposing Release, *supra* footnote 5, at n.24 and accompanying text (stating that institutional investment managers subject to section 13(f)

reporting requirements exercised investment discretion over approximately $39.79 trillion in section 13(f) securities as of March 31, 2021).

[9] In addition to amendments to Form N–PX, the Commission proposed new rule 14Ad–1 under the Exchange Act to require managers to annually report their say-on-pay votes on Form N–PX.

[10] *See* 15 U.S.C. 78n–1(d).

[11] *See* Exchange Act Release No. 63123 (Oct. 18, 2010) [75 FR 66622 (Oct. 28, 2010)] ("2010 Proposing Release").

[12] The comment letters on the Proposing Release (File No. S7–11–21) are available at *https://www.sec.gov/comments/s7-11-21/s71121.htm.*

[13] *See, e.g.,* Comment Letter of the American Sustainable Business Council (Oct. 12, 2021) ("ASBC Comment Letter"); Comment Letter of the Long-Term Stock Exchange, Inc. (Dec. 13, 2021) ("LTSE Comment Letter"); Comment Letter of the Consumer Federation of America (Dec. 14, 2021) ("CFA Comment Letter"); Comment Letter of Better Markets (Dec. 14, 2021) ("Better Markets Comment Letter"); and Comment Letter of the Vanguard

Group, Inc. (Dec. 14, 2021) ("Vanguard Comment Letter").

[14] *See* Comment Letter of As You Sow (Dec. 14, 2021) ("As You Sow Comment Letter"); and Comment Letter of Ceres Accelerator for Sustainable Capital Markets (Dec. 14, 2021) ("Ceres Comment Letter").

[15] *See, e.g.,* Comment Letter of the Investment Company Institute (Dec. 14, 2021) ("ICI Comment Letter I"); Comment Letter of Federated Hermes, Inc. (Dec. 14, 2021) ("Federated Hermes Comment Letter"); comment letter of BlackRock, Inc. (Dec. 14, 2021) ("BlackRock Comment Letter"); Comment Letter of the Managed Funds Association (Dec. 14, 2021) ("MFA Comment Letter"); and Comment Letter of Glass Lewis (Dec. 14, 2021) ("Glass Lewis Comment Letter").

[16] *See, e.g.,* ICI Comment Letter I; Comment Letter of the State of Utah (Dec. 14, 2021) ("Utah Comment Letter"); and Comment Letter of Institutional Shareholder Services, Inc. (Dec. 14, 2021) ("ISS Comment Letter").

[17] *See, e.g.,* Comment Letter of Teachers Insurance and Annuities Association of America (Dec. 14, 2021) ("TIAA Comment Letter"); and Comment Letter of Pickard Djinis and Pisarri LLP (Nov. 23, 2021) ("Pickard Comment Letter").

[18] *See, e.g.,* Comment Letter of the Alternative Investment Management Association (Dec. 14, 2021) ("AIMA Comment Letter"); and MFA Comment Letter.

[19] *See, e.g.,* Comment Letter of Betterment LLC (Dec. 14, 2021) ("Betterment Comment Letter"); Comment Letter of Morningstar, Inc. (Dec. 13, 2021) ("Morningstar Comment Letter").

language.[20] Other commenters, however, had general concerns about the proposed amendments, questioning the Form N–PX approach to fund proxy vote reporting or suggesting that the costs of the proposed amendments would be high relative to the expected benefits.[21]

We are adopting the amendments largely as proposed, but with certain modifications in response to the comments we received. First, while we will require reporting persons to categorize the voting matters reported on Form N–PX as proposed, the categories we are adopting are consolidated from those in the proposal, and we are not adopting the proposed requirement for reporting persons to use subcategories. Second, Form N–PX as amended will require reporting persons to identify proxy voting matters using the same language as disclosed in the issuer's form of proxy, presented in the same order as the matters appear in the form of proxy, and identify directors separately for director election matters only if a form of proxy in connection with a matter is subject to 17 CFR 240.14a–4 ("rule 14a–4"). Third, Form N–PX as amended will allow managers that have a disclosed policy of not voting proxies and that did not vote during the reporting period to indicate this on the form without providing additional information about each voting matter individually. We discuss these changes, among others, in more detail below.

**II. Discussion**

*A. Scope of Funds' Form N–PX Reporting Obligations*

Every fund is required to file its proxy voting record annually on Form N–PX. We did not propose to modify the scope of investment companies subject to Form N–PX reporting requirements, but we did propose to amend the scope of voting decisions these funds must report. Currently, funds are required to report information for each matter relating to a portfolio security considered at any shareholder meeting held during the reporting period and with respect to which the fund was entitled to vote.[22] We are amending this

standard, as proposed, to provide that, for purposes of Form N–PX, a fund would be entitled to vote on a matter if its portfolio securities are on loan as of the record date for the meeting. Because the reporting fund could recall and vote these loaned securities, this amendment is designed to ensure that a fund's filings on Form N–PX reflect the effect of its securities lending activities on its proxy voting, providing context to the information funds already provide about revenue from securities lending.[23]

A number of commenters offered their views on the effect of including lent share disclosure in the form, which is discussed in more detail below in section II.C.3. On the overall scope of the form as it relates to funds, one commenter recommended requiring equity unit investment trusts ("UITs") to file reports on Form N–PX.[24] Due to the unmanaged nature of UITs and the fixed nature of their portfolios, we do not think it is appropriate to require periodic reporting from UITs regarding proxy voting at this time. We understand that UITs largely vote their securities in the same proportion as the vote of all other holders of those securities ("mirror vote"), which limits the ability of such funds to influence the outcome of shareholder votes and therefore reduces the benefit that is provided by periodic reporting on Form N–PX.[25]

*B. Scope of Managers' Form N–PX Reporting Obligations*

1. Managers Subject to Form N–PX and Categories of Votes They Must Report

We are adopting amendments, as proposed, that require each person that (1) is an "institutional investment manager" as defined in the Exchange Act; and (2) is required to file reports under section 13(f) of the Exchange Act, to report its say-on-pay votes on Form N–PX.[26] This reporting obligation is consistent with the reporting obligation in section 14A(d) of the Exchange Act

and provides that a manager otherwise required to report on Form 13F is required to disclose its say-on-pay votes on Form N–PX.[27] The types of say-on-pay votes that managers must report are the same as the types of shareholder advisory votes section 14A of the Exchange Act requires. This includes votes on the approval of executive compensation and on the frequency of such executive compensation approval votes, as well as votes to approve "golden parachute" compensation in connection with a merger or acquisition.[28]

Commenters generally supported the requirement for managers to report say-on-pay votes.[29] Some commenters agreed that the reporting requirement was appropriately tailored to managers who file Form 13F.[30] Certain commenters also agreed that the proxy vote reporting requirements for managers should be focused only on say-on-pay votes, as proposed.[31] Other commenters, however, suggested that managers should be required to report other proxy votes in addition to say-on-pay votes.[32] We continue to believe that it is appropriate at this time to limit managers' reporting obligations to say-on-pay votes, consistent with the statutory mandate in section 14A.[33]

---

[20] *See, e.g.,* Morningstar Comment Letter; Comment Letter of the CFA Institute and the Council of Institutional Investors (Dec. 14, 2021) ("CFA/CII Comment Letter").

[21] *See* Comment Letter of Caleb N. Griffin, Brian R. Knight, and Andrew N. Vollmer (Nov. 11, 2021) ("Mercatus Center Comment Letter") (suggesting an alternative proxy voting approach where funds seek investor input prior to voting proxies and vote in reasonable accord with such input); and Comment Letter of the Mutual Fund Directors Forum (Dec. 14, 2021) ("MFDF Comment Letter").

[22] *See* Item 1 of current Form N–PX.

[23] *See* Proposing Release, *supra* footnote 5, at section II.A. *See also infra* section II.C.3.b.

[24] *See* Morningstar Comment Letter. This commenter also recommended that both the lender and borrower be required to report what was lent or borrowed, respectively, and voted. A fund or manager typically will not know how a borrower has voted borrowed shares. If a borrower is itself a reporting person, however, the borrower will report its own voting record on Form N–PX, including votes cast with respect to borrowed shares. *See infra* section II.C.3.

[25] *See* Fund of Funds Arrangements, Investment Company Act Release No. 33329 (Dec. 19, 2018) [84 FR 1286 (Feb. 1, 2019)] (suggesting that mirror voting "effectively nullifies" the voting power of a fund that utilizes it).

[26] *See* rule 14Ad–1(a); 15 U.S.C. 78m(f). *See also* Proposing Release, *supra* footnote 5, at section II.B.1.

[27] Rule 14Ad–1(a); Item 1 of amended Form N–PX.

[28] *See* section 14A(a) and (b) of the Exchange Act; 17 CFR 240.14a–21. Shareholder votes on executive compensation that are not required by sections 14A(a) and (b), such as in the case of foreign private issuers (as defined in 17 CFR 240.3b–4(c) ("rule 3b–4(c) under the Exchange Act")) that are exempt from the proxy solicitation rules, will not be required to be reported on Form N–PX.

[29] *See e.g.,* AIMA Comment Letter; ASBC Comment Letter; Better Markets Comment Letter; Comment Letter of Kyle Ratcliff (Oct. 15, 2021) ("Ratcliff Comment Letter"); Pickard Comment Letter; Comment Letter of Seattle City Employees' Retirement System (Dec. 7, 2021) ("SCERS Comment Letter"); Comment Letter of Shareholder Commons and B Lab US/CAN (Dec. 13, 2021) ("Shareholder Commons Comment Letter I"); CFA/CII Comment Letter; ASBC Comment Letter; Comment Letter of Christopher Pearce (Oct. 8, 2021) ("Pearce Comment Letter"); Comment Letter of John L. Friess (Nov. 22, 2021) ("Friess Comment Letter"); ICI Comment Letter I.

[30] *See* AIMA Comment Letter; Better Markets Comment Letter; MFA Comment Letter.

[31] *See* Pickard Comment Letter; MFA Comment Letter; AIMA Comment Letter.

[32] *See* Comment Letter of Alan Reid (Oct. 18, 2021) ("Reid Comment Letter"); Comment Letter of Heather Rhee (Nov. 18, 2021) ("Rhee Comment Letter"); Shareholder Commons Comment Letter I; SCERS Comment Letter (recommending the reporting of votes related to climate change metrics and qualitative reporting, net zero commitments, and board member elections).

[33] *See* Proposing Release, *supra* footnote 5, at the paragraph containing nn.35–36; *see also* 2010 Proposing Release, *supra* footnote 11, at section II.B.1 ("The scope of votes that would be required to be reported under the proposal is the same as the scope provided by new Section 14A(d) of the Exchange Act.").

One commenter suggested that managers and funds should have different reporting forms.[34] Another commenter suggested that the Commission permit managers to file their say-on-pay votes through a revised Form 13F to relieve the additional regulatory burden that would result from a new, separate filing requirement.[35] We believe that both managers and funds should report proxy voting matters on the same form to reduce the potential for investor confusion and to enhance investors' ability to compare voting records from various reporting persons both over a uniform reporting period and through the use of a single form. In addition, the use of a revised Form 13F for managers would necessitate the creation and use of an expanded custom XML schema for Form 13F that would mirror the new custom XML schema for Form N–PX, leading to technical redundancies and inefficiencies compared to using a single new custom XML schema for Form N–PX that covers both funds and managers. It also would be confusing for both reporting persons and investors if managers included say-on-pay votes on Form 13F because, as the final rule provides, reports on Form N–PX cover different periods and different securities than those covered by reports on Form 13F.

2. Managers' Exercise of Voting Power

We are adopting, as proposed, a two-part test for determining whether a manager "exercised voting power" over a security and must report a say-on-pay vote on Form N–PX.[36] As proposed, a manager is required to report a say-on-pay vote for a security only if the manager: (1) has the power to vote, or direct the voting of, a security; and (2) "exercises" this power to influence a voting decision for the security.[37] In the first part of the test, the ability to vote the security or direct the voting of the security includes the ability to determine whether to vote the security at all, or to recall a loaned security before a vote. Under the rule, voting power could exist or be exercised either directly or indirectly by way of a contract, arrangement, understanding,

or relationship. Per this analysis, multiple parties could both have and exercise voting power over the same securities and, in the proposal, we provided the example of a party exercising voting power when it influences the way a third party votes the security, even where the manager is not the sole decision-maker.[38]

As proposed, we are defining the exercise of voting power to mean the actual use of voting power to influence a voting decision. The framework focuses on the exercise, rather than mere possession, of voting power. Thus, managers will exercise voting power when they vote or influence a vote using their own independent judgment. As an example, a manager exercises voting power when it votes (or directs another party to vote) in accordance with the manager's own guidelines or based on the manager's own judgment, including exercising independent judgment or expertise to determine how a client's voting policies should apply to a say-on-pay vote. A manager also exercises voting power when it influences the decision of whether to vote a security, such as by determining not to vote on a say-on-pay matter or whether to recall loaned securities in advance of a vote in order to vote the shares. Given this focus on a manager influencing the voting decision, a manager will have no reporting obligation with respect to a voting decision that is entirely determined by its client or another party.[39] We are adopting the amendments as proposed because we believe the two-part test balances investor informational needs, reporting burdens, and the statutory obligations.

Some commenters generally supported our proposed definition of the exercise of voting power.[40] Other commenters preferred what they viewed as a more objective approach, suggesting that the "exercise of voting power" standard could be subjective, burdensome, and cause confusion in situations in which multiple managers exercise voting power over the same security.[41] One commenter recommended either basing the reporting obligation on who actually marks the proxy card or, in the alternative, limiting the reporting obligation to the party who "primarily"

influences a voting decision.[42] Another commenter suggested that only the managers who actually voted or instructed an intermediary to vote securities should be required to report.[43]

We recognize that the framework we are adopting could result in some subjectivity in some cases. Nonetheless, this approach addresses the section 14A requirement for managers to report how they voted. We believe the appropriate focus is on when a manager exercises discretion in determining how to vote on a say on pay matter, as implemented in the final rule's definition of the exercise of voting power. This provides more comprehensive information for investors by requiring each manager who uses its voting power to influence a say-on-pay vote to report how the manager voted (or determined not to vote), even though there may be some degree of subjectivity in particular cases in determining whether a given manager is required to report a vote.

Conversely, the tests suggested by commenters would limit the utility of Form N–PX for investors. For example, while it may lessen the reporting obligations for some managers, a test based on who physically marks the proxy card (or its electronic equivalent), who primarily influenced a voting decision, or who actually voted or instructed a vote would exclude managers' votes that would be covered under the final rules, depriving investors of useful information regarding say-on-pay voting decisions. For example, if both managers A and B influenced a voting decision and manager B marked the proxy card, a test that only requires the manager marking the proxy card to report the vote would not provide investors any information about manager A's participation in the voting decision. As another example, a test that focuses exclusively on situations in which a manager actually votes or instructs a vote would not capture instances in which a manager determines not to cast a vote. Determining when a manager "primarily" influences a voting decision would create its own subjective analysis and thus does not appear to address commenter concerns about subjectivity. As for situations in which multiple managers exercise voting power over the same security, those managers will be able to rely on the joint reporting provisions to reduce the associated reporting burdens.

One commenter questioned whether a manager would "influence" a voting

---

[34] *See* Rhee Comment Letter.

[35] *See* AIMA Commenter Letter.

[36] *See* Proposing Release, *supra* footnote 5, at section II.B.2.

[37] *See* rule 14Ad–1(d)(1) (defining voting power) and rule 14Ad–1(d)(2) (defining exercise of voting power). This approach is tailored to considerations associated with section 14A of the Exchange Act and the scope of say-on-pay reporting obligations. As a result, the definitions of "voting power" and the "exercise" of voting power do not affect the meaning of these or similar terms used in other Commission rules.

[38] Proposing Release, *supra* footnote 5, at section II.B.2.

[39] For a discussion of examples where a manager does or does not exercise voting power, *see* Proposing Release, *supra* footnote 5, at section II.B.2.

[40] *See* ICI Comment Letter I; Morningstar Comment Letter.

[41] *See* Pickard Comment Letter; MFA Comment Letter.

[42] *See* Pickard Comment Letter.

[43] *See* MFA Comment Letter.

decision if the advice given to a client or co-manager was not taken and the vote was cast differently than the manager suggested.[44] Under the approach we are adopting, and in keeping with exercise of voting power analysis, a manager would not be viewed as influencing a vote if the vote is cast differently than the manager's recommendation or suggestion.

### 3. Additional Scoping Matters for Manager Reporting of Say-on-Pay Votes

We are adopting, as proposed, amendments that require a manager to report say-on-pay votes under section 14A with respect to any security over which it exercised voting power. Like both the 2010 Proposing Release and the Proposing Release, we are not modifying the scope of securities to align with those reported on Form 13F or to provide an exception from reporting where the manager does not vote. We are, however, amending Form N–PX to limit the reporting obligation for managers who have a disclosed policy of not voting proxies and who, in line with those policies, have in fact not voted proxies during the reporting period.

Some commenters supported the Commission's proposal to require managers to report all say-on-pay votes, suggesting that such a requirement provides investors with a manager's full voting record.[45] Other commenters recommended that we align the scope of securities reported on Form N–PX with those reported on Form 13F and proposed various ways to do so.[46] Some commenters suggested that the Commission provide a *de minimis* exemption that would, consistent with Form 13F, exclude from the Form N–PX reporting obligation securities holdings of fewer than 10,000 shares and less than $200,000 aggregate fair market value.[47] Some commenters suggested that the Form N–PX reporting requirements should be limited to the kinds of securities managers are required to report on Form 13F (*i.e.,* section 13(f) securities) on the basis that

such an approach would be clearer to investors and would limit regulatory costs.[48] One of these commenters suggested this report would be consistent with the Exchange Act, which imposes the say-on-pay vote reporting requirement on managers subject to section 13(f) of that Act.[49] Another one of these commenters urged the Commission to exclude from the reporting obligation securities that are exempt from registration under section 12 of the Exchange Act.[50] This commenter asserted that managers would have difficulty obtaining the information needed to complete Form N–PX for these securities because of a lack of adequate and reliable data. Another commenter suggested that managers who do not report a security on Form 13F because they lack investment discretion over such security should not be required to disclose on Form N–PX votes related to that security.[51] Other commenters suggested that only securities held at the end of a calendar quarter should be reported because these securities would also be reported on Form 13F.[52] Some commenters urged that, in the alternative, short-term positions, such as those held for fewer than 30 days, should be excluded from the reporting obligation.[53]

We are not limiting the scope of securities subject to the Form N–PX reporting requirement as these commenters suggested because doing so would exclude say-on-pay voting information that would be beneficial to investors. A more limited reporting obligation would reduce the utility of the say-on-pay reporting disclosure by depriving investors of a manager's full voting record.[54] We do not believe that section 14A suggests or requires that the Commission align the scope of securities required to be reported on Form N–PX with those required for Form 13F or apply Form 13F's *de*

*minimis* exemption to Form N–PX. Section 14A requires *every* institutional investment manager subject to section 13(f) to report how it voted on *any* say-on-pay shareholder vote, which would include say-on-pay votes held by issuers of securities that are not reported on Form 13F. If Form N–PX reporting contained a *de minimis* exemption or were limited only to those securities reported on Form 13F or only those securities over which managers have investment discretion, then investors would not be able to identify on Form N–PX all say-on-pay votes required under the statute.

In addition, a commenter urged the Commission to limit the reporting requirement to section 13(f) securities because managers may not have sufficient information to report say-on-pay votes conducted by issuers whose securities are exempt from registration under section 12 of the Exchange Act. There are, however, securities other than section 13(f) securities that are subject to section 12 registration, including certain non-exchange-traded securities.[55] Moreover, issuers of securities that are exempt from section 12 are not required to conduct say-on-pay votes in the first instance, and if such an issuer were to conduct a say-on-pay vote voluntarily, managers would not be required to report that vote because section 14A(d) only requires managers to report votes pursuant to subsections 14A(a) and 14A(b).[56]

We also are not adopting commenters' suggestions to align Form N–PX reporting requirements with Form 13F such that a manager would only report votes for securities reported at quarter end on Form 13F. Doing so would potentially exclude a significant number of say-on-pay votes, thus limiting the usefulness of the information for investors as well as potentially omitting the reporting of how a manager voted on a say-on-pay vote as required pursuant to section 14A. For example, Form 13F reports are not required to include securities held during the quarter but subsequently disposed of prior to the end of the quarter.[57] We are also not

---

[44] *See* Pickard Comment Letter.

[45] *See, e.g.,* Better Markets Comment Letter; CFA/CII Comment Letter; Comment Letter of Principles for Responsible Investment (Dec. 14, 2021) ("PRI Comment Letter").

[46] *See, e.g.,* AIMA Comment Letter; MFA Comment Letter; Pickard Comment letter.

[47] *See* Pickard Comment Letter; AIMA Comment Letter; MFA Comment Letter; *see also* Special Instruction 10 of Form 13F. *But see* Better Markets Comment Letter; Morningstar Comment Letter (suggesting that we not provide a *de minimis* exemption because it would reduce the value of votes by omitting a manager's full voting record and would create the wrong incentives by encouraging managers to leave shares out on loan to stay below the reporting threshold).

[48] *See* AIMA Comment Letter; MFA Comment Letter. Section 13(f) securities are equity securities of a class described in section 13(d)(1) of the Exchange Act that are admitted to trading on a national securities exchange or quoted on the automated quotation system of a registered securities association. The Commission publishes a list of these securities pursuant to section 13(f)(4) of the Exchange Act. *See* 17 CFR 240.13f–1(c).

[49] *See* MFA Comment Letter.

[50] *See* AIMA Comment Letter.

[51] *See* Pickard Comment Letter.

[52] *See* MFA Comment Letter; AIMA Comment Letter.

[53] *See* AIMA Comment Letter; MFA Comment Letter.

[54] Proposing Release, *supra* footnote 5, at section II.B.3; *see also* Better Markets Comment Letter (suggesting that a *de minimis* exception or otherwise limiting say-on-pay votes to securities that managers report on Form 13F would exclude votes that section 14A(d) is meant to capture).

[55] *See* section 12(g) of the Exchange Act [15 U.S.C. 78*l*(g)].

[56] *See* Shareholder Approval of Executive Compensation and Golden Parachute Compensation, Exchange Act Release No. 63768 (Jan. 25, 2011) [76 FR 6010 (Feb. 2, 2011)], at n.38 ("[The say-on-pay rules for issuers] as adopted apply to issuers who have a class of equity securities registered under section 12 [15 U.S.C. 78*l*] of the Exchange Act and are subject to our proxy rules.")

[57] *See* Proposing Release, *supra* footnote 5, at section II.B.3. *See also* Better Markets Comment Letter (suggesting that say-on-pay vote reporting should not be limited to positions reported on Form

adopting a framework that would only require the reporting of securities held for at least a specified period of time for similar reasons.

Some commenters responded to our request for comment as to whether we should modify our proposed approach for managers who do not vote their shares. For example, the Commission requested comment on whether to exempt a manager who does not vote its shares from certain disclosure requirements and whether any modified approach should be subject to conditions, such as the manager having disclosed to its clients that it does not vote.[58] Commenters addressing these points suggested that the Commission limit the reporting obligation for managers who have a disclosed policy of not voting proxies.[59] These commenters stated that some registered investment advisers do not vote proxies and disclose their general policy of not voting proxies in other materials, including Part 2A of their Form ADV. One of these commenters suggested that, under the proposed rule, these advisers would only be disclosing their security holdings, not the quantitative voting data contemplated by the proposed amendments.[60] Other commenters articulated their view that disclosure of a no-vote policy sufficiently addresses any transparency concerns by providing investors with an understanding of a manager's votes.[61] Relatedly, one of these commenters suggested that imposing the full reporting obligation on managers who have a disclosed policy of not voting creates a burden on managers, is of limited value to investors, and thus these managers should be exempted.[62] Other commenters suggested a more streamlined reporting process for managers with no or limited say-on-pay votes, with one such commenter suggesting that Form N–PX include a checkbox for managers that have a general policy of not participating in one or more categories of say-on-pay votes to alleviate such managers of reporting non-votes in those categories.[63]

As a result, we are adopting a streamlined reporting option for

managers who have a disclosed policy of not voting proxies and in fact have not voted proxies during the reporting period. After considering those comments, we believe there is limited value for investors in requiring the full scope of Form N–PX reporting by managers, such as information about individual voting matters, under these circumstances. Accordingly, we are adding a designation to Form N–PX that would permit managers who have a disclosed policy of not voting proxies, and who did not in fact vote during the reporting period, to indicate such in a notice report. The manager would not have to report any information on a security-by-security basis and instead would be required only to file N–PX's cover page and required signature. This approach balances appropriate transparency with the reporting burden. However, we do not believe it is appropriate to exempt these managers fully from reporting on Form N–PX as this may limit the ability of investors to understand fully how a manager exercises its voting power.[64] Further, these notice reports will aid in the effectiveness of the Commission's oversight of managers in complying with the requirements of section 14A. Information filed on Form N–PX in a structured data language is easier to analyze systematically than a narrative disclosure and has the benefit of differentiating cases where a manager has no votes to report from cases where a manager simply fails to report. For similar reasons, as proposed, we are requiring managers that do not have any proxy votes to report for the reporting period to file a notice report to this effect.[65]

*C. Proxy Voting Information Reported on Form N–PX*

We are adopting the proposed amendments to the proxy voting information reported on Form N–PX largely as proposed, but have made certain revisions as laid out below . We believe the amendments we are adopting will make the information more useful to investors as compared to both the current form and the proposal. For example, the amendments facilitate investors' ability to locate the same proxy voting matter on different reports on Form N–PX, aiding investor identification of proxy voting matters that are of interest to them. The amendments also provide additional

quantitative information to help investors understand how reporting persons balance voting decisions against other priorities, and, in general, make the information reported more useful to investors.

1. Identification of Proxy Voting Matters

We proposed to require reporting persons to use the same language that is on the form of proxy to identify the matter on Form N–PX, and to report proxy voting matters in the same order in which they are presented on the issuer's form of proxy, including identifying each director separately in the same order as on the form of proxy, even if the election of directors is presented as a single matter on the form of proxy ("voting matter identification requirements"). We are adopting these amendments as proposed, but with two modifications.

First, under the amendments, these requirements will only apply to proxy votes if a form of proxy in connection with a matter is subject to rule 14a–4 under the Exchange Act. That rule requires the form of proxy, or "proxy card," included in the proxy materials to clearly and impartially identify each voting matter (an "SEC proxy card"). SEC proxy cards contain the information reporting persons need to comply with the new voting matter identification requirements. Second, in all other cases, reporting persons will be subject to the current requirement to provide a "brief identification of the matter voted on," except that we are adopting one modification limiting abbreviations used in the descriptions of these voting matters as described in more detail below. The amendments, with these modifications to the proposal, are designed to address challenges identified by commenters with respect to certain voting matters, while making it easier for investors to locate identical voting matters on different Form N–PX reports by different reporting persons.

Commenters supporting the proposed voting matter identification requirements asserted that they would assist investors in understanding how reporting persons vote shares and make the form more useful.[66] For instance, one commenter stated that non-standard descriptions made it difficult to

13F because securities disposed of before quarter end would not be reported).

[58] *See* Proposing Release, *supra* footnote 5, at section II.B.3.

[59] *See* Pickard Comment Letter; AIMA Comment Letter; MFA Comment Letter.

[60] *See* AIMA Comment Letter.

[61] *See* Pickard Comment Letter; AIMA Comment Letter (suggesting that many registered investment advisers disclose in Form ADV that they do not vote proxies).

[62] *See* Pickard Comment Letter.

[63] *See* MFA Comment Letter.

[64] *See* Proposing Release, *supra* footnote 5, at n.63 and accompanying paragraph.

[65] As discussed in more detail below, we have moved this language from the form to the cover page.

[66] *See, e.g.,* CFA/CII Comment Letter; Morningstar Comment Letter; Comment Letter of James McRitchie (Dec. 13, 2021) ("McRitchie Comment Letter II"). James McRitchie also wrote a separate comment letter dated Dec. 13, 2021 ("McRitchie Comment Letter I") and a comment letter dated Dec. 14, 2021 ("McRitchie Comment Letter III"). The letters are referred to collectively as if they were a single letter ("McRitchie Comment Letter").

compare votes across different reports on Form N–PX.[67] A different commenter stated that the current lack of standardization imposes a cost on investors, who need to expend time and resources to compare different reporting persons.[68]

Conversely, many commenters suggested that the proposed voting matter identification requirements could raise challenges, especially in the case of foreign issuers. For example, one commenter stated that "the descriptions of proxy voting matters by [companies not subject to the Commission's proxy rules] vary widely between markets and, at least in some cases, are neither concise nor particularly descriptive, and in many cases are not in English." [69] Several other commenters also noted that non-English filings could create special challenges.[70] Commenters also stated that, in certain cases, voting matters may not be clearly described, and that descriptions of proxy voting matters can be quite extensive and can surpass standard character count limits, either of which could result in N–PX filings being longer than they are currently.[71] With regard to the ordering requirement, two commenters stated that the items presented in proxy materials issuers provide are not in a standardized order, with one stating that issuers may present a particular matter in multiple orders in different parts of the filing.[72] Another commenter suggested that, while a consistent ordering of content would be helpful for reading the data without using a program to analyze it, ordering is not needed when data is reported in structured format.[73] However, several commenters that raised concerns with the proxy voting matter identification requirements suggested their concerns would not extend to issuers whose form of proxy meets the proxy requirements of the Exchange Act.[74]

After considering the comments, we are adopting the voting matter identification requirements as proposed, except that they will only apply if a form of proxy in connection with a matter is subject to the requirements of rule 14a–4 under the Exchange Act, *i.e.,* an SEC proxy card is available for the matter.[75] As noted in the Proposing Release and as required by rule 14a–4, "the descriptions and ordering used on an issuer's form of proxy, which is publicly available and must identify clearly and impartially each separate matter intended to be acted upon, would address the previously identified practical issues associated with standardized descriptions." [76] Forms of proxy subject to rule 14a–4 therefore will identify the matter in a clear manner, listed in order where the form of proxy covers multiple matters, and be in the English language. Reporting persons would not need to review other documents or filings of the issuer, such as a proxy statement, beyond the form of proxy to determine the description or order of presentation. We recognize that the voting matter identification requirements will involve changes to reporting persons' processes, or those of their service providers,[77] in order to comply with the voting matter identification requirements. These costs are justified by the benefits of the disclosure and may be reduced by applying the voting matter identification requirements only where a form of proxy is available to supply the information.[78]

Reporting persons, however, may hold securities for which voting matters are not subject to our proxy rules and for which an SEC proxy card is not available. In this case the associated proxy materials may not clearly provide the information required to satisfy the voting matter identification requirements, or may not provide that information in English. We recognize the practical challenges raised by commenters in complying with the proposed proxy voting matter identification requirements in these circumstances. Requiring reporting persons to use the same language that is on the form of proxy to identify the matter will be less useful to investors if the language on the form of proxy is not in English, or is not clearly presented. Reporting persons also would face challenges in reporting proxy voting matters in the same order in which they are presented on the issuer's form of proxy if, as some commenters asserted, items presented in proxy materials provided by some issuers are not in a standardized order.

The modifications to the voting matter identification requirements are intended to address these concerns because, under the amendments, these requirements will only apply when the reporting person will have the information necessary to satisfy them from an SEC proxy card. Where an SEC proxy card is not available for a matter, reports regarding the matter will instead be required to provide "a brief identification of the matter voted on," consistent with the current requirement.[79] In an effort to improve the usefulness of this information to investors, and in a change from the proposal, descriptions of these matters will be required to limit the use of abbreviations to commonly understood terms or terms that the issuer abbreviated in its description of the matter. As we discussed in the Proposing Release, abbreviations and other shorthand were one of the fund practices that can make it difficult for investors to identify and compare voting matters.[80] The requirement to limit abbreviations should help ensure that, to the extent that a reporting person is abbreviating terminology on the form, the reporting person is doing so consistently, either because the abbreviation is commonly understood or was part of the issuer's description of the matter.

## 2. Identification of Proxy Voting Categories

As proposed, we are adopting a requirement for reporting persons to select from specified, standardized categories to identify the subject matter of each reported proxy voting item. The

---

[67] *See* Ceres Comment Letter.

[68] *See* CFA/CII Comment Letter.

[69] Glass Lewis Comment Letter.

[70] *See* ISS Comment Letter; ICI Comment Letter (stating that it was not clear whether or not reporting persons would be permitted to file N–PX in a language other than English); Federated Hermes Comment Letter.

[71] *See* Bloomberg Comment Letter (not clearly described); ISS Comment Letter (descriptions can be extensive).

[72] Federated Hermes Comment Letter (with regards to foreign issuers); Bloomberg Comment Letter.

[73] XBRL Comment Letter.

[74] *See, e.g.,* Glass Lewis Comment Letter (stating that the justification for requiring standardization only applies to issuers subject to the Commission's proxy rules); Federated Hermes Comment Letter ("[W]e believe this aspect of the Proposal to be workable where it concerns domestic issuers"). The proxy requirements of the Exchange Act are largely

limited to securities registered pursuant to section 12 of the Exchange Act. *See, e.g.,* 15 U.S.C. 78n(a)(1). Foreign private issuers are exempted from these requirements. *See* 17 CFR 240.3a12–3(b).

[75] Special Instruction D.3 of amended Form N–PX.

[76] *See* Proposing Release, *supra* footnote 5, at n.76 and accompanying text (citing rule 14a–4(a)(3), which requires that the form of proxy identify clearly and impartially each separate matter intended to be acted upon, and associated guidance on descriptions of matters in forms of proxy). *See also* 17 CFR 240.14a–4(a)(3); *see* 17 CFR 232.306 (requiring the use of the English language in all electronic filings); Division of Corporation Finance, Compliance and Disclosure Interpretations, Section 301 (Mar. 22, 2016), *available at https:// www.sec.gov/divisions/corpfin/guidance/exchange-act-rule-14a-4a3-301.htm.*

[77] *See* ICI Comment Letter I; ISS Comment Letter.

[78] In addition, recognizing that the structured data requirements may reduce the need for a consistent ordering when the filings are analyzed with the assistance of a computer program, the consistent ordering requirement should nonetheless aid investors who choose to review the filings in plain text format.

[79] *See* Item 1(e) of current Form N–PX.

[80] *See* Proposing Release, *supra* footnote 5, at text accompanying n.222.

categories are designed to cover matters on which funds frequently vote. In a change from the proposal, we have streamlined and consolidated the proposed list of categories, based on suggestions from commenters, to reduce overlap and make the categories easier to use. We also have eliminated the proposed requirement to select from a list of subcategories and have included in Form N–PX examples of matters that would fall into each category that generally track subjects that were previously proposed as subcategories. Collectively, we believe these changes from the proposal will increase the usefulness of the categories while reducing potential difficulties identified by commenters.

In general, commenters who supported the proposed categorization requirement believed the requirement would provide benefits to users of the form. For example, commenters stated that categorizing proxy votes makes a fund's disclosed proxy voting record more useful because it is more searchable, which makes it easier for investors to focus on topics they find important.[81] As one commenter stated, this "significantly lowers the costs of consumption" of the data.[82] Another commenter stated that categorizing proxy votes provides a signal to investors of the fund's investment criteria and overarching goals.[83]

Most commenters who addressed the categorization requirement stated that the proposed version would be burdensome for reporting persons and would not provide useful information for investors. For example, many commenters asserted that the proposed 17 categories and approximately 90 subcategories would not be helpful to investors, with some suggesting that the granularity could complicate investors' ability to compare different filings to locate matters relating to particular categories.[84] Some stated the proposed approach would result in numerous judgments as to the category or subcategory in which a matter belonged.[85] Commenters also suggested that a categorization requirement with fewer, broader categories would accomplish what they viewed as the main policy objective of the proposal while also reducing the likelihood of potential differences among reporting persons.[86] A number of commenters

suggested that we remove the proposed subcategories but retain them as examples of matters to be included in the categories.[87] Certain commenters objected to particular categories or subcategories, asserting that they might not be representative of voting matters in future years.[88] Others suggested the burden of categorization would be better assigned to issuers, to reduce burdens on funds and provide consistency in funds' categorizations, or that we exempt small funds because they do not typically have enough voting power to change the outcome of most proxy votes.[89]

After considering these comments, we are modifying the proposed categorization requirement to reduce the burden and the level of uncertainty among potentially overlapping categories for reporting persons while enhancing the usefulness of categorization to investors. Specifically, based in part on suggestions from commenters, we have streamlined the list of categories, including combining certain categories that were particularly likely to overlap and thus could cause confusion on how to categorize. For example, one commenter recommended that we change the board of directors category to only address director elections and add the remaining elements of the board of directors category to the corporate governance category, combine meeting governance with the corporate governance category, combine securities issuance with capital structure, and combine political activities with other social issues.[90] As detailed in the chart below, we have made changes to the categories that are generally consistent with these recommendations. These changes should reduce questions about how to categorize voting matters on these topics and reduce overlap between categories.

We are not, however, combining section 14A reporting with other compensation matters, as one commenter suggested, in order to aid managers in complying with this

categorization requirement given that they are only reporting say-on-pay votes, and to aid investors in finding say-on-pay votes efficiently.[91] We are also not combining or otherwise changing the categories relating to environmental or climate, human rights or human capital/workforce, or diversity, equity, and inclusion as we believe that these are sufficiently distinct topics that they should be separately identified.[92]

We also are removing entirely the proposed requirement to assign matters to subcategories. Instead, the amendments include examples of matters that would be included within each category. The examples we are adopting are largely the same as the proposed subcategories, but, when combining categories, we added the subcategories from the eliminated category as examples in the combined category.[93] In addition because these examples are now illustrative rather than comprehensive, we eliminated proposed subcategories that simply clarified that any other matter within a category needed to be included (e.g., "other audit-related matters (along with a brief description)").

Accordingly, relative to the proposal we are adopting a categorization requirement with fewer, but broader, categories. Adopting broader categories and eliminating subcategories seeks to reduce potential overlap among categories and also reduce the likelihood that the categories are not representative since they are broader and less likely to change.[94] As a result, the changes should reduce the need for subjective judgments on the part of reporting persons in determining the applicable categories. In particular, the differences between categories should be clearer and reporting persons need not determine which of several subcategories may apply to a matter. This, in turn, will increase comparability, and therefore the utility, of the information for investors.[95] We

---

[81] See, e.g., Morningstar Comment Letter; CFA/CII Comment Letter.

[82] Bloomberg Comment Letter.

[83] LTSE Comment Letter.

[84] See, e.g., ICI Comment Letter I.

[85] See, e.g., Blackrock Comment Letter.

[86] See, e.g., Federated Hermes Comment Letter.

[87] See, e.g., ICI Comment Letter I; CFA/CII Comment Letter; Federated Hermes Comment Letter. Some commenters also suggested that we change one or more subcategories. See, e.g., PRI Comment Letter; CFA/CII Comment Letter. However, we are not adopting the subcategorization requirement.

[88] See Comment Letter of the National Center for Public Policy Research (Dec. 9, 2021) ("NCPPR Comment Letter"); US Chamber of Commerce Comment Letter; Utah Comment Letter; McRitchie Comment Letter.

[89] See, e.g., AIMA Comment Letter (issuers should categorize), but see Blackrock Comment Letter (funds, not issuers, should categorize); Ultimus Comment Letter (issuers should categorize and exempt small funds).

[90] See, e.g., ICI Comment Letter I.

[91] See id.

[92] See id.; see also PRI Comment Letter.

[93] In addition, we added the example of "proxy access" in the corporate governance category to further clarify where those votes should be categorized.

[94] While any chosen list of categories may not perfectly capture unanticipated trends that arise in the future, the use of broader categories that are less likely to change helps to address concerns that the chosen categories are based on a proxy season that some commenters asserted was not representative. See, e.g., NCPPR Comment Letter; US Chamber of Commerce Comment Letter.

[95] Although one commenter suggested that activists, rather than fund investors, would use this information to try to influence how funds vote, fund advisers are subject to fiduciary duties and

Continued

therefore believe the modifications to the proposal balance the concerns raised by commenters on the proposed categorization requirement with the benefits provided by voting matter classifications. We also believe that the reduced burden further reinforces our decision not to require issuers to categorize voting matters. In the context of this rulemaking, which is focused on the requirement for funds to report their proxy voting records and implementing section 14A for managers, we believe the categorization requirement should apply to those reporting persons. The reduced burden of the categorization requirement relative to the proposal also supports not exempting small funds, therefore allowing investors in those funds to benefit from the categorization requirement. The table below outlines the changes to the categories in the proposal.

TABLE 1—CHANGES TO CATEGORIES FROM THE PROPOSAL

| Proposed category | Adopted category | Change from proposal |
|---|---|---|
| Board of directors | Director elections | Limited to elections; other board matters categorized as corporate governance. |
| Section 14A | Section 14A | None. |
| Audit-related | Audit-related | None. |
| Investment company matters | Investment company matters | None. |
| Shareholder rights and defenses | Shareholder rights and defenses | None. |
| Extraordinary transactions | Extraordinary transactions | None. |
| Security Issuance | n/a | Consolidated with capital structure. |
| Capital structure | Capital structure | Now includes security issuance. |
| Compensation | Compensation | None. |
| Corporate governance | Corporate governance | Includes board matters other than director elections and meeting governance. |
| Meeting governance | n/a | Consolidated with corporate governance. |
| Environment or climate | Environment or climate | None. |
| Human rights or human capital/workforce | Human rights or human capital/workforce | None. |
| Diversity, equity, and inclusion | Diversity, equity, and inclusion | None. |
| Political activities | n/a | Consolidated with other social issues. |
| Other social issues | Other social issues | Now includes political activities. |
| Other | Other | None. |

As proposed, the list of categories will be non-exclusive and reporting persons are instructed to select all categories applicable to the matter.[96] This approach will further aid investors in locating useful information by allowing them to identify multiple topics that may be of interest. For example, a fund that casts a vote on a proxy proposal tying executive compensation to the completion of a merger (other than a section 14A proposal) would categorize the vote in both the compensation and extraordinary transactions categories, enabling investors who are interested in either the fund's votes on compensation issues or its votes on the merger to locate the vote.

3. Quantitative Disclosures

We are adopting as proposed changes to Form N–PX that will require reporting persons to disclose quantitative information about the shares that were voted or instructed to be voted, as well as shares the reporting person loaned and did not recall.

(a) Disclosure of Number of Shares Voted or Instructed To Be Voted

Consistent with the proposal, amended Form N–PX will require reporting persons to disclose the number of shares voted (or instructed to be voted) and how those shares were voted (e.g., for or against proposal, or abstain), as reflected in their records at the time of filing a report on Form N–PX. If a reporting person has not received confirmation of the actual number of votes cast, the Form N–PX report instead may reflect the number of shares instructed to be cast on the date of the vote. If the votes were cast in multiple manners (e.g., both for and against), reporting persons will be required to disclose the number of shares voted (or instructed to be voted) in each manner.[97]

We are requiring this disclosure because providing the number of votes cast improves the transparency of fund and manager voting records and more effectively enables investors to monitor their funds' and managers' involvement in the governance activities of their investments. It also provides information about the magnitude of a reporting person's voting power. This disclosure also provides important context for the disclosure of the number of shares the reporting person loaned and did not recall and disclosures where a manager votes in multiple ways on the same matter.[98]

Many commenters supported the proposed approach, although some of these commenters suggested that we require additional information.[99] Specifically, some of these commenters suggested that reporting persons should be required to identify the number of shares voted by subadvisers or other third parties such as an independent fiduciary retained to avoid conflicts of interest.[100] In initially adopting Form

thus must make voting determinations in the best interest of the fund and its shareholders. See Utah Comment Letter; see also infra footnotes 331–333 and accompanying text. In addition, the amendments to the format and content of Form N–PX may also help deter fund voting decisions motivated by conflicts of interest. See infra footnotes 281–284 and accompanying text.

[96] Special Instruction D.4 of amended Form N–PX.

[97] Item 1(k) of amended Form N–PX. As proposed, in the case of a shareholder vote on the

frequency of executive compensation votes, a reporting person will be required to disclose the number of shares, if any, voted in favor of each of one-year frequency, two-year frequency, or three-year frequency, and the number of shares, if any, that abstained. The number zero ("0") would be entered if no shares were voted, so that responses to this item would be uniformly numeric in nature. Item 1(l) of amended Form N–PX.

[98] See Proposing Release, supra footnote 5, at section II.C.3.a. While we understand that funds do not split votes regularly, investors should benefit

from parity in disclosure between funds and managers in cases where funds do split votes.

[99] See, e.g., Better Markets Comment Letter; Morningstar Comment Letter; see also ICI Comment Letter I (not objecting to providing quantitative data generally, but objecting to the lent share quantitative data requirement).

[100] See Morningstar Comment Letter; Bloomberg Comment Letter.

N–PX, the Commission stated that investors in mutual funds have a fundamental right to know how a fund casts proxy votes on its shareholders' behalf.[101] Consistent with this view, how a fund casts its proxy votes is the more salient information for investors than whether, for example, a particular subadvisor cast the vote.

In addition, the form will provide investors with some indication of how subadvisers may have influenced the fund's votes. For example, a fund may have multiple subadvisers exercising the power to vote over a portion of securities held by the fund. To the extent one of these subadvisers voted a reporting fund's shares differently than the other subadvisers to the fund, the fund's quantitative disclosures will reflect this split vote by showing the fund had a number of shares voted both for and against. Further, investors will continue to have access to descriptions of funds' proxy voting policies and procedures through required disclosures, which would include applicable descriptions of the policies and procedures of investment advisers or other third parties that are used to determine how to vote fund proxies.[102] In addition, some subadvisers or third parties will likely be managers subject to say-on-pay reporting and so investors will also have access to how those parties voted on say on pay matters.[103]

One commenter also suggested that we require funds to indicate, per ballot, how many shares were voted, along with associated share class voted, noting that in some cases companies offer multiple share classes with different voting rights.[104] In this circumstance, reporting persons should report different share classes separately as different portfolio securities for purposes of Form N–PX because of this difference in relative voting power and rights.

Another commenter objected to disclosure of the number of shares voted, particularly its application to manager say-on-pay votes.[105] This commenter argued that quantitative information about the number of shares voted went beyond the statutory mandate regarding say-on-pay and did not provide any useful information that was not already available to investors under 17 CFR 275.206(4)–6 ("rule 206(4)–6"), the investment adviser proxy voting rule. This commenter suggested instead that we only require disclosure of the number of shares voted in split vote situations. We are not adopting this change because requiring quantitative disclosure only for split votes could result in potentially confusing inconsistencies within each report on Form N–PX. Moreover, this disclosure provides a number of benefits beyond illustrating how reporting persons split votes. It improves the transparency of fund and manager involvement in corporate governance, including providing relevant information about the magnitude of the reporting person's voting power.[106] To enable investors to understand how a fund or manager has exercised its voting power, investors need to have access to quantitative information about the number of shares voted, in addition to shares on loan and not recalled. For these reasons, requiring quantitative information about the number of shares voted is consistent with the statutory mandate for a manager to report "how it voted" pursuant to section 14A(d).

We also disagree that the Form N–PX disclosure does not provide useful information beyond that already required to be disclosed under rule 206(4)–6. That rule requires a registered investment adviser to disclose to clients how they may obtain information from the adviser about how it voted with respect to their securities. Thus, it does not apply to all managers because not all managers are registered investment advisers. Further, it does not provide the same level of transparency as the amendments we are adopting, because voting information under rule 206(4)–6 is only required to be made available to a single client, related solely to that client's securities, and only upon the client's request. Voting records on Form N–PX are available to the public. Even if a client were to request information from its adviser about how it voted with respect to the client's securities, that client could not use it to compare their manager's voting activities to other managers' voting activities unless that client had an existing advisory relationship with those other managers.[107]

The amendments permit a reporting person to report the number of shares voted as reflected in its records at the time of filing a report on Form N–PX.[108] If the reporting person has not received confirmation of the actual number of votes cast prior to filing a report on Form N–PX, the reporting person may report the number of shares instructed to be cast. If the reporting person learns prior to filing its Form N–PX that a different number of shares were voted than were instructed to be cast, the reporting person will be required to report the actual number of votes cast.[109] However, if confirmation of the actual number of votes cast occurs after the reporting person files the Form N–PX report, a reporting person will not be required to amend a previously filed Form N–PX report.[110] This approach will limit the compliance burden of providing information regarding the number of shares voted and, in situations where the actual number of votes cast may differ from the number of shares instructed to be cast, the information provided will reflect how a reporting person intended to vote such shares.

(b) Disclosure of Number of Shares the Reporting Person Loaned and Did Not Recall

As proposed, we are requiring disclosure of the number of shares the reporting person loaned and did not recall in addition to the number of shares a reporting person voted.[111] This requirement is designed to provide transparency into how a reporting person's securities lending activities affects its proxy voting, which had been raised by commenters in the context of the 2010 Proposing Release and Proxy Mechanics Concept Release.[112] It also would help address commenter concerns with a requirement in the 2010 proposal to disclose the total number of shares a fund was entitled to vote or over which a manager had or shared voting power.[113]

Commenters were mixed on this aspect of the proposal. A number of commenters supported this disclosure,

---

[101] See 2003 Adopting Release, *supra* footnote 4, at section I.

[102] See, e.g., Item 17(f) of Form N–1A ("[D]escribe the policies and procedures that the Fund uses to determine how to vote proxies relating to portfolio securities . . . Include any policies and procedures of the Fund's investment adviser, or any other third party, that the Fund uses, or that are used on the Fund's behalf, to determine how to vote proxies relating to portfolio securities."); Item 18.16 of Form N–2. A fund may satisfy the requirement to provide a description of the policies and procedures that it uses to determine how to vote proxies by including a copy of the policies and procedures themselves.

[103] See Special Instruction D.6.b to amended Form N–PX.

[104] See Morningstar Comment Letter.

[105] See Pickard Comment Letter.

[106] See, e.g., Proposing Release, *supra* footnote 5, at section I (discussing the substantial institutional voting power that funds exercise on behalf investors).

[107] See rule 206(4)–6(b).

[108] Item 1(i) of amended Form N–PX; Special Instruction D.5 to amended Form N–PX.

[109] Special Instruction D.5 to amended Form N–PX.

[110] Id.

[111] Item 1(i) of amended Form N–PX.

[112] See Proposing Release, *supra* footnote 5, at n.99 and accompanying text.

[113] See Proposing Release, *supra* footnote 5, at nn.100–103 and accompanying text.

suggesting it would provide helpful context to investors about how securities lending activities affect voting practices and help issuers better understand their shareholder base.[114] Commenters opposing this aspect of the proposal argued that the disclosures would not provide meaningful information to investors, particularly in light of expected costs.[115] Some were also concerned that these disclosures did not reflect the complete context of the analysis reporting persons perform when determining whether to engage in securities lending and did not show the benefits of keeping shares on loan during a vote.[116] Many of these commenters suggested that these disclosures, or fund securities lending practices in general, would provide an incomplete picture of the securities lending activities and could be viewed in a negative light, for example by market data firms that provide environmental, social, and governance ("ESG") rankings, which may consider these disclosures in forming their ESG rankings.[117] Some commenters asserted that reporting persons may programmatically recall lent shares to avoid a negative implication, resulting in negative impacts both to the reporting person and the securities lending market in general.[118] A number of commenters recommended that, instead of the proposed quantitative disclosure, we require a narrative discussion to provide investors additional context, such as disclosure of the reporting person's policies and procedures for determining whether to recall lent shares ahead of a proxy vote.[119]

The disclosure of the number of shares the reporting person loaned and did not recall will provide transparency on a specific, security-by-security basis. Absent this disclosure, investors would not have quantified information showing how securities lending may have impacted the degree of proxy voting by the reporting person.[120] As a result, we believe that the quantitative disclosure in the final amendments will provide important information to investors and that it is consistent with other information provided on Form N–PX in enabling shareholders to monitor how the reporting person voted on a particular voting matter.[121] For these reasons, we believe that the costs to respondents in providing the quantitative disclosures are justified in light of the increased level of information and transparency provided to investors.

We appreciate that the quantitative disclosures, alone, will not provide the full context of a decision of whether to recall a security on loan. An adviser must make a determination regarding whether to retain a security and vote the accompanying proxy or lend out the security that is in the client's best interest.[122] The considerations underlying this analysis will not be reflected in the disclosed number of shares on loan and not recalled. Reporting persons will, however, have the option to provide this or other information on Form N–PX. The form as amended permits a reporting person to provide additional information on the cover page and/or on a vote-by-vote basis.[123] This flexibility will facilitate a reporting person's ability to provide additional information about a particular vote, such as with respect to portfolio securities on loan, or about the reporting person's voting practices in general, if the reporting person so chooses. For example, in a given case where a fund did not recall loaned securities, the fund could disclose that

not recalling the shares provided the fund with additional revenue in order to show the benefits fund shareholders received by leaving the securities out on loan. Therefore, although some commenters were concerned that the quantitative disclosure alone would not provide full context, a reporting person with this concern will have the option to provide additional information about its process for determining whether to recall lent shares ahead of a proxy vote in order to provide investors with additional context in cases where the reporting person believes the information is helpful.

We do not believe that the narrative discussion or disclosure of the reporting person's policies and procedures for determining whether to recall lent shares ahead of a proxy vote that some commenters suggested would be an adequate substitute for the quantitative disclosure we are adopting.[124] The commenters' alternative would not provide investors with an understanding of the specific number of shares a reporting person has or has not recalled to vote a proxy, which is important to understand the relationship between securities lending and proxy voting. While a narrative discussion or disclosure of the reporting person's policies and procedures may provide some overall context, it may be difficult for investors to understand how the narrative disclosures suggested by commenters relate to the reporting person's voting record disclosed on the form, particularly if that disclosure applies to a number of funds covered in the report, or is otherwise not specific to any vote. Under the final amendments to Form N–PX, in contrast, reporting persons will be permitted to provide optional narrative disclosure in their reports alongside the required quantitative disclosure, which can be provided on a vote-by-vote basis or on their voting record as a whole.

Finally, we recognize that an adviser and its client may agree that the adviser would not vote due to the opportunity costs of recalling the loaned securities in order to vote and that it can be in the client's best interest not to recall the loaned securities.[125] There are legitimate reasons why an adviser or other reporting person may decide not to recall any loaned securities. The quantitative disclosure we are adopting is designed to provide investors with additional information about a reporting person's proxy voting activities. The

---

[114] *See, e.g.,* Better Markets Comment Letter ("Form N–PX does not currently account for loaned securities that are not recalled, a major loophole that the SEC should close as proposed. This will ensure that investors and the public have a more complete picture of how funds' and managers' securities lending activities, in search of revenue, impact their ability to vote shares in their investors' interests."); Public Citizen Comment Letter; LTSE Comment Letter ("Having actual knowledge of the extent to which an investor retained its voting rights—or relinquished them by having loaned the shares—can help a company better understand its shareholder base.") (footnote omitted); Morningstar Comment Letter; Bloomberg Comment Letter.

[115] *See, e.g.,* ISS Comment Letter; BlackRock Comment Letter; ICI Comment Letter I; MFDF Comment Letter; Utah Comment Letter.

[116] *See, e.g.,* TIAA Comment Letter; BlackRock Comment Letter; Comment Letter of the Securities Lending Council of the Risk Management Association (Dec. 14, 2021) ("RMA Comment Letter"); Federated Hermes Comment Letter.

[117] *See, e.g.,* RMA Comment Letter; TIAA Comment Letter; Pickard Comment Letter; AIMA Comment Letter.

[118] *See, e.g.,* RMA Comment Letter; Federated Hermes Comment Letter; TIAA Comment Letter.

[119] *See, e.g.,* ISS Comment Letter; ICI Comment Letter I; IAA Comment Letter.

[120] *See* Proposing Release, *supra* footnote 5, at n.106 and accompanying text.

[121] *See* Proposing Release, *supra* footnote 5, at n.15 and accompanying text.

[122] *See* Proposing Release, *supra* footnote 5, at nn.104–105 and accompanying text; Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers, Investment Company Release No. 33605 (Aug. 21, 2019) [84 FR 47420 (Sept. 10, 2019)], at n.34 ("Proxy Voting Guidance"); *see also* BlackRock Comment Letter; TIAA Comment Letter.

[123] *See* Special Instruction B.4 to amended Form N–PX; Item 1(o) to amended Form N–PX. The disclosures permitted by these items are optional. A reporting person is not required to respond to Item 1(o) for any vote. If a reporting person does provide additional information for one or more votes, it is not required to provide this information for all votes.

[124] *See, e.g.,* RMA Comment Letter; Federated Hermes Comment Letter; TIAA Comment Letter.

[125] Proxy Voting Guidance, *supra* footnote 122, at n.34.

disclosure requirement is not intended to change the analysis reporting persons may undertake currently as to whether to recall a loaned security, such as by creating pressure for reporting persons to programmatically recall lent shares, or to create a negative implication when a reporting person does not recall a loaned security in any given case. Such determinations are subject to an adviser's fiduciary duties owed to its clients.[126] If a reporting person believes that leaving securities on loan is in the client's best interest, the reporting person should leave those securities on loan. Further, as discussed above, to the extent a reporting person believes additional narrative information may be helpful for investors to understand fully a determination whether to recall a loaned security and mitigate any perceived negative implications of this reporting, the reporting person will have the option of providing additional information on Form N–PX as amended.

Some commenters raised the concern that reporting persons are often not aware of the issues that will be voted on at a particular shareholder meeting at the record date because proxy materials often are not distributed until after that date, leaving reporting persons with limited information to make a determination as to whether to recall shares to vote proxies.[127] We understand that industry practices have developed that allow reporting persons to make informed decisions about voting matters and whether to recall loaned securities in these circumstances. For example, one commenter has previously told the Commission that, even though proxy statements often are sent after the record date, funds "have long been in the business of loaning securities and have been able to develop methods to monitor corporate developments and make arrangements to recall shares in the event of a vote on a material matter" and that it, at the time, did "not believe it is essential for the Commission to adopt additional regulations to facilitate the recall of securities for voting purposes."[128] Reporting persons today already are analyzing whether to recall

loaned securities, even though proxy materials may be distributed after the record date for a vote.[129] This disclosure is not intended to change that analysis.

Commenters also raised concerns that information about the number of shares on loan and not recalled may not be readily available in all cases. Specifically, some commenters stated that custodians do not always provide full information on the number of shares on loan with the proxy ballot, which reporting persons could use to provide the disclosure.[130] We recognize that practices may vary and that in some cases providing the disclosure may require coordination among reporting persons, custodians, proxy voting services providers, and others, as some commenters observed.[131] Disclosure requirements for reporting persons under the Federal securities laws often can require some degree of coordination amongst parties to produce required information, and we believe the costs associated with this quantitative disclosure are justified in light of the increased level of information and transparency provided to investors.

As proposed, the disclosure we are adopting will be required only where the reporting person has loaned the securities. The reporting person may have loaned such securities directly or indirectly through a lending agent.[132] However, the disclosures would not be required in scenarios where the manager is not involved in lending shares in a client's account, either directly or indirectly. For example, if a manager is not a party to the client's securities lending agreement and has not itself (rather than the client) loaned the securities, such as when a manager's prime broker has rehypothecated securities in a manager's margin account, then the manager would not be involved in decisions to lend securities or recall loaned securities for that account.[133]

Similarly, a manager will not exercise voting power over loaned securities when its client hires a securities lending agent to lend securities in the client's account and the manager has no involvement in the securities lending arrangement or in decisions to recall loaned securities.[134] In these cases, as when a client entirely directs a given vote, the manager would not report because the manager did not make a determination to lend a security in the first instance or to leave it on loan. Thus, the manager would not have any say-on-pay reporting obligations with respect to those loaned securities because it did not exercise voting power. Alternatively, if a reporting person has loaned securities and instructs its lending agent, custodian, or other service provider to recall lent shares but for various reasons those shares are not returned on time for a proxy vote, the reporting person would report these shares as being on loan but not recalled because they were not in fact recalled in time for the vote.[135] The reporting person may, however, choose to explain that it attempted to recall the securities in Item 1(o) of the amended form.

### 4. Additional Amendments to Form N–PX

We are adopting as proposed all but two of the proposed additional amendments to Form N–PX designed to enhance the usability of Form N–PX reports and to modernize or clarify existing form requirements.

First, we are adopting as proposed the requirement for funds that have multiple series of shares to provide each series' Form N–PX disclosure separately by series.[136] We received no comments on this aspect of the proposal. This change will make Form N–PX disclosure easier to review and compare among reporting persons by allowing investors to focus on disclosure relevant to them, rather than to investors in other series.

We also are adopting as proposed the instruction requiring the information otherwise required or permitted to be reported on Form N–PX to be reported in the order presented on the form.[137] No commenters discussed this aspect of the proposal and we continue to believe it will make Form N–PX disclosure

---

[126] *See* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003), at 15 (stating that under the Advisers Act, "an adviser is a fiduciary that owes each of its clients duties of care and loyalty with respect to all services undertaken on the client's behalf, including proxy voting," citing *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180 (1963)).

[127] *See, e.g.,* BlackRock Comment Letter; ICI Comment Letter I; AIMA Comment Letter.

[128] Comment Letter of the Investment Company Institute (Oct. 20, 2010) (regarding the concept release on the U.S. proxy system (File No. S7–14–10)).

[129] *See, e.g.,* AIMA Comment Letter; BlackRock Comment Letter (stating that in the United States, the record date of a shareholder meeting typically falls before the proxy mateirals are released).

[130] *See* BlackRock Comment Letter; ISS Comment Letter.

[131] *See* Glass Lewis Comment Letter; Broadridge Comment Letter.

[132] *See* Special Instruction D.7 to amended Form N–PX. To the extent a reporting person allocates a number of securities to the lending agent for lending purposes and treats that number of securities as being on loan when determining how many shares it can vote in a matter, the reporting person should report all of the allocated shares as being on loan and not recalled (excluding any shares the reporting person recalled for the vote).

[133] *Cf.* MFA Comment Letter (raising concerns about obtaining the required information in this scenario).

[134] *See supra* footnote 39 and accompanying text.

[135] *See* Item 1(j) of amended Form N–PX.

[136] Special Instruction D.9 to amended Form N–PX. For example, a fund that has multiple series of shares would provide Series A's full proxy voting record, followed by Series B's full proxy voting record.

[137] Special Instruction D.1 to amended Form N–PX.

easier to review and compare among reporting persons.[138]

We are not, however, adopting the proposed requirement to identify whether a voting matter is a proposal or a counterproposal. Some commenters who discussed this aspect of the proposal opposed it, stating that, in practice, the difference between a proposal or counterproposal would not always be clear.[139] After considering these comments, we agree that it may be challenging to distinguish between proposals and counterproposals, which could make this requirement challenging for reporting persons to implement and the information less useful for investors. In addition and discussed above, we are adopting requirements that will standardize the ways in which proxy voting matters are identified and require reporting persons to identify the category of each voting matter, both of which could assist investors in identifying the information they seek.

As proposed, the revised form will require that a reporting person disclose whether a vote was for or against management's recommendation.[140] Two commenters recommended that we remove this item, arguing that investors can determine this themselves if management's recommendation was disclosed as well.[141] It will be easier for investors to understand whether a reporting person voted for or against management's recommendation with this information, rather than trying to discern it from the other information reported on the form.

As proposed, we are amending Form N–PX to require a reporting person to report only one security identifier,

security's Committee on Uniform Securities Identification Procedures ("CUSIP") number or International Securities Identification Number ("ISIN"), as opposed to the form's current requirement to report both a security's CUSIP and ticker symbol. Under the amendments, a reporting person will be required to report the security's CUSIP unless it is not available through reasonably practicable means. If the CUSIP number is not reported, then Form N–PX will require the security's ISIN, unless it also is not available through reasonably practicable means. We also are removing the current requirement to report the ticker symbol of a security, as proposed.[142]

In addition to proposing these changes related to security identifiers, the Commission also sought comment on whether to require an alternative identifier instead of, or in addition to, CUSIP, and we received several comments suggesting alternative identifiers.[143] In particular, some commenters requested that we use an open-source securities identifier, such as the security's Financial Instrument Global Identifier ("FIGI"), and one suggested concerns with CUSIP identifiers in particular due to concerns relating to CUSIP licensing fees.[144] Although we appreciate that CUSIPs have licensing fees, reporting persons are already subject to CUSIP reporting requirements, such as on Form 13F and Form N–PORT, and would therefore incur licensing costs associated with storing CUSIPs for their holdings even if CUSIPs were not required to be reported on Form N–PX. While the final rules will maintain the requirement to disclose CUSIP, we believe that providing the flexibility of reporting an additional security identifier, along with CUSIP, would be appropriate. CUSIP numbers and FIGIs are both able to provide the unique identification of a reported security in a manner that is standard across datasets.[145] Reporting

persons choosing to report using FIGI would provide the share class level FIGI which, like CUSIP, is standard across exchanges.[146] Providing reporting persons with the option of reporting a FIGI, in addition to the mandatory CUSIP number, for some or all of the reporting person's securities will enhance the utility of holdings data reported on Form N–PX and the usefulness of such information to the Commission, other regulators, or members of the public and other market participants by allowing analysis based on FIGI where managers choose to report that identifier. For example, investors who analyze data reported on Form N–PX and that use FIGIs in their internal analyses could use the reported FIGIs without having to first convert a security's CUSIP number to a FIGI.

By contrast we are not amending the form to allow a reporting person to report the corresponding legal entity identifier ("LEI") of the issuer of such security as one commenter suggested.[147] Because an LEI is an identifier of legal entities (such as issuers of securities reported on Form N–PX), rather than an identifier of securities, it would not provide comparable information to a CUSIP number or a FIGI.[148]

*D. Joint Reporting Provisions*

We are adopting, as proposed, amendments that permit reporting persons to report jointly their say-on-pay votes in three scenarios. Specifically, we will permit a single manager to report say-on-pay votes in cases where multiple managers exercise voting power. We are also permitting a fund to report a manager's say-on-pay votes on behalf of a manager exercising voting power over some or all of the fund's securities. Lastly, we are allowing two or more managers who are affiliated persons to file a single report on Form N–PX for all affiliated person managers within the group, notwithstanding that they do not exercise voting power over the same securities. In any of these instances, the non-reporting manager would be

---

[138] One commenter did express that it generally supported the goal of formatting reports on Form N–PX consistently. *See* Vanguard Comment Letter. The requirement to report the required information in the order presented on Form N–PX is distinct from the requirement to report the votes themselves in the same order as they are displayed on the issuer's form of proxy, which we are also adopting. *Compare* Proposing Release, *supra* footnote 5, at n.112 and accompanying text and Special Instruction D.1 to amended Form N–PX *with* Proposing Release, *supra* footnote 5, at n.74 and accompanying text and Special Instruction D.3 to amended Form N–PX.

[139] *See* Blackrock Comment Letter; ISS Comment Letter. *But see* Bloomberg Comment Letter (suggesting that this is an important data point that should be given an XML or JSON tag as it may not be sufficiently clear to investors).

[140] This is conceptually similar to the current form's requirement, which requires that reporting persons identify whether the votes being disclosed represent votes for or against management. The changed wording is intended to more clearly describe what is being reported, that is, whether the reporting voted for or against management's recommendation.

[141] *See* Bloomberg Comment Letter; ISS Comment Letter.

[142] We proposed this change in response to a comment to the 2010 Proposing Release that recommended that a ticker symbol be required only if a CUSIP number was unavailable since certain securities listed on more than one exchange have multiple ticker symbols. *See* Proposing Release, *supra* footnote 5, at section II.C.4.

[143] *See, e.g.,* GLEIF Comment Letter (suggesting use of LEI).

[144] *See* XBRL Comment Letter (support for FIGI); Morningstar Comment Letter (same); Bloomberg Comment Letter (same); McRitchie Comment Letter (same); IAA Comment Letter (specific concerns with CUSIP).

[145] FIGI is an open-sourced, non-proprietary, data standard for the identification of financial instruments across asset classes. FIGI allows users to link various identifiers for the same security to each other, which includes mapping the CUSIP number of a security to its corresponding FIGIs. *See*

Object Management Group Standards Development Organization, Financial Instrument Global Identifier, *available at https://www.omg.org/figi/.*

[146] *See* About OpenFigi, *available at https://www.openfigi.com/about* (stating that the Share Class level FIGI is assigned to equities and enables users to link multiple FIGIs for the same instrument in order to obtain an aggregated view for that instrument across all countries globally).

[147] *See* GLEIF Comment Letter.

[148] *See* Introducing the Legal Entity Identifier (LEI), *available at https://www.gleif.org/en/about-lei/introducing-the-legal-entity-identifier-lei* (stating that the LEI "connects to key reference information that enables clear and unique identification of legal entities participating in financial transactions"). *Cf supra* section II.E.

required to file a "notice" or "combination" Form N–PX report that identifies each manager or fund reporting on its behalf.[149] We also are making certain technical amendments to Form N–PX to specify on whose behalf reporting is being made and to permit the reporting of votes by parties other than the reporting person.

We are adopting, as proposed, a number of technical changes to facilitate joint reporting. Specifically, in all three cases, the non-reporting manager's notice or combination report on Form N–PX will have to identify the other managers or funds reporting on its behalf.[150] In addition, where another reporting person reports say-on-pay votes on a manager's behalf, the report on Form N–PX that includes the non-reporting manager's votes would be required to identify that manager (and any other managers) on whose behalf the filing is being made on the Summary Page. Further, we will require a manager to report the number of shares the manager is reporting on behalf of another manager pursuant to the joint reporting provisions separately from the number of shares the manager is reporting only on its own behalf. A manager will also be required to separately report shares when the groups of managers on whose behalf the shares are reported are different. For example, if the reporting manager is reporting on behalf of Manager A with respect to 10,000 shares and on behalf of Managers A and B with respect to 50,000 shares, then the groups of 10,000 and 50,000 shares must be separately reported. Similarly, a fund will be required to report separately shares that are reported on behalf of different managers or groups of managers.[151]

This approach is designed to allow managers' clients and investors to easily search for all votes where the manager exercised voting power, whether or not those votes are reported on the manager's own Form N–PX. Use of the joint reporting provisions is optional, however, and reporting persons can

elect to report the relevant say-on-pay votes individually instead of relying on the joint reporting provisions. If a manager does not rely on the joint reporting provisions, it would not be subject to the disclosure requirements tied to joint reporting that facilitate identification of all of a manager's say-on-pay votes. In such case, the manager's report on Form N–PX would provide its complete proxy voting record for say-on-pay votes during the reporting period, without reference to any other reports on Form N–PX, and would not include any votes where the manager did not exercise voting power. This requirement is designed to further our goal of providing meaningful information to investors by allowing investors to clearly see how a particular manager exercised voting power.

As discussed in the Proposing Release, we believe that joint reporting will implement the statutory mandate to require say-on-pay vote reporting and mitigate potentially confusing duplicative reporting.[152] It should also reduce the reporting burden for reporting persons by permitting them to either divide reporting responsibility among themselves or to report individually, creating operational efficiencies for reporting persons without negatively impacting the quality or accessibility of the information they report on Form N–PX. The votes of each relevant manager will be identifiable under the joint reporting framework since the amendments require reporting persons that are reporting say-on-pay votes on behalf of other managers (including a fund on behalf of their sub-advisers) to separately report the number of shares being reported for those other managers.[153] The requirement to submit Form N–PX reports in a structured data format also will allow for the joint reporting data to be sorted and filtered in a manner that gives investors the ability to view votes by each relevant manager.

Commenters who addressed these amendments generally supported them.[154] One commenter, however, stated that each reporting person should be required to make its own report,

though that commenter did not object to joint filing if voting information was transparent and provided for each voting entity.[155] As discussed, reporting persons that rely on the joint reporting provisions must identify all managers included in the report and separate reporting of the shares reported on behalf of the non-reporting managers. One commenter suggested that a manager completing Form N–PX should not be required to separately identify the relevant managers for each vote and, instead, should be allowed to jointly report say-on-pay votes without separate attribution to each specific manager.[156] This commenter suggested that allowing large groups of affiliated managers to aggregate votes would be less complex and burdensome and would avoid providing unnecessary detail regarding the underlying portfolio to persons who are neither clients nor investors associated with the managers. We are not making this change because we do not believe that aggregated data is consistent with section 14A, as investors would be unable to determine in such circumstances how each manager voted.

*E. The Cover Page*

We are adopting the amendments to the cover page of Form N–PX largely as proposed, but with some changes intended to increase the efficiency of filing for reporting persons. The amendments are designed to address the addition of managers as a class of reporting persons and to facilitate the joint reporting provisions we are adopting. As proposed, we are adopting amendments to require reporting persons to identify more clearly whether the reporting person is a fund or a manager and the type of report being filed. Also, as proposed, managers will be required to disclose on the cover page the name of the reporting person, the address of its principal executive offices, the name and address of the agent for service, the telephone number of the reporting person, identification of the reporting period, and the reporting person's file number. In addition, managers will be required to provide their Central Registration Depository ("CRD") number and other SEC file number, if any. In a change from the proposal, and as detailed below, we have expanded the types of "notice" reports relative to those in the proposal.[157] Specifically, reporting

---

[149] If the manager is relying upon another manager or a fund to report all of its say-on-pay votes, it would file an "Institutional Manager Notice Report," whereas if the manager is reporting some votes but is relying on another manager or a fund to report others, it would file an "Institutional Manager Combination Report." *See* Special Instructions B.2.d and B.2.e to amended Form N–PX.

[150] General Instructions C.5 and C.6 to amended Form N–PX; Special Instructions C.2 and D.6 to amended Form N–PX.

[151] Special Instruction D.6 to amended Form N–PX. Reporting persons will not be required to report shares separately when they are not relying on the joint reporting provisions, even if another manager exercised voting power over some of the shares reported.

[152] *See* Proposing Release, *supra* footnote section 5, at section II.D.1 (noting that section 14A(d) generally requires managers to report say-on-pay votes and stating that "we believe that allowing consolidated reporting in this manner would yield reported data that would be at least as useful as separately reported data while reducing burden for reporting persons who may prefer to report jointly.").

[153] *See* Special Instruction D.6 to amended Form N–PX.

[154] *See, e.g.,* Pickard Comment Letter; ICI Comment Letter I; Bloomberg Comment Letter.

persons will be required to check a box in order to identify the report as one of the following types:

• "Fund Voting Report:" to be used when the fund holds one or more securities it is entitled to vote. As proposed, this reporting type is for registered investment companies with votes to report. In a change from the proposal, we changed the title of the report type from "Registered Management Investment Company Report" to "Fund Voting Report." We are adopting a clearer name that reflects that this fund report, in contrast to the newly added Fund Notice Report type, contains a report of the fund's votes;

• "Fund Notice Report:" to be used when the fund does not hold any securities it is entitled to vote. Under the proposal, if a reporting person did not have any proxy votes to report for the reporting period, the reporting person would have been required to file a report with the Commission stating that fact. In a change from the proposal, rather than requiring a fund to file with the Commission a report stating the fact that it had no proxy votes to report, under the amendments the fund would instead indicate: (i) that the fund has no votes to report by ticking this box on the cover page; and (ii) file only the cover page, required signature, and information about the series on the summary page. This change only relates to the manner in which the information is provided and does not change the scope of what is to be reported. Ticking a box on the cover page will be more efficient for funds than affirmatively stating they have no votes to report. This approach will be more efficient for investors because they can identify a fund that does not vote via a check box on the cover page, as opposed to having to review the report and find the manager's affirmative assertion that it has no votes to report;

• "Institutional Manager Voting Report:" to be used when a manager is reporting all of its proxy votes that are required to be reported in a single report. As proposed, this reporting type is for managers when the report contains all say-on-pay votes of the manager;

• "Institutional Manager Notice Report:" to be used when the report contains no say-on-pay votes of the manager. As proposed, a manager would use the notice report option when all of its say-on-pay votes are reported by other managers or funds under the joint reporting provisions. In a change from

"Institutional Manager Voting," "Institutional Manager Notice," and "Institutional Manager Combination" reports.

the proposal, a manager also will be permitted to file a notice report in two additional circumstances. First, consistent with the addition of a fund notice report, a manager that does not exercise voting power for any reportable voting matter during the reporting period and therefore does not have any proxy votes to report would file a notice report and indicate this fact on the cover page. This should be more efficient for managers and investors than requiring managers to affirmatively state they have no votes to report. Second, as discussed above, Form N–PX as amended will allow managers that have a disclosed policy of not voting proxies and that did not vote during the reporting period to indicate this on the form without providing additional information about each voting matter individually. We are making a conforming change, based in part on a suggestion from a commenter, on the cover page to allow a manager to indicate that it is filing a notice report, and therefore not providing additional information about each voting matter individually, because it is relying on this reporting option; [158]

• "Institutional Manager Combination Report:" to be used when the report contains some say-on-pay votes of the manager but additional votes are reported by other managers or funds under the joint reporting provisions. As proposed, this reporting type addresses situations in which the manager is reporting some say-on-pay votes and other votes are reported by other managers or by funds.

Any "notice" or "combination" report will include on the cover page a list of the file numbers and names, as well as CRD numbers (if any), of any other managers and funds whose Form N–PX reports include say-on-pay votes of the reporting manager.[159]

Commenters generally supported the proposed changes to the Form N–PX cover page.[160] However, in response to a request for comment regarding the inclusion of additional information on the cover page such as an LEI, some commenters suggested that we require certain reporting persons to list additional identifiers, including LEIs, on the Form N–PX cover page.[161] This additional information will be helpful in identifying the reporting person, whether a fund or a manager. Therefore, in a change from the proposal, we will

[158] See MFA Comment Letter.
[159] Special Instruction B.2 to amended Form N–PX.
[160] See Morningstar Comment Letter; MFA Comment Letter.
[161] See Morningstar Comment Letter; Bloomberg Comment Letter.

require that all reporting persons that have an LEI report that information on the Cover Page.[162]

*F. The Summary Page*

We are adopting, largely as proposed, amendments to add a new summary page to Form N–PX to facilitate the joint reporting framework we are adopting and to enable investors to readily identify which fund series are intended to be covered by the report as well as any managers (besides the reporting person) ("included managers") with say-on-pay votes included on the Form N–PX report. The summary page will be required on all Form N–PX reports by funds as well as manager "voting" and "combination" filings.[163]

Commenters who addressed this aspect of the proposal generally supported the new Form N–PX summary page as proposed.[164] In addition, one commenter responded to a request for comment in the proposing release asking if the Commission should require other information, such as a series' LEI, that would enable investors to identify which funds a report covers more easily. The commenter suggested that we require that funds disclose the LEI for each series of the fund on the basis that it would assist investors in identifying and analyzing parent-subsidiary relationships.[165] After considering this comment, we are amending the Form N–PX summary page to include a section that requires funds to identify the LEI for the fund series. The LEI would be in addition to the other information about the fund series in the proposal, including the series identification number and series name. We agree that the LEI would help investors identity the funds covered in the report, and funds already have LEIs because we currently require each series to report its LEI in other reports to the Commission.[166] In light of this change with respect to funds, we are also

[162] While the request for comment, and commenters, only identified managers for this item, we do not see a reason to distinguish between funds and managers on this point. *See infra* footnotes 165–166 and accompanying paragraph.
[163] *See* Special Instructions B.2.a–d to amended Form N–PX. The summary page would not be required in a "notice" report by managers because, since the notice report would not contain any say-on-pay votes at all, it would not report any say-on-pay votes of other managers.
[164] *See* Morningstar Comment Letter; MFA Comment Letter.
[165] *See* Morningstar Comment Letter (suggesting the inclusion of a fund series' LEI on the summary page). Although another commenter advocated against including LEIs for funds' series because series LEIs do not exist, funds currently report series LEI in other Commission reports, including Form N–PORT. *See* Bloomberg Comment Letter.
[166] *See* Item A.2 of Form N–PORT.

amending the Form N–PX summary page to require that included managers identify their LEI, if any. Although no commenter specifically suggested that LEIs of other managers whose information is included in the report under the joint reporting provisions be reported on the summary page, we solicited comment in the proposal as to whether there was any other information that additional managers should provide. In light of the comments related to the addition of LEI for fund series, we believe investors could similarly benefit if included managers provided their LEI, if any, as well.[167]

The required summary page information will assist investors in identifying on a Form N–PX report the relevant managers or series associated with the reported votes by providing a standardized approach to the reported data, making it easier to access and review, while at the same time permitting reporting persons to reduce their reporting burden and avail themselves of the joint-report framework. The summary page will require reporting persons to identify the names and total number of included managers with say-on-pay votes included in the report in list format. The instructions to Form N–PX specify the contents of this information, including the title, column headings, and format.

If a Form N–PX report includes the say-on-pay votes of included managers, the summary page list would be required to include all such managers together with their respective Form 13F file numbers and, if they exist, any CRD numbers, LEI, and other SEC file numbers.[168] In addition, and similar to Form 13F, reporting persons must assign a number (which need not be consecutive) for each such manager, and present the list in sequential order.[169] These numbers will help identify the particular managers who exercised the power to vote the securities. While we anticipate that the sequential numbering requirement will make the list easier to use, the amendments permit non-consecutive numbering to allow managers to retain the same number across filings of different reporting persons and different time periods. If a Form N–PX filing does not disclose the proxy votes of an included manager, the reporting person would enter the word

"NONE" under the title and would not include the column headings and list entries. To the extent a fund's report on Form N–PX includes the votes of multiple series, the summary page would require the name, the series identifier, and LEI of each series.

*G. Form N–PX Reporting Data Language*

We are adopting, as proposed, amendments to require reporting persons to file reports on Form N–PX in a structured data language.[170] The amendments require that Form N–PX reports be filed in a custom eXtensible Markup Language ("XML") -based structured data language created specifically for reports on Form N–PX ("custom XML").[171] Reports on Form N–PX are currently required to be filed in HTML or ASCII.[172] As stated in the proposal, use of a custom XML language will make it easier for reporting persons to prepare and submit the information required by Form N–PX accurately and, additionally, increase the utility of the information submitted. To further increase the accessibility of Form N–PX data, we are developing electronic "style sheets" that, when applied to the reported XML data, will present Form N–PX data in human-readable form.

Many commenters supported the use of structured data for Form N–PX filings.[173] Many commenters suggested that the unstructured data format of current Form N–PX disclosure is difficult to interpret and analyze.[174]

Some commenters suggested that structured data language would allow investors to search, aggregate, and analyze the reported data more easily.[175] One commenter, however, generally opposed the proposal on the basis that the existing disclosure regime and the current ability of data aggregators to assess proxy voting information were sufficient.[176]

As stated in the Proposing Release, the use of structured data on Form N–PX should make it easier for reporting persons to prepare and submit information on the form accurately and increase the utility of the information submitted.[177] Currently, reporting persons generally need to reformat required information prior to submission of Form N–PX, including stripping out incompatible metadata related to normal business uses. However, this process is not necessary when using an XML-based reporting data language. Further, using an XML-based reporting language permits the Commission to provide a web-based reporting application for Form N–PX, which would not be possible currently. The use of structured data should also result in reported data that is sufficiently standardized to make structured data useful for interested parties.[178]

In addition, the current requirement to file Form N–PX in HTML or ASCII is not suitable for automated validation or aggregation. In contrast, the custom XML data language will allow investors to aggregate and analyze reported data in a much less labor-intensive manner.[179] Also, while certain Form N–PX data may be available commercially by third-parties, users of third-party data may also benefit if the costs associated with third-party data analysis—and the costs to users to access that data—fall as a result of the structured data requirement, or if this

[167] *See* Proposing Release, *supra* footnote 5, at section II.D.3.

[168] The SEC file number would be any file number (*e.g.,* 801–, 8–, 866–, 802–) assigned by the Commission to the manager other than the manager's 13F file number. *See* Special Instruction B.3 to amended Form N–PX.

[169] *See* Special Instruction 8.b to Form 13F.

[170] *See* General Instruction D.2. to amended Form N–PX (specifying that reporting persons must file reports on Form N–PX electronically on the Electronic Data Gathering, Analysis, and Retrieval system ("EDGAR"), except as provided by the form's confidential treatment instructions, and consult the EDGAR Filer Manual for EDGAR filing instructions). *See also* 17 CFR 232.301 (requiring filers to prepare electronic filings in the manner prescribed by the EDGAR Filer Manual). We are also amending rule 101(a)(1)(iii) of Regulation S–T to provide that reports filed pursuant to section 14A(d) of the Exchange Act must be submitted in electronic format. Reports filed pursuant to section 30 of the Investment Company Act are already subject to electronic filing. *See* rule 101(a)(1)(iv) of Regulation S–T.

[171] This would be consistent with the approach used for other XML-based structured data languages created by the Commission for certain EDGAR Forms, including the data languages used for reports on each of Form N–CEN, Form N–PORT, and Form 13F.

[172] *See* Regulation S–T, 17 CFR 232.101(a)(1)(iv); 17 CFR 232.301; EDGAR Filer Manual (Volume II) version 62 (June 2022), at 5–1 (requiring EDGAR filers generally to use ASCII or HTML for their document submissions, subject to certain exceptions).

[173] *See, e.g.,* Morningstar Comment Letter ("As demonstrated by other examples, such as Forms NFP, N–CEN, and N-Port, there is significant value in using a structured data language."); ICI Comment Letter I; Blackrock Comment Letter; Bloomberg Comment Letter.

[174] *See, e.g.,* Ceres Comment Letter; SCERS Comment Letter; Blackrock Comment Letter;

Bloomberg Comment Letter; LTSE Comment Letter; CFA/CII Comment Letter; McRitchie Comment Letter III.

[175] *See* Morningstar Comment Letter; XBRL Comment Letter; Blackrock Comment Letter ("[U]se of an XML-based format would make the N–PX data more consistent, usable, and accessible."); Bloomberg Comment Letter; CFA/CII Comment Letter.

[176] *See* MFDF Comment Letter.

[177] *See* Proposing Release, *supra* footnote 5, at the text following n.169.

[178] *See* Proposing Release, *supra* footnote 5, at the text accompanying n.175.

[179] *See id.* at the text following n.177. Some investors review funds' voting practices by accessing Form N–PX reports directly on EDGAR, while others may obtain information about funds' voting practices through analysis or synthesis of Form N–PX reports by data aggregators or others. A variety of market participants and other stakeholders also use data reported on Form N–PX. *See id.* at n.10.

requirement facilitates additional third-party data analyses for the benefit of investors. The structured data requirement would likely improve any third-party analyses of voting information and, in doing so, potentially benefit investors through reduced costs for accessing those third-party analyses.

Several commenters specifically supported requiring the use of custom XML language to file Form N–PX reports.[180] These commenters generally agreed that use of an XML-based structured data language would make the Form N–PX information more accessible and useful to interested parties.[181] Some other commenters suggested the use of other structured data languages besides XML. Two of these commenters suggested the use of JavaScript Object Notation ("JSON") as the structured data language on the basis that XML is not frequently used and that JSON involves smaller file sizes, does not require specialized tools, and is more user-friendly.[182] Other commenters suggested use of eXtensible Business Reporting Language ("XBRL") language on the basis that XBRL could utilize various built-in taxonomies that include certain identifying information, would have smaller file sizes, and would be easier for other analytical applications and data collection systems to read.[183] One commenter suggested use of XBRL–CSV on the basis that issuers could use the same applications they use today to prepare their financials and that end users of the data could leverage the same tools they currently use to extract financial statement data from SEC reporting entities.[184] Some commenters also offered suggestions about ways to address the size of Form N–PX files, such as establishing a file size limit so that computer and software memory constraints do not impede data processing or accessibility, or that each series be required to file separately.[185]

The use of a custom XML language for Form N–PX will minimize reporting costs while yielding reported data that would be more useful to investors.[186] In our experience, we have found that XML-based structured data languages

for EDGAR filings allow investors to aggregate and analyze reported data in a streamlined manner. Concerns related to file size issues and the related suggestion by some commenters to require each series to file separately will be addressed by our adoption of the custom XML language for Form N–PX because the XML-based structured data language substantially reduces the size of both the submitted forms and the human-readable information available to investors to review. In addition, the use of custom XML is consistent with other Commission forms, particularly Form 13F, Form N–CEN, and Form N–PORT, such that it should be familiar both to reporting persons and investors. The Commission has also developed web-based reporting applications that allow persons without structured data expertise to file custom XML documents on EDGAR, while still permitting reporting persons with structured data expertise to submit filings directly to EDGAR in the applicable custom XML data language. By contrast, no EDGAR filings are currently filed using JSON or comma-separated values format ("CSV"), and the EDGAR system currently does not accept these formats.[187] Furthermore, with respect to XBRL–CSV, the Commission believes using the XBRL data model to define the elements and relationships featured in Form N–PX would add unnecessary complexity because Form N–PX consists of a relatively simple two-dimensional set of rows and columns, and does not feature any complex interlinking relationship among different rows. In addition, XBRL–CSV is not likely to create significant efficiencies in preparing and using managers' Form N–PX data because only a small number of managers are subject to a reporting requirement to file XBRL disclosures with the Commission.[188]

Custom XML will not significantly impact either the filing process or the accessibility of the data. In addition to using structured data to allow investors to aggregate and analyze the reported data efficiently, the electronic "style sheets" we are developing will present Form N–PX data in a human-readable form for the benefit of investors who review Form N–PX reports on the Commission's EDGAR system.

Commenters who discussed the proposed use of Commission-developed style sheets supported them on the basis that style sheets would reduce the costs of filing reports on Form N–PX and make them more accessible and user-friendly.[189]

Some commenters raised issues related to the timing for the implementation of the custom XML language. Some commenters suggested that the Commission provide the custom XML taxonomy in advance of the compliance date to provide reporting persons with time to implement the structured data language and that we offer a beta period so that reporting persons can test filings in advance of the compliance date.[190] We agree that reporting persons could benefit from a testing period that allows advance access to the various technical specifications for the custom XML reporting language and permits test filings using the EDGAR system. Therefore, there will be an EDGAR pilot that will provide reporting persons the opportunity to test the custom XML filing process in advance of the effective date of the amendments.[191]

*H. Time of Reporting*

As proposed, funds will continue to be required to report their proxy voting records, and managers will be required to report say-on-pay votes, annually on Form N–PX no later than August 31 of each year for the most recent 12-month period ended June 30. This reporting timeframe for managers—and retaining the current reporting timeframe for funds—seeks to appropriately balance the benefits of prompt reporting and the burdens associated with that reporting.[192]

Comments were mixed as to whether we should retain the current reporting frequency for funds and apply it to managers. A number of commenters supported these time frames and opposed more frequent reporting.[193] These commenters stated that more frequent reporting was unnecessary and would not provide meaningful information to investors because most

---

[180] *See, e.g.,* Morningstar Comment Letter; Federated Hermes Comment Letter; AIMA Comment Letter; Vanguard Comment Letter; Blackrock Comment Letter.

[181] *See id.*

[182] *See* Bloomberg Comment Letter; *see also* Morningstar Comment Letter.

[183] XBRL Comment Letter; GLEIF Comment Letter.

[184] *See* XBRL Comment Letter.

[185] *See* Morningstar Comment Letter; Bloomberg Comment Letter; Rhee Comment Letter.

[186] *See* Proposing Release, *supra* footnote 5, at section II.E.

[187] *See supra* footnote 172.

[188] *See* 17 CFR 232.405(b) (not applying the requirement to file an Interactive Data File consisting of financial statements to registered management investment companies). Based on structured data from EDGAR filings, less than 5% of Form 13F filers in the second quarter of 2022 also filed XBRL financial statements over the same period. *See* DERA Data Library, *available at https://www.sec.gov/dera/data.*

[189] *See* ICI Comment Letter I; Federated Hermes Comment Letter.

[190] *See* ICI Comment Letter I (stating that reporting persons need sufficient time to incorporate the custom XML taxonomy into their systems and perform test filings); XBRL Comment Letter.

[191] For additional information regarding the EDGAR filing process and the current technical specifications, *see https://www.sec.gov/edgar/filer-information.*

[192] *See also* Proposing Release, *supra* footnote 5, at section II.F.

[193] *See, e.g.,* ICI Comment Letter I, Federated Hermes Comment Letter, MFA Comment Letter.

proxy votes occur during the second quarter of the calendar year ("Proxy Season").[194] One also stated that the information produced on Form N–PX can take a significant amount of time to process in highlighting the need for the 60-day delay between the end of the reporting period and the deadline for filing the form.[195]

Other commenters, however, urged that we require prompt or real-time disclosure of votes.[196] One commenter stated that accountability requires full and timely transparency of votes.[197] Several suggested technological solutions that would automate the process of providing this information to avoid additional costs of this more frequent reporting.[198]

According to our analysis, over 60% of proxy votes conducted by Russell 3000 components in 2020 and 2021 happened during Proxy Season, whereas only 9% to 16% of votes occur in any other given calendar quarter.[199] Proxy Season ends on the same day as the end of the reporting period covered by the form, June 30, and reporting persons will continue to have 60 days to compile and file the form from that date. As a result, annual reporting will timely capture a significant percentage of the votes cast by reporting persons.[200] In addition, although not required, funds can choose to disclose their proxy votes more frequently than annually, for example on their websites, to provide enhanced transparency and facilitate greater insight into the fund's proxy voting activities. We also believe that

the 60-day delay between the end of the reporting period and the deadline for filing the form continues to be appropriate and we are not adopting a shorter period to require more prompt reporting, particularly in light of the additional items that we are requiring on the amended form and for smaller funds or managers.

Some commenters suggested that funds or managers also should be required to provide some pre-vote transparency to investors, or that funds be required to seek the views of their investors before voting proxies.[201] These commenters suggested that this is necessary to provide accountability to these entities. We are not mandating that funds and managers disclose their intended votes on a prospective basis, nor are we requiring funds to seek the views of their investors before voting proxies, as both of these approaches raise questions that are distinct from those associated with reporting a fund or manager's voting record and that would benefit from further consideration. Moreover, reporting persons that are funds and registered investment advisers are currently required to describe their proxy voting policies and procedures.[202] Investors also can use the other reforms that we are adopting to help provide accountability, for example, by using the structured data in Form N–PX to monitor voting trends over time.[203] However, the adopted amendments will not restrict a manager's or fund's ability to voluntarily provide pre-vote transparency or survey investors.

### I. Requests for Confidential Treatment

We are adopting, substantially as proposed,[204] instructions in Form N–PX

that allow managers to request confidential treatment of proxy voting information consistent with rule 24b–2. The required content, procedures for filing both the request itself and information that is no longer entitled to confidential treatment, and the standard for approving such requests will be the same as for confidential treatment requests under section 13(f) of the Exchange Act.[205]

In addition, and consistent with recent amendments to Form 13F, confidential treatment requests regarding Form N–PX will be required to be filed electronically via EDGAR.[206] This is consistent with the Commission's statement in the proposing release that the instructions on Form N–PX provide that a reporting person requesting confidential treatment of information filed on Form N–PX should follow the same procedures set forth in Form 13F for filing confidential treatment requests.[207] Managers seeking

[194] See Federated Hermes Comment Letter ("[m]ore frequent submissions of vote reporting would result in periods of relatively fewer votes reported followed by a surge in vote data relating to the peak voting period which for most markets occurs during the spring"); ICI Comment Letter I.

[195] See ICI Comment Letter I.

[196] See, e.g., Betterment Comment Letter; Comment Letter of the Board Director Training Institute of Japan (Dec. 14, 2021); Bloomberg Comment Letter; see also Morningstar Comment Letter (suggesting quarterly reporting).

[197] Shareholder Commons Letter; see also McRitchie Comment Letter (suggesting that current Form N–PX reporting frequency can produce data that is seen as out of date when filed).

[198] See Bloomberg Comment Letter; McRitchie Comment Letter.

[199] Our analysis is based on shareholder meeting dates in calendar year 2020 and 2021 for the Russell 3000 Index. This index measures the performance of the largest 3,000 U.S. companies representing approximately 96% of the investable U.S. equity market, as of the most recent reconstitution. *See* The Russell 3000 Index Fact Sheet, *available at* https://www.ftserussell.com/products/indices/russell-us. This information is provided to the Commission staff by a third party that provides proxy voting services.

[200] Alignment with Proxy Season is also why we decline, as suggested by one commenter, to align the annual deadline for managers reporting say-on-pay votes with that for Form 13F (December 31). *See* AIMA Comment Letter.

[201] See, e.g., Reid Comment Letter; Mercatus Comment Letter; McRitchie Comment Letter.

[202] See, e.g., rule 206(4)–6(c); Item 17(f) of Form N–1A; Item 18.16 of Form N–2.

[203] See, e.g., rule 206(4)–6(c); Item 17(f) of Form N–1A; Item 18.16 of Form N–2.

[204] We are making corresponding changes to paragraphs (a)(1) and (d) of Rule 101 of Regulation S–T and rule 24b–2 to effectuate the electronic submission of these requests as discussed below. *See infra* footnote 206 and accompanying text. We have also revised the final Form N–PX confidential treatment instructions in order to make them consistent with amendments to Form 13F that we have adopted since the proposal. *See* Electronic Submission of Applications for Orders Under the Advisers Act and the Investment Company Act, Confidential Treatment Requests for Filings on Form 13F, and Form ADV–NR; Amendments to Form 13F, Release No. 34–95148 (June 23, 2022) [87 FR 38943 (June 30, 2022)] ("E-Filings Release"). Also, consistent with Form 13F, we added a check-box to indicate when information has been omitted due to a request for confidential treatment. These changes are consistent with the Confidential Treatment Instructions to proposed Form N–PX that would have required a reporting person to file all requests for information subject to the request

[205] Section 13(f)(4) of the Exchange Act provides that the Commission, as it determines to be necessary or appropriate in the public interest or for the protection of investors, may delay or prevent public disclosure of information filed on Form 13F in accordance with the Freedom of Information Act. Section 13(f)(4) also provides that any information filed on Form 13F that identifies the securities held by the account of a natural person or an estate or trust (other than a business trust or investment company) shall not be disclosed to the public. Section 13(f)(5) of the Exchange Act additionally provides that, in order to grant confidential treatment under section 13(f), the Commission must determine that such action is necessary or appropriate in the public interest and for the protection of investors or to maintain fair and orderly markets.

[206] The Commission recently adopted amendments to require electronic filing of, among others, the confidential treatment requests made in conjunction with Form 13F. *See* E-Filings Release, *supra* footnote 204.

[207] The Commission stated in the Proposing Release that the Form N–PX confidential treatment instructions were "designed to provide a similar opportunity to prevent confidential information that is protected from disclosure on Form 13F from being disclosed on Form N–PX" and that [Form N–PX's] "instructions provide that a person requesting confidential treatment of information filed on Form N–PX should follow the same procedures set forth in Form 13F for filing confidential treatment requests." *See* Proposing Release, *supra* footnote 5. The Commission also requested comment in the Proposing Release as to whether the Commission should "require reporting persons to file confidential treatment requests for Form N–PX in the same manner as Form 13F requires." *Id.* While the Commission did not receive any comments relevant to this specific point, a commenter on the E-Filings Release urged "the SEC to replace other outdated paper filing requirements with electronic

Continued

confidential treatment with respect to information on Form N–PX already will be required to file any confidential treatment requests related to Form 13F on EDGAR. Also, any confidential treatment requests a manager files with respect to Form N–PX will be subject to the same standards in determining whether to approve the request, as discussed below in this section of the release. Requiring managers to file Form N–PX confidential treatment requests on EDGAR therefore provides a consistent process for a manager seeking confidential treatment, whether the information is reported on either or both of Form 13F and Form N–PX. As adopted, the confidential treatment instructions to Form N–PX only refer to managers.[208] While the instructions in the Proposing Release referred to "reporting persons," the Proposing Release also stated that the Commission was not aware of any situation in which confidential treatment would be justified under rule 24b–2 for information filed by funds on Form N–PX, as the form did not include any confidential treatment instructions prior to these amendments and, apart from Form N–PX, funds already disclose their portfolio holdings.[209] We requested comment in the Proposing Release on whether we should allow funds to request confidential treatment under some circumstances and we received no comments on this subject.

One commenter suggested we automatically extend confidential treatment for a vote on Form N–PX if we have granted it for a position on Form 13F or, alternatively, develop a streamlined process that would allow for a combined confidential treatment request for both Forms 13F and N–PX.[210] We do not believe this would be a practical approach because reports on Form 13F are filed quarterly while reports on Form N–PX are filed annually. For example, a manager may receive confidential treatment for a position in the first quarter of the year, but by the time filings are due for Form N–PX, the position may no longer meet the criteria for granting confidential treatment. In addition, the positions that managers are required to report on Form 13F may not always be the same as the

positions for which the manager is reporting proxy votes on Form N–PX.

We will apply the same standards in determining whether to approve a confidential treatment request in relation to Form N–PX as we do for requests for confidential treatment regarding Form 13F.[211] For example, confidential treatment may be justified when a manager has filed a confidential treatment request for information reported on Form 13F that is pending or has been granted and where confidential treatment of information filed on Form N–PX would be necessary in order to protect information that is the subject of such Form 13F confidential treatment request.[212] As the Commission stated in the Proposing Release, confidential treatment would not be merited solely in order to prevent proxy voting information from being made public given the public disclosure intent of section 14A(d) and the confidential treatment requirements of rule 24b–2 under the Exchange Act.[213] As a result, we are not expanding the standards for requesting and obtaining confidential treatment to cover situations in which a manager has a confidentiality agreement with a client regarding disclosure of portfolio information because it would not meet the standards for confidential treatment in connection with Form 13F.

*J. Website Availability of Fund Proxy Voting Records*

The Commission is adopting amendments to Forms N–1A, N–2, and N–3 to require a fund to disclose that its proxy voting record is publicly available on (or through) its website and available upon request, free of charge in both cases. We are adopting these amendments as proposed, except that, in response to a comment, we are clarifying on the affected forms that a fund must make its proxy voting record available on its website only if it has a website.[214] Accordingly, under the amendments a fund must file Form N–PX reports in a custom XML language, post the fund's proxy voting record on the fund's website if it has one, and provide the voting record upon request.

We also are amending Form N–1A and Form N–3 to require that a fund provide the email address, if any, that an investor may use to request the proxy voting record. These amendments will make a fund's proxy voting record more accessible to investors.[215]

Most commenters generally supported this aspect of the proposal.[216] One commenter suggested that we should clarify in the forms that funds are, consistent with statements made in the Proposing Release, able to comply with the website disclosure requirement by providing a direct link on their website to the HTML-rendered Form N–PX report on EDGAR.[217] We agree and we have amended Forms N–1A, N–2, and N–3 accordingly.[218] One commenter suggested that funds should not be required to mail proxy voting records upon request.[219] We understand, however, that most funds currently make their proxy voting records available to shareholders upon request and believe this practice should continue so that investors without website access are not disadvantaged.

*K. Effective Date*

As described above, funds will continue to be required to report their proxy votes, and managers will be required to report their say-on-pay votes, annually on Form N–PX not later than August 31 of each year, for the most recent twelve-month period ended June 30. In order to provide time for reporting persons to prepare to comply with the amendments, we are delaying the effectiveness of the amendments until July 1, 2024. Managers and funds will therefore be required to file their first reports on amended Form N–PX by August 31, 2024, with these reports covering the period of July 1, 2023, to June 30, 2024. The period provided by the extended effective date is generally consistent with the length of the compliance period described in the Proposing Release, under which reporting persons would have likely been required to file their first reports on amended Form N–PX by August 31,

---

[208] *See* Request for Confidential Treatment Instruction 1 to amended Form N–PX.

[209] *See* Proposing Release, *supra* note 5, at n.202 and accompanying text.

[210] *See* MFA Comment Letter.

filing," stating that doing so "will reduce costs and burdens on filers and facilitate Commission staff review and processing." Comment Letter of the Investment Company Institute (Dec. 17, 2021) (regarding File No. S7–15–21 and S7–16–21).

[211] *See* 15 U.S.C. 78m(f)(4) and (5) and rule 24b–2; *see also* Request for Confidential Treatment Instruction 4 to amended Form N–PX.

[212] A manager also may seek confidential treatment for information that is not reported on Form 13F but would have been the subject of a Form 13F confidential treatment request if it were required to be reported (for example, a *de minimis* position that is not required to be reported on Form 13F but would have been eligible for confidential treatment if it were required to be reported on the form).

[213] *See* Proposing Release, *supra* note 5, at nn. 200–201 and accompanying text.

[214] *See* ICI Comment Letter I.

[215] *See* Proposing Release, *supra* footnote 5, at section II.H.

[216] *See, e.g.,* PRI Comment Letter; Public Citizen Comment Letter; McRitchie Comment Letter I; ICI Comment Letter I (noting their suggestions with respect to funds without websites and compliance with the amendments by linking to EDGAR); CFA/CII Comment Letter; Vanguard Comment Letter.

[217] *See* ICI Comment Letter I.

[218] *See also* Proposing Release, supra footnote 5, at section II.H (stating that a fund could comply with the requirement to disclose the proxy voting record in a human-readable format by, for example, "providing a direct link on its website to the HTML-rendered Form N–PX report on EDGAR").

[219] *See* McRitchie Comment Letter I.

2024, and with the views of commenters that addressed this issue, who urged that the Commission provide at least a year or one full reporting period to allow reporting persons time to implement necessary changes.[220] Thus, under the extended effective date, reporting persons and their third-party service providers will have at a minimum one full reporting period to prepare for the amended reporting requirements before any reporting person will file on amended Form N–PX. Further, setting an effective date on July 1, 2024, will provide a uniform transition to the amended form beginning with the reporting period ended June 30, 2024. In addition, although the compliance period in the proposal would have required reporting persons to report votes in conformity with amended Form N–PX for votes occurring six months after the effective date, this could have created additional operational complexity to have different Form N–PX requirements that apply in the same reporting period, and we believe that providing reporting persons until July 1, 2024 to begin reporting under the amendments provides sufficient time for reporting persons to prepare to include all applicable votes on amended Form N–PX at that time. We also will provide an EDGAR pilot program before July 1, 2024, to allow reporting persons to test file the amended form.[221]

### L. Transition Rules for Managers

We are adopting as proposed transition rules that govern the timing of a manager's Form N–PX filing obligations for say-on-pay vote reporting whenever the manager enters and exits from the obligation to file Form 13F reports. We received no comments on this aspect of the proposal.

In particular, rule 14Ad–1 will not require managers to file a Form N–PX report for the 12-month period ending June 30 of the calendar year in which the manager's initial filing on Form 13F is due.[222] Instead, managers will be required to file a report on Form N–PX for the period ending June 30 for the calendar year following the manager's initial filing on Form 13F. For example, assume that a manager does not meet the $100 million threshold test on the last trading day of any month in 2023 but does meet the $100 million threshold test on the last trading day of at least one month in 2024. As a result, under the rules that currently apply to Form 13F, the manager would be required to file a Form 13F report no later than February 15, 2025, for the period ending December 31, 2024.[223] Additionally, under rule 14Ad–1(b) as adopted, the manager will be required to file a Form N–PX report no later than August 31, 2026, for the 12-month period from July 1, 2025, through June 30, 2026.[224] The following chart illustrates the timing of the entrance of a manager to its obligation under the rule to file reports on Form N–PX.

### INITIAL FORM N–PX FILING

| Date manager exceeds reporting threshold | First Form 13F filing due | First proxy reporting period | First Form N–PX due |
|---|---|---|---|
| Mar. 31, 2023 | Feb. 15, 2024 | July 1, 2024–June 30, 2025 | Aug. 31, 2025 |
| Dec. 31, 2023 | Feb. 15, 2024 | July 1, 2024–June 30, 2025 | Aug. 31, 2025 |
| Jan. 31, 2024 | Feb. 15, 2025 | July 1, 2025–June 30, 2026 | Aug. 31, 2026 |

In addition, as proposed, we will not require a manager to file a report on Form N–PX with respect to any shareholder vote at a meeting that occurs after September 30 of the calendar year in which the manager's final filing on Form 13F is due.[225] Instead, the manager will be required to file a report on Form N–PX for the period July 1 through September 30 of the calendar year in which the manager's final filing on Form 13F is due. This short-period Form N–PX filing will be due no later than March 1 of the immediately following calendar year.[226] A manager's obligation to file Form 13F reports always terminates with the September 30 report, and the transition rule we are adopting conforms the ending date for reporting say-on-pay votes with the ending date for Form 13F reporting.[227] The March 1 due date would provide a two-month period for filing after December 31, when the manager's Form 13F filing status will be conclusively determined for the coming year.[228]

For example, assume that a manager ceases to meet the $100 million threshold in 2023. In other words, the manager meets the threshold on at least one of the last trading days of the months in 2022, but does not meet the threshold on any of the last trading days of the months in 2023. The manager's final report on Form 13F would be filed for the quarter ended September 30, 2023. The manager's final report on Form N–PX would include all say-on-pay votes cast during the period from July 1, 2023, through September 30, 2023, and will be required to be filed no later than March 1, 2024. The following chart illustrates the timing of the exit of a manager from its obligation to file Form N–PX.

---

[220] See ICI Comment Letter I (suggesting that the first reports on amended Form N–PX be filed by the August 31st that is a minimum of 14 months from the effective date); IAA Comment Letter (suggesting the Commission extend the compliance date to allow for at least one full reporting period for reporting persons to file).

[221] See also supra section II.E discussing timing of technical specification releases and beta testing of Form N–PX's structured data format.

[222] Rule 14Ad–1(b); General Instruction F to amended Form N–PX. For this purpose, an "initial filing" on Form 13F means any quarterly filing on Form 13F if no filing on Form 13F was required for the immediately preceding calendar quarter. Id.

[223] Currently, under 17 CFR 240.13f–1 ("rule 13f–1"), the obligation to file Form 13F arises when a manager exercises investment discretion over accounts holding at least $100 million in section 13(f) securities as of the "last trading day of any month of any calendar year." However, the manager's obligation to file Form 13F commences with the report for December 31 of that year, which is required to be filed within 45 days after December 31. Rule 13f–1(a)(1); General Instruction 1 to Form 13F. See 17 CFR 240.0–3.

[224] Rule 14Ad–1(b); General Instruction F to amended Form N–PX.

[225] Rule 14Ad–1(c); General Instruction F to amended Form N–PX. For this purpose, a "final filing" on Form 13F means any quarterly filing on

Form 13F if no filing on Form 13F is required for the immediately subsequent calendar quarter. Id.

[226] Rule 14Ad–1(c); General Instruction F to amended Form N–PX.

[227] See rule 13f–1(a) (manager that meets $100 million threshold on last trading day of any month of any calendar year is required to file Form 13F for December 31 of that year and the first three calendar quarters of the subsequent calendar year).

[228] A manager is required to file a report on Form 13F in the coming year if it meets the $100 million threshold on the last trading day of any month of the current calendar year. As a result, in cases where the manager does not meet the threshold in January through November, its status will not be determined until December 31.

FINAL FORM N–PX FILING

| Date manager ceases to meet threshold | Final form 13f filing due | Final proxy reporting period | Final form N–PX due |
|---|---|---|---|
| Mar. 30, 2023 ............................. | Nov. 14, 2024 ............................. | July 1, 2024–Sept. 30, 2024 ........ | Mar. 1, 2025 |
| Dec. 30, 2023 ............................. | Nov. 14, 2024 ............................. | July 1, 2024–Sept. 30, 2024 ........ | Mar. 1, 2025 |
| Feb. 1, 2024 ............................. | Nov. 14, 2025 ............................. | July 1, 2025–Sept. 30, 2025 ........ | Mar. 1, 2026 |

## M. Technical and Conforming Amendments

We are adopting as proposed two technical and conforming amendments. First, we are amending the heading of subpart D of part 249 of the Code of Federal Regulations to include new section 14A of the Exchange Act and to indicate that Exchange Act reports are filed by both issuers and other persons (*e.g.*, managers). We are also adopting amendments to reflect the fact that Form N–PX will be an Exchange Act form, as well as an Investment Company Act form.[229] We received no comments on this aspect of the proposal.

## N. Delegation of Commission Authority

In order to facilitate the efficient consideration of requests for confidential treatment of information required pursuant to amended Form N–PX, the Commission is amending 17 CFR 200.30–5(c–1) to provide delegated authority to the Director of the Division of Investment Management ("Director") to grant and deny these requests. Section 4A of the Exchange Act provides the Commission the authority to delegate, by published order or rule, any of its functions to a division of the Commission, subject to certain limitations.[230] The authority to grant and deny applications for confidential treatment and revoke a grant of confidential treatment is delegated to several members of our staff. We believe that it is appropriate for the Director to exercise such functions and that delegating this authority will conserve our resources and improve efficiency. Specifically, we are amending rule 30–5(c–1)(1) to authorize the Director to grant and deny applications filed pursuant to section 24(b) of the Exchange Act and rule 24b–2 thereunder for confidential treatment of information filed pursuant to section 14A(d) of the Exchange Act and rule 14Ad–1 thereunder. The Commission finds, in accordance with section 553(b)(3)(A) of the Administrative Procedure Act ("APA"), that the amendment to rule 30–5(c–1)(1) relates solely to agency organization,

procedures, or practices.[231] Accordingly, the APA's provisions regarding notice of rulemaking and opportunity for public comment are not applicable.[232]

## III. Other Matters

Pursuant to the Congressional Review Act, the Office of Information and Regulatory Affairs has designated these rules as a "major rule" as defined by 5 U.S.C. 804(2). If any of the provisions of these rules, or the application thereof to any person or circumstance, is held to be invalid, such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application.

## IV. Economic Analysis

### A. Introduction

The Commission is adopting amendments to Form N–PX to enhance the information funds currently report annually about their proxy votes on both executive compensation and other matters to make these reports more informative and easier to analyze. The amendments to Form N–PX will require the categorization of votes, structuring and tagging the data reported, and, if the form of proxy in connection with a matter reported on the form is subject to rule 14a–4 of the Exchange Act, require that the reporting person use the same language used on the form of proxy to identify the matter, identify all matters in the same order as on the form of proxy, and, for election of directors, identify each director separately in the

same order as on the form of proxy. The amendments will also provide investors with additional information about the extent to which a reporting person votes or loans its shares.

The Commission is also adopting rule and form amendments that will complete the implementation of section 951 of the Dodd-Frank Act by requiring a manager to report how it voted proxies relating to executive compensation matters. Specifically, the rule and form amendments will require managers to report their say-on-pay votes annually on Form N–PX. For managers that have a disclosed policy of not voting proxies and that did not vote during the reporting period, the rule and form amendments will allow them to indicate this on Form N–PX without providing additional information about each voting matter individually. Funds that did not hold any securities entitled to vote during the reporting period would also be permitted to make a similar short-form filing.

The Commission is sensitive to the economic effects, including the costs and benefits, imposed by the final rule and form amendments.[233] Where practicable, we have attempted to quantify the costs, benefits, and effects on efficiency, competition, and capital formation expected to result from the final rule and form amendments. In some cases, however, data needed to quantify these economic effects are not currently available to the Commission or otherwise publicly available. For example, we are unable to quantify the degree to which funds and managers may choose to forego income from securities lending as a result of any

---

[229] Rule 30b1–4; 17 CFR 249.326 and 274.129.
[230] 15 U.S.C. 78d–1.

[231] 5 U.S.C. 553(b)(3)(A).
[232] For the same reason, and because the amendment to rule 30–5(c–1)(1) does not substantively affect the rights or obligations of non-agency parties, the provisions of the Small Business Regulatory Enforcement Fairness Act are not applicable to this amendment. Additionally, the provisions of the Regulatory Flexibility Act, which apply only when notice and comment are required by the APA or other law, are not applicable to this amendment. Section 23(a)(2) of the Exchange Act requires the Commission, in adopting rules under that Act, to consider the anticompetitive effects of any rules it adopts. The Commission does not believe that this amendment will have any impact on competition. Finally, this amendment does not contain any collection of information requirements as defined by the Paperwork Reduction Act of 1995. *See* 5 U.S.C. 804(3)(C); 5 U.S.C. 603; 15 U.S.C. 78w(a)(2).

[233] Section 3(f) of the Exchange Act, section 2(b) of the Securities Act, and section 2(c) of the Investment Company Act require the Commission, whenever it engages in rulemaking and is required to consider or determine whether an action is necessary or appropriate in (or, with respect to the Investment Company Act, consistent with the public interest), to consider, in addition to the protection of investors, whether the action would promote efficiency, competition, and capital formation. Additionally, Section 23(a)(2) of the Exchange Act requires the Commission, when making rules under the Exchange Act, to consider the impact such rules would have on competition. Exchange Act Section 23(a)(2) prohibits the Commission from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.

incentive effects associated with the disclosure of the number of shares loaned but not recalled. While we provide a qualitative discussion of the potential effect, we are unable to estimate its magnitude because we do not have data to predict how funds and managers would trade off any perceived benefits from recalling shares on loan with the anticipated loss in securities lending income.[234]

*B. Economic Baseline*

The economic baseline against which we measure the economic effects of this final rule, including its potential effects on efficiency, competition, and capital formation, is the state of the world as it currently exists.

1. Funds' Reporting of Proxy Voting Records

Since 2003, funds have been required to file Form N–PX to report their proxy voting records annually for each matter relating to a portfolio security considered at any shareholder meeting held during the reporting period and with respect to which the fund was entitled to vote. In May 2022, we estimate that there were approximately 12,492 funds and series of management investment companies with average total net assets of $35.1 trillion that were required to file reports on Form N–PX.[235] As of year-end 2021, assets held in mutual funds and other registered investment companies account for approximately 32% of the market capitalization of all U.S.-issued equities outstanding.[236]

On the current Form N–PX, among other things, a fund discloses whether it cast its votes on each proposal, how it voted (*e.g.,* for or against the proposal, or abstained), and whether any votes cast were for or against management. Although the form specifies the information that each fund must provide, it does not specify the format of the disclosure or how funds present or organize the information. Reports on Form N–PX also are not currently filed in a machine-readable, or ''structured,'' data language. Investors can access a fund's Form N–PX filings online through the EDGAR website. Funds also

must disclose that their proxy voting records are available to investors either upon request or on (or through) their websites, with most funds disclosing that this information is available upon request.

We understand that many funds currently use vendors to prepare their Form N–PX filings.[237] These vendors typically provide a summary of the ballot description and may also provide a link to the issuer's proxy statement. Vendors may also list ballot items in an order that deviates from that on the proxy statement. According to some commenters, larger funds are more likely to use a vendor to prepare their Form N–PX than smaller funds.[238]

Current Form N–PX reports have improved transparency into fund voting. However, these reports can be difficult for investors to read and analyze. For example, under the current rules, Form N–PX is routinely filed as a large HTML or plain-text (ASCII) file. Many funds use automated systems to produce their Form N–PX records, which is often a simple output from a database maintained by the reporting person that covers meetings, proposals, and votes over a given period.[239] A fund may own hundreds of different securities each of which may have ten or more proposals each year. As a result, Form N–PX reports disclosing proxy voting records for all securities and proposals can be overwhelmingly long.[240] Investors also may have difficulty finding a particular fund's voting history within a single Form N–PX filing because many fund complexes include information about several different funds in a single Form N–PX report, given the structure of many funds as series of a trust.

Funds also often use their own descriptions and abbreviations when describing a particular voting matter, which can differ from the descriptions on an issuer's form of proxy. This can make it difficult for investors to identify a particular voting matter or category of similar voting matters, and to compare funds' voting records.

In addition to difficulties collecting and analyzing data provided on current Form N–PX, certain gaps in the current required disclosures may provide an incomplete picture of a fund's proxy voting practices. For example, current Form N–PX does not require funds to provide information about the potential effects of a fund's securities lending activities on its proxy voting. A fund's securities lending activities can generate additional income for the fund and its shareholders. However, when a fund lends its portfolio securities, it transfers incidents of ownership, including proxy voting rights, for the duration of the loan. As a result, the fund loses its ability to vote the proxies of such securities, unless the securities are recalled, the loan is terminated, and the securities are returned to the fund before the record date for the vote.

2. Managers' Reporting of Say-on-Pay Votes

Section 951 of the Dodd-Frank Act added new section 14A to the Exchange Act requiring issuers to provide shareholders with a vote on say-on-pay matters, and requires managers to report how they voted on those matters. Section 14A generally requires public companies to hold non-binding say-on-pay shareholder advisory votes to: (1) approve the compensation of its named executive officers; (2) determine the frequency of such votes; and (3) approve ''golden parachute'' compensation in connection with a merger or acquisition. Section 14A(d) requires that every manager report at least annually how it voted on say-on-pay votes,[241] unless such vote is otherwise required to be reported publicly. However, until these amendments, there have been no rules or forms governing how managers comply with their reporting obligation under section 14A(d).[242] Some managers, such as public pension funds, disclose their proxy voting records on their websites, although we understand that their disclosures generally do not contain quantitative information and presentation practices of website

---

[234] We do not anticipate any significant economic effects associated with the technical and conforming amendments discussed in *supra* section II.M.

[235] These estimates are based on Form N–CEN filings of management investment companies registered with the Commission as of May 2022.

[236] This figure has ranged between 30 and 34 percent over the past four years. ICI 2022 Fact Book, *supra* footnote 2, at Figure 2.7. *See also supra* section I.

[237] *See, e.g.,* ICI Comment Letter I.

[238] *See* ICI Comment Letter I, Ultimus Comment Letter.

[239] *See* Chong Shu, *The Proxy Advisory Industry: Influencing and Being Influenced,* U.S.C. Marshall School of Business Research Paper (May 23, 2022), at 28), *available at* https://ssrn.com/abstract=3614314 (retrieved from SSRN Elsevier database) (observing widespread use of voting platforms to report votes on Form N–PX, including the use of three voting platforms by approximately 90% of mutual funds from 2007 to 2017).

[240] Based on reports on Form N–PX, larger funds can have filings in excess of 1,000 pages. *See also supra* footnote 14.

[241] Based on Form 13F filings covering the first quarter of 2022, as of March 31, 2022, there were 8,147 managers with investment discretion over approximately $44.4 trillion in section 13(f) securities.

[242] Although managers as a whole have not been required to file reports on Form N–PX, a subset of managers advise funds and each of these funds has been and is required to report its own proxy voting record, including say-on-pay votes, annually on Form N–PX.

reporting vary across managers.[243] Registered investment advisers also are required to disclose to clients, upon the client's request, how the adviser voted the client's securities.[244] Unlike publicly available reports on Form N–PX, however, this information is only required to be made available to a single client, related solely to that client's securities, and only upon the client's request. The adoption of say-on-pay vote reporting requirements for managers completes the implementation of section 951.

### 3. Other Affected Parties

#### (a) Users of Proxy Voting Data

Form N–PX information is used by fund investors, other market participants, corporate issuers, and regulators such as the Commission. In addition, there are service providers that help collect and analyze proxy voting information or that provide advice based on information contained in Form N–PX disclosures. Such service providers include proxy voting advisers, proxy data providers and analysts, and equity analysts.

According to an association representing regulated funds, as of December 2021, 62.2 million (47.9%) U.S. households and 108.1 million individuals owned U.S. registered investment companies.[245] Median mutual fund assets of mutual fund-owning households were $200,000 with the median number of mutual funds held being four.[246] Moreover, registered funds play an important role in individuals' retirement savings. 63% of households with tax-advantaged retirement savings with $12.6 trillion invested in mutual funds either through defined contribution plans or IRAs.[247]

#### (b) Custodians and Securities Lending Agents

Funds and managers typically hold client securities with a custodian, who safeguards these assets. The custody service industry has been characterized as dominated by a small number of large market share participants; as of 2018,

"[n]early half of the total assets [were] under the custody of the four largest [firms], which are all from the US." [248] The vast majority of custodians also provide a range of related services, which may include acting as a securities lending agent to administer a fund's or manager's securities lending program.[249] A commenter stated that custodians are a primary source of data on which fund shares are on loan over a record date and another commenter similarly stated that for funds and managers to collect information on shares on loan, custodians and securities lending agents would be expected to be involved in the process.[250]

### C. Benefits and Costs

#### 1. Amendments to Funds' Reporting of Proxy Votes

##### (a) Benefits

The fund-related amendments to Form N–PX will benefit fund investors, other market participants, and other proxy voting data users,[251] by enhancing the information funds currently report about their proxy votes and making that information easier to collect and analyze. The amendments include the following principal elements: (1) requiring the disclosure of information about the number of shares that were voted (or instructed to be voted) and the number of shares that a fund loaned and did not recall before the record date for the vote; [252] (2) if a form of proxy in connection with a voting matter is subject to rule 14a-4 under the Exchange Act, requiring that funds describe the matter using the same language, and in the same order, as found in the issuer's form of proxy; [253] (3) requiring funds to categorize voting matters by type; (4) requiring funds to provide disclosure separately by series of shares; (5) requiring the reporting of information

on Form N–PX in a custom XML language; and (6) requiring funds to disclose that their proxy voting records are publicly available on (or through) their websites and available upon request, free of charge in both cases.

The amendments are designed to broaden the scope of the benefits that the Commission originally identified when adopting Form N–PX namely: (1) to provide better information to investors who wish to determine to which fund managers they should allocate their capital, and whether their existing fund managers are adequately maximizing the value of their shares; (2) to deter fund voting decisions that are motivated by considerations of the interests of a fund's adviser rather than the interests of the fund's investors; and (3) to provide stronger incentives for fund managers to vote their proxies carefully.[254]

We expect that the amendments to the Form N–PX format and content will help investors and other data users more easily collect and analyze proxy voting information, resulting in lower costs of gathering and understanding this information.[255] As a result, we expect these amendments will facilitate comparisons of voting patterns across a wide range of funds or within an individual fund over time. To the extent that investors choose among funds based on their proxy voting policies and records, in addition to other factors such as expenses, performance, and investment policies, we expect that investors will be able to select funds that suit their preferences more efficiently.[256]

Some commenters stated that the proposed amendments would facilitate investors' acquisition and use of information about proxy votes that funds disclose.[257] Specifically, a number of commenters supported the view that the structured data language requirement in the proposed

---

[243] Some pension funds publish some or all of their proxy votes. *See, e.g.*, Office of N.Y. State Comptroller, N.Y. State Common Retirement Fund Proxy Voting (2021), *available at* https://www osc state ny us/files/common-retirement-fund/corporate-governance/pdf/proxy-voting-2021 pdf; CalPERS Global Proxy Voting Decisions, *available at* https://viewpoint glasslewis com/VD/?siteId=CalPERS; CPP Investments, Proxy Voting, *available at* https://www cppinvestments com/the-fund/sustainable-investing/proxy-voting

[244] Rule 206(4)–6(b).

[245] *See* ICI 2022 FactBook, *supra* footnote 2, at "2021 Facts at a Glance" Table.

[246] *Id*

[247] *Id*

[248] Deloitte [Luxembourg], *The evolution of core financial service  Custodian & Depository Banks*, (2019), at 10 ("Deloitte White Paper"), *available at* https://www2.deloitte.com/content/dam/Deloitte/lu/Documents/financial-services/lu-the-evolution-of-a-core-financial-service.pdf.

[249] *See* Deloitte White Paper, *supra* footnote 249, at 13.

[250] *See* Blackrock Comment Letter; Glass Lewis Comment Letter.

[251] *See supra* section IV.B.3.a.

[252] Funds that did not hold any securities entitled to vote during the reporting period can indicate this on the form without providing additional information about each voting matter individually.

[253] In a change from the proposal, when reporting proxy votes in all other cases, reporting persons will remain subject to the current requirements regarding the language used for identifying proxy matters, with the modification that these reports will be required to limit the use of abbreviations.

[254] 2003 Adopting Release, *supra* footnote 4. The discussion of the interests of funds' investors is not intended to describe the interests of any particular investor or investors, but instead refers to the funds' investors, considered as a whole.

[255] Many commenters agreed that the proposed amendments will facilitate investors' acquisition and use of information about proxy votes that funds disclose. *See, e.g.*, CFA/CII Comment Letter; Morningstar Comment Letter; LTSE Comment Letter.

[256] For example many commenters agreed that the proposed amendments can help increase transparency regarding proxy voting on ESG matters. *See, e.g.*, The Shareholder Commons Comment Letter; LTSE Comment Letter; PRI Comment Letter.

[257] *See, e g*, CFA/CII Comment Letter; Morningstar Comment Letter; LTSE Comment Letter; ASBC Comment Letter; Ratcliff Comment Letter. *See also infra* footnote 258 and footnote 259.

amendments would make Form N–PX easier to use, would facilitate investors' comparison of funds' voting information, and would make Form N–PX more informative for investors and other users of proxy voting information.[258] Some commenters also stated that the website disclosure requirement would make proxy voting information more accessible, and the requirement would make it easier and less costly for investors to compile information on funds' voting history.[259]

While some commenters agreed that the requirement for funds to characterize voting matters by type would facilitate the comparison of voting patterns across funds,[260] other commenters stated that the proposed requirement would not provide useful information to investors, for example because of the potential for a lack of consistency of classifications by funds or in light of the information that is already disclosed on Form N–PX.[261] In a change from the proposal, under the amendments we are adopting reporting persons will select from a streamlined and consolidated list of categories and will not be required to select from a list of subcategories. As discussed above, and in light of the comments we received, these changes should increase the usefulness of the categories.[262] As a result, we anticipate that this change may enhance the benefits to investors and other data users compared to the proposal and ultimately enable investors to have more information about reporting persons' proxy voting records which may aid them in their investment decisions. In a change from the proposal, the amendments will permit reporting persons to include certain additional identifiers, such as LEIs and FIGIs, when identifying themselves, other reporting persons reporting on their behalf, which series are included in a fund's reporting, or which portfolio security the reporting person is reporting votes for.[263] The inclusion of these additional identifiers should benefit users of Form N–PX data

by providing additional identifying information methods to supplement the existing identifying information provided on Form N–PX (for example, the CUSIP number). Form N–PX data users could benefit from certain features from this other identifying information, including the ability to use a security identifier without fees or charges.

Also, a commenter expressed the view that the proposed amendments are not likely to change retail investors' tendency to not use Form N–PX but instead rely on fund websites for information about proxy voting.[264] While many retail investors may not make direct use of Form N–PX as noted by other commenters, retail investors that rely on third parties such as research analysts to access and evaluate proxy voting information will benefit indirectly because those third parties will face lower costs in accessing information from Form N–PX as a result of the structured data language component of the amendments.[265] As a result of making funds' proxy voting information easier to collect and analyze, the amendments may lead some investors to change how they allocate capital across funds to better match their preferences. While some commenters questioned the importance of proxy voting information for investors' decisions,[266] we anticipate that some investors will find this information valuable in making their investment decisions.[267] Another commenter expressed the view that the ability to switch funds may be limited by potential taxes on gains associated with changing funds and, in the case of participants in employer-sponsored retirement plans, investors' inability to change asset managers without changing their employer, which may hamper the degree to which investors could realize this benefit.[268] This commenter also stated that the usefulness of past proxy voting information for investors in selecting funds is limited to the extent that funds deviate from their past voting behavior in the future.[269] While we

agree that for some investors there may be meaningful impediments to switching funds, and that for certain participants in employer-sponsored retirement plans those impediments may be prohibitively large, for other investors it may still be worthwhile to change funds if information on funds' past proxy voting practices significantly conflicts with the preferences of these investors.

We expect additional benefits to investors and other proxy voting data users from the new quantitative disclosure on amended Form N–PX regarding the number of shares voted and the number of shares loaned but not recalled. This additional information will benefit investors and other data users by providing more information about the scope of a fund's participation in proxy voting activities, the fund's voting preferences, the magnitude of the reporting fund's voting power, and whether funds have recalled securities on loan to vote proxies.

A number of commenters agreed that the disclosure of the number of shares voted and the number of shares lent but not recalled would benefit investors and other proxy voting data users by providing useful information on the fund's proxy voting record, the fund's decision not to vote, and whether the fund has recalled shares lent to vote proxies.[270] For example, some commenters expressed the view that the disclosure of shares lent but not recalled would enable investors to better understand the scope of funds' proxy voting activities, including (1) funds' voting preferences; (2) the extent of funds' voting for or against a certain ballot measure; (3) the influence funds have on the outcome of shareholder votes and their influence on issuer firms' corporate governance; and (4) funds' decision not to vote their shares.[271] However, other commenters expressed the view that benefits from this disclosure may be limited to the extent that other quantitative or qualitative information such as financial benefits from share lending, operational constraints to recalling shares, the size of the fund's position, and the ability to influence voting outcome, would not be

[258] See, e.g., Morningstar Comment Letter; ICI Comment Letter I; Vanguard Comment Letter; Blackrock Comment Letter; Bloomberg Comment Letter; PRI Comment Letter; US Chamber of Commerce Comment Letter.

[259] See, e.g., Vanguard Comment Letter; CFA/CII Comment Letter.

[260] See, e.g., Morningstar Comment Letter; CFA/CII Comment Letter.

[261] See, e.g., ICI Comment Letter I.; Utah Comment Letter.

[262] See supra section II.C.1 for a discussion of the comments we received on this aspect of the proposal.

[263] As proposed, we are also including ISINs as an additional identifier for portfolio securities the reporting person is reporting votes for.

[264] See Blackrock Comment Letter.

[265] See supra footnote 258 and accompanying text.

[266] See, e.g., Chamber of Commerce Comment Letter; MFDF Comment Letter.

[267] See supra footnote 257 and accompanying text.

[268] See Mercatus Center Comment Letter.

[269] To the extent that a fund follows its proxy voting policies and procedures, however, reported votes may be more likely to have predictive value. In addition, the amendments may lead funds to vote more consistently on similar issues over time, including at multiple portfolio companies, as a result of making funds' proxy voting information easier to collect and analyze. Specifically, if fund managers know that investors are able to track their

voting behavior at low cost, then this may increase funds' incentives to vote consistently on similar issues in order to align with the preferences of their investors.

[270] See, e.g., Bloomberg Comment Letter; LTSE Comment Letter; Alliance Bernstein Comment Letter.

[271] See, e.g., Better Markets Comment Letter; PRI Comment Letter; LTSE Comment Letter. Also see supra footnotes 89–93 and accompanying text for a discussion of comments we received on the disclosure requirement of the number of shares voted.

disclosed and would be needed to contextualize the information to be disclosed.[272]

While we agree with commenters' view that disclosure of lent shares alone may not provide comprehensive information on the funds' decision to recall or not recall shares, we believe that disclosure of a fund's shares that were lent but not recalled will still facilitate investors' understanding on funds' securities lending activities, particularly as funds may provide additional voluntary disclosures on their securities lending activities if they believe such disclosures are helpful.

The amendments to Form N–1A, Form N–2, and Form N–3 may help some investors and other users of the form access the information on Form N–PX, which is also publicly available on EDGAR, more easily. Under the baseline, most funds make information regarding how the fund voted proxies relating to portfolio securities available upon request, while other funds provide this information on (or through) their websites. The amendments would allow investors to choose between accessing a fund's proxy voting information via the fund's website and requesting the information from the fund.[273] Thus, the amendments would benefit those investors that prefer a delivery method that their fund does not offer currently. For example, some investors in the majority of funds that currently make a fund's voting record available upon request only may prefer to access this information on the fund's website directly rather than place a request and wait for the fund to deliver the voting record.

In light of the increased transparency the amendments will provide on fund voting, the final rule may also provide an incentive for fund managers to devote additional time and resources to their participation in voting proxies, which can lead to an improvement in the performance of corporate issuers and enhance shareholder wealth.[274]

Assets held in funds account for approximately 32% of the market capitalization of all publicly traded U.S. corporations as of year-end 2021,[275] and therefore funds have the ability to exercise a considerable amount of influence in proxy votes which can affect the value of these corporations.[276] Academic research provides some evidence that actively voting funds may help sway shareholder votes toward value-maximizing outcomes when voting on matters such as CEO turnover, executive compensation, anti-takeover provisions, and mergers.[277] These potential corporate governance improvements resulting from more active participation in proxy voting by funds can have a positive externality effect, as the benefits will be accessible to all holders of the fund's underlying equity securities, and not limited to fund investors. A commenter provided the view that the increase in transparency resulting from the proposed amendments will emphasize the effort made by institutional investors in the proxy voting process, which may incentivize reporting persons to put more effort into participating in proxy voting.[278] However, other commenters expressed the view that increases in disclosure from the proposed amendments is unlikely to change funds' proxy voting behavior.[279] While there is likely to be variability in how the amendments influence behavior at different funds, to the extent that the proposed amendments increase fund managers' efforts put into proxy voting, this will provide more information about proxy voting to fund investors and other owners of funds' underlying equity securities. These benefits may be

reduced for smaller funds who are less able to devote additional time and resources to their participation in voting proxies, and may also be mitigated to the extent that additional time and resources devoted to fund participation in voting proxies raises costs to investors.[280]

In addition, the amendments to the format and content of Form N–PX may also help deter fund voting decisions motivated by conflicts of interest.[281] For example, some academic research observes that mutual funds' proxy voting may be affected by business ties such as those where a fund's adviser also manages the firm's pension plan, as well as through personal connections between fund managers and corporate executives.[282] More generally, although fund managers are fiduciaries that owe duties of care and loyalty to each client, their proxy voting decisions may be driven by their economic interest in attracting more investments into the fund or more investment opportunities.[283] A fund's proxy voting

---

[272] See, e.g., Pickard Comment Letter; Federated Hermes Comment Letter; RMA Comment Letter; MFDF Comment Letter; MFA Comment Letter; Blackrock Comment Letter; Alliance Bernstein Comment Letter. See also supra section II.C.3.(b) for a discussion of comments received on this aspect of the proposal.

[273] See supra section II.J for a complete description of the requirements.

[274] See Peter Iliev & Michelle Lowry, Are Mutual Funds Active Voters, 28 Rev. Fin. Studies 446 (2015), available at https://academic.oup.com/rfs/article/28/2/446/1599644; Vincente Cunat, Mireia Gine, & Maria Guadalupe, The Vote is Cast The Effect of Corporate Governance On Shareholder Value, 67 J. Fin. 1943 (2012), available at https://onlinelibrary.wiley.com/doi/full/10.1111/j.1540-6261.2012.01776.x (finding that passing a governance provision is associated with an increase

in shareholder value, and more so when proposals are sponsored by institutional investors).

[275] See supra footnote 2.

[276] See supra section I.

[277] See, e.g., Angela Morgan, Annette Poulsen, Jack Wolf, and Tina Yang, Mutual Funds as Monitors Evidence from Mutual Fund Voting, 17 J. Corp. Fin. 914 (2011) (finding that, "in general, mutual funds vote more affirmatively for potentially wealth-increasing proposals and funds' voting approval rates for these beneficial resolutions are significantly higher than those of other investors"). See also Jean Helwege, Vincent Intintoli, and Andrew Zhang, Voting with Their Feet or Activism? Institutional Investors' Impact on CEO Turnover, 18 J. Corp. Fin. 22 (2012), for a review of the literature. But, see also infra footnotes 282–284 and accompanying text. A number of commenters expressed the view that the proposed amendments' enhanced proxy voting disclosure requirement will be beneficial in light of funds' significant role in proxy voting on corporate governance at issuer firms. See, e.g., The Shareholder Commons Comment Letter I; Ratcliff Comment Letter; Friess Comment Letter.

[278] See Glass Lewis Comment Letter.

[279] See MFDF Comment Letter; Mercatus Center Comment Letter.

[280] See infra section IV.C.1.(b).

[281] See, e.g., Gerald Davis & Han Kim, Business Ties and Proxy Voting by Mutual Funds, 85 J Fin. Econ. 552 (2007) ("To the extent that good corporate governance leads to higher valuations, fund managers have incentives to use their voting power to demand good corporate governance and accept (reject) proposals that may benefit (harm) investors. However, such fiduciary responsibilities may be compromised if mutual funds' corporate parents manage employee benefit plans (such as 401(k) plans) for their portfolio firms at the behest of management."). According to the article, on average, earnings from 401(k)-related business equal 14% of the revenues that mutual fund families earn from their equity funds, and such income can represent as much as 25% of fund family revenues. A commenter agreed with our view that there may be conflicts of interests arising from proxy voting by funds and fund advisers. See Mercatus Center Comment Letter.

[282] See, e.g., Rasha Ashraf, Narayanan Jayaraman, and Harley Ryan, Do Pension-Related Business Ties Influence Mutual Fund Proxy Voting? Evidence from Shareholder Proposals on Executive Compensation, 47 J. Fin. Quant. Anal. 567 (2012) (find that "fund families support management when they have pension ties to the firm"); Dragana Cvijanovic, Amil Dasgupta, & Konstantinos Zachariadis, Ties That Bind How Business Connections Affect Mutual Fund Activism, 71 J. Fin. 2933 (2016) (find that "business ties significantly influence pro-management voting at the level of individual pairs of fund families and firms."); Gerald Davis & Han Kim, Business Ties and Proxy Voting by Mutual Funds, 85 J. Fin. Econ. 552 (2007); and Alexander Butler & Umit Gurun, Educational Networks, Mutual Fund Voting Patterns, and CEO Compensation, 25 Rev. Fin. Studies 2533 (2012) (observe that "mutual funds whose managers are in the same educational network as the firm's CEO are more likely to vote against shareholder-initiated proposals to limit executive compensation than out-of-network funds are.").

[283] See, e.g., Lucian Bebchuk, Alma Cohen, and Scott Hirst, The Agency Problems of Institutional Investors, 31 J. Econ. Perspectives 89 (2017) (discussing that fund managers' proxy voting decisions may be driven by their economic interest

also may be affected by the fund manager's personal preferences that may not align with the best interests of the fund's investors.[284]

While advisers have a fiduciary duty to make voting determinations in the best interests of their clients, and cannot place their own interests ahead of the interests of clients, commenters offered differing views as to the likely effectiveness of the proposed amendments at deterring votes from being driven by a conflict of interest. One commenter expressed the view that inconsistencies in proxy votes by different fund advisers for large index funds and socially responsible investing funds [285] suggest that the best interest of investors standard has not ensured that proxy voting decisions are not motived by conflicts of interest and that, as a result, a disclosure-based approach is not adequate to cause fund advisers to vote in the best interest of investors.[286] This commenter also stated that disclosure of proxy votes will not capture the influence of funds' engagement with corporate issuers outside of the proxy voting process. Conversely, statements from a number of commenters support the view that that the proposed amendments will help deter fund votes motivated by conflicts of interest. Specifically, these commenters expressed the view that the transparency provided by the proposed amendments will provide investors with information to help align funds' voting decisions with investors' expectations and improve investors' oversight over

funds' proxy voting.[287] Aligning funds' voting decisions with investors' expectations and improving investors' oversight over voting by definition mitigates risks of conflicts of interest, in which investors (the principals) and fund managers (the agents) have different preferences and goals.

Finally, we considered whether the additional transparency the final amendments will provide regarding the number of shares on loan but not recalled may also help assess concerns regarding the extent to which borrowed shares could be used to affect a proxy vote towards an outcome that enhances a borrower's benefits instead of an outcome beneficial for a fund's shareholders.[288] We believe that the final amendments are unlikely to provide information that is meaningful in assessing these concerns as the information required to be disclosed would not allow an inference as to whether shares that were not recalled were used for such a purpose.

**(b) Costs**

The amendments to Form N–PX, Form N–1A, Form N–2, and Form N–3, will lead to some additional costs for funds. Any portion of these costs that is not borne by a fund's adviser or other sponsor will ultimately be borne by the fund's shareholders. Direct costs for funds will consist of both internal costs (for compliance attorneys and other, non-legal staff of a fund, such as computer programmers, to prepare and review the required disclosure and to update systems [289]) and external costs (such as any costs associated with third-party service providers to collect and report the information disclosed in Form N–PX).[290] The costs borne by

funds will be borne equally by all of their investors. But to the extent that the required additional reporting is important to only certain fund investors or other interested parties, the proposed requirements subsidize some fund investors and other interested parties relative to other fund investors.

A commenter expressed the view that our analysis assumes the process of complying with the proposed amendments to Form N–PX will be automated but that automation may be logistically challenging given that the reporting process happens only annually.[291] Another commenter expressed the view that describing ballot items using the issuer's language and presenting them in the same order as in the issuer's form of proxy presents operational challenges and additional costs for funds and their shareholders.[292]

In a change from the proposal, however, the voting matter identification requirements will be limited to situations where a form of proxy in connection with a voting matter is subject to rule 14a–4 under the Exchange Act. Because this requirement would have extended to other situations under the proposal, this change will reduce the compliance costs associated with the requirement.[293] Similarly, the use of a streamlined and consolidated list of categories, and the omission of subcategories from which reporting persons would have been required to select, will reduce costs compared to the proposal.[294]

in attracting more business for the fund rather than engaging in generating governance gains at portfolio companies). The Commission has brought at least one enforcement action against a registered investment adviser for having proxy voting policies that did not address material potential conflicts when the adviser selected voting guidelines explicitly favored by certain clients to vote all its clients' securities, in order to improve the adviser's ranking in a third-party proxy voting survey. *See* In the Matter of INTECH Investment Management LLC, Investment Advisers Act Release No. 2872 (May 7, 2009) (settled order).

[284] *See, e.g.,* Paul Mahoney & Julia Mahoney, *The New Separation of Ownership and Control Institutional Investors and ESG,* 2 Colum. Bus. L. Rev. 840 (2021). *See also infra* footnote 332 and accompanying text.

[285] *See* Caleb N. Griffin, *Environmental and Social Voting at Index Funds,* 44 Del. J. Corp. L. 167, 171 (2020) (comparing proxy voting decisions in 2018–2019 of the largest funds and designated socially responsible investing funds at the three largest fund complexes with competitor index funds and concluding that data from inconsistent voting decisions implies "that index fund investors' interests likely do not determine voting decisions for the [largest index funds].").

[286] *See, e.g.,* Mercatus Center Comment Letter (also stating that a disclosure rule puts the burden on fund investors to evaluate whether a fund and adviser vote proxies in the best interest of the investors.)

[287] *See, e.g.,* PRI Comment Letter; SCERS Comment Letter.

[288] *See also* Henry Hu & Bernard Black, *Equity and Debt Decoupling and Empty Voting: II Importance and Extensions,* 156 U. Penn. L. Rev. 625 (2008). The authors describe an empty voting strategy that involves borrowing shares in the stock loan market just before the record date and returning the shares immediately afterwards, which under standard borrowing agreements leaves the borrower holding votes without economic ownership. The authors provide examples of situations when such decoupling of voting rights from economic ownership can affect the control of corporations. However, to date, we are not aware of evidence on whether such voting with borrowed shares occurs on a regular basis or whether it has a significant effect on proxy voting outcomes. Commenters also did not provide such evidence.

[289] Several commenters pointed out that reporting persons may need to update existing systems. *See, e.g.,* ICI Comment Letter I, Ultimus Comment Letter.

[290] Based on the results of the Paperwork Reduction Act ("PRA") analysis provided in Table 2, we estimate that the annual direct costs attributable to information collection requirements in the amendments for funds that hold equity securities will be approximately $10,012 per fund,

which consists of $8,512 in internal costs and $1,500 in external costs. For funds not holding equity securities, the direct costs are not expected to change. For funds of funds, the annual direct costs attributable to information collection requirements in the amendments will comprise internal and external costs and are estimated at $436 per fund. Our annual direct cost estimates include both initial and ongoing costs with the former being amortized over three years.

[291] *See* Bloomberg Comment Letter.

[292] *See* ICI Comment Letter I.

[293] Commenters stated that the reporting of proxy votes by foreign issuers, which are not subject to rule 14a–4, would have involved more operational challenges and higher costs relative to the costs for proxy votes cast on domestic issuers. This is because, according to these commenters, a foreign issuer's form of proxy may not be in English and formatting of the issuer's proxy in foreign markets may have more variation across vendors. *See* ICI Comment Letter I; MFDF Comment Letter. Conversely, we anticipate that the costs for reporting persons to limit the use of abbreviations when reporting proxy votes in other circumstances will be minimal because we anticipate that reporting persons will choose not to use abbreviations (other than those used by the issuer on the card of proxy) unless an abbreviation is clearly a commonly understood term.

[294] *See supra* sections II.C.1 and 2 for or a discussion of the comments we received on this aspect of the proposal.

Several commenters discussed the direct cost of disclosing the number of shares the fund loaned and did not recall for voting and stated that obtaining this information may be costly for funds.[295] One commenter stated that it would be costly for funds to obtain information from shareholder meetings while a share is on loan (because in many cases the lending fund would not receive a ballot or meeting information for the position on loan) and to combine this data with securities lending information.[296] Another commenter stated that obtaining the required data would be costly for funds, particularly smaller firms, absent the data being provided by the fund's custodian, and stated that not all custodians currently provide this data.[297] We therefore anticipate that funds that currently do not have access to this data will engage their custodians or securities lending agents to obtain it. These service providers may then increase the fees they charge to funds to compensate for any costs of providing this information.

By contrast, we anticipate that any additional direct costs associated with certain other aspects of the amendments will be relatively low. Specifically, we believe that the costs of the amendments' requirements to use a custom XML language and to publish proxy voting records on the fund's website will be relatively low given that funds already accommodate similar requirements in their other reporting, and can utilize their existing capabilities for preparing and publishing an updated Form N–PX.[298] Similarly, a commenter expressed the view that the use of structured data language will facilitate reporting persons' preparation and submission of the information required by Form N–PX.[299]

We do not expect the LEI disclosure requirements for reporting persons and fund series under the amendments to result in significant compliance costs. Both the reporting person LEI disclosure requirement and the fund series LEI disclosure requirement will apply only to entities that already have an LEI, so the costs associated with obtaining and renewing an LEI will not be applicable. Furthermore, funds are already subject

to fund series LEI disclosure obligations in Form N–PORT reports, so compliance costs associated with retrieving and retaining LEIs for each fund series are already reflected in the baseline.[300] We also do not expect the new FIGI disclosure on Form N–PX to result in additional compliance costs, because the disclosure of FIGIs is optional rather than mandatory, nor do we expect the new requirement to report ISINs rather than CUSIP numbers, where CUSIP numbers are not available through reasonably practicable means, to create significant compliance costs due to substantially similar existing disclosure requirements.[301]

We expect that the costs of complying with the amendments to Form N–1A, Form N–2, and N–3, will be small, as most funds already provide their proxy voting information upon request and the requirement to add this information to the fund's website that applies to funds with an existing website can be satisfied cost-effectively by including a link to the Form N–PX filing on EDGAR. In addition, funds that already provide their proxy voting information on their website are unlikely to incur significant cost as a result of also making this information available upon request, as we understand that funds who provide the option today rarely receive such requests from their investors.[302]

Some commenters expressed views about the costs borne by smaller funds. A commenter expressed a concern about relatively greater costs and burdens borne by smaller funds due to lack of economies of scale. For example, according to this commenter, many smaller funds do not currently use a vendor to prepare Form N–PX. To comply with the proposed amendments, these smaller funds may hire a vendor and incur the associated costs.[303] One commenter stated that the minimum charge for a proxy service provider is several thousand dollars, which would not be insubstantial for a smaller fund.[304] One commenters also suggested that the proposed amendments would result in an increase in their filling costs, and the cumulative regulatory burden on small funds as a result of the proposed amendments would be larger in relative terms because of the fixed

nature of these costs and the funds' inability to achieve economies of scale that larger funds can realize.[305] However, another commenter expressed that while smaller funds may incur new costs, the fact that they are likely to already have information that they need to report will likely mitigate these costs. The commenter stated a view that, because the new costs are likely to be mitigated, the benefit of increased transparency outweighs any incremental cost incurred.[306] To account for these costs, we have increased our burden estimates to account for these costs.[307]

Indirect costs for funds will include the costs associated with additional actions that funds may decide to undertake in light of the increased transparency of their voting records and practices. To the extent that the amendments provide an incentive for fund managers to devote additional time and resources to voting proxies, this may result in additional expenses for funds, some of which may be passed on to funds' shareholders. Also, as a result of increased scrutiny by investors, a fund manager may be incentivized to vote against an issuer firm's management with whom the fund has business ties. This could jeopardize the fund manager's relationship with the client firm and result in lost revenue if, for example, a client firm were to decide to relocate its employee benefit accounts elsewhere.[308]

In addition, some fund advisers may decide to voluntarily incur the cost of providing additional information on Form N–PX to provide context for the disclosure of the number of shares the fund loaned and did not recall for voting, some of which may be passed on to funds' shareholders.[309]

---

[295] *See, e.g.,* BlackRock Comment Letter. Commenters did not provide estimates of the size of the associated costs.

[296] *See* ISS Comment Letter.

[297] *See* BlackRock Comment Letter.

[298] In addition, the custom XML requirement will allow reporting persons to forgo the step of stripping out incompatible HTML metadata from their Form N–PX before filing it on EDGAR, further mitigating compliance costs. *See infra* section II.G.

[299] *See* Morningstar Comment Letter.

[300] *See supra* footnote 166.

[301] Funds that hold securities for which CUSIP numbers are not available must report their ISINs on Form N–PORT. *See* Item C.1 of Form N–PORT.

[302] *See supra* section II.J for a discussion of comment letters received on this aspect of the proposal. Commenters did not provide estimates of costs for these requirements.

[303] *See* ICI Comment Letter I. *See generally* MFDF Comment Letter.

[304] *See* Ultimus Comment Letter.

[305] *See* ICI Comment Letter I.

[306] *See* CFA/CII Comment Letter ("We wish to address the concern that the proposed amendments to form N–PX will place a burden in costs and resources on investors in tracking, gathering and disclosing this information. We understand that this cost will be borne most by smaller funds and managers who must meet any N–PX related obligations. We sympathize with this view and acknowledge that there will be some incremental costs with the proposed changes to N–PX. However, many smaller funds and managers may already track or report this information. Thus, we are of the view that the benefit of increased transparency for investor clients outweighs any incremental costs incurred.").

[307] *See infra* section V for the revised PRA analysis. *See also infra* section VI.B.2 for a detailed discussion of the comments received regarding the burden on small funds.

[308] A commenter agreed that disclosing proxy votes may result in conflict with clients if clients disagree with how the vote was cast by the manager. *See, e.g.,* SCERS Comment Letter.

[309] *See also supra* footnote 123. We anticipate that this cost is likely to be relatively small, as those funds would likely provide the same or similar disclosure on subsequent filings of Form N–PX. We

The requirement for funds to disclose the number of shares a fund voted and the number of shares the fund loaned and did not recall for voting may reduce funds' securities lending activity and the associated revenue for the fund and ultimately its shareholders.[310] Specifically, in light of the increased transparency the amendments will provide on funds' securities lending activities, some funds may decide to recall their loaned securities to be able to vote the proxies of these securities.[311] A commenter expressed the view that the proposed amendments' requirement to disclose loaned shares that are not recalled may have negative effects on funds' ESG rankings, since forgoing proxy voting may be perceived negatively by investors.[312] One commenter also stated that an additional reason for funds to recall loaned shares may be external pressures to support political or social causes.[313] Such incentive effects could be present for funds that currently do not have a disclosed policy of recalling all shares ahead of proxy voting.[314] Any change in the fund's lending activity can also affect the fund's adviser and its affiliates. For example, some funds use securities lending agents that are affiliated with the fund's adviser and that are compensated in their role as

agent with a share of the proceeds generated by the lending program.

Funds that decide to recall loaned securities ahead of proxy voting would likely seek to lend their shares again immediately after the vote record date in order to minimize lost revenues from security lending. This is consistent with findings in academic research showing that the supply of shares available to lend starts to decrease about 20 days before the vote record date and reverts to its pre-event levels immediately after the vote record date.[315] However, as pointed out by some commenters, funds that decide to recall shares to vote proxies may not immediately be able to place the recalled shares back on loan after the vote and their opportunities for participating in the securities lending market may be diminished.[316]

We expect that funds will factor income from securities lending, among other considerations, into their lending decision and recall loaned securities when they expect the value of their voting rights will exceed lost income from securities lending. This is consistent with findings in academic research showing that the recall of shares ahead of the voting record date is sensitive to the borrowing fee and that recall is lower if the fee paid by borrowers is higher.[317] Many commenters agreed that the decision to recall loaned shares for proxy voting is based on informed decisions by funds after factoring into consideration costs and benefits of such decisions.[318] While we cannot predict the degree to which funds will recall loaned shares, and the new amendments represent new potential costs and benefits for funds to take into consideration (such as negative attention from activists), one commenter stated that the proposed amendments would not likely change funds' securities lending activities.[319]

Since stock loans can be used for many different purposes, including short selling, arbitrage, and hedge trading strategies, changes in funds' securities lending practices can have an impact on these activities, which may impose additional costs on market participants. A number of commenters expressed the opinion that for securities lending activity with high demand or low supply, recalls from funds to cast proxy votes may decrease market

liquidity, which could increase trading costs in the given security, and may negatively impact fund investors.[320] For most securities, we expect that the market for securities lending has sufficient depth to withstand these short-term recalls by some funds ahead of the voting record date without experiencing significant changes. One academic study estimated that the equity lending market has a slack in supply with approximately a quarter of a corporate issuer's market capitalization typically available for lending and less than one-fifth of these shares being on loan.[321] Therefore, if some funds decided to recall their securities to participate in proxy voting, other lenders may step in to supply shares for loan on similar terms.[322] This is consistent with findings in some academic research noting that changes in borrowing fees during the recall period tend to be economically small or insignificant.[323] However, one commenter stated that funds will not be able to easily re-lend their shares after voting, or may not be able to easily re-lend them for the same rates as prior to voting, due to the readily available supply of certain securities where lending supply is significantly greater than borrower demand.[324] While this could lead to a loss of income for funds, because lending rates for readily available securities are low (because the supply of such securities is high, and the demand is low), this loss of income is likely to be small.

Conversely, the impact on borrowing fees can be more pronounced for hard-to-borrow stocks such as stocks with low lendable supply and/or high borrowing demand, also known as "special."[325] If funds recalled a significant number of shares of such stocks ahead of the vote record date, this

estimate that a fund that chooses to provide this voluntary disclosure may incur a cost of between $250 to $750 for the initial disclosure but no material cost for each subsequent disclosure.

[310] Based on Form N–CEN filings received through May 2022, 63.9% of funds were authorized to engage and 38.8% participated in lending their securities. Funds that lent their securities reported aggregate net income from securities lending in the last year of $1.9 billion, representing an average of 0.021% of average total net assets in the last year. A number of commenters agreed that the proposed amendments requiring disclosure of loaned shares may incentivize funds to recall their loaned shares (or not to loan shares in the first place), which could result in decrease in revenues from securities lending for funds and their shareholders. *See, e.g.,* Pickard Comment Letter; Federated Hermes Comment Letter; RMA Comment Letter; MFDF Comment Letter. A commenter agreed that funds' changes in securities lending activity as a result of the proposed amendments could impose other costs on funds. *See* IAA Comment Letter.

[311] *See also* Federated Hermes Comment Letter; RMA Comment Letter; Utah Comment Letter.

[312] *See* RMA Comment Letter.

[313] *See* Utah Comment Letter.

[314] *See, e.g.,* Reena Aggarwal, Pedro A. C. Saffi, & Jason Sturgess, *The Role of Institutional Investors in Voting: Evidence from the Securities Lending Market,* 70 J. Fin. 2309, 2314 (2015) ("Aggarwal, Saffi, & Sturgess"), *available at https://onlinelibrary.wiley.com/doi/10.1111/jofi.12284* (referencing a survey of institutional investors in which 37.9% of the respondents stated that a formal policy on securities lending is part of their proxy voting policy, with some institutional investors requiring a total recall of shares ahead of proxy voting, while others weigh the lost income from securities lending against the benefits of voting on a specific proposal).

[315] *See id.,* at 2316.

[316] *See, e.g.,* RMA Comment Letter; BlackRock Comment Letter.

[317] *See* Aggarwal, Saffi, & Sturgess, *supra* footnote 314, at 2328.

[318] *See, e.g.,* RMA Comment Letter; Federated Hermes Comment Letter; Vanguard Comment Letter; Blackrock Comment Letter.

[319] *See* Blackrock Comment Letter.

[320] *See, e.g.,* RMA Comment Letter; Blackrock Comment Letter.

[321] *See* Aggarwal, Saffi, & Sturges, *supra* footnote 314, at 2315.

[322] A commenter agreed and stated that the vast majority of lending activity (approximately 90% of outstanding loan balances) will be a segment of the lending market with greater lending supply compared to borrower demand. *See* RMA Comment Letter.

[323] *See* Aggarwal, Saffi, & Sturgess, *supra* footnote 314, at 2327. *See also* Susan Christoffersen, Christopher Geczy, David Musto, & Adam Reed, *Vote Trading and Information Aggregation,* 62 J. Fin. 2897, 2912 (2007), *available at https://www.jstor.org/stable/4622357.*

[324] *See* RMA Comment Letter.

[325] The Aggarwal, Saffi, & Sturges study, *supra* footnote 314, estimated that such special stocks represented about 9% of their considered equity lending sample, which covers more than 85% of the lending market. The study finds that "special" stocks have a higher average annualized borrowing fee of 429 basis points, compared with a fee of 9.3 basis points for the non-special stocks.

would have the potential to impact the price [326] or liquidity [327] of stocks. In addition, a reduction in the ability to short shares may negatively affect price discovery.[328] However, "special" stocks are typically associated with higher borrowing fees [329] and, therefore, as discussed above in this section, we would expect funds to be reluctant to recall these shares from loan if the income from lending them exceeds the benefits of participating in proxy voting. Consistent with this, one academic study shows that the lendable supply of "special" stocks changes by less than that of the non-special stocks prior to the vote record date.[330] As a result, we expect the amendments could have a more limited effect on securities lending activities for special stocks relative to non-special stocks, which may limit adverse effects on liquidity and price discovery.

One commenter stated that activists would seek to use the proposal's required categorization of voting matters to sway funds towards voting outcomes that are not for the benefit of fund shareholders.[331] To the extent that the concern is harm to fund shareholders from a vote, we believe this is less likely if a fund's adviser follows its fiduciary duty obligations. Specifically, investment advisers are fiduciaries that owe duties of care and loyalty to each client.[332] To satisfy its fiduciary duty in making any voting determination on behalf of a fund, an investment adviser must make determinations in the best interest of its client. Further, an investment adviser cannot place its own interests ahead of the interests of its client.[333]

Finally, the amendments could affect service providers used by funds to report information on Form N–PX. Some commenters stated that the proposed amendments could necessitate reconfiguration of their processes.[334] We agree that service providers that currently do not provide the information with the same degree of uniformity that will be required under the final rule will have to update their processes to help funds meet the new requirements. These service providers may pass on the costs of updating their processes to funds, and those costs may therefore be borne in part by investors. Larger service providers may be able to update or reform their operations with greater economies of scale than smaller service providers. To the extent that this results in consolidation of service providers, service provider prices may increase more broadly, representing an additional potential cost to funds and investors.

Conversely, because the amendments require that funds identify a voting matter using the exact same language and order found in a form of proxy subject to rule 14a–4 under the Exchange Act, service providers would save the cost currently associated with producing a summary of the voting matter in these circumstances. Service providers may pass some or all of the increased costs to fund advisers, who may ultimately pass these costs on to fund investors.

### 2. Amendments To Require Manager Reporting of Say-on-Pay Votes

#### (a) Benefits

Under the amendments, managers will publicly disclose annually on Form N–PX information about their proxy votes relating to say-on-pay matters. The information will include: (1) if the form of proxy in connection with a say-on-pay matter reported on the form is subject to rule 14a–4 of the Exchange Act, a description and ordering of say-on-pay matters using the same language that is on an issuer's form of proxy, (2) a standardized classification, (3) the number of shares voted and number of shares loaned and not recalled, and (4) how shares were voted by the manager. Managers will be required to provide this information in a custom XML language. However, managers are permitted to file a notice report that omits voting information where either (1) all proxy votes for which the manager exercised voting power are reported by other reporting persons; (2) the manager did not exercise voting power for any reportable voting matter and therefore does not have any proxy

votes to report; or (3) the manager has a clearly disclosed policy of not voting, and did not vote, on any proxy voting matter. Managers will be allowed to request confidential treatment of proxy voting information electronically consistent with rule 24b–2.

The final rule may benefit the securities markets by providing investors with access to information about how managers vote on issuers' say-on-pay recommendations. As of March 31, 2022, managers that file reports on Form 13F exercised investment discretion over approximately $44.4 trillion in section 13(f) equity securities. In many cases, managers also exercise voting power for proxies relating to these equity securities. This voting power means that managers, although making decisions only for the securities they manage, have the ability to affect significantly the outcomes of shareholder votes and influence the governance of corporations.

Recent academic literature shows that the requirement of holding say-on-pay votes can have an impact on executive compensation and other corporate governance practices for corporate issuers.[335] The final rule will enable investors to observe how managers exercised their proxy votes regarding such matters.[336] To the extent the information contained in say-on-pay votes is understood and valued by investors,[337] investors can benefit from using this additional information in selecting managers that vote say-on-pay matters according to investor preferences.[338]

---

[326] See, e.g. Jesse Blocher, Adam Reed, & Edward Van Wesep, *Connecting Two Markets: An Equilibrium Framework for Shorts, Longs, and Stock Loans,* 108 J. Fin. Econ. 302 (2013), *available at* https://doi.org/10.1016/j.jfineco.2012.12.006 (finding that when share loan supply is "reduced around dividend record dates, prices of hard-to-borrow stocks increase 1.1% while prices of easy-to-borrow stocks are unaffected"). While the study looked at the effect around the dividend record date, it is possible that similar results could hold around vote record dates.

[327] See also supra footnote 320.

[328] See, e.g., Ekkehart Boehmer & Juan Wu, *Short Selling and the Price Discovery Process,* 26 Rev. Fin. Studies 2 (2013), *available at* https://www.jstor.org/stable/23356856 (finding that stock prices are more accurate when short sellers are more active).

[329] See supra footnote 325.

[330] See Aggarwal, Saffi, & Sturges, *supra* footnote 314, at 2323.

[331] See Utah Comment Letter.

[332] Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Investment Advisers Act Release No. 5248 (June 5, 2019) [84 FR 33669 (July 12, 2019)].

[333] Proxy Voting Guidance, *supra* footnote 122.

[334] See ICI Comment Letter I; ISS Comment Letter.

[335] See Peter Iliev & Svetla Vitanova, *The Effect of the Say-on-Pay Vote in the United States,* 65 Management Science 4451 (2019), *available at* https://doi.org/10.1287/mnsc.2018.3062; James Cotter, Alan Palmiter & Randall Thomas, *The First Year of Say-on-Pay under Dodd-Frank An Empirical Analysis and Look Forward,* 81 Geo. Wash. L. Rev. 967 (2013), *available at* http://www.gwlr.org/wp-content/uploads/2013/04/Thomas.pdf.

[336] A number of commenters agreed that the proposed amendments will provide information about managers' proxy voting information in an accessible form to the beneficiaries of managers. *See, e.g.,* Morningstar Comment Letter. Some commenters also expressed the opinion that the proposed amendments will help ensure that managers follow stated policies on executive compensation. *See, e.g.,* SCERS Comment Letter.

[337] See, e.g., David Larcker, Ronald Schneider, Brian Tayan, and Aaron Boyd, *2015 Investor Survey Deconstructing Proxy Statements – What Matters to Investors,* Stanford University, RR Donnelley, and Equilar Report (Feb. 2015), *available at* https://www.gsb.stanford.edu/faculty-research/publications/2015-investor-survey-deconstructing-proxy-statements-what-matters (finding that 58 percent of shareholders believe that say-on-pay is effective in influencing or modifying pay practices).

[338] Several commenters stated that the transparency provided by the proposed

This information may also help deter votes motivated by conflicts of interest and promote accountability of executives who often are in a position to shape their own pay arrangements. To the extent that executives are sensitive to approval from their institutional shareholder base, the adoption of the final rule should help align the incentives of executives and investors, which will result in better corporate governance practices at corporate issuers.[339]

Public companies currently subject to the Dodd-Frank Act's say-on-pay vote requirements may also benefit from the transparency provided by this rule. Knowing how managers have voted on executive compensation matters in the past, and knowing how they voted on say-on-pay matters at similar firms or other firms in the same industry, can be useful for the companies as they consider their own executive compensation practices and policies.

However, there may be cases where the information required to be reported on Form N–PX may not provide the entire context of a manager's proxy voting decision. For example, a commenter expressed the view that disclosure of proxy voting may be difficult to interpret when managers manage a range of different accounts with different policies and guidelines for proxy voting.[340] The commenter also stated that ambiguity in the definition of when a manager exercised voting power could lead to a situation where a manager may be required to report a vote they did not agree with in cases where multiple managers provide input on applying a client's voting policies but they ultimately disagree on a voting decision.[341]

Section IV.C.1.a discusses additional aspects of the proposal and the associated comments we received in the context of funds. Our analysis of the following aspects of the amendments in that context also applies to these requirements in the context of reporting by managers: i) the quantitative

disclosures of the number of shares voted and the number of shares loaned but not recalled, ii) the structured disclosure requirement, and iii) the optional use of certain additional identifiers such as LEIs and FIGIs. Our analysis of both aspects of the amendments in the context of reporting by funds also applies to these requirements in the context of reporting by managers.

(b) Costs

The final rule will lead to some additional direct and indirect costs for managers associated with disclosing required information about their say-on-pay votes annually on Form N–PX. A manager may incur additional direct compliance costs associated with a filing if the manager seeks confidential treatment for the filing by making, via EDGAR, a confidential treatment request. Any portion of these costs that is not borne by the manager will ultimately be borne by the manager's clients. Some of these costs are a direct result of section 14A(d)'s statutory mandate for managers to report annually how they have voted.

Direct costs to each manager will include both internal costs (for compliance attorneys and other, non-legal staff, such as computer programmers, to prepare and review the required disclosure and to update systems)[342] and external costs (such as any costs associated with third-party service providers to collect and report the information disclosed in Form N–PX).[343] Direct costs also include the cost associated with determining whether a manager has exercised voting power and therefore must report a say-on-pay vote on Form N–PX. As discussed above, this determination may require subjective determinations by managers, and so there may be marginal cases where managers must undertake additional costly internal assessments to determine if they must report a say-on-pay vote.[344] Managers may also face additional costs

to the extent they conservatively evaluate their voting power, and ultimately conduct the required reporting in cases where they may not have been required to report a say-on-pay voting of a security. For example, as observed above, one commenter stated that ambiguity in the definition of when a manager exercised voting power could lead to a situation where a manager may be required to report a vote in cases where multiple managers provide input on applying a client's voting policies, even if they ultimately disagree on the voting decision.[345]

We anticipate that costs for managers associated with obtaining the information required to be reported by the final rule will be limited to the extent that many managers may already track most of the necessary data.[346]

As discussed in section IV.C.1.b in the context of funds, commenters have observed that not all custodians currently provide their customers with the information that managers will need to report the number of shares the manager loaned but did not recall. We therefore anticipate that managers that currently do not have access to this data will engage their custodians or securities lending agents to obtain it. These service providers may then increase the fees they charge to compensate for any costs of providing this information, which may be passed down to investors.

In a departure from the proposal, managers that have a disclosed policy of not voting proxies and that did not vote during the reporting period, will be permitted to indicate as such, and will therefore incur lower costs compared to the proposal, which would have required them to report information on a security-by-security basis.

Some commenters expressed concerns about the costs and burdens borne by smaller managers. For example, according to these commenters, to comply with the proposed amendments, these smaller managers may hire a vendor which they currently do not use.[347] However, other commenters expressed a different view. According to these other commenters, while smaller managers may incur new costs, they are likely to have the information that they

---

amendments will help align managers' voting decisions with clients' expectations and improve clients' oversight over managers' proxy voting. *See infra* footnote 287. *See, e.g.,* SCERS Comment Letter; The Shareholder Commons Comment Letter; PRI Comment Letter.

[339] A number of commenters expressed the view that the proposed amendments will help investors and other users or proxy voting information to evaluate managers and their influence over corporate governance of issuer firms, *See, e.g.,* Corporate Governance Comment Letter; SCERS Comment Letter; Friess Comment Letter.

[340] *See* Pickard Comment Letter.

[341] *See, e.g.,* Pickard Comment Letter. *See also supra* section II.B.2 for a detailed discussion of comments we received on this aspect of the proposal.

[342] Several commenters pointed out that reporting persons may need to update existing systems. *See, e.g.,* ICI Comment Letter I, Ultimus Comment Letter.

[343] Based on the results of the PRA analysis provided in Table 2, the Commission estimates that the annual direct costs attributable to information collection requirements in the amendments for managers will be approximately $10,308 per manager, consisting of $7,808 in internal costs and $2,500 in external costs. These annual direct costs include initial as well as ongoing costs, with the former amortized over three years. For purposes of this estimate, we are assuming that every manager will file its full record of say-on-pay votes on "voting" report, and not file a "notice" report.

[344] *See also supra* footnote 41 and accompanying text, discussing that the framework for determining voting power could result in some subjectivity and the comments we received on this aspect of the proposal.

[345] *See, e.g.,* Pickard Comment Letter. *See also supra* section II.B.2 for a detailed discussion of comments we received on this aspect of the proposal.

[346] *See, e.g.,* CFA/CII Comment Letter (stating that the cost of complying with the proposed amendments "will be borne most by smaller funds and managers" but that "many smaller funds and managers may already track or report this information.").

[347] *See* ICI Comment Letter I; Ultimus Comment Letter.

need to report already. Therefore, these commenters anticipate that incremental costs may not be unduly burdensome for most of the smaller managers.[348] Nevertheless, we have increased our burden estimates to account for these costs.[349]

The costs arising from the final rule to use Form N–PX to implement section 14A's say-on-pay vote reporting requirements will be mitigated for managers that are advisers to funds and that therefore already have experience with filing Form N–PX reports on behalf of funds. In addition, the use of a custom XML data language for Form N–PX is not expected to impose significant costs on managers subject to say-on-pay voting requirements, as managers have experience filing other EDGAR forms that use similar custom XML data languages, such as Form 13F. The Commission believes that managers will incur an estimated cost of $540 per filing to file Form N–PX in a custom XML data language.[350]

With respect to the LEI reporting requirement on Form N–PX, some managers may be subject to LEI reporting requirements pursuant to Commission rules. For example, managers that are registered investment advisers provide their LEI on Form ADV if they have one.[351] For these managers, compliance costs associated with retrieving and retaining LEIs are similarly reflected in the baseline.

We also do not expect the FIGI disclosure on Form N–PX to result in significant additional compliance costs for managers, because the disclosure of FIGIs is optional rather than mandatory. We likewise do not expect the requirement to report ISINs rather than CUSIP numbers, where CUSIP numbers are not available through reasonably practicable means, to impose significant additional compliance costs on managers. Managers that report securities other than 13(f) securities and that do not already store ISINs for those securities would incur additional costs as a result of this requirement, because they would need to pay fees to license the storing of ISINs for those securities. By contrast, the requirement to report ISINs would not affect managers that report only 13(f) securities, because all 13(f) securities have CUSIP numbers and do not have ISINs. We do not have data on which to estimate the number

of managers that could be affected or the extent to which such managers hold non-section 13(f) securities.

The electronic submission of confidential treatment requests via EDGAR obviates the need for filers to incur printing and mailing costs associated with paper submissions. In addition, managers are experienced in using the EDGAR system, which further mitigates the costs of filing these requests electronically. The Commission believes that managers will not incur an additional cost for submitting confidential treatment requests via EDGAR as compared to filing these requests in paper form.[352]

The costs associated with the final rule may vary depending on existing levels of voluntary disclosure, organizational structure, and investment objectives of each manager. For example, the cost of compliance with the final rule is likely to be lower for managers that exercise voting power on behalf of funds because such votes are already reported on Form N–PX, and the amendments will not require managers to separately report say-on-pay votes cast on behalf of funds in compliance with the joint reporting provisions. Also, the costs are likely to be lower for managers who already voluntarily track and disclose some of the data the final rule would require.

Some of the indirect costs to managers associated with the amendments will be the same as those discussed in the context of funds in section IV.C.1.b. Specifically, to the extent that the amendments may provide an incentive for managers to devote additional time and resources to proxy voting, this may result in additional expenses for managers, some of which may be passed on to their clients. Also, an increase in scrutiny by investors as a result of increased transparency under the amendments may incentivize managers to vote against the management of an issuer with which the manager may have a business relationship, which could weaken the manager's relationship with the issuer firm and result in lost revenue.

Similarly, the disclosure requirements for managers can create incentives for them to recall their loaned securities to cast proxy votes on say-on-pay matters for these securities. This can reduce these managers' and their clients' revenues and may have a short-term impact on the securities lending and underlying stock markets.[353] In

addition, some managers may decide to voluntarily incur the cost for providing additional information on Form N–PX to provide context for the disclosure of the number of shares the manager loaned and did not recall for voting, some of which may be passed on to their clients.[354]

Finally, the amendments could affect service providers used by managers to report information on Form N–PX. Specifically, service providers that currently do not provide the information with the same degree of uniformity that will be required under the final rule will have to update their processes to help managers meet the new requirements. Service providers may pass some or all of the changes in costs they will incur to their manager customers, who may ultimately pass these costs on to their clients.[355]

*D. Effects on Efficiency, Competition, and Capital Formation*

In this section we consider whether the final rule and form amendments will promote efficiency, competition, and capital formation.

1. Amendments to Funds' Reporting of Proxy Votes

The amendments to Form N–PX will provide investors with greater access to information regarding the proxy voting decisions of the funds they invest in. This can help investors make better informed investment decisions if they want to take into account funds' voting records, and thus more efficiently express their voting preferences. To the degree that some investors face meaningful impediments to switching funds, for example as a result of possible tax implications or because of the selection of asset managers by their current employer, this may in those cases limit the improvement in allocative efficiency.[356] Conversely, to the extent that the additional information disclosed on Form N–PX leads some investors to accept lower returns (for a given level of risk) in exchange for investing in funds that

[348] *See, e.g.,* CFA Comment Letter.

[349] *See infra* section V for the revised PRA analysis.

[350] *See* Short Position and Short Activity Reporting by Institutional Investment Managers, Exchange Act Release No. 94313 (Feb. 25, 2022) [87 FR 14950, 14973 (Mar. 16, 2022)].

[351] *See* Item 1.P of Form ADV.

[352] *See* E-Filings Release, *supra* footnote 204, at section V.D.

[353] *See supra* footnotes 253—258 and accompanying text for the discussion related to the

effect on securities lending for funds and the potential effects on underlying markets, which would also apply to changes in managers' securities lending activities.

[354] *See also supra* footnote 123. As discussed in the context of funds, we anticipate that this cost is likely to be relatively small, as those managers (like funds) would likely provide the same or similar disclosure on subsequent filings of Form N–PX. We estimate that a fund that chooses to provide this voluntary disclosure may incur a cost of between $250 to $750 for the initial disclosure but no material cost for each subsequent disclosure.

[355] *See supra* footnote 334 and accompanying text for a discussion of the comments received on this aspect of the proposal.

[356] *Cf. supra* footnote 268 and accompanying text.

better align with their political, social, or other preferences, this could reduce the overall allocative efficiency of capital in the economy.

The amendments will also make it easier for investors and other proxy voting data users to compare and evaluate proxy voting records across a wide variety of funds. This may improve competition among funds, to the extent that funds seek to differentiate themselves based on their voting records.[357] For example, a fund that follows a strategy designed to provide good governance to its portfolio companies may be able to show a track record of more effective proxy voting patterns relative to their peers that follow similar strategies but less effectively. This can further promote a more efficient allocation of capital by investors among competing funds. Further, as proxy voting information becomes easier to gather and analyze, data-collecting service providers can face an increased competitive pressure to improve and develop new tools and methodologies and/or reduce their service fees.

Finally, the increased transparency with regard to funds' proxy voting may encourage more investors to invest in funds, which may increase capital formation.[358] In addition, to the extent that the final rule leads funds to make voting decisions that positively affect corporate issuers' productive use of capital, this could also enhance capital formation.[359]

### 2. Amendments To Require Manager Reporting of Say-on-Pay Votes

The amendments to require manager reporting of say-on-pay votes can promote more efficient allocation of capital to managers. The amendments will enable investors, including investors who are not currently advisory clients of any given manager, to obtain managers' proxy voting information which, to the extent that investors review the disclosures, can help investors allocate assets to managers who cast proxy votes that are consistent with investors' preference for voting on executive compensation matters.[360]

Because the final rule applies equally to all managers that are required to file reports under section 13(f) of the Exchange Act, we do not anticipate that any competitive disadvantages will be created. To the contrary, we anticipate that the final rule may encourage competition by raising awareness about manager voting on say-on-pay matters and may facilitate differentiation among managers.

Finally, we do not anticipate any significant effects of the amendments on capital formation.

### E. Reasonable Alternatives

#### 1. Scope of Managers' Say-on-Pay Reporting Obligations

We considered several alternatives that would limit the scope of managers' say-on-pay reporting obligations by more closely aligning managers' reporting requirements on Form N–PX with their reporting requirements on Form 13F.[361]

One alternative we considered was to add a *de minimis* exception. Reporting persons on Form 13F are permitted to exclude positions when the positions have a dollar value of less than $200,000 and consist of fewer than 10,000 shares. Several commenters suggested that we include such a *de minimis* exception.[362] We also considered other alternatives suggested by commenters. Specifically, we considered limiting the reporting obligation to (i) votes on section 13(f) securities,[363] (ii) votes on securities held at the end of a calendar quarter,[364] and (iii) exclude short-term positions such as those held for fewer than 30 days.[365]

The benefits of say-on-pay vote reporting to managers' clients and to other investors, as discussed above, do not appear to be limited to votes of a certain size, to section 13(f) securities, or securities held at the end of a calendar quarter or those held for longer periods of time. Investors should benefit from a manager's full voting record, and a more limited reporting obligation would reduce the usefulness of the say-on-pay disclosure. We also believe that the cost savings of limiting the scope of the reporting requirement in any of

these alternative ways would be minimal, because many reporting entities may already track or report this information.[366] To the extent that a filing could reveal information about a reporting person's trading strategy that would permit it to be front-run, we believe that the instructions for requesting confidential treatment will adequately address this concern.

We also considered as an alternative allowing managers to not file on Form N–PX when they did not exercise voting power over securities that held say-on-pay votes during the reporting period. We do not believe this alternative would substantially reduce costs for relevant managers relative to the final rule because the final rule only requires these managers to file a notice report indicating that they have no votes to report. Moreover, we believe that requiring all managers to make a filing will permit Commission staff to identify more easily managers who may have missed a filing obligation. Not requiring all managers to make a filing would reduce the usefulness of Form N–PX filings because investors will not necessarily understand whether a manager did not make a filing because it did not exercise voting power or because it simply neglected to file the form. In addition, we believe that other means for managers to disclose that they have no votes to report, such as by publishing that information on a website, would not be substantially less costly than filing a notice report as required by the final rule and would be less useful for Commission oversight.

#### 2. Amendments to Proxy Voting Information Reported on Form N–PX

We are adopting changes to Form N–PX that will require disclosure of information about the number of shares that were voted (or, if not known, the number of shares that were instructed to be cast), as well as disclosure of the number of shares the reporting person loaned and did not recall.

We considered adopting a requirement to disclose the number of shares voted (or instructed to be cast) while not requiring disclosure of the number of shares the reporting person loaned but did not recall. This approach would have provided information to understand split votes, but would have limited utility otherwise. Specifically, this approach would not provide information to help investors understand the full extent to which a reporting person is voting shares. While the alternative approach would reduce reporting burdens for some funds and

---

[357] Some commenters expressed the view that enhanced proxy voting disclosure from the proposed amendments will help investors and regulators become more informed, which can promote competition among investors and protect investors and general public from the concentration of power in the asset management industry. *See, e.g.,* Friess Comment Letter; Corporate Governance Comment Letter.

[358] *See, e.g.,* Flores Comment Letter.

[359] *Cf. supra* footnote 274 and accompanying text.

[360] Many commenters agreed that enhanced proxy voting disclosure from the proposed amendments can help investors to align their interests on

important topics (*e.g.,* ESG) with those of managers. *See, e.g.,* SCERS Comment Letter; LTSE Comment Letter; The Shareholder Commons Comment Letter; Corporate Governance Comment Letter.

[361] We also considered alternatives to the definition of the exercise of voting power. *See supra* section II.B.2 for a discussion of these alternatives and the comment letters we received on this aspect of the proposal.

[362] *See* Pickard Comment Letter; MFA Comment Letter; AIMA Comment Letter.

[363] *See supra* footnote 48 and accompanying text.

[364] *See supra* footnote 52 and accompanying text.

[365] *See supra* footnote 53 and accompanying text.

[366] *See supra* footnote 306.

managers, it would also have fewer benefits for investors such as transparency into how a reporting person's securities lending affects its proxy voting.[367]

3. Amendments to the Time of Reporting on Form N–PX or Placement of Funds' Voting Records

As an alternative to maintaining the current timeline for filing reports on Form N–PX, we considered requiring funds or managers to report relevant proxy votes more frequently, such as on a semiannual, quarterly, or monthly basis, or shortly after a given vote is held. We also considered maintaining the current annual reporting requirement but requiring reporting persons to file their reports more quickly (*e.g.*, by the end of July, rather than by the end of August). In general, these alternatives would provide investors and other data users with more timely information about how a fund or manager votes.

A semiannual reporting requirement could have been incorporated into funds' current reporting of annual and semiannual shareholder reports on Form N–CSR. The Commission proposed a similar approach to requiring disclosure of funds' proxy voting records in 2002.[368] At that time, some commenters raised concern about the burdens of such an approach for fund complexes with staggered fiscal year ends, as these fund complexes could be required to file reports on Form N–CSR with complete proxy voting records as many as twelve times per year.[369] An approach to requiring more frequent reporting of proxy voting records that is tied to funds' fiscal year ends would likely create administrative complexity for many fund complexes and increase costs associated with filing proxy voting information more frequently.

As for a semiannual or quarterly reporting requirement on Form N–PX that is based on the calendar year, either of these approaches may not significantly enhance the timeliness of voting information in many cases because most corporate issuers hold proxy votes within the few months leading up to June 30, which is the end of the current Form N–PX annual reporting period. As a result, if we

required semiannual or quarterly reporting of Form N–PX, most votes would likely be in the reporting person's report for the first half of the year (for semiannual reports) or for the second calendar quarter (for quarterly reports). A semiannual or quarterly reporting requirement would also increase reporting costs, as reporting persons would be required to file either two or four Form N–PX reports per year rather than one report per year.

A requirement to report monthly or shortly after each proxy vote is held would have provided voting information much more quickly to investors and this could have provided certain benefits. For example, timelier public reporting of funds' proxy votes has the potential to facilitate fund shareholders' ability to monitor their funds' involvement in the governance activities of portfolio companies, including within a single proxy season. Annual reporting will timely capture a significant percentage of the votes cast by reporting persons because most votes occur during Proxy Season. As discussed above in section II.H, while some commenters supported more frequent reporting, for example suggesting that reporting persons be required to provide prompt or real-time disclosure of votes, this frequency of reporting may make it difficult for investors reading a reporting person's Form N–PX reports to evaluate overall patterns in the reporting person's voting behavior.

Also, these alternative approaches would require reporting persons to disclose a position in a security before disclosure of the position is required on Form 13F or Form N–PORT, increasing the potential for disclosure of sensitive information that competitors can use to front-run or reverse engineer investing strategies. In addition, we expect that both alternative approaches would increase costs associated with reporting proxy voting information because reporting would take place more frequently.

Shortening the timeline for filing annual Form N–PX reports, which is currently approximately two months after the end of the reporting period, would marginally improve the timeliness of the reported information. However, shortening the filing timeline by more than a few weeks would also increase the possibility of a reporting person being required to disclose a vote on a security before otherwise being required to disclose a position in that security on Form 13F or Form N–PORT. As a result, this approach could to some extent increase the potential for disclosure of sensitive information that

competitors could potentially use to front-run or reverse engineer investing strategies.

**V. Paperwork Reduction Act Analysis**

Certain provisions of the final rules and form amendments contain "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995 ("PRA").[370] The Commission published a notice requesting comment on changes to these collection of information requirements in the Proposing Release and submitted these requirements to the Office of Management and Budget ("OMB") for review in accordance with the PRA.[371] The title for the collection of information is: "Form N–PX—Annual Report of Proxy Voting Record" (OMB Control No. 3235–0582).[372] An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

Section 14A(d) of the Exchange Act requires that every manager subject to section 13(f) of the Exchange Act report at least annually how it voted on say-on-pay votes, unless such vote is otherwise required to be reported publicly by rule or regulation of the Commission. To implement section 14A(d), we are adopting new rule 14Ad–1 under the Exchange Act, which will require managers to file their record of say-on-pay votes with the Commission annually on Form N–PX.[373] We are also adopting amendments to Form N–PX, which was adopted pursuant to section 30 of the Investment Company Act and is currently used by funds to file their complete proxy voting records with the Commission, to accommodate the new filings by managers and to enhance the information funds provide on their proxy votes. In addition, we are adopting amendments Forms N–1A, N–2, and N–3 to require funds to disclose that their proxy voting records are available on (or through) their websites. Although the website availability requirement will be located in the relevant registration form, we are reflecting the burden for these requirements in the burden estimate for Form N–PX—Annual Report of Proxy

---

[367] *See supra* section II.C.3.b for detailed discussion.

[368] *See* Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companies, Investment Company Act Release No. 25739 (Sept. 20, 2002) [67 FR 60828 (Sept. 26, 2002)].

[369] *See* 2003 Adopting Release, *supra* footnote 4. We did not receive comments on this alternative.

[370] 44 U.S.C. 3501 *et seq.*

[371] 44 U.S.C. 3507(d); 5 CFR 1320.11.

[372] The title for the collection of information relating to Form N–PX will be renamed from "Form N–PX—Annual Report of Proxy Voting Record of Registered Management Investment Companies."

[373] For purposes of the PRA analysis, the burden associated with the requirements of rule 14Ad–1 is included in the collection of information requirements of Form N–PX.

Voting Record, and not in the burden for Forms N–1A, N–2, or N–3.

Form N–PX, including the amendments, contains collection of information requirements. Compliance with the disclosure requirements of the form is mandatory. Responses to the disclosure requirements will not be kept confidential unless granted confidential treatment as discussed above.

Approximately 12,492 funds and series (each a "portfolio") file on Form N–PX.[374] We estimate that the 12,492 portfolios are composed of approximately 5,496 portfolios that do or may hold equity securities, 2,339 portfolios holding no equity securities, and 1,619 portfolios holding fund securities (*i.e.,* funds of funds).[375] In addition, the Commission estimates that there are approximately 8,147 managers required to file Form 13F reports with the Commission, which will be required to file Form N–PX reports under the amendments.[376]

We also estimate that managers will file approximately 234 amendments to Form N–PX reports as a result of the final adverse disposition of a request for confidential treatment or upon expiration of confidential treatment.[377] For purposes of this estimate, we are assuming that every manager will file its full record of say-on-pay votes on "voting" report, and not file a "notice" report. In practice, because certain managers exercise voting power over the same securities as other managers, or

exercise voting power over say-on-pay votes that funds already report, the number of parties who need to separately maintain records and prepare filings may be lower.

While several commenters provided comments on the potential costs of the proposed amendments, no commenters specifically addressed our PRA analysis.[378] Two commenters stated that some reporting persons use service providers in the reporting process and that the proposed amendments could necessitate reconfiguration of the processes those service providers use.[379] One commenter suggested that proxy voting advisory firms will undertake much of the work of vote categorization, which will result in costs for funds for their services.[380] The commenter also stated that smaller funds that do not currently use an outside vendor to file Form N–PX may engage one as a result of the rule. On the other hand, a commenter stated that, while certain funds may bear new costs, funds may already track much of the information they will be required to report; the increased costs would thus only be due to transferring existing data onto a new form, rather than designing a new process to track the information in the first place.[381] In addition, several commenters stated that lent share disclosure may be burdensome to implement.[382]

Conversely, as discussed above, the amendments as adopted have been

modified in some respects from the proposal. While we recognize that some of these changes may increase the burdens on respondents from what was proposed, for example, by necessitating that reporting persons ensure that LEI information is included on Form N–PX where applicable, the balance of these changes should reduce burdens on respondents. For example, the change that consolidates the proposed categories and removes the proposed subcategories as part of the categorization requirement should lower burdens on respondents by simplifying the categorization process resulting in less time taken in completing the form as compared to the proposal. As a result, while the amendments as adopted address many of the cost concerns suggested by commenters we are nonetheless increasing our burden estimates to account for the costs of the amendments as suggested by commenters. Regarding service providers, because not all filers use service providers, for PRA purposes, we have assumed that all burdens associated with the modifications will be incurred by filers, even if in certain cases it would be incurred by the service provider and passed on to the filer in the form of added costs.

The tables below summarize the proposed and final Form N–PX estimates of the initial and ongoing annual burden associated with the amendments.

TABLE 2—FORM N–PX PRA ESTIMATES

| | Internal initial burden hours | Internal annual burden hours [1] | | Wage rate [2] | Internal ime costs | Annual external cost burden |
|---|---|---|---|---|---|---|
| **Proposed Estimates** | | | | | | |
| **Funds Holding Equity Securities** | | | | | | |
| Estimated annual burden of current Form N–PX per response | ................... | 7.2 | × | [3] $373 | $2,686 | $1,000 |
| Estimated initial burden to accommodate new reporting requirements | 24 | 8 | × | [4] 325 | 2,600 | ................... |
| Additional estimated annual burden associated with amendments to Form N–PX | ................... | 10 | × | [5] 335 | 3,350 | 500 |
| Proposed website availability requirement [6] | ................... | 0.5 | × | [6] 254 | 127 | ................... |

[374] *See supra* footnote 235 and accompanying text.

[375] Based on Commission data as of December 31, 2021, of these, approximately 1,619 are funds of funds. Of the remaining 10,873, we estimate that 49% (5,332) are funds or series that invest primarily in equity securities, 6% (614) are "hybrid" funds or series that may hold some equity securities (5,332 + 614 = 5,496), 22% (2,339) are bond funds or series that hold no equity securities and 2% (250) are money market fund portfolios that hold no equity securities (2,339 + 250 = 2,588). *See* ICI 2022 Fact Book, *supra* footnote 2, at 170–214.

[376] *See supra* footnote 241. We assume, for purposes of our PRA analysis, that all of these filers are filing a complete Form N–PX. Because some managers will not make a full report but instead will file notice reports, for example those that have a clearly disclosed policy of not voting, and did not vote, on any proxy matters during the reporting

period, the burden estimates may be overstated. We lack the data, however, to estimate the number of managers who will file notice reports. Form 13F–NT filers report their holdings on the Form 13F–HR of a different filer; while certain of those filers may be eligible to use the joint reporting provisions of Form N–PX, we have assumed for the purpose of this analysis that they will file their own reports on Form N–PX.

[377] This is based on the number of Form 13F filers as of the first quarter of 2022. In addition to these 8,147 filers, we also received 936 amendments to filings covering one of the four quarters in 2021; consistent with the proposal, for purposes of this analysis, we have included these amendment filings in our analysis divided by four. Consistent with the proposal, for purposes of this estimate, we are conservatively assuming that all amendments filed are related to the adverse disposition of a request for confidential treatment or the expiration of

confidential treatment, and that this results in the full burden of a new Form N–PX filing being borne by the manager. We do so even though we recognize that Form 13F amendments are also filed to correct errors or omissions in a filing that does not relate to a request for confidential treatment. Consistent with the proposal, our estimate does not allocate a separate burden to amendments that merely correct errors or omissions in a separate filing. For that reason, and because we assume funds will not file confidential treatment-related amendments, we are not including a burden estimate for amendments filed by funds. *See* Proposing Release, *supra* footnote 5, at n.270 and accompanying text.

[378] *See supra* section II.

[379] *See* ICI Comment Letter I; ISS Comment Letter.

[380] *See* ICI Comment Letter I.

[381] *See* CFA Institute/CII Comment Letter.

[382] *See, e.g.,* Blackrock Comment Letter.

TABLE 2—FORM N–PX PRA ESTIMATES—Continued

| | Internal initial burden hours | Internal annual burden hours[1] | | Wage rate[2] | Internal time costs | Annual external cost burden |
|---|---|---|---|---|---|---|
| Estimated number of annual responses[8] | | × 7,064 | | | × 7,064 | × 7,064 |
| Total annual burden | | 181,545 | | | 61,901,832 | 10,596,000 |
| **Funds Not Holding Equity Securities** | | | | | | |
| Estimated annual burden of current Form N–PX per response | | 0.17 | × | [3] 373 | 63 | |
| Additional estimated annual burden associated with amendments to Form N–PX | | | | | | |
| Estimated number of annual responses[8] | | × 3,188 | | | × 3,188 | |
| Total annual burden | | 542 | | | 200,844 | |
| **Funds of Funds** | | | | | | |
| Estimated annual burden of current Form N–PX per response | | 1 | × | [3] 373 | 373 | 100 |
| Additional estimated annual burden associated with amendments to Form N–PX | | 0.5 | × | [3] 373 | 187 | 100 |
| Proposed website availability requirement[6] | | 0.5 | × | [6] 254 | 127 | |
| Estimated number of annual responses[8] | | × 1,367 | | | × 1,367 | × 1,367 |
| Total annual burden | | 2,734 | | | 939,129 | 273,400 |
| **Institutional Investment Managers** | | | | | | |
| Changes to systems to accommodate new reporting requirements | 30 | 10 | × | [9] 325 | 3,250 | |
| Estimated annual burden associated with Form N–PX filing requirement | | 5 | × | [10] 335 | 1,675 | 1,000 |
| Estimated number of annual responses[11] | | × 7,744 | | | × 7,744 | × 7,744 |
| Total annual burden | | 116,160 | | | 38,139,200 | 7,744,000 |
| **Final Estimates** | | | | | | |
| **Funds Holding Equity Securities** | | | | | | |
| Estimated annual burden of current Form N–PX per response | | 7.2 | × | [3] 400 | 2,880 | 1,000 |
| Estimated initial burden to accommodate new reporting requirements[12] | 36 | 12 | × | [4] 349 | 4,188 | [13] 500 |
| Additional estimated annual burden associated with amendments to Form N–PX[12] | | 12 | × | [5] 349 | 4,188 | [13] 1,000 |
| Website availability requirement[6] | | 0.5 | × | [6] 272 | 136 | |
| Estimated number of annual responses[8] | | × 5,496 | | | × 5,496 | |
| Total annual burden | | 188,490 | | | 67,737,479 | 14,865,142 |
| **Funds Not Holding Equity Securities** | | | | | | |
| Estimated annual burden of current Form N–PX per response | | 0.17 | × | [3] 400 | 68 | |
| Additional estimated annual burden associated with amendments to Form N–PX | | | | | | |
| Estimated number of annual responses[8] | | × 2,588 | | | × 2,588 | |
| Total annual burden | | 440 | | | 176,005 | |
| **Funds of Funds** | | | | | | |
| Estimated annual burden of current Form N–PX per response | | 1 | × | [3] 400 | 400 | 100 |
| Additional estimated annual burden associated with amendments to Form N–PX | | 0.5 | × | [3] 400 | 200 | 100 |
| Website availability requirement[6] | | 0.5 | × | [6] 272 | $136 | |
| Estimated number of annual responses[8] | | × 1,619 | | | × 1,619 | × 1,619 |
| Total annual burden | | 3,238 | | | 1,191,584 | 323,800 |
| **Institutional Investment Managers** | | | | | | |
| Changes to systems to accommodate new reporting requirements[12] | 45 | 15 | × | [9] 349 | 5,235 | [13] 500 |
| Estimated annual burden associated with Form N-PX filing requirement[12] | | 7.5 | × | [10] 343 | 2,573 | [13] 2,000 |
| Estimated number of annual responses[11] | | × 8,381 | | | × 8,381 | × 8,381 |
| Total annual burden | | 188,572 | | | 65,438,848 | 20,952,500 |
| **Total Burden** | | | | | | |
| Currently Approved Burden | | 47,984 | | | | 17,657,958 |
| Additional Burden Associated with Amendments | | 332,757 | | | | 18,483,484 |

TABLE 2—FORM N–PX PRA ESTIMATES—Continued

| | Internal initial burden hours | Internal annual burden hours [1] | | Wage rate [2] | Internal ime costs | Annual external cost burden |
|---|---|---|---|---|---|---|
| Total Burden ........................................................ | ..................... | 380,741 | ..................... | ..................... | ..................... | 36,141,445 |

Certain products and sums do not tie due to rounding.

[1] Includes initial burden estimates amortized over a three-year period.

[2] The Commission's estimates of the relevant wage rates are based on salary informa ion for the securities industry compiled by the Securities Industry and Financial Markets Association's Office Salaries in the Securities Industry 2013. The estimated figures are modified by firm size, employee benefits, overhead, and adjusted annually to account for the effects of inflation, wi h the last adjustment occurring in early 2022 (or 2021 in the case of estimates from the proposal). See Securities Industry and Financial Markets Association, Report on Management & Professional Earnings in he Securities Industry 2013.

[3] Represents the estimated hourly wage rate of a compliance attorney.

[4] Represents the blended estimated hourly wage rates of a programmer and a compliance attorney and includes, *inter alia*, the costs of obtaining from service providers data on the number of shares on loan but not recalled. In the case of the final estimates, the blended hourly rate is based on 18 hours for a programmer at $297 per hour and 18 hours for a compliance attorney at $400 per hour.

[5] Represents the blended estimated hourly wage rates of a programmer and a compliance attorney. In the case of the final estimates, the blended hourly rate is based on 6 hours for a programmer at $297 per hour and 6 hours for a compliance attorney at $400 per hour.

[6] While the amendments will require funds to disclose that their proxy voting records both are available on fund websites and will be delivered to investors upon request, the Form N–PX PRA estimates includes only the burdens associated with website posting. Funds' registration forms currently require them to disclose that they either make their proxy voting records available on their websites or deliver them upon request. We understand most funds deliver proxy voting records upon request and, therefore, the burdens of delivery upon request are already included in the information collection burdens of each relevant registration form.

[7] Represents the estimated hourly wage rate of a webmaster.

[8] These estimates are conducted for each fund portfolio, not for each filing, and are an average estimate across all Form N–PX reporting persons. In certain cases, a single Form N–PX filing will report the proxy voting records of multiple fund portfolios. In those circumstances, the reporting person will bear the burden associated with each fund portfolio it reported. This average estimate takes into account higher costs for funds filing reports for multiple portfolios without assuming any economies of scale that multiple-portfolio fund complexes may be able to achieve.

[9] Represents the blended estimated hourly wage rates of a programmer and a compliance attorney. In the case of the final estimates, the blended hourly rate is based on 22.5 hours for a programmer at $297 per hour and 22.5 hours for a compliance attorney at $400 per hour.

[10] Represents the blended es imated hourly wage rates of a programmer and a compliance attorney. In the case of the final estimates, the blended hourly rate is based on 3 hours for a programmer at $297 per hour and 4.5 hours for a compliance attorney at $400 per hour.

[11] At proposal, included 7,550 initial filings and assumed an additional 194 filings as a result of the final adverse disposition of a request for confidential treatment or upon expiration of confidential treatment. Now includes 8,147 initial filings and estimates an additional 234 filings.

[12] The Commission's estimates of the internal initial and annual time burdens associated with the amendments have been increased by 50% compared to the proposal.

[13] In light of comments and modifications to the proposal, the Commission's es imates of the external ongoing costs associated with the amendments have been doubled compared to the proposal, and the Commission has additionally included estimated ini ial costs of compliance. While the specific external costs will vary depending on the reporting person, this could include the costs of external reporting vendors or external counsel or of reporting in a custom XML data language. *See* footnote 343. Costs are estimated on a per-portfolio (not per-fund complex) basis, and as noted by a commenter, larger fund complexes may be able to achieve greater economies of scale. The same may also be true of managers.

## VI. Regulatory Flexibility Act Certification for Managers and Final Regulatory Flexibility Analysis for Funds

### A. Regulatory Flexibility Act Certification for Managers

Pursuant to section 605(b) of the Regulatory Flexibility Act ("RFA"), the Commission certified that, if adopted, new rule 14Ad–1 and the amendments to Form N–PX relating to managers ("final manager rules") would not have a significant economic impact on a substantial number of small entities.[383] As discussed in more detail in the Proposing Release, for purposes of this rulemaking and the RFA, a manager is a small entity if it: (i) has assets under management having a total value of less than $25 million; (ii) did not have total assets of $5 million or more on the last day of its most recent fiscal year; and (iii) does not control, is not controlled by, and is not under common control with another investment adviser that has assets under management of $25 million or more, or any person (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year. The Commission therefore stated in the Proposing Release that no small entities for purposes of 17 CFR 240.0–10 ("rule 0–10 under the Exchange Act") would

be affected by proposed rule 14Ad–1 and the amendments to Form N–PX relating to managers. This is because a manager would only be required to comply with those requirements if the manager exercises investment discretion with respect to accounts holding section 13(f) securities having an aggregate fair market value on the last trading day of any month of any calendar year of at least $100 million. The Commission requested comment on both the use of this small entity definition and the Commission's certification in section VI of the Proposing Release. No commenters responded to these requests request. For the same reasons as stated in the proposing release, we again certify that the final manager rules will not have a significant economic impact on a substantial number of small entities.

### B. Final Regulatory Flexibility Analysis for Funds

The Commission has prepared the following Final Regulatory Flexibility Analysis ("FRFA") in accordance with section 604 of the RFA.[384] It relates to amendments to Form N–PX relating to funds, as well as amendments to Forms N–1A, N–2, and N–3 ("final fund rules"). The Proposing Release included an Initial Regulatory Flexibility Act Analysis ("IRFA") with regard to funds

that solicited comment and was prepared in accordance with the RFA.[385]

#### 1. Need for and Objectives of the Final Fund Rules

The Commission is amending Form N–PX under Investment Company Act to enhance the information mutual funds, ETFs, and certain other funds currently report annually about their proxy votes and to make that information easier to analyze. The amendments to Form N–PX will standardize the order in which reporting persons disclose information, categorize votes, structure and tag the data reported, and require reporting persons to identify proxy voting matters using the same language as disclosed in the issuer's form of proxy, presented in the same order as the matters appear in the form of proxy, and separate directors for director election matters only if a form of proxy in connection with a matter is subject to rule 14a-4 of the Exchange Act. In all other cases, reporting persons will instead remain subject to the current requirement to provide a brief identification of the matters voted on. In a change from current practice, however reporting persons will be required to limit use of abbreviations, which should not be used other than for commonly

---

[383] 5 U.S.C. 605(b).

[384] 5 U.S.C. 604.

[385] *See* Proposing Release, *supra* footnote 5, at section VI.

understood terms or for terms that the issuer abbreviated in its description of the matters regarding the language used for identifying proxy matters. The final fund rules will also provide additional information about the extent to which a fund votes or loans its shares. In addition, we are amending Forms N–1A, N–2, and N–3 to require these funds to disclose that their proxy voting records are publicly available on (or through) their websites and available upon request, free of charge in both cases to make this information easier for investors to access.

All of these requirements are discussed in detail in section II of this release. The costs and burdens of these requirements on small funds are discussed below as well as above in our Economic Analysis and Paperwork Reduction Act Analysis, which discuss the applicable costs and burdens on all funds.[386]

2. Significant Issues Raised by Public Comment

In the Proposing Release, we requested comment on the IRFA, including a request for comment on the number of small entities that may be affected by our proposed rules and guidelines and whether the proposed rules and guidelines would have any effects not considered in our analysis. We also requested that commenters describe the nature of any effects on small entities subject to the rules and forms and provide empirical data to support the nature and extent of such effects. We also requested comment on the proposed compliance burdens and the effect those burdens would have on smaller entities.

Some commenters highlighted some of the concerns specific to small funds relative to the proposal, such as needing to hire a third party vendor to prepare Form N–PX as a result of the amendments, resulting in increased costs.[387] One of these commenters also suggested that the proposed amendments would result in an increase in their filing costs, and the cumulative regulatory burden on small funds as a result of the proposed amendments would be larger in relative terms because of the fixed nature of these costs and the funds' inability to achieve economies of scale that larger funds can realize.[388] One commenter stated that the proposed amendments may be less beneficial to investors because of the

lessened impact of their holdings on voting outcomes and suggested that we exempt small funds from the categorization requirements in particular.[389] Another commenter made a similar suggestion about the quantitative data disclosures.[390] A different commenter, however, suggested that the additional costs and resources required for compliance with the Form N–PX amendments would impact smaller funds, but that many small funds may already have in place systems to track and report the information and that the benefits of the increased transparency stemming from the amendments outweigh the incremental costs that would be incurred.[391] One other commenter stated that, to ensure the availability of the full dataset, all reporting persons, irrespective of size, should be required to file Form N–PX reports in a structured data language.[392]

It is important to establish a consistent framework for proxy information provided by funds to enhance the consistency and availability of this information to investors, and investors in funds of all sizes will benefit from the enhancements to Form N–PX we are adopting in this release. Therefore, the final fund rules establish requirements for reporting proxy information that are broadly applicable to all funds, including small funds. We have, however, made certain modifications to the proposed requirement regarding categorization that may have the effect of easing unnecessary burdens for all funds, including smaller funds. In particular, we have streamlined the list of categories from which reporting persons will be required to choose in order to reduce overlap between the categories and eliminated the proposed requirement to select from a list of subcategories in addition to the categories. Thus, while we acknowledge that the final fund rules will impose costs on smaller funds, the final fund rules are tailored to accomplish our goals while minimizing those costs.

3. Small Entities Subject to the New Rule and Amendments

The amendments will affect funds that are small entities. For purposes of Commission rulemaking in connection with the RFA, an investment company is a small entity if, together with other investment companies in the same group of related investment companies, it has net assets of $50 million or less as of the end of its most recent fiscal year.[393] Commission staff estimates that, as of June 2022, approximately 35 registered mutual funds, 11 registered open-end ETFs, and 31 registered closed-end funds (collectively, 77 funds) are small entities.

4. Projected Reporting, Recordkeeping, and Other Compliance Requirements

We are amending Form N–PX, which funds currently use to file their complete proxy voting records with the Commission, to require reporting in a custom XML language, to require other formatting and presentation changes, and to add certain new or modified disclosure items.

The amendments to Form N–PX will affect funds that are currently required to report on the form, including those that are small entities. For instance, the amendments require funds to tie the description of the voting matter to the issuer's form of proxy under certain circumstances and to categorize voting matters by type. In addition, the amendments require information about the number of shares that were voted (or, if not known, the number of shares that were instructed to be cast), as well as the number of shares the fund loaned and did not recall. The amendments also require reporting of information on Form N–PX in a structured data language.

We are adding a new section on the cover page of Form N–PX where the reporting person would provide information in cases where the form is filed as an amendment to a previously filed Form N–PX report. We are also requiring that the cover page include information to help users identify whether the reporting person is a fund or a manager. We are also adding a new summary page to Form N–PX on which a fund is required to provide information about series or managers whose votes are included in the report, if applicable.

The amendments are discussed in detail in sections I and II above. We discuss the specifics of these burdens in the Economic Analysis and Paperwork Reduction Act sections above. For

---

[386] See supra sections IV and V. Section V also discusses the professional skills that we believe compliance with the rules will entail.

[387] ICI Comment Letter I; Ultimus Comment Letter.

[388] See ICI Comment Letter I.

[389] See Ultimus Comment Letter.

[390] See ICI Comment Letter I. This commenter also suggested that smaller funds in particular would benefit from being permitted to comply with the website disclosure requirement by providing a direct link on their website to the HTML-rendered Form N–PX report on EDGAR, but, as discussed above, all funds, including smaller funds, will be permitted to do this. See supra footnote 218 and accompanying text.

[391] See CFA/CII Comment Letter.

[392] See XBRL Comment Letter.

[393] See 17 CFR 270.0–10(a).

purposes of the PRA analysis, we have estimated that the aggregate annual reporting, administrative, and paperwork costs imposed by the form amendments on funds will be approximately $56 million.[394] We also estimate aggregate one-time reporting, administrative, and paperwork costs of approximately $26 million for funds that hold equity securities.[395]

### 5. Agency Action To Minimize Effect on Small Entities

The RFA directs us to consider alternatives that would accomplish our stated objectives, while minimizing any significant adverse effect on small entities. Accordingly, we considered the following alternatives: (i) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (ii) the clarification, consolidation, or simplification of compliance and reporting requirements under the amendments for small entities; (iii) the use of performance rather than design standards; and (iv) an exemption from coverage of the amendments, or any part thereof, for small entities.

The Commission does not presently believe that the amendments would require the establishment of special compliance requirements, timetables, or exceptions for small entities. The amendments are designed to increase transparency about how funds vote. As discussed above in response to comments, different disclosure requirements for small entities, such as reducing the level of proxy voting disclosure for small entities, would prevent investors in small funds from benefitting from the information provided by the amendments. Small funds currently must follow the same proxy voting reporting requirements as large funds in light of these concerns.

We have endeavored through the proposed amendments to Form N–PX to minimize the regulatory burden, including on small entities, while meeting our regulatory objectives. To this end, we made adjustments to the proposed amendments in the final fund rules as discussed in more detail above. Further, the proposed amendments took into account comments on the 2010 proposal, which resulted in retention of key disclosures to help investors understand how a fund votes, while reducing the burdens on funds.

We have endeavored to clarify, consolidate, and simplify the requirements applicable to funds,

including those that are small entities. Finally, we do not consider the use of performance standards to be consistent with our statutory mandate of investor protection with respect to reporting of proxy voting records.

### Statutory Authority

The Commission is adopting new rule 14Ad–1 and amendments to the rules and forms discussed above pursuant to the authority set forth in sections 5, 6, 7, 10, 19(a), and 28 of the Securities Act [15 U.S.C. 77e, 77f, 77g, 77j, 77s(a), and 77z–3]; sections 4A, 4B, 10(b), 13, 14A, 15(d), 23, 24, 35A, and 36 of the Exchange Act [15 U.S.C. 78d–1, 78d–2, 78j(b), 78m, 78n–1, 78o(d), 78w, 78x, 78*ll*, and 78mm]; sections 6(c), 8, 24(a), 30, 31, 38, and 45 of the Investment Company Act [15 U.S.C. 80a–6(c), 80a–8, 80a–24(a), 80a–29, 80a–30, 80a–37, and 80a–44]; and section 204 of the Investment Advisers Act [15 U.S.C. 80b–4].

### List of Subjects

*17 CFR Part 200*

Administrative practice and procedure, Authority delegations (Government agencies).

*17 CFR Part 232*

Administrative practice and procedure, Reporting and recordkeeping requirements, Securities.

*17 CFR Parts 240 and 249*

Reporting and recordkeeping requirements, Securities.

*17 CFR Parts 270 and 274*

Investment companies, Reporting and recordkeeping requirements, Securities.

### Text of Rule and Form Amendments

For the reasons set out in the preamble, the Commission is amending title 17, chapter II, of the Code of Federal Regulations as follows:

### PART 200—ORGANIZATION; CONDUCT AND ETHICS; AND INFORMATION AND REQUESTS

■ 1. The authority citation for part 200 continues to read as follows:

**Authority:** 5 U.S.C. 552, 552a, 552b, and 557; 11 U.S.C. 901 and 1109(a); 15 U.S.C. 77c, 77e, 77f, 77g, 77h, 77j, 77o, 77q, 77s, 77u, 77z–3, 77ggg(a), 77hhh, 77sss, 77uuu, 78b, 78c(b), 78d, 78d–1, 78d–2, 78e, 78f, 78g, 78h, 78i, 78k, 78k–1, 78l, 78m, 78n, 78o, 78o–4, 78q, 78q–1, 78w, 78t–1, 78u, 78w, 78ll(d), 78mm, 78eee, 80a–8, 80a–20, 80a–24, 80a–29, 80a–37, 80a–41, 80a–44(a), 80a–44(b), 80b–3, 80b–4, 80b–5, 80b–9, 80b–10(a), 80b–11, 7202, and 7211 *et seq.;* 29 U.S.C. 794; 44 U.S.C. 3506 and 3507; Reorganization

Plan No. 10 of 1950 (15 U.S.C. 78d nt); sec. 8G, Pub. L. 95–452, 92 Stat. 1101 (5 U.S.C. App.); sec. 913, Pub. L. 111–203, 124 Stat. 1376, 1827; sec. 3(a), Pub. L. 114–185, 130 Stat. 538; E.O. 11222, 30 FR 6469, 3 CFR, 1964–1965 Comp., p. 36; E.O. 12356, 47 FR 14874, 3 CFR, 1982 Comp., p. 166; E.O. 12600, 52 FR 23781, 3 CFR, 1987 Comp., p. 235; Information Security Oversight Office Directive No. 1, 47 FR 27836; and 5 CFR 735.104 and 5 CFR parts 2634 and 2635, unless otherwise noted.

### Subpart A—Organization and Program Management

■ 2. Section 200.30–5 is amended by revising paragraphs (c–1) introductory text and (c–1)(1) to read as follows:

#### § 200.30–5   Delegation of authority to Director of Division of Investment Management.

\*   \*   \*   \*   \*

(c–1) With respect to the Securities Exchange Act of 1934:

(1) To grant and deny applications filed pursuant to section 24(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78x(b)) and § 240.24b–2 of this chapter (Rule 24b–2) for confidential treatment of information filed pursuant to section 13(f) of that Act (15 U.S.C. 78m(f)) and § 240.13f–1 of this chapter (Rule 13f-1) and the instructions to Form N–PX (§§ 249.326 and 274.129 of this chapter).

\*   \*   \*   \*   \*

### PART 232—REGULATION S–T— GENERAL RULES AND REGULATIONS FOR ELECTRONIC FILINGS

■ 3. The general authority citation for part 232 is revised to read as follows:

**Authority:** 15 U.S.C. 77c, 77f, 77g, 77h, 77j, 77s(a), 77z–3, 77sss(a), 78c(b), 78*l*, 78m, 78n, 78n–1, 78o(d), 78w(a), 78*ll*, 80a–6(c), 80a–8, 80a–29, 80a–30, 80a–37, 7201 *et seq.;* and 18 U.S.C. 1350, unless otherwise noted.

\*   \*   \*   \*   \*

■ 4. Section 232.101 is amended by revising paragraphs (a)(1)(iii) and (xxii) and (d) to read as follows:

#### § 232.101   Mandated electronic submissions and exceptions.

(a) \*  \*  \*

(1) \*  \*  \*

(iii) Statements, reports, and schedules filed with the Commission pursuant to sections 13, 14, 14A(d), 15(d), or 16(a) of the Exchange Act (15 U.S.C. 78m, 78n, 78n–1(d), 78o(d), and 78p(a)), and proxy materials required to be furnished for the information of the Commission pursuant to §§ 240.14a–3 and 240.14c–3 of this chapter (Rules 14a–3 and 14c–3) or in connection with annual reports on Form 10–K (§ 249.310

[394] *See supra* section V, Table 2.

[395] *Id.*

of this chapter) filed pursuant to section 15(d) of the Exchange Act;

**Note 1 to paragraph (a)(1)(iii).** Electronic filers filing Schedules 13D and 13G with respect to foreign private issuers should include in the submission header all zeroes (*i.e.,* 00–0000000) for the Internal Revenue Service (IRS) tax identification number because the EDGAR system requires an IRS number tag to be inserted for the subject company as a prerequisite to acceptance of the filing.

**Note 2 to paragraph (a)(1)(iii).** Foreign private issuers must file or submit their Form 6–K reports (§ 249.306 of this chapter) in electronic format.

\* \* \* \* \*

(xxii) Confidential treatment requests filed with the Commission pursuant to section 13(f) of the Exchange Act (15 U.S.C. 78m(f)) and the rules and regulations in this chapter, including Form 13F (§ 249.325 of this chapter), or pursuant to the instructions to Form N–PX (§§ 249.326 and 274.129 of this chapter). The filings must be made on EDGAR in the format required by the EDGAR Filer Manual, as defined in § 232.11 (Rule 11 of Regulation S–T). Notwithstanding § 232.104 (Rule 104 of Regulation S–T), the documents filed or furnished under this paragraph (a)(1)(xxii) will be considered as officially filed with or furnished to, as applicable, the Commission; and

\* \* \* \* \*

(d) All documents, including any information with respect to which confidential treatment is requested, filed pursuant to section 13(n) (15 U.S.C. 78m(n)) and section 13(f) (15 U.S.C. 78m(f)) of the Exchange Act and the rules and regulations in this chapter and the instructions to Form N–PX (§§ 249.326 and 274.129 of this chapter) shall be filed in electronic format.

## PART 240—GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

■ 5. The general authority citation for part 240 continues to read as follows:

**Authority:** 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z–2, 77z–3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78c–3, 78c–5, 78d, 78e, 78f, 78g, 78i, 78j, 78j–1, 78k, 78k–1, 78*l*, 78m, 78n, 78n–1, 78*o*, 78*o*–4, 78*o*–10, 78p, 78q, 78q–1, 78s, 78u–5, 78w, 78x, 78dd, 78*ll*, 78mm, 80a–20, 80a–23, 80a–29, 80a–37, 80b–3, 80b–4, 80b–11, and 7201 *et seq.*, and 8302; 7 U.S.C. 2(c)(2)(E); 12 U.S.C. 5221(e)(3); 18 U.S.C. 1350; Pub. L. 111–203, 939A, 124 Stat. 1376 (2010); and Pub. L. 112–106, sec. 503 and 602, 126 Stat. 326 (2012), unless otherwise noted.

\* \* \* \* \*

■ 6. Add § 240.14Ad–1 to read as follows:

**§ 240.14Ad–1   Report of proxy voting record.**

(a) Subject to paragraphs (b) and (c) of this section, every institutional investment manager (as that term is defined in section 13(f)(6)(A) of the Act (15 U.S.C. 78m(f)(6)(A))) that is required to file reports under section 13(f) of the Act (15 U.S.C. 78m(f)) must file an annual report on Form N–PX (§§ 249.326 and 274.129 of this chapter) not later than August 31 of each year, for the most recent 12-month period ended June 30, containing the institutional investment manager's proxy voting record for each shareholder vote pursuant to sections 14A(a) and (b) of the Act (15 U.S.C. 78n–1(a) and (b)) with respect to each security over which the manager exercised voting power (as defined in paragraph (d) of this section).

(b) An institutional investment manager is not required to file a report on Form N–PX (§§ 249.326 and 274.129 of this chapter) for the 12-month period ending June 30 of the calendar year in which the manager's initial filing on Form 13F (§ 249.325 of this chapter) is due pursuant to § 240.13f–1. For purposes of this paragraph (b), "initial filing" on Form 13F means any quarterly filing on Form 13F if no filing on Form 13F was required for the immediately preceding calendar quarter.

(c) An institutional investment manager is not required to file a report on Form N–PX (§§ 249.326 and 274.129 of this chapter) with respect to any shareholder vote at a meeting that occurs after September 30 of the calendar year in which the manager's final filing on Form 13F (§ 249.325 of this chapter) is due pursuant to § 240.13f–1. An institutional investment manager is required to file a Form N–PX for the period July 1 through September 30 of the calendar year in which the manager's final filing on Form 13F is due pursuant to § 240.13f–1; this filing is required to be made not later than March 1 of the immediately following calendar year. For purposes of this paragraph (c), "final filing" on Form 13F means any quarterly filing on Form 13F if no filing on Form 13F is required for the immediately subsequent calendar quarter.

(d) For purposes of this section:

(1) *Voting power* means the ability, through any contract, arrangement, understanding, or relationship, to vote a security or direct the voting of a security, including the ability to determine whether to vote a security or to recall a loaned security.

(2) *Exercise* of voting power means using voting power to influence a voting decision with respect to a security.

■ 7. Amend § 240.24b–2 by revising paragraph (i) to read as follows:

**§ 240.24b–2   Nondisclosure of information filed with the Commission and with any exchange.**

\* \* \* \* \*

(i) An institutional investment manager shall omit the confidential portion from the material publicly filed in electronic format pursuant to section 13(f) of the Act (15 U.S.C. 78m(f)) and the rules and regulations in this part and the instructions to Form N–PX (§§ 249.326 and 274.129 of this chapter). The institutional investment manager shall indicate in the appropriate place in the material publicly filed that the confidential portion has been so omitted and filed separately with the Commission. In lieu of the procedures described in paragraph (b) of this section, an institutional investment manager shall request confidential treatment electronically pursuant to section 13(f) (15 U.S.C. 78m(f)), the rules and regulations in this part, and the instructions to Form N–PX (§§ 249.326 and 274.129 of this chapter).

## PART 249—FORMS, SECURITIES EXCHANGE ACT OF 1934

■ 8. The general authority citation for part 249 continues to read as follows:

**Authority:** 15 U.S.C. 78a *et seq.* and 7201 *et seq.*; 12 U.S.C. 5461 *et seq.*; 18 U.S.C. 1350; Sec. 953(b) Pub. L. 111–203, 124 Stat. 1904; Sec. 102(a)(3) Pub. L. 112–106, 126 Stat. 309 (2012), Sec. 107 Pub. L. 112–106, 126 Stat. 313 (2012), Sec. 72001 Pub. L. 114–94, 129 Stat. 1312 (2015), and secs. 2 and 3 Pub. L. 116–222, 134 Stat. 1063 (2020), unless otherwise noted.

\* \* \* \* \*

■ 9. Revise the heading for subpart D to read as follows:

**Subpart D—Forms for Annual and Other Reports of Issuers and Other Persons Required Under Sections 13, 14A, and 15(d) of the Securities Exchange Act of 1934**

■ 10. Add § 249.326 to read as follows:

**§ 249.326   Form N–PX, annual report of proxy voting record.**

This form shall be used by institutional investment managers to file an annual report pursuant to § 240.14Ad–1 of this chapter containing the manager's proxy voting record.

## PART 270—RULES AND REGULATIONS, INVESTMENT COMPANY ACT OF 1940

■ 11. The general authority citation for part 270 continues to read as follows:

**Authority:** 15 U.S.C. 80a–1 *et seq.,* 80a–34(d), 80a–37, 80a–39, and Pub. L. 111–203, sec. 939A, 124 Stat. 1376 (2010), unless otherwise noted.

\* \* \* \* \*

### § 270.30b1–4 [Amended]

■ 12. Amend § 270.30b1–4 by removing the phrase ''Form N–PX (§ 274.129 of this chapter)'' and adding in its place ''Form N–PX (§§ 249.326 and 274.129 of this chapter)''.

## PART 274—FORMS PRESCRIBED UNDER THE INVESTMENT COMPANY ACT OF 1940

■ 13. The authority citation for part 274 is revised to read as follows:

**Authority:** 15 U.S.C. 77f, 77g, 77h, 77j, 77s, 78c(b), 78*l,* 78m, 78n, 78n–1, 78*o*(d), 80a–8, 80a–24, 80a–26, 80a–29, and sec. 939A, Pub. L. 111–203, 124 Stat. 1376, unless otherwise noted.

■ 14. Amend Form N–1A (referenced in §§ 239.15A and 274.11A) by revising Item 17(f) and Item 27(d)(5) to read as follows:

**Note:** The text of Form N–1A does not, and these amendments will not, appear in the Code of Federal Regulations.

**Form N–1A**

\* \* \* \* \*

### Item 17. Management of the Fund

\* \* \* \* \*

(f) *Proxy Voting Policies.* Unless the Fund invests exclusively in non-voting securities, describe the policies and procedures that the Fund uses to determine how to vote proxies relating to portfolio securities, including the procedures that the Fund uses when a vote presents a conflict between the interests of Fund shareholders, on the one hand, and those of the Fund's investment adviser; principal underwriter; or any affiliated person of the Fund, its investment adviser, or its principal underwriter, on the other. Include any policies and procedures of the Fund's investment adviser, or any other third party, that the Fund uses, or that are used on the Fund's behalf, to determine how to vote proxies relating to portfolio securities. Also, state that information regarding how the Fund voted proxies relating to portfolio securities during the most recent 12-month period ended June 30 is available (1) without charge, upon request, by calling a specified toll-free telephone number and, if any, contacting a specified email address; (2) on or through the Fund's website, if it has one, at a specified internet address; and (3) on the Commission's website at *http://www.sec.gov.*

**Instructions**

1. A Fund may satisfy the requirement to provide a description of the policies and procedures that it uses to determine how to vote proxies relating to portfolio securities by including a copy of the policies and procedures themselves.

2. If a Fund (or financial intermediary through which shares of the Fund may be purchased or sold) receives a request for the Fund's proxy voting record by phone or email, the Fund (or financial intermediary) must send the information disclosed in the Fund's most recently filed report on Form N–PX in a human-readable format, within three business days of receipt of the request, by first-class mail or other means designed to ensure equally prompt delivery.

3. If a Fund has a website, it must make publicly available free of charge the information disclosed in the Fund's most recently filed report on Form N–PX on or through its website as soon as reasonably practicable after filing the report with the Commission. The information disclosed in the Fund's most recently filed report on Form N–PX must be in a human-readable format and remain available on or through the Fund's website for as long as the Fund remains subject to the requirements of Rule 30b1–4 (17 CFR 270.30b1–4). A Fund may satisfy the requirement to provide this information in a human-readable format by providing a direct link to the relevant HTML-rendered Form N–PX report on EDGAR.

\* \* \* \* \*

### Item 27. Financial Statements

\* \* \* \* \*

(d) *Annual and Semiannual Reports.* Every annual and semiannual report to shareholders required by rule 30e–1 must contain the following:

\* \* \* \* \*

(5) *Statement Regarding Availability of Proxy Voting Record.* A statement that information regarding how the Fund voted proxies relating to portfolio securities during the most recent 12-month period ended June 30 is available (i) without charge, upon request, by calling a specified toll-free telephone number and, if any, contacting a specified email address; (ii) on or through the Fund's website, if it has one, at a specified internet address; and (iii) on the Commission's website at *http://www.sec.gov.*

**Instructions**

1. If a Fund (or financial intermediary through which shares of the Fund may be purchased or sold) receives a request for the Fund's proxy voting record by phone or email, the Fund (or financial intermediary) must send the information disclosed in the Fund's most recently filed report on Form N–PX in a human-readable format, within three business days of receipt of the request, by first-class mail or other means designed to ensure equally prompt delivery.

2. If a Fund has a website, it must make publicly available free of charge the information disclosed in the Fund's most recently filed report on Form N–PX on or through its website as soon as reasonably practicable after filing the report with the Commission. The information disclosed in the Fund's most recently filed report on Form N–PX must be in a human-readable format and remain available on or through the Fund's website for as long as the Fund remains subject to the requirements of rule 30b1–4 (17 CFR 270.30b1–4). A Fund may satisfy the requirement to provide this information in a human-readable format by providing a direct link to the relevant HTML-rendered Form N–PX report on EDGAR.

\* \* \* \* \*

■ 15. Amend Form N–2 (referenced in §§ 239.14 and 274.11a–1) by revising Item 18.16, Item 24.6.d, and Item 24.8 to read as follows:

**Note:** The text of Form N–2 does not, and these amendments will not, appear in the Code of Federal Regulations.

**Form N–2**

\* \* \* \* \*

### Item 18. Management

\* \* \* \* \*

16. Unless the Registrant invests exclusively in non-voting securities, describe the policies and procedures that the Registrant uses to determine how to vote proxies relating to portfolio securities, including the procedures that the Registrant uses when a vote presents a conflict between the interests of the Registrant's shareholders, on the one hand, and those of the Registrant's investment adviser; principal underwriter; or any affiliated person (as defined in Section 2(a)(3) of the Investment Company Act and the rules thereunder) of the Registrant, its investment adviser, or its principal underwriter, on the other. Include any policies and procedures of the Registrant's investment adviser, or any other third party, that the Registrant uses, or that are used on the Registrant's behalf, to determine how to vote proxies relating to portfolio securities. Also, state that information regarding how the Registrant voted proxies relating to portfolio securities during the most

recent 12-month period ended June 30 is available (i) without charge, upon request, by calling a specified toll-free telephone number and, if any, contacting a specified email address; (ii) on or through the Registrant's website, if it has one, at a specified internet address; and (iii) on the Commission's website at *http://www.sec.gov.*

**Instructions**

1. A Registrant may satisfy the requirement to provide a description of the policies and procedures that it uses to determine how to vote proxies relating to portfolio securities by including a copy of the policies and procedures themselves.

2. If a Registrant (or financial intermediary through which shares of the Registrant may be purchased or sold) receives a request for the Registrant's proxy voting record by phone or email, the Registrant (or financial intermediary) must send the information disclosed in the Registrant's most recently filed report on Form N–PX [17 CFR 274.129] in a human-readable format, within 3 business days of receipt of the request, by first-class mail or other means designed to ensure equally prompt delivery.

3. If a Registrant has a website, it must make publicly available free of charge the information disclosed in the Registrant's most recently filed report on Form N–PX on or through its website as soon as reasonably practicable after filing the report with the Commission. The information disclosed in the Registrant's most recently filed report on Form N–PX must be in a human-readable format and remain available on or through the Registrant's website for as long as the Registrant remains subject to the requirements of Rule 30b1–4 under the Investment Company Act [17 CFR 270.30b1–4]. A Registrant may satisfy the requirement to provide this information in a human-readable format by providing a direct link to the relevant HTML-rendered Form N–PX report on EDGAR.

\*　\*　\*　\*　\*

**Item 24. Financial Statements**

\*　\*　\*　\*　\*

6. Every annual and semiannual report to shareholders required by Section 30(e) of the Investment Company Act and Rule 30e–1 thereunder shall contain the following information:

\*　\*　\*　\*　\*

d. A statement that information regarding how the Registrant voted proxies relating to portfolio securities during the most recent 12-month period

ended June 30 is available (1) without charge, upon request, by calling a specified toll-free telephone number and, if any, contacting a specified email address; (2) on or through the Registrant's website, if it has one, at a specified internet address; and (3) on the Commission's website at *http://www.sec.gov.*

\*　\*　\*　\*　\*

8. a. When a Registrant (or financial intermediary through which shares of the Registrant may be purchased or sold) receives a request for a description of the policies and procedures that the Registrant uses to determine how to vote proxies, the Registrant (or financial intermediary) must send the information most recently disclosed in response to Item 18.16 of this Form or Item 7 of Form N–CSR within 3 business days of receipt of the request, by first-class mail or other means designed to ensure equally prompt delivery.

b. If a Registrant (or financial intermediary through which shares of the Registrant may be purchased or sold) receives a request for the Registrant's proxy voting record by phone or email, the Registrant (or financial intermediary) must send the information disclosed in the Registrant's most recently filed report on Form N–PX in a human-readable format, within 3 business days of receipt of the request, by first-class mail or other means designed to ensure equally prompt delivery.

c. If a Registrant has a website, it must make publicly available free of charge the information disclosed in the Registrant's most recently filed report on Form N–PX on or through its website as soon as reasonably practicable after filing the report with the Commission. The information disclosed in the Registrant's most recently filed report on Form N–PX must be in a human-readable format and remain available on or through the Registrant's website for as long as the Registrant remains subject to the requirements of Rule 30b1–4 under the Investment Company Act. A Registrant may satisfy the requirement to provide this information in a human-readable format by providing a direct link to the relevant HTML-rendered Form N–PX report on EDGAR.

\*　\*　\*　\*　\*

■ 16. Amend Form N–3 (referenced in §§ 239.17a and 274.11b) by revising Item 23(f), Item 31.4(d), and Item 31.6 to read as follows:

**Note:** The text of Form N–3 does not, and these amendments will not, appear in the Code of Federal Regulations.

**Form N–3**

\*　\*　\*　\*　\*

**Item 23. Management of the Registrant**

\*　\*　\*　\*　\*

(f) *Proxy Voting Policies.* Unless the Registrant invests exclusively in non-voting securities, describe the policies and procedures that the Registrant uses to determine how to vote proxies relating to portfolio securities, including the procedures that the Registrant uses when a vote presents a conflict between the interests of investors, on the one hand, and those of the Registrant's investment adviser; principal underwriter; or any affiliated person of the Registrant, its investment adviser, or its principal underwriter, on the other. Include any policies and procedures of the Registrant's investment adviser, or any other third party, that the Registrant uses, or that are used on the Registrant's behalf, to determine how to vote proxies relating to portfolio securities. Also, state that information regarding how the Registrant voted proxies relating to portfolio securities during the most recent 12-month period ended June 30 is available (1) without charge, upon request, by calling a specified toll-free telephone number and, if any, contacting a specified email address; (2) on or through the Registrant's website, if it has one, at a specified internet address; and (3) on the Commission's website at *http://www.sec.gov.*

**Instructions**

1. A Registrant may satisfy the requirement to provide a description of the policies and procedures that it uses to determine how to vote proxies relating to portfolio securities by including a copy of the policies and procedures themselves.

2. If a Registrant (or financial intermediary through which shares of the Registrant may be purchased or sold) receives a request for the Registrant's proxy voting record by phone or email, the Registrant (or financial intermediary) must send the information disclosed in the Registrant's most recently filed report on Form N–PX [17 CFR 274.129] in a human-readable format, within three business days of receipt of the request, by first-class mail or other means designed to ensure equally prompt delivery.

3. If a Registrant has a website, it must make publicly available free of charge the information disclosed in the Registrant's most recently filed report on Form N–PX on or through its website as soon as reasonably practicable after filing the report with the Commission. The information disclosed in the

Registrant's most recently filed report on Form N–PX must be in a human-readable format and remain available on or through the Registrant's website for as long as the Registrant remains subject to the requirements of rule 30b1–4 [17 CFR 270.30b1–4]. A Registrant may satisfy the requirement to provide this information in a human-readable format by providing a direct link to the relevant HTML-rendered Form N–PX report on EDGAR.

*    *    *    *    *

**Item 31. Financial Statements**

*    *    *    *    *

4. Every report required by section 30(e) of the 1940 Act and rule 30e–1 under it [17 CFR 270.30e–1] shall contain the following information:

*    *    *    *    *

(d) a statement that information regarding how the Registrant voted proxies relating to portfolio securities during the most recent 12-month period ended June 30 is available (i) without charge, upon request, by calling a specified toll-free telephone number and, if any, contacting a specified email address; (ii) on or through the Registrant's website at a specified internet address, if applicable; and (iii) on the Commission's website at *http:// www.sec.gov;*

*    *    *    *    *

6. (a) When a Registrant (or financial intermediary through which units of the Registrant may be purchased or sold) receives a request for a description of the policies and procedures that the Registrant uses to determine how to vote proxies, the Registrant (or financial intermediary) must send the information disclosed in response to Item 23(f) of this Form, within three business days of receipt of the request, by first-class mail or other means designed to ensure equally prompt delivery.

(b) If a Registrant (or financial intermediary through which units of the Registrant may be purchased or sold) receives a request for the Registrant's proxy voting record by phone or email, the Registrant (or financial intermediary) must send the information disclosed in the Registrant's most recently filed report on Form N–PX [17 CFR 274.129] in a human readable format, within three business days of receipt of the request, by first-class mail or other means designed to ensure equally prompt delivery.

(c) If a Registrant has a website, it must make publicly available free of charge the information disclosed in the Registrant's most recently filed report on Form N–PX on or through its website

as soon as reasonably practicable after filing the report with the Commission. The information disclosed in the Registrant's most recently filed report on Form N–PX must be in a human-readable format and remain available on or through the Registrant's website for as long as the Registrant remains subject to the requirements of rule 30b1–4 under the Investment Company Act [17 CFR 270.30b1–4]. A Registrant may satisfy the requirement to provide this information in a human-readable format by providing a direct link to the relevant HTML-rendered Form N–PX report on EDGAR.

*    *    *    *    *

■ 17. Amend § 274.129 by revising the heading to read as follows:

**§ 274.129   Form N–PX, annual report of proxy voting record.**

*    *    *    *    *

■ 18. Form N–PX (referenced in §§ 249.326 and 274.129) is revised.

**Note:** Form N–PX is attached as appendix A to this document. Form N–PX will not appear in the Code of Federal Regulations.

By the Commission.
Dated: November 2, 2022.

**Vanessa A. Countryman,**
*Secretary.*

**Appendix A—Form N–PX**

**United States**

**Securities and Exchange Commission**

**Washington, DC 20549**

**Form N–PX**

**Annual Report of Proxy Voting Record**

**General Instructions**

*A. Rule as to Use of Form N–PX*

Form N–PX is to be used by a registered management investment company, other than a small business investment company registered on Form N–5 (17 CFR 239.24 and 274.5), to file the registered management investment company's complete proxy voting record pursuant to Section 30 of the Investment Company Act of 1940 ("Investment Company Act") and Rule 30b1–4 thereunder (17 CFR 270.30b1–4). Form N–PX also is to be used by a person that is required to file reports under Rule 13f–1 ("Institutional Manager"), to file the Institutional Manager's proxy voting record regarding votes pursuant to Sections 14A(a) and (b) of the Securities Exchange Act of 1934 ("Exchange Act") on certain executive compensation matters, pursuant to Section 14A(d) of the Exchange Act and Rule 14Ad–1 thereunder (17 CFR 240.14Ad–1). Form N–PX is to be filed not later than August 31 of each year for the most recent 12-month period ended June 30, except in the case of Institutional Managers that make initial or final filings on Form 13F during the relevant 12-month period as described in General Instruction F.

*B. Application of General Rules and Regulations*

The General Rules and Regulations under the Investment Company Act and the Exchange Act contain certain general requirements that are applicable to reporting on any form under those Acts. These general requirements should be read and observed carefully in the preparation and filing of reports on this form, except that any provision in the form or in these instructions is controlling.

*C. Joint Reporting Rules*

1. If two or more Institutional Managers, each of which is required by Rule 14Ad–1 to file a report on Form N–PX for the reporting period, exercised voting power over the same securities on a vote pursuant to Section 14A(a) or (b) of the Exchange Act, only one such Institutional Manager must include the information regarding that vote in its report on Form N–PX.

2. Two or more Institutional Managers that are affiliated persons, as defined in Section 2(a)(3) of the Investment Company Act, may file a joint report on a single Form N–PX notwithstanding that such Institutional Managers do not exercise voting power over the same securities.

3. An Institutional Manager is not required to report proxy votes that are reported on a Form N–PX report that is filed by a Fund.

4. An Institutional Manager that exercised voting power over any security with respect to proxy votes that are reported by another Institutional Manager or Managers pursuant to General Instruction C.1 or C.2, or are reported on a Form N–PX report filed by a Fund, must identify each Institutional Manager and Fund reporting on its behalf in the manner described in Special Instruction B.2.d. and B.2.e.

5. An Institutional Manager reporting proxy votes on behalf of another Institutional Manager pursuant to General Instruction C.1 or C.2 must identify any other Institutional Managers on whose behalf the filing is made in the manner described in Special Instruction C.2.

6. A Fund reporting proxy votes that would otherwise be required to be reported by an Institutional Manager must identify any Institutional Managers on whose behalf the filing is made in the manner described in Special Instruction C.2.

*D. Signature and Filing of Report.*

1. a. For reports filed by a Fund, the report must be signed on behalf of the Fund by its principal executive officer or officers. For reports filed by Institutional Managers, the report must be signed on behalf of the Institutional Manager by an authorized person. Attention is directed to Rule 12b–11 under the Exchange Act and Rule 8b–11 under the Investment Company Act concerning signatures.

b. The name and title of each person who signs the report shall be typed or printed beneath his or her signature.

2. A reporting person must file reports on Form N–PX electronically using the Commission's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system in accordance with Regulation S–T. Consult the

EDGAR Filer Manual and Appendices for EDGAR filing instructions.

*E. Definitions.*

As used in this Form N–PX, the terms set out below have the following meanings:

"Fund" means a registered management investment company (other than a small business investment company registered on Form N–5 (17 CFR 239.24 and 274.5)) or a separate Series of the registered management investment company.

"Institutional Manager" means a person that is required to file reports under Rule 13f–1 under the Exchange Act.

"LEI" means, with respect to any company, the "legal entity identifier" as assigned by a utility endorsed by the Global LEI Regulatory Oversight Committee or accredited by the Global LEI Foundation. "Reporting Person" means the Institutional Manager or Fund filing this report or on whose behalf the report is filed.

"Series" means shares issued by a registered management investment company that represent undivided interests in a portfolio of investments and that are preferred over all other series of shares for assets specifically allocated to that series in accordance with Rule 18f–2(a) under the Investment Company Act [17 CFR 270.18f–2(a)].

*F. Transition Rules for Institutional Managers*

1. An Institutional Manager is not required to file a report on Form N–PX for the 12-month period ending June 30 of the calendar year in which the manager's initial filing on Form 13F is due pursuant to Rule 13f–1 under the Exchange Act. For purposes of this paragraph, an "initial filing" on Form 13F means any quarterly filing on Form 13F if no filing on Form 13F was required for the immediately preceding calendar quarter.

2. An Institutional Manager is not required to file a report on Form N–PX with respect to any shareholder vote at a meeting that occurs after September 30 of the calendar year in which the manager's final filing on Form 13F is due pursuant to Rule 13f–1 under the Exchange Act. An Institutional Manager is required to file a Form N–PX for the period July 1 through September 30 of the calendar year in which the manager's final filing on Form 13F is due pursuant to Rule 13f–1 under the Exchange Act; this filing is required to be made not later than March 1 of the immediately following calendar year. For purposes of this paragraph, a "final filing" on Form 13F means any quarterly filing on Form 13F if no filing on Form 13F is required for the immediately subsequent calendar quarter.

**Special Instructions**

*A. Organization of Form N–PX*

1. This form consists of three parts: the Form N–PX Cover Page ("Cover Page"), the Form N–PX Summary Page ("Summary Page"), and the proxy voting information required by the form ("Proxy Voting Information").

2. Present the Cover Page and the Summary Page information in the format and order provided in the form. Do not include any additional information on the Summary Page.

*B. Cover Page*

1. Amendments to a Form N–PX report must either restate the Form N–PX report in its entirety or include only proxy voting information that is being reported in addition to the information already reported in a current public Form N–PX report for the same period. If the Form N–PX report is filed as an amendment, then the reporting person must check the amendment box on the Cover Page, enter the amendment number, and check the appropriate box to indicate whether the amendment (a) is a restatement or (b) adds new Proxy Voting Information. Each amendment must include a complete Cover Page and, if applicable, a Summary Page.

2. Designate the Report Type for the Form N–PX report by checking the appropriate box in the Report Type section of the Cover Page, and include, where applicable, the List of Other Persons Reporting for this Manager (on the Cover Page), the Summary Page, and the Proxy Voting Information, as follows:

a. For a report by a Fund, if the Fund held one or more securities it was entitled to vote, check the box for Report Type "Fund Voting Report," omit from the Cover Page the List of Other Persons Reporting for this Manager, and include both the Summary Page and the Proxy Voting Information.

b. For a report by a Fund, if the Fund did not hold any securities it was entitled to vote and therefore does not have any proxy votes to report, check the box for Report Type "Fund Notice Report" and file the Cover Page, required signature, and, if applicable, the Summary Page information about the series.

c. For a report by an Institutional Manager that includes all proxy votes required to be reported by the Institutional Manager, check the box for Report Type "Institutional Manager Voting Report," omit from the Cover Page the List of Other Persons Reporting for this Manager, and include both the Summary Page and the Proxy Voting Information.

d. For a report by an Institutional Manager, if no proxy votes are reported by the Institutional Manager in the filing, check the box for Report Type "Institutional Manager Notice Report," on the Cover Page and complete the notice report filing explanation section. If all the votes required to be reported by the Institutional Manager are reported by another Institutional Manager or by one or more Funds, check the explanatory box indicating "all proxy votes are reported by other reporting persons," include the List of Other Persons Reporting for this Manager, and file the Cover Page and required signature only. All other reporting persons may omit this section. If the reporting manager did not exercise voting power over securities involving any reportable voting matter, check the explanatory box indicating "the reporting person did not exercise voting power for any reportable voting matter and therefore does not have any proxy votes to report for the reporting period" and file the Cover Page and required signature only. If the reporting manager has a policy not to vote on any proxy matters, clearly disclose the policy, and did not vote any proxy matters during the reporting period, check the explanatory box indicating "the reporting

person has a clearly disclosed policy of not voting, and did not vote, on any proxy voting matters" and file the Cover Page and required signature only.

e. For a report by an Institutional Manager, if only part of the proxy votes required to be reported by the Institutional Manager are reported by another Institutional Manager or Managers or one or more Funds, check the box for Report Type "Institutional Manager Combination Report," include on the Cover Page the List of Other Persons Reporting for this Manager, and include both the Summary Page and the Proxy Voting Information.

3. If the Institutional Manager has a number assigned by the Financial Industry Regulatory Authority's Central Registration Depository system or by the Investment Adviser Registration Depository system ("CRD number"), provide the Manager's CRD number. If the Institutional Manager has a file number (*e.g.,* 801–, 8–, 866–, 802–) assigned by the Commission ("SEC file number"), provide the Manager's SEC file number. If the Reporting Person has a Legal Entity Identifier ("LEI"), provide the Reporting Person's LEI.

4. The Cover Page may include information in addition to the required information, so long as the additional information does not, either by its nature, quantity, or manner of presentation, impede the understanding or presentation of the required information. Place all additional information at the end of the Cover Page, except as permitted by paragraph (o) of Item 1.

*C. Summary Page*

1. Include on the Summary Page the total number of included Institutional Managers with votes reported in this Form N–PX report pursuant to General Instruction C, not counting the reporting person filing this report. *See* Special Instruction C.2. If none, enter the number zero ("0").

2. Include on the Summary Page the list of included Institutional Managers with votes reported in this Form N–PX report pursuant to General Instruction C. Use the title, column headings, and format provided.

a. If this Form N–PX report does not report the proxy votes of any Institutional Manager other than the reporting person, enter the word "NONE" under the title and omit the column headings and list entries.

b. If this Form N–PX report reports the proxy votes of one or more Institutional Managers other than the reporting person, enter in the list of included Institutional Managers all such Institutional Managers together with their respective Form 13F file numbers, if known, and, if they exist, any of the respective CRD Numbers, LEIs, and SEC File Numbers assigned to each manager. (The Form 13F file numbers are assigned to Institutional Managers when they file their first Form 13F). Assign a number to each Institutional Manager in the list of included Institutional Managers, and present the list in sequential order. The numbers need not be consecutive. Do not include the reporting person filing this report.

3. For reports filed by a Fund, include on the Summary Page: the total number of Series of the Fund reported in this Form N–PX, if any; the name of each Series included; each

Series identification number; and the LEI for any Series of the Fund. If this Form N–PX report does not report the proxy votes of any Series, enter the word ''NONE'' under the title and omit the column headings and list entries.

### D. Proxy Voting Information

1. Disclose the information required or permitted by Item 1 in the order presented in paragraphs (a) through (o) of Item 1.

2. A reporting person must provide the Council on Uniform Securities Identification Procedures (''CUSIP'') number for the security pursuant to Item 1(b), unless the CUSIP is not available through reasonably practicable means, *e.g.,* in the case of certain securities of foreign issuers. If the CUSIP is not available through reasonably practicable means, the reporting person must provide the International Securities Identification Number (''ISIN'') pursuant to Item 1(c), unless the ISIN is not available through reasonably practicable means. A reporting person may choose to report the global share class Financial Instrument Global Identifier (''FIGI'') for the security pursuant to Item 1(d).

3. Item 1(f) requires an identification of the matter voted on for all matters. If a form of proxy in connection with a matter is subject to rule 14a–4 under the Exchange Act [17 CFR 240.14a–4], the description in Item 1(f) must: (i) use the same language that is on the form of proxy to identify the matter; (ii) identify all matters in the same order as on the form of proxy; and (iii) for election of directors, identify each director separately in the same order as on the form of proxy, even if the election of directors is presented as a single matter on the form of proxy. In all other cases, provide a brief identification of the matters voted on and limit use of abbreviations, which should not be used other than for commonly understood terms or for terms that the issuer abbreviated in its description of the matter.

4. Item 1(g) requires the reporting person to categorize each matter from a list of categories that may apply to such matter. In responding to Item 1(g), a reporting person must choose all categories applicable to such matter.

5. In responding to paragraph (i) of Item 1, a reporting person may use the number of shares voted as reflected in its records at the time of filing a report on Form N–PX. If the reporting person has not received confirmation of the actual number of votes cast prior to filing a report on Form N–PX, the numbers reported may reflect the number of shares instructed to be cast. A reporting person is not required to amend a previously filed Form N–PX report if the reporting person subsequently receives confirmation of the actual number of votes cast.

6. In responding to paragraphs (i) and (j) of Item 1:

a. An Institutional Manager must report the number of shares that the Institutional Manager is reporting on behalf of another Institutional Manager pursuant to General Instruction C.1 or C.2 separately from the number of shares that the Institutional Manager is reporting only on its own behalf. An Institutional Manager also must

separately report shares when the groups of Institutional Managers on whose behalf the shares are reported are different. For example, if the reporting Institutional Manager is reporting on behalf of Manager A with respect to 10,000 shares and on behalf of Managers A and B with respect to 50,000 shares, then the groups of 10,000 and 50,000 shares must be separately reported.

b. A Fund must separately report shares that are reported on behalf of different Institutional Managers or groups of Institutional Managers pursuant to General Instruction C.3.

7. For purposes of paragraph (j) of Item 1, a reporting person is considered to have loaned securities if it loaned the securities directly or loaned the securities indirectly through a lending agent.

8. If management did not make a recommendation on how to vote on a particular matter, a reporting person should respond ''none'' to paragraph (l) of Item 1 for that matter.

9. In the case of a reporting person that is a Fund that offers multiple Series, provide the information required by Item 1 separately by Series (for example, provide Series A's full proxy voting record, followed by Series B's full proxy voting record).

10. In response to paragraph (o), a reporting person may provide additional information about the matter or how it voted, provided the information does not, either by its nature, quantity, or manner of presentation, impede the understanding or presentation of the required information. The disclosure permitted by paragraph (o) is optional. A reporting person is not required to respond to paragraph (o) for any vote, and if a reporting person does provide additional information for one or more votes, it is not required to provide this information for all votes.

### Instructions for Confidential Treatment Requests

1. An Institutional Manager should make requests for confidential treatment of information reported on this form in accordance with rule 24b–2(i) under the Exchange Act [17 CFR 240.24b–2(i)].

2. Paragraph (i) of rule 24b–2 requires a person filing confidential information with the Commission to indicate at the appropriate place in the public filing that the confidential portion has been so omitted and filed separately with the Commission. An Institutional Manager must comply with this provision by including on the Cover Page a statement that confidential information has been omitted from the public Form N–PX report and filed separately with the Commission.

3. An Institutional Manager must file electronically, in accordance with rule 101(d) of Regulation S–T [17 CFR 232.101(d)], all requests for and information subject to the request for confidential treatment.

4. An Institutional Manager must file all requests for and information subject to the request for confidential treatment in accordance with the instructions for filing confidential treatment requests for information filed on Form 13F. In making a determination as to requests for confidential

treatment of information filed on Form N–PX, the Commission will apply the same standards as set forth in Section 13(f)(4) and (5) of the Exchange Act [15 U.S.C. 78m(f)(4) and (5)] and rule 24b–2. If a request for confidential treatment of information filed on Form N–PX relates to a request for confidential treatment of information included in an Institutional Manager's filing on Form 13F, the Institutional Manager should so state and identify the related request. In such cases, the Institutional Manager need not repeat the analysis set forth in the request for confidential treatment in connection with the Form 13F filing. The Institutional Manager's request, however, must explain whether and, if so, how the Form N–PX and Form 13F confidential treatment requests are related and should identify if any of the analysis in its request for confidential treatment on Form 13F does not apply, or applies differently, to its report on Form N–PX.

5. An Institutional Manager requesting confidential treatment must provide enough factual support for its request to enable the Commission to make an informed judgment as to the merits of the request, including a demonstration that the information is customarily and actually kept private by the Institutional Manager and that failure to grant the request for confidential treatment would be likely to cause harm to the Institutional Manager.

6. State, and provide justification for, the period of time for which confidential treatment of the proxy voting information is requested. The time period specified may not exceed one (1) year from the date that the Form N–PX report is required to be filed with the Commission.

7. At the expiration of the period for which confidential treatment has been granted (the ''Expiration Date'') and unless a *de novo* request for confidential treatment of the information that meets the requirements of Rule 24b–2 and these Confidential Treatment Instructions is filed with the Commission at least fourteen (14) days in advance of the Expiration Date, the Institutional Manager will make such proxy voting information public as set forth in Confidential Treatment Instruction 8.

8. Unless a hardship exemption is available, the Institutional Manager must submit electronically within six (6) business days of the expiration of confidential treatment or notification of denial, as applicable, a Form N–PX amendment to its previously filed public Form N–PX report that includes the proxy voting information as to which the Commission denied confidential treatment or for which confidential treatment has expired. Such Form N–PX amendment must be timely filed: (i) upon the denial by the Commission of a request for confidential treatment; (ii) upon expiration of the time period for which an Institutional Manager has requested confidential treatment; or (iii) upon the expiration of the confidential treatment previously granted for a filing. If an Institutional Manager files an amendment, the amendment must be a restatement; the Institutional Manager must designate it as an amendment that adds new proxy voting

information. The Institutional Manager must include at the top of the Form N–PX Cover Page the following legend to correctly designate the type of filing being made:

THIS FILING LISTS PROXY VOTE INFORMATION REPORTED ON THE FORM N–PX FILED ON (DATE) PURSUANT TO A REQUEST FOR CONFIDENTIAL TREATMENT AND FOR WHICH (THAT REQUEST WAS DENIED/CONFIDENTIAL TREATMENT EXPIRED) ON (DATE).

**Paperwork Reduction Act Information**

Form N–PX is to be used by a Fund to file reports with the Commission pursuant to Section 30 of the Investment Company Act and Rule 30b1–4 thereunder. Form N–PX also is to be used by an Institutional Manager to file reports with the Commission as required by Section 14A(d) of the Exchange Act and Rule 14Ad–1 thereunder. Form N–PX is to be filed not later than August 31 of each year, containing the reporting person's proxy voting record for the most recent 12-month period ended June 30. The Commission may use the information provided on Form N–PX in its regulatory, disclosure review, inspection, and policymaking roles.

Funds and Institutional Managers are required to disclose the information specified by Form N–PX, and the Commission will make this information public. Funds and Institutional Managers are not required to respond to the collection of information contained in Form N–PX unless the Form displays a currently valid Office of Management and Budget ("OMB") control number. Please direct comments concerning the accuracy of the information collection burden estimate and any suggestions for reducing the burden to the Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–1090. The OMB has reviewed this collection of information under the clearance requirements of 44 U.S.C. 3507.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

**FORM N–PX**

**ANNUAL REPORT OF PROXY VOTING RECORD**

FORM N-PX COVER PAGE

_____
(Name of reporting person) (For registered management investment companies, provide exact name of registrant as specified in charter)

_____
(Address of principal executive offices)          (Zip code)

_____
(Name and address of agent for service)

Telephone number of reporting person, including area code: _____

Report for the [year ended June 30, _____] [period July 1, _____ to September 30, _____]

SEC Investment Company Act or Form 13F File Number: [811- ] [028- ]_____

CRD Number (if any): _____

Other SEC File Number (if any): _____

Legal Entity Identifier (if any): _____

Check here if amendment ☐; Amendment number: _____

     This Amendment (check only one):  ☐ is a restatement.

                                       ☐ adds new proxy voting entries.

Report Type (check only one):     Registered Management Investment Company.

                                  ☐ Fund Voting Report (Check here if the registered management investment company held one or more securities it was entitled to vote.)

                                  ☐ Fund Notice Report (Check here if the registered management investment company did not hold any securities it was entitled to vote and therefore does not have any proxy votes to report.)

                                  Institutional Manager.

☐ Institutional Manager Voting Report (Check here if all proxy votes of this reporting manager are reported in this report.)

☐ Institutional Manager Notice Report (Check here if no proxy votes are reported in this report and complete the notice report filing explanation section below)

Notice report filing explanation:

☐ all proxy votes for which the manager exercised voting power are reported by other reporting persons

☐ the manager did not exercise voting power for any reportable voting matter and therefore does not have any proxy votes to report

☐ the manager has a clearly disclosed policy of not voting, and did not vote, on any proxy voting matters

☐ Institutional Manager Combination Report (Check here if a portion of the proxy votes for this reporting manager are reported in this report and a portion are reported by other reporting person(s).)

[ ]    Confidential Treatment Requested. (The Institutional Manager has omitted from this public Form N-PX one or more proxy vote(s) for which it is requesting confidential treatment from the U.S. Securities and Exchange Commission pursuant to the instructions of this form)

List of Other Persons Reporting for this Manager:
[If there are no entries in this list, omit this section.]

| Investment Company Act or Form 13F File Number | CRD Number (if any) | Other SEC File Number (if any) | LEI (if any) | Name |
|---|---|---|---|---|
| [811- ] [028- ]_____ | _____ | _____ | _____ | _____ |

[Repeat as necessary.]

# FORM N-PX SUMMARY PAGE

## Information about Institutional Managers.

Number of Included Institutional Managers: _____

List of Included Institutional Managers:

Provide a numbered list of the name(s), 13F file number(s), CRD Numbers (if any), SEC File Number(s) (if any), and LEI (if any) of all Institutional Managers with respect to which this report is filed, other than the reporting person filing this report.

[If there are no entries in this list, state "NONE" and omit the column headings and list entries.]

| No. | Form 13F File Number 28- | CRD Number (if any) | SEC File Number (if any) | LEI (if any) | Name |
|-----|--------------------------|---------------------|--------------------------|--------------|------|
| _____ | _____ | _____ | _____ | _____ | _____ |

[Repeat as necessary.]

## Information about the Series.

Number of Series: _____

Provide a list of the name(s) and identification number(s) of all Series with respect to which this report is filed.

[If there are no entries in this list, state "NONE" and omit the column headings and list entries.]

| Series Identification Number | LEI | Series Name |
|------------------------------|-----|-------------|
| _____ | _____ | _____ |

[Repeat as necessary.]

**FORM N–PX**

**Item 1. Proxy Voting Record**

If the reporting person is a Fund, disclose the following information for each matter relating to a portfolio security considered at any shareholder meeting held during the period covered by the report and with respect to which the Fund was entitled to vote, including securities on loan for purposes of this form. If the reporting person is an Institutional Manager, disclose the following information for each shareholder vote pursuant to Sections 14A(a) and (b) of the Exchange Act over which the Institutional Manager exercised voting power, as defined in Rule 14Ad–1(d) under the Exchange Act [17 CFR 240.14Ad–1].

(a) The name of the issuer of the security;

(b) The Council on Uniform Securities Identification Procedures ("CUSIP") number for the security;

(c) The International Securities Identification Number ("ISIN") for the security;

(d) The global share class Financial Instrument Global Identifier ("FIGI") for the security (optional);

(e) The shareholder meeting date;

(f) An identification of the matter voted on;

(g) All categories applicable to the matter voted on from the following list of categories:

(A) Director elections;

(B) Section 14A say-on-pay votes (examples: section 14A executive compensation, section 14A executive compensation vote frequency, section 14A extraordinary transaction executive compensation);

(C) Audit-related (examples: auditor ratification, auditor rotation);

(D) Investment company matters (examples: new or changed investment management agreement, assignment of investment management agreement, business development company approval of restricted securities or asset coverage ratio change, closed-end investment company issuance of shares below net asset value);

(E) Shareholder rights and defenses (examples: adoption or modification of a shareholder rights plan, control share acquisition provisions, fair price provisions, board classification, cumulative voting);

(F) Extraordinary transactions (examples: merger, asset sale, liquidation, buyout, joint venture, going private, spinoff, delisting);

(G) Capital structure (examples: security issuance, stock split, reverse stock split, dividend, buyback, tracking stock, adjustment to par value, authorization of additional stock);

(H) Compensation (examples: board compensation, executive compensation (other than Section 14A say-on-pay), board or executive anti-hedging, board or executive anti-pledging, compensation clawback, 10b5–1 plans);

(I) Corporate governance (examples: term limits, board committee issues, size of board, articles of incorporation or bylaws, codes of ethics, approval to adjourn, acceptance of minutes, proxy access);

(J) Environment or climate (examples: greenhouse gas (GHG) emissions, transition planning or reporting, biodiversity or ecosystem risk, chemical footprint, renewable energy or energy efficiency, water issues, waste or pollution, deforestation or land use, say-on-climate, environmental justice);

(K) Human rights or human capital/workforce (examples: workforce-related mandatory arbitration, supply chain exposure to human rights risks, outsourcing or offshoring, workplace sexual harassment);

(L) Diversity, equity, and inclusion (examples: board diversity, pay gap);

(M) Other social issues (examples: lobbying, political or charitable activities, data privacy, responsible tax policies, consumer protection); or

(N) Other (along with a brief description).

(h) For reports filed by Funds, disclose whether the matter was proposed by the issuer or by a security holder;

(i) The number of shares that were voted, with the number zero ("0") entered if no shares were voted;

(j) The number of shares that the reporting person loaned and did not recall;

(k) How the shares in paragraph (i) were voted (*e.g.,* for or against proposal, or abstain; for or withhold regarding election of directors) and, if the votes were cast in multiple manners (*e.g.,* for and against), the number of shares voted in each manner;

(l) Whether the votes disclosed in paragraph (k) represented votes for or against management's recommendation;

(m) If applicable, identify each Institutional Manager on whose behalf this Form N–PX report is being filed (other than the reporting person filing the report) that exercised voting power over the security by entering the number assigned to the Institutional Manager on the Summary Page;

(n) If applicable, identify the Series that was eligible to vote the security by providing the Series identification number listed on the Summary Page; and

(o) Any other information the reporting person would like to provide about the matter or how it voted.

**Signatures**

[See General Instruction D]

Pursuant to the requirements of the [Securities Exchange Act of 1934 (for Institutional Managers)] [Investment Company Act of 1940 (for Funds)], the reporting person has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

(Reporting Person) ■■■■■■■■■
By (Signature and Title) ■■■■■■■■■
Date ■■■■■■■■■■■■■■■■

Print the name and title of each signing officer under his or her signature.

[FR Doc. 2022–24292 Filed 12–21–22; 8:45 am]