No. 23-60079

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS, STATE OF LOUISIANA, STATE OF UTAH, AND STATE OF WEST VIRGINIA,

*Petitioners,*

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of a Final Action
of the United States Securities and Exchange Commission

## BRIEF FOR PETITIONERS

ANGELA COLMENERO
Provisional Attorney General

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General

DAVID BRYANT
Special Counsel
David.Bryant@oag.texas.gov

Counsel for Petitioner State of Texas

Additional counsel listed in signature block

# CERTIFICATE OF INTERESTED PERSONS

No. 23-60079

STATE OF TEXAS, STATE OF LOUISIANA, STATE OF UTAH, AND STATE
OF WEST VIRGINIA,

*Petitioners,*

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Petitioners, as governmental parties, need not furnish a certificate of interested persons.

/s/ David Bryant
DAVID BRYANT
Counsel for Petitioner State of Texas

# Statement Regarding Oral Argument

This case involves the legality of a Final Rule by which the Securities and Exchange Commission seeks to pressure investment advisors—and, by extension, publicly traded companies—to favor its preferred social and environmental policies under the guise of proxy vote disclosure requirements. Petitioners The States of Texas, Louisiana, Utah, and West Virginia ("the States") respectfully suggest that oral argument will aid the Court in its decisional process.

# Table of Contents

Certificate of Interested Persons ...............................................................ii

Statement Regarding Oral Argument ........................................................iii

Table of Contents ......................................................................................iv

Table of Authorities ..................................................................................vi

Introduction ................................................................................................1

Statement of Jurisdiction ...........................................................................2

Issues Presented .........................................................................................3

Statement of the Case ................................................................................4

    I.    The Basics of Securities Regulation: Full Disclosure ...................4

    II.   The "ESG" Movement Among Activist Shareholders....................8

    III.  The Proposed and Final Rule................................................... 11

Summary of the Argument....................................................................... 17

Standard of Review .................................................................................. 19

Argument...................................................................................................20

    I.    The States Have Standing to Seek Review of the Final Rule ...................20

        A.   The Rule will cause Texas pocketbook injury. ................................ 21

        B.   Texas has *parens patriae* standing. .........................................25

    II.   The SEC Exceeded its Statutory Authority and Abused its Discretion in Adopting the Final Rule.......................................28

    III.  The SEC Acted Arbitrarily and Capriciously in Adopting the Final Rule. .....................................................................30

        A.The SEC failed to show evidence of broad fund investor demand for the categorization mandate or conduct any rational cost-benefit analysis.............................................. 31

        B.    The SEC arbitrarily and capriciously chose a single, highly atypical year as the basis for its proxy vote categorization mandate. ............................................ 35

C.  The SEC acted arbitrarily and capriciously by failing to consider whether and to what extent the categories it chose will cause fund managers to act contrary to their fiduciary duties or cause disinvestment in industries disfavored by ESG activists. ............................................................................. 39

Conclusion ............................................................................................ 42

Certificate of Service ........................................................................... 44

Certificate of Compliance .................................................................... 44

# Table of Authorities

Cases                                                                                                    Page(s)

*Affiliated Ute Citizens of Utah v. United States,*
  *406 U.S. 128 (1972)* ....................................................................................5

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez,*
  458 U.S. 592 (1982) ...................................................................................26

*BCCA Appeal Grp. v. EPA,*
  355 F.3d 817 (5th Cir. 2002) .................................................................. 20

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................................... 19

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) ................................................... 20, 23, 25, 28

*Bloomberg, L. P. v. SEC,*
  45 F. 4th 462 .............................................................................. 37, 38

*Burlington Truck Lines v. United States,*
  371 U. S. 156 (1962) .................................................................................. 19

*Carlson v. Postal Reg. Comm'n,*
  938 F.3d  (D. C. Cir. 2019) ..................................................................34

*Carlson v. Postal Reg. Comm'n,*
  938 F.3d 337 (D. C. Cir. 2019) .............................................................. 11

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
  511 U.S. 164 (1994) ..............................................................................4, 5

*Collins v. Yellen,*
  141 S. Ct. 1761 (2021) .............................................................................. 21

*Conway v. Emeny*,
   96 A.2d 221 (Conn. 1953) ...................................................................39

*Czyzewski v. Jevic Holding Corp.*,
   580 U.S. 451 (2017) ...........................................................................20

*Estate of Rothko*,
   372 N.E. 2d 291 (N. Y. 1977) .............................................................39

*FCC v. Prometheus Radio Project*,
   141 S. Ct. 1150 (2021) ........................................................................19

*Haaland v. Brackeen*,
   143 S. Ct. 1609 (2023) ........................................................................26

*Herpich v. Wallace*,
   430 F.2d 792 (5th Cir. 1970) ................................................................ 6

*La. Dept. of Wildlife & Fisheries,*
   70 F.4th .............................................................................................26

*Lampkin v. UBS PaineWebber, Inc.*,
   238 F. Supp. 3d 799 (S. D. Tex. 2017) ................................................. 6

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .......................................................................20, 22

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ......................................................................26, 28

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ............................................................................26

*Mexican Gulf Fishing Co. v. United States DOC*,
   60 F.4th 956 (5th Cir. 2023) .....................................................33, 34, 41

*Michigan v. EPA*,
   576 U. S. 743 (2015) ...........................................................................34

*Missouri v. Biden*,
    No. 3:22-CV-01213, 2023 WL 4335270 (W.D. La. July 4, 2023) ............... 26, 28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................... 19

*National Grain & Feed Ass'n v. OSHA*,
    866 F.2d 717 (5th Cir. 1988) ............................................................ 33

*SEC v. Capital Gains Rsch. Bureau, Inc.*,
    375 U. S. 180 (1963) ...................................................................... 5, 6

*Texas Independent Ginners v. Marshall*,
    630 F.2d 398 ................................................................................. 33

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ............................................................ 41

*Texas v. EEOC*,
    933 F.3d 433 (5th Cir. 2019) ............................................................ 19

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ................................................... 20, 22, 28

*Tittle v. Enron Corp.*,
    284 F. Supp. 2d 511 (S. D. Tex. 2003)............................................... 39

*TransUnion, LLC v. Ramirez*,
    141 S. Ct. 2190 at 2204 (2021)......................................................... 20

*Tyler v. Hennepin County.*,
    598 U. S. 631 (2023)....................................................................... 20

*Uzyel v. Kadisha*,
    116 Cal. Rptr. 244, 276, 118 Cal. App. 4th (Cal. App. 2010).............. 45

## Statutes

15 U. S. C. §§ 77(a), 80a-42a, 80b-13a ..................................................3
15 U.S. C. § 78y(b)(1) ...........................................................................3, 28
15 U.S.C. §§ 77a-77aa ...............................................................................4
15 U.S.C. §§ 78a-78kk ...............................................................................4
15 U.S.C. §§ 80a-29 ...................................................................................1
15 U.S.C. §§ 80b-1 to 80b-21 ("1940 ........................................................5
5 U.S.C. § 704 ..........................................................................................19
5 U.S.C. § 706(2)(A) ...............................................................................19
Tex. Const. art. IV, §§ 1, 2. ....................................................................22
Tex. Const. art. XVI, § 67(b)(1) .............................................................24
Tex. Const. art. XVI, § 67(b)(2) .............................................................23
Tex. Gov't Code § 404.102(a) .................................................................22
Tex. Gov't Code § 404.103(f) ..................................................................23
Tex. Gov't Code § 404.104(a) .................................................................22
Tex. Gov't Code § 811.002 ......................................................................24
Tex. Gov't Code § 811.003 ......................................................................24
Tex. Gov't Code § 821.003 ................................................................24, 25

## Rules

Federal Rule of Appellate Procedure 32(a)(7)(B) ...................................44
Rule 32(a)(5) ............................................................................................44
Rule 32(a)(6) ............................................................................................44
Rule 32(f); and (2) ...................................................................................44

## Regulations

17 C.F.R. § 274.129 (2021) ......................................................................12
68 Fed. Reg. 6,564 (Feb. 7, 2003) .......................................................7, 12
85 Fed. Reg. 72,846 (November 13, 2020) ..........................................9, 10
85 Fed. Reg. 81,658 (December 16, 2020) ................................................9
86 Fed. Reg. .............................................................................................10
86 Fed. Reg. 57,478 (Oct. 15, 2021) ..................................................13, 14
87 Fed. Reg. 78770 (Dec. 22, 2022) ................................................. passim

## Other Authorities

*An Energy and Sustainability Roadmap for West Virginia,*
115 W. Va. L. Rev. 879 (2013) ................................................................27

*Are Existing Stock Broker Standards Sufficient? Principles, Rules, and Fiduciary Duties,*
2010 Colum. Bus. L. Rev. 710 (2010) ................................................. 6

*Multiple Use on Public Lands by the Numbers,*
34 Utah B. J. 48 (2021) ........................................................... 27

*President Biden,*
Executive Order 13990 ............................................................. 8

*President Biden,*
Executive Order 14008 ............................................................. 8

*President Biden,*
Executive Order 14030 ............................................................. 9

*Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis,*
86 Fed. Reg. 7,037 (Jan. 20, 2021) ................................................. 8

*Protection from What? Investor Protection and the Jobs Act,*
13 U.C. Davis Bus. L.J. 207 (2013) ................................................. 4

*Securities and Exchange Commission's Enhanced Disclosure and New Prospectus Delivery Option for Registered Mutual Funds,*
83 St. John's L. Rev. 1431 (2009) .................................................. 7

*The Historical Need for a Mandatory Corporate Disclosure System,*
9 J. Corp. L. 1 (1983) ............................................................. 4

*The Securities and Exchange Commission and Corporate Social Transparency,*
112 Harv. L. Rev. 1197 (1999) ...............................................ii, 1, 3

*U.S. Department of Labor Releases Statement on Enforcement of Its Final Rules on ESG Investments, Proxy Voting By Employee Benefit Plans,*
USDL 21-0371 (Dep't of Labor Mar. 10, 2021) ...................................... 10

# Introduction

The central purpose of federal securities laws in general, and the Investment Company Act of 1940 in particular, is the protection of securities investors. To serve these interests, Congress charged the Securities and Exchange Commission ("SEC" or "Commission") with requiring registered investment companies to file periodically and transmit to shareholders financial, as well as "such other information as the Commission deems necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. §§ 80a-29. The SEC's assigned mission was to ensure that investors received full and accurate information necessary for them to freely choose their investments, but not to selectively promote or disfavor particular companies or industries.

Congress did *not* make the SEC the conscience of the nation. Nor did it empower the SEC to steer the public toward investments the Government of the day deems socially or politically beneficial.[1] The SEC is meant to evenhandedly oversee the enforcement of the nation's *securities* laws—laws that aim to ensure that information material to investors' financial investment decisions is fully and truthfully made available to them. The SEC's role is not to tell the public (or even subtly suggest) how to invest.

---

[1] Congress can—and has—set innumerable policies that promote social, environmental, and governance issues ranging from Title VII to the Clean Air Act. But those are the regulatory remit of other agencies, not the SEC.

1

In the Rule challenged in this proceeding, the SEC traversed those limits and stepped into areas that Congress has left to other agencies. In that Rule, SEC clothes its actions in the rhetoric of "transparency" and "full disclosure." But this is pretext: the real purpose and likely effect of the Rule is to empower corporate activists rather than the investing public, and the Rule is further meant to pressure investment companies and securities issuers to promote controversial corporate policies favored by a majority of the unelected SEC Commissioners (and the current Presidential Administration). By overstepping its limited authority to ensure that investment funds provide objective, material, and and unbiased information to investors, the SEC has exceeded its statutory authority and abused its discretion. Moreover, because the SEC failed to adequately consider and explain its actions, the Rule is arbitrary and capricious and should be set aside under the Administrative Procedure Act ("APA").

## Statement of Jurisdiction

The Rule challenged in this proceeding, "Enhanced Reporting of Proxy Votes by Registered Management Investment Companies; Reporting of Executive Compensation Votes by Institutional Investment Managers," Investment Company Act Release No. 34745, 87 Fed. Reg. 78770 (Dec. 22, 2022) (the "Rule" or "Final

Rule") is to become effective on July 1, 2024. AR 2.[2] The petition for review was timely filed on February 21, 2023, invoking this Court's jurisdiction under 15 U.S. C. § 78y(b)(1). *See also* 15 U. S. C. §§ 77(a), 80a-42a, 80b-13a.

## Issues Presented

1.  Whether the States have standing to challenge the Rule because it harms the States' own investments and its citizenry.

2.  Whether the SEC acted in excess of its statutory jurisdiction and/or abused its discretion by requiring the disclosure of certain categories of proxy votes in order to promote social or political goals unrelated to the financial interests of investors.

3.  Whether the Rule's provisions regarding categorization of proxy votes required to be disclosed are arbitrary and capricious because the SEC relied on improper considerations or skewed data or failed to reasonably consider or explain its choices.

---

[2] Citations to the administrative record are noted as "AR". The "AR" documents cited in this brief are from the Certified List Describing the Record in Proceedings Before the Securities and Exchange Commission, filed in this Court on April 3, 2023. They are identified by document number listed in the Certified List.

## Statement of the Case

## I.  The Basics of Securities Regulation: Full Disclosure

"The centrality of investor protection to federal securities regulation in the United States is evident in: (1) the language of the enabling federal statutes, (2) judicial decisions interpreting these statutes, and (3) commentary on federal securities regulations." Michael D. Guttentag, *Protection from What? Investor Protection and the Jobs Act*, 13 U.C. Davis Bus. L.J. 207, 208-09 (2013). United States stock markets crashed in 1929 and fell even further in the early 1930's—leading the nation into the Great Depression. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 170 (1994). Misleading or fraudulent representations to the investing public were among the root causes leading to the meteoric rise of the stock market and its equally historic crash.

As a result, Congress passed three important statutes between 1933 and 1940 designed to prevent a recurrence of the Great Depression: the Securities Act of 1933. 38, 48 Stat. 74 (codified as amended at 15 U.S.C. §§ 77a-77aa) ("1933 Act"), the Securities Exchange Act of 1934, ch. 404, 48 Stat. 881 (codified as amended at 15 U.S.C. §§ 78a-78kk) ("1934 Act"), and the Investment Advisers Act of 1940, ch. 686, 54 Stat. 847 (codified as amended at 15 U.S.C. §§ 80b-1 to 80b-21 ("1940 Act"). The 1933 Act "requires the registration of all securities when first made publicly available," whereas the 1934 Act "regulates all aspects of publicly traded

securities." Thomas Lee Hazen & Kris Markarian, *Federal Securities Law*, pt. I.A.1, pt. I.A.2 (4th ed. 2022) (ebook). The 1940 Act "regulates investment company management composition, capital structure, advisory contracts, and investment policy modifications" as well as "subject[s] investment companies to the disclosure requirements of the 1933 Act when offering their securities publicly and to the reporting, proxy solicitation, and insider-trading provisions of the 1934 Act." *Id.* at n.8.

For decades, the prevailing view of these statutes has been that "[t]ogether," they "embrace a fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of *caveat emptor.*" *Central Bank of Denver*, *N. A. v. First Interstate Bank of Denver, N. A.*, 511 U.S. 164, 171 (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (omission and emphasis in original)); *see also SEC v. Capital Gains Rsch. Bureau, Inc.*, 375 U. S. 180, 191-92 (1963) (explaining that the "evident purpose" of the 1940 Act is to implement a "philosophy of full disclosure"). Congress has never changed the SEC's primary mission to combat securities fraud by placing the investing public on a more even informational footing with insiders and speculators.

Moreover, the law has long recognized that investment advisers subject to the 1940 Act have fiduciary duties to the investors who entrust their savings to those investment advisers.

> Even though the word 'fiduciary' does not appear in [the Investment Company Act of 1940], investment advisers are

> fiduciaries to their clients and must meet the fiduciary duties of
> care and loyalty.

*Lampkin v. UBS PaineWebber, Inc.*, 238 F. Supp. 3d 799, 844 (S. D. Tex. 2017), *citing* (citing Thomas Lee Hazen, *Are Existing Stock Broker Standards Sufficient? Principles, Rules, and Fiduciary Duties*, 2010 Colum. Bus. L. Rev. 710, 716 (2010)). See *SEC v. Capital Gains Rsch. Bureau, Inc.*, 375 U. S. at 191-94(1940 Act "reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship") (internal quotations omitted). As stated by the Fifth Circuit in *Herpich v. Wallace*, the 1940 Act was based on "the understanding that those who manage other people's money are trustees acting for others." 430 F.2d 792, 816 (5th Cir. 1970).

The fiduciary duty of loyalty is the investment adviser's duty to act solely in the interests of his investors. *See* Restatement (Third) of the Law of Trusts §78 (Am. L. Inst. 2007) (explaining the duty of loyalty of a trustee to a beneficiary). The investment adviser cannot act for the benefit of third parties; cannot act for his own benefit; and cannot act for other business or personal motives. *See id.* § 78 & cmt. f.

To carry out its obligations under the securities laws, the SEC has adopted a number of specific—and burdensome—disclosure requirements on both securities issuers and investment companies. Indeed, the SEC has required so much disclosure, that there have been suggestions that "[i]investment companies have become accustomed to disclosing to consumers too much information. . . without carefully considering the drawbacks of this practice." Sara B. Zimmer, Note,

*Securities and Exchange Commission's Enhanced Disclosure and New Prospectus Delivery Option for Registered Mutual Funds*, 83 St. John's L. Rev. 1431, 1440 (2009) (quoting Former SEC Chairman Arthur Levitt that "[m]ore disclosure does not always mean better disclosure" (alteration in original)).

Of relevance here, in 2003, the SEC adopted Form N-PX, extending its reach into proxy voting by investment funds. Disclosure of Proxy Voting Policies and Proxy Voting Records, 68 Fed. Reg. 6,564 (Feb. 7, 2003). Investment fund managers are empowered to cast proxy votes on matters submitted for vote by the shareholders of the companies held in their funds. *See id.* at 6,574-75 (discussing fund manager's ability to cast proxy votes). The SEC through Form N-PX mandated annual public disclosure of such proxy votes by funds, *Id.* at 6,569, which includes mutual funds and exchange traded funds ("ETFs"). By and large, this requirement has not been controversial because the great majority of the matters submitted for shareholder vote are the annual election of corporate directors; the annual appointment of independent auditors; the approval or rejections of corporate transactions such as mergers and acquisitions; and the approval or rejection of changes to corporate charters or by-laws. *See id.* at 6,567 (discussing types of information that to be disclosed).

## II. The "ESG" Movement Among Activist Shareholders

In addition to ordinary course proxy votes regarding corporate governance issues, activists—who often own tiny percentages of corporate shares—increasingly have submitted matters for corporate shareholder vote out of ideological or political fervor and to promote and publicize causes or ideologies dear to them.

Such issue-driven corporate proposals have more recently become relatively common. *E.g.*, Capital Group, ESG Global Study 9-10 (2022), www.capitalgroup.com/advisor/pdf/shareholder/ITGEOT-028-658081.pdf. (discussing less skepticism by some investors). Often, they deal with issues such as climate change or environmental issues; labor or human rights issues; and what is often referred to as "diversity, equity, and inclusion." Generically, such matters are often referred to as ESG concerns.

The new Presidential Administration in 2021 launched ESG and climate-related initiatives on a broad array of issues.[3] President Biden on May 20, 2021, signed

---

[3]    Immediately upon taking office, President Biden signed Executive Order 13990 on January 20, 2021, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7,037 (Jan. 20, 2021). Section 2 directed agencies to review all regulations adopted during the previous administration that might be inconsistent with the new policies set forth in Section 1. This was followed by Executive Order 14008 on January 27, 2021, in which the President announced "the policy of my Administration to organize and deploy the full capacity of its agencies to combat the climate crisis to implement a Government-wide approach" Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg 7,619, 7,622 (Jan. 27, 2021).

Executive Order 14030 on May 20, 2021. Climate-Related Financial Risk, 86 Fed. Reg. 27,967 (May 20, 2021). This Order included a directive that the "Financial Stability Oversight Council" issue a report to the President discussing the "necessity of any actions to enhance climate-related disclosure by regulated entities" and a "recommended implementation plan for taking these actions," *Id.* at 27,968. This Executive Order also specifically directed the Secretary of Labor to "consider publishing, by September 2021, for notice and comment a proposed rule to suspend, revise, or rescind "Financial Factors in Selecting Plan Investments," and "'Fiduciary Duties Regarding Proxy Voting and Shareholder Rights.'" *Id.* at 27,968-69 (first citing Financial Factors in Selecting Plan Investments, 85 Fed. Reg. 72,846 (November 13, 2020) (the "ERISA Plan Investment Rule"), and then citing "Fiduciary Duties Regarding Proxy Voting and Shareholder Rights," 85 Fed. Reg. 81,658 (December 16, 2020) (the "ERISA Proxy Voting Rule")).

The ERISA Proxy Voting Rule is especially significant here. In it, the Department of Labor in late 2020 directed ERISA fiduciaries to act in proxy voting "in a manner consistent with the economic interests of [retirement] plans and plan participants that does not subordinate their interests to any non-pecuniary objectives or promote goals unrelated to the financial interest of participants and beneficiaries", such as ESG concerns. 85 Fed. Reg. at 81,660.

> This duty of loyalty—a bedrock principle of ERISA, with deep
> roots in the law of trusts—requires those serving as fiduciaries
> to act with a single-minded focus on the interests of
> beneficiaries. *Id.* at 81,658.

After the change in Administration, the new Secretary of Labor quickly blocked enforcement of both the ERISA Plan Investment Rule and the ERISA Proxy Voting Rule. On March 10, 2021, the Secretary issued a Statement advising that "the Department will not enforce either final rule or otherwise pursue enforcement actions against any plan fiduciary based on a failure to comply with those final rules." *U.S. Department of Labor Releases Statement on Enforcement of Its Final Rules on ESG Investments, Proxy Voting By Employee Benefit Plans,* USDL 21-0371 (Dep't of Labor Mar. 10, 2021).

 The Department of Labor in 2022 adopted a new rule (the "ESG Retirement Plan Rule") that loosened the ERISA standard for fiduciaries of retirement plans, who were previously required to invest beneficiaries' funds "based retirement plans, who were previously required to invest beneficiaries' funds "based only on pecuniary factors" weighed according to "impact on risk and return." 85 Fed. Reg. at 72,858, 72,865. The ESG Retirement Plan Rule was intended to enable the consideration also of "climate change and other ESG issues by fiduciaries." 86 Fed. Reg. at 57,299.[4]

---

[4] Congress on March 1, 2023, passed legislation to block this 2022 ESG Retirement Plan Rule. President Biden vetoed that legislation.  Doina Chiacu, et. al, *Biden Uses First Veto to Defend Rule on ESG Investing,* Reuters (Mar. 20, 2023) https://tinyurl.com/44s28vdu. A legal challenge to the 2022 ESG Retirement Plan Rule by Petitioners and other States and private parties is pending as *State of Utah et al. v. Walsh, et al.*, No. 2:23-cv-00016-Z, N. D. Tex.).

At the SEC, the ESG push under new Chair Gary Gensler included the Rule on fund proxy voting at issue here, but also several other fronts as well. The new Chair's regulatory agenda also included, for example, mandating enhanced disclosures on purported climate-change-related risk; disclosures on board of directors' diversity; and additional disclosures about "human capital management." *See, e.g.,* Gensler, Prepared Remarks at London City Week (June 23, 2021) https://www.sec.gov/news/speech/gensler-speech-london - city-week-062321. The Rule challenged here is one such effort by the unelected majority of the SEC to advance the administration's ESG agenda.

## III. The Proposed and Final Rule

The Final Rule encompasses multiple subjects, but Petitioners only challenge one of them in this proceeding:[5] a portion the SEC refers to as "Identification of Proxy Voting Categories." 87 Fed. Reg. at 78,776-78. The Form N-PX approved by the SEC in 2003 had required funds to report publicly their proxy-voting records on

---

[5] The Rule, for example, also requires institutional investment managers to file reports regarding "say-on-pay" votes, 87 Fed. Reg. at 78,774, changes reporting requirements as to proxy votes with respect to securities that are on loan to others at the time of the proxy vote, *id.* at 78779, and alters various technical requirements related to Form N-PX itself, including a requirement that form be filed electronically in a structured format, *e.g.*, *id.* at 78787-88. These changes, while questionable in their own right, are not the subject of this petition. This Court may sever only a part of a rule that is arbitrary and capricious if it finds the SEC would have adopted the unchallenged part of the rule and it can function sensibly without the challenged provision. *Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 351 (D. C. Cir. 2019).

an annual basis. *See* 68 Fed. Reg. at 6,564. However, the 2003 Form N-PX did not require investment managers to categorize their proxy-votes so as to emphasize or highlight any particular issues—only "[a] brief identification of the matter voted on" and how the registrant cast its vote was required. *Id.* at 6,569; *see also* 17 C.F.R. § 274.129 (2021).

Purportedly to "improve the utility" of Form N-PX, the SEC on September 29, 2021, proposed amendments to Form N-PX to "enhance the information" provided on that Form and to "make that information easier to analyze." 87 Fed. Reg. at 78,771. The Proposed Rule did so by expanding the required reporting from a "brief identification of the matter voted on" to seventeen categories and approximately ninety subcategories including:

> (L) Environment or climate (sub-categories: Greenhouse gas (GHG) emissions, transition planning or reporting, biodiversity or ecosystem risk, chemical footprint, renewable energy or energy efficiency, water issues, waste or pollution, deforestation or land use, say-on-climate, environmental justice, or other environment or climate matters (along with a brief description));

> (M) Human rights or human capital/workforce (subcategories: Workforce-related mandatory arbitration, supply chain exposure to human rights risks, outsourcing or offshoring, workplace sexual harassment, or other human rights or human capital/workforce matters (along with a brief description));

> (N) Diversity, equity, and inclusion (subcategories: Board diversity, pay gap, pr other diversity, equity, and inclusion matters (along with a brief description));

(O) Political activities (subcategories: Lobbying, political contributions, or other political activity matters (along with a brief description));

(P) Other social (subcategories: Data privacy, responsible tax policies, charitable contributions, consumer protection, other social matters (along with a brief description)).

86 Fed. Reg. 57,478, 57,524 (Oct. 15, 2021).

SEC Commissioner Hester M. Perce voted against the proposal, explaining that the Commission appeared to have been motivated to adopt the proposal for reasons unrelated to its investor protection mission:[6]

> The discretionary amendments to Form N-PX are being justified in the name of enhanced transparency. Our disclosure rules are in place to help *investors*, but these proposed disclosures could harm investors, as existing N-PX disclosure may already be doing.
>
> At the risk of apostasy, I posit that proxy voting is not the most important activity in which a fund engages. Although a fund's voting strategy can be an important part of the overall fund management strategy, how or why a fund votes, or even *whether* a fund votes on a particular issue at a particular portfolio company is unlikely materially to influence an investor's choice to invest in a particular fund. The proposing release, however, is replete with statements insisting that investor demand for more data on specific fund vote compels this rulemaking . . . .

Commissioner Peirce then pinpointed both the true genesis of the Rule and the politicization of fund proxy voting it will engender:

> The real interest in this kind of detailed voting information seems to come from activists and the ever-expanding population of "stakeholders," for whom proxy voting seems to be the fund's highest purpose. In 2003, when the SEC was considering the original Form N-PX fund voting disclosure

---

[6] Comm. Hester M. Peirce, *Statement on Enhanced Reporting of Proxy Votes by Registered Management Investment Companies* (Sep. 29, 2021) https://www.sec.gov/news/public-statement/peirce-open-meeting-2021-09-29.

mandate, the heads of the two then-largest asset managers jointly penned a remarkably prescient Wall Street Journal opinion piece. In it, they warned that:

> [R]equiring mutual-fund managers to disclose their votes on corporate proxies would politicize proxy voting. In case after case, it would open mutual-fund voting to thinly veiled intimidation from activist groups whose agendas may have nothing to do with maximizing our clients' returns.

Those words resonate now that so many proxy votes involve highly contentious social and political issues. So while fund shareholders may not be interested in this information, activists of every stripe can use the fact that funds have to publish their votes to increase their leverage through intimidation and negative publicity. Thus these stakeholders shape how proxy votes are cast . . . .

Peirce, *supra*.

SEC Commissioner Elad L. Roisman noted that the proposed Form N-PX Amendments "go beyond mere 'modernization' and appear designed to alter the way funds fundamentally think about voting -- in ways I do not believe will necessarily serve investors."[7] He continued:

> [T]he process by which we have devised this framework does not appear to be based on rigorous analysis. Rather than grounding it on a review of proxy voting matters from several prior years, we focused only on the most recent proxy season for which information was available – 2020 –and started from there. Moreover, we did not tabulate even these 2020 votes into our proposed categories, and it remains a mystery to me whether some of these categories and subcategories include matters voted on at hundreds of companies or merely one or two. This is hardly a recipe for longevity."

*Id.*

---

[7] Comm. Elad L. Roisman, *Statement on Proposed Changes to Asset Managers' Proxy Voting Disclosures* (Sep. 29, 2021) https://www.sec.gov/news/public-statement/roisman-open-meeting-2021-09-29.

Commissioner Roisman then explained the significance of the apparently result-oriented focus on 2020:

> The proposal's myopic focus on the year 2020 has substantive policy implications as well. The most obvious example is our proposed "ESG" categories and subcategories. In the year 2020, ESG investment strategies proliferated for myriad reasons. Whether they have staying power in their current form is yet to be seen, but by permanently memorializing their interests into our reporting of votes, we seem to be underscoring the importance of these issues to all investors for years to come.

After the proposed Rule was approved, the SEC received many comments from the public and interested industry participants and groups, including from Petitioner State of Utah. AR 57. Utah, through its Attorney General, Treasurer, and State Auditor, noted the proposed categories were limited to those identified by the SEC staff as ones frequently voted on in 2020, and stated: "This unexplained limitation signals that the expanded categories are being proposed to further political and social agendas, not to protect or benefit investors." *Id.* at 1-2. Utah also questioned the need for that proposal, because of its limited value to actual investors as opposed to corporate activists. *Id.*at 4-6. Utah also urged that "these new reporting requirements and voting pressures may conflict with a fund's fiduciary duties to their investors." *Id.* at 5. Utah urged that the SEC "**should not**" adopt the proposed categories. *Id.* at 1-2 (emphasis in original).

Many commenters expressed strong misgivings about the SEC's proposed proxy vote categorization mandates. Some decried the costs of the proposal as compared to their limited value to investors—which surely would be passed on not only to institutional investors like the States, but also to individual fund investors of

15

modest means. *E.g.*, AR 43 at 2 (Quaadman, U. S. Chamber of Commerce). Other commenters criticized the number, complexity, and vagueness of the proposed mandated categories, and believed that they would engender confusion among investors rather than benefit them. *E.g.,* AR 46 at 5-6 (O'Brien & Denize, Teachers Insurance & Annuity Ass'n). Still others echoed Commissioner Roisman's concerns that the categories chosen should be "evergreen," rather than those chosen by the SEC based on 2020 alone. *E.g.*, AR 22 at 2-3 (Shepard, Nat'l Ctr. for Pub. Policy Research; AR 29 at 4-6 (Olson & Bessin, Inv. Co. Inst.); AR 34 at 3-4 (Kniczek & Haymon, Federated Hermes, Inc.); AR 43 at 2 (Quaadman, U. S. Chamber of Commerce).

In the end, however, the SEC pushed ahead and adopted the Final Rule in December 2022 with only minor changes from the 2021 Proposed Rule. It used the eighty or so proposed "subcategories" for a slightly different purpose: "We have also eliminated the proposed requirement to select from a list of subcategories and have included in Form P-NX examples of matters that would fall into each category that generally track subjects that were previously proposed as subcategories." 87 Fed. Reg. at 78,777.

Similarly, the Final Rule clung to its selection of 2020 as the sole basis of categories chosen but combined a few categories. "Security issuance" was consolidated with "capital structure." *Id*. at 78777-78. "Meeting governance" was combined with "corporate governance." And "political activities" was combined with "other social issues." *Id*.  But ESG issues remain as four of the thirteen categories on which the SEC insists all funds must report their proxy votes:

"Environment or climate"; "Human rights or human capital/workplace"; "diversity, equity, and inclusion"; and "other social issues". *Id.* at 78,778.

## Summary of the Argument

**I**. Texas and The Other States have standing. They are threatened with imminent pocketbook injury by the Rule. They invest in funds subject to the Rule, which will cause them additional costs that will be passed on to fund investors like the States. In addition, the States have *parens patriae* standing because of the widespread effects of the Rule on their citizens and economies.

**II**. The SEC exceeded its statutory authority and abused its rulemaking discretion in the proxy vote categorization provisions of the Final Rule. It did so by promoting the interests of ESG corporate activists and its own ESG agenda at the expense of the fund investors whom the Investment Company Act of 1940 and other securities laws exist to protect. The Final Rule diminishes the net returns of the broad majority of fund investors who have not demanded and do not benefit from having the proxy votes of their funds categorized, and provides benefits only to a narrow sliver of fund investors motivated by the ESG agenda.

**III.**    The SEC acted arbitrarily and capriciously in adopting the Final Rule. The Final Rule violates the APA and should be set aside in whole or with respect to its proxy vote categorization provisions for at least three independent reasons.

*First*, the SEC failed to adduce data to demonstrate that there is any general demand or need among investors for the categorization of proxy votes in the Final Rule. The SEC also failed to make any rational cost-benefit analysis comparing the

benefits of the Final Rule to investors as compared to the additional costs that the Final Rule will cause the investing public to bear, or to explain why it failed to do so.

*Second*, the SEC acted arbitrarily and capriciously in adopting the Final Rule in its selection of the categories that funds will be mandated to use in reporting their proxy votes. The SEC purportedly chose those categories based on its staff's determination of the most common categories of proxy votes in a single and highly atypical year, 2020. Yet the SEC did not provide even the 2020 data to support that choice, which an SEC Commissioner aptly described as "myopic." The SEC also gave no rational basis for determining the number of 2020 proxy votes it chose as a threshold for selection of a "category." It further did not consider using data that encompassed a number of years, nor did it discuss or explain why it failed to do so. And the SEC ignored comments both by SEC Commissioners and the public in the administrative record criticizing this choice on multiple grounds.

*Third*, the SEC acted arbitrarily and capriciously in adopting the Final Rule by failing to consider or discuss whether and to what extent the Final Rule will or may cause fund managers to act contrary to their fiduciary duties to fund investors to act solely in their financial interests and maximize the value of their investments. The SEC also failed to consider whether and to what extent the Final Rule will increase activist leverage and pressure on fund managers and cause disinvestment in securities of companies and industries targeted by ESG activists.

## Standard of Review

The States seek review by this Court of the Final Rule under the APA. The Final Rule constitutes "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. It marks the consummation of the agency's decision-making process; it also determines rights or obligations and produces legal consequences. *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). The APA requires courts to hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Although judicial review under that standard is deferential, the reviewing court must still ensure that an agency "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U. S. 156, 168 (1962)). A rule is arbitrary and capricious if the agency relied on "impermissible factors, failed to consider important aspects of the problem, offered an explanation for its decision that is contrary to record

evidence, or is so irrational that it could not be attributed to a difference in opinion or the result of agency expertise." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 834 (5th Cir. 2002).

## ARGUMENT

### I.   The States Have Standing to Seek Review of the Final Rule

To demonstrate standing, the States must show "a concrete and imminent harm to a legally protected interest, like property or money [,] . . . that is fairly traceable to the challenged conduct and likely to be redressed by the lawsuit." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "If at least one plaintiff has standing, the suit may proceed." *Id.* Monetary harm is an injury that confers standing. *See Tyler v. Hennepin County.*, 598 U. S. 631, 636 (2023); *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190 at 2204 (2021). "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022) (quoting *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017)).

Here, the SEC has conceded that the additional reporting required by the Final Rule will lead to increased costs for funds and that those costs likely will ultimately be borne by investors. 87 Fed. Reg. at 78795. Because the States and their governmental entities invest in funds subject to the Rule, these increased reporting

costs will be paid for with the State's money. That is a classic pocketbook injury that gives the States standing. In addition, the Final Rule will affect a large segment of the States' population by increasing costs for investors, prompting fund managers to pursue interests other than maximizing financial returns, and harming the States' fossil-fuel industry. That gives the States *parens patriae* standing to challenge the Rule. Because as shown below Texas, at least, has standing, this suit may proceed.

### A.    The Rule will cause Texas pocketbook injury.

A pocketbook injury "is a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021). And the SEC has stated in the Final Rule itself that "[t]he amendments to Form N–PX . . . will lead to some additional costs for funds." 87 Fed. Reg. at 78,795. As the SEC further explained:

> Any portion of these costs that is not borne by a fund's adviser or other sponsor will ultimately be borne by the fund's shareholders. Direct costs for funds will consist of both internal costs (for compliance attorneys and other, non-legal staff of a fund, such as computer programmers, to prepare and review the required disclosure and to update systems) and external costs (such as any costs associated with third--party service providers to collect and report the information disclosed in Form N–PX). The costs borne by funds will be borne equally by all of their investors.

*Id.* (footnotes omitted).

21

That assessment comports with common sense. Extensive information gathering and processing like that required by the Final Rule are not free. For standing purposes, the exact cost is irrelevant. *Texas*, 50 F.4th at 518. Whether the price is more than $10,000 per fund or only a few hundred dollars, *see* 87 Fed. Reg. at 78,795 n.290 (suggesting a range), the result is the same: the SEC effectively has conceded that costs caused the Rule will be passed on to fund investors, establishing injury in fact and traceability. And that injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561. If the Final Rule is set aside, funds will not bear the additional reporting costs and will not pass those costs along to their investors, including Texas and its governmental entities.

Thus, all that remains to establish standing is to demonstrate that Texas has invested in funds subject to the Final Rule. Because Texas has done so, the States have standing.

**1.** The Texas Treasury Safekeeping Trust Company ("the Trust Company") is "a special-purpose trust company" authorized by the Texas Legislature. Tex. Gov't Code § 404.102(a). The Texas Comptroller of Public Accounts (the "Comptroller"), who is a constitutional elected state executive official, Tex. Const. art. IV, §§ 1, 2, is the Trust Company's "sole officer, director, and shareholder," Tex. Gov't Code § 404.104(a). The Trust Company's purpose is "to provide a means for the [C]omptroller to obtain direct access to services provided by the Federal Reserve System and to enable the [C]omptroller to manage, disburse, transfer, safekeep, and invest funds and securities more efficiently and economically." *Id.* § 404.102(a). Because the Trust Company is "an

instrumentality . . . created and operated to fulfill a public function," it is part of the state government for purposes of standing. *See Nebraska v. Biden*, 143 S. Ct. at 2365-68 (2023).

The most recent audited financial statement of the Trust Company  is available to the public at [www.ttstc.org](www.ttstc.org). As of the date of its most recent annual financial report, the investments of the Endowment Funds managed by the Trust Company included approximately $2 million in value of mutual funds owning global equities; approximately $77 million in mutual funds owning global equities was held in the State Water Implementation Fund for Texas ("SWIFT"). Texas Treasury Safekeeping Trust Company, *Annual Financial Report, August 31, 2022*, at 28, 31 [https://tinyurl.com/ttstcfinancialreport2022](https://tinyurl.com/ttstcfinancialreport2022) [hereinafter *Annual Financial Report*]. Both the Endowment Funds and SWIFT continue to own investments in mutual funds holding global equities today. Declaration of Mike Reissig (Appendix).

The Texas Legislature has authorized the Trust Company to collect fees for its services. Tex. Gov't Code § 404.103(f). For the fiscal year ending in August 2022, those fees exceeded $34 million. *Annual Financial Report* at 12.

Several of the funds in which the Trust Company invests are subject to the Final Rule's enhanced reporting requirements. The Rule will impose additional costs on those funds, s*ee* 87 Fed. Reg. at 78,795. And those costs will be passed along to the Texas governmental entities and Funds, whose assets are managed by the Trust Company, in the form of fees. *See* 87 Fed. Reg. at 78,795.

**2.** The Employees Retirement System of Texas ("ERS") is a public entity created by the Texas Constitution and Legislature. Tex. Const. art. XVI, § 67(b)(2);

Tex. Gov't Code § 811.003. ERS provides "a program of benefits for members, retirees, and other beneficiaries of the retirement system." *Tex. Gov't Code* § 811.002. The Legislature established a trust fund for ERS. *Id.* § 815.310(a).

The ERS Investments Division "manages the ERS Retirement Trust Fund on behalf of active and retired state employees and other qualified participants." *Investment Overview*, ERS, (accessed Sept. 5, 2023) https://tinyurl.com/ersoverview. "ERS is a long-term investor that balances risk to achieve positive investment returns at a reasonable cost, with the ultimate goal of providing lifetime retirement benefits for State of Texas retirees." *Id.*

According to its most recent annual report, ERS held more than $32 billion as a fiduciary. *Annual Comprehensive Financial Report—2022* at 42 (Dec. 2022), https://tinyurl.com/ersreport2022. Among its assets were approximately $400 million in ETFs holding publicly traded equities subject to the Final Rule. *Id.* at 61. According to its Holdings of Listed Securities as of July 31, 2023, ERS Trust Funds owned 1,088,100 shares of the Vanguard S&P 500 ETF, as well as other ETFs. ERS, *ERS of Tex. Trust Funds Holdings of Listed Securities as of July 31, 2023* at 24 (Dec. 2022), https://tinyurl.com/ersreport2022. Thus, ERS will incur additional expenses, that will be passed on to it by the funds it owns, because of the Final Rule. *See* 87 Fed. Reg. at 78795.

**3.** Like ERS, the Teacher Retirement System of Texas ("TRS") is a public entity created by the Texas Constitution and Texas Legislature. Tex. Const. art.

XVI, § 67(b)(1); Tex. Gov't Code § 821.003. TRS serves more than 1.9 million participants. *Teacher Retirement Sys. 2022 Annual Comprehensive Financial Report* at 6 (2022), https://tinyurl.com/trsreport2022 [hereinafter *TRS Annual Report*]. As of August 31, 2022, TRS had approximately $97.7 billion, or 53.24% of its fund, invested in global equities. *Id.* at 113. Of this, approximately $29.6 billion were invested in U.S. equities. *Id.* TRS had approximately $285 million invested in a single fund that is subject to the Final Rule, the Vanguard S&P 500 ETF. *Id.* at 116. Again, the Final Rule's "enhanced" reporting requirements will impose additional expenses on the funds owned by TRS, who will pass those additional costs on to TRS. *See* 87 Fed. Reg. at 78,795.

Texas has invested hundreds of millions of dollars in funds subject to the Final Rule. As the SEC has admitted, such funds will incur "some additional costs" because of changes required by the Final Rule, and those costs will be borne by fund investors. 87 Fed. Reg. 78,795. Here, the costs will be borne by the State of Texas through its investments held by the Trust Company, ERS, and TRS. That classic pocketbook injury gives Texas standing to challenge the Final Rule. *See Nebraska*, 143 S. Ct. at 2365. And because Texas, at least, has standing, this suit may proceed for all the States. *Id.*

### B.    Texas has *parens patriae* standing.

Although the Supreme Court has held that States do not have third-party *parens patriae* standing to sue the federal government, *e.g.*, *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023); *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), a State may assert *parens patriae* standing to vindicate its quasi-sovereign interests, *e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 520 & n.17 (2007); *see Missouri v. Biden*, No. 3:22-CV-01213, 2023 WL 4335270, at *65 (W.D. La. July 4, 2023) (explaining this distinction). This Court has recently acknowledged that States have "a quasi-sovereign interest in the general economic well-being of [their] residents." *La. Dept. of Wildlife & Fisheries*, 70 F.4th at 881.

The Rule infringes on quasi-sovereign interests of Texas and other States because it will injure "a sufficiently substantial segment of its population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 607 (1982). Millions of residents of these States have directly or indirectly invested in funds subject to the Rule; for example, Texas' TRS alone has over 1.9 million participants. *TRS Annual Report* at 6. As the SEC noted, over 45% of U.S. households own funds. 87 Fed. Reg. at 78770. These investors in the States will be forced to shoulder their portion of the increased costs of the Final Rule acknowledged by the SEC. *See* 87 Fed. Reg. at 78,795.

In addition, the Rule will cause widespread economic damage by pressuring fund managers to promote social and political aims over financial returns to investors, *see* Utah Comment Letter, AR 57 at 4-6. Those managers will be pressured

as well to disinvest in companies and industries targeted by ESG activists. And that pressure and resulting damage will be particularly important for Texas and the other States, all of which are important energy producers.

Texas is the top oil and natural gas producing state in the United States[8], producing over 42 % of the nation's crude oil in 2022. *See Texas State Energy Profile,* U.S. Energy Information Administration (last updated June 15, 2023), https:// www.eia.gov/state/print.php?sid=TX; - *Texas' Energy Profile*, Texas Comptroller of Public Accounts (Sept. 2022) https://tinyurl.com/txenergyprofile (noting that, in 2021, "Texas was the largest producer of oil (43 percent), natural gas (25 percent) and wind-powered electricity (26 percent) in the nation").

The Rule will lead to reduced investment in the fossil-fuel industry, causing decreased employment, adverse impacts for industries that support fossil-fuel development, and decreased overall economic activity. Because the fossil-fuel industry is such a large employer in Texas[9] and the other States; is a major taxpayer[10], and is interwoven with other sectors of the States' economies, a

---

[8]     Louisiana is the nation's ninth largest producer of crude oil and the third largest producer of natural gas. O'Brien, *2021 State Oil and Gas Production and Price Projections* (Mar. 2021) https:// tinyurl.com/ms3yt6a5. "Oil and gas are the primary resources in Utah, followed by coal." Halverson, *Multiple Use on Public Lands by the Numbers*, 34 Utah B. J. 48, 49 (2021). And "[t]hroughout its history, energy resources have been a driver for the West Virginia economy, with a heavy emphasis on fossil fuels (coal, oil, and natural gas) in particular. Van Nostrand, *An Energy and Sustainability Roadmap for West Virginia*, 115 W. Va. L. Rev. 879, 880 (2013).

[9]     Texas oil and gas production and other mining jobs were at about 210,000 in January 2023. Texas Workforce Commission, "Jobs in the Oil Patch: A New Dawning" (May 2, 2023) www.twc.state.tx.us. That does not include Texas jobs is support of those activities; in petroleum and coal products manufacturing; and in pipeline transportation.

[10]     The Texas oil and gas industry paid $ 24.7 billion in state and local taxes and state royalties n 2022. *TXOGA's 2022 Annual Energy and Economic Impact Report*, www.txoga.org.

substantial segment of the State's population and economy will be adversely affected.

In addition to having quasi-sovereign interests at stake, the States also have "a procedural right to challenge the action in question" under the APA. *Texas*, 50 F.4th at 514; *see* 15 U.S.C. § 78y(b)(1). Accordingly, the State's *parens patriae* standing arguments are entitled to "special solicitude." *See Massachusetts*, 549 U.S. at 520; *Texas*, 50 F.4th at 514; *Missouri*, 2023 WL 4335270, at *64. For all these reasons, Texas and the other States have *parens patriae* standing to challenge the Final Rule, and the suit may proceed for all Petitioners. *Biden v. Nebraska*, 143 S. Ct. at 2365.

## II. The SEC Exceeded its Statutory Authority and Abused its Discretion in Adopting the Final Rule.

The SEC exists to enforce the federal securities laws, which in turn exist to protect investors and foster orderly and free securities markets. However, in this instance, the SEC has not acted for these purposes, but instead to advance the interests of corporate activists and to increase the pressure and leverage they can bring to bear on fund managers in the service of their pet ESG causes. Furthering the interests of such corporate activists is not the purpose of the federal securities laws the SEC is charged to enforce, but merely serves the political and policy agenda of the current SEC majority and the current Administration.

The SEC claims that it has authority to promulgate the Final Rule under the 1940 Act, but its rulemaking power is limited to furthering the Act's purposes of protecting investors and enforcing the statutory and fiduciary duties of investment

28

advisers to act solely in the financial best interests of investors. The Final Rule is an abuse of discretion because it (a) furthers the social and political agenda of ESG activists (and the current Administration), rather than protects the great majority of fund investors. who do not share that ESG agenda or any agenda other than maximizing the net return on their fund investments; (b) forces the majority of fund investors who do not share the ESG agenda to pay the costs for providing information they do not need and did not ask for; and (c) foreseeably results in increased pressure on fund managers to act *contrary* to their fiduciary duties to fund investors. See Section III(C).

The SEC asserts, but the administrative record does not substantiate, that there is broad fund investor demand for detailed categorization of fund proxy votes. From this false premise, the SEC assumes, but the administrative record does not substantiate, that the unquantified supposed benefits of that categorization to fund investors will justify the substantial costs that the categorization mandate will generate. Then the SEC assumes, but the administrative record does not substantiate, that there is some reasonable relationship between the fund investors who actually want categorization of fund proxy votes and those who will pay the costs of that categorization.

In reality, the vast majority of fund investors invest their savings in very large and highly diversified funds, like S & P 500 ETFs.[11] They care very much about the

---

[11] The largest ETF worldwide as of January 16, 2023, was the SPDR S&P 500 Trust, with a market capitalization of $ 365.73 billion. The second largest was iShares Core S&P 500 ($ 300.67 billion), and the third largest was Vanguard S&P 500 ETF ($ 272.38 billion). Market Capitalization

net return on their fund investments but care little if anything about how their funds cast proxy votes. Yet it is those investors who will pay the lion's share of the costs under the Final Rule to further the ESG agendas of activists and the current Administration. The net return on fund investments thus will be diminished for these investors -- who the 1940 Act exists to *protect* rather than hurt -- by this Final Rule supposedly adopted by the SEC for their benefit.

The States acknowledge that agencies have considerable discretion in rulemaking to accomplish the goals of the statutes they are charged to enforce. Here, the SEC has abused that discretion by acting to advance narrow social and political agendas that are not within the relevant statutory purposes, and at the expense of the far broader body of investors they are charged to protect. The Court should set aside the proxy vote categorization portions of the Final Rule for this reason.

## III. The SEC Acted Arbitrarily and Capriciously in Adopting the Final Rule.

The Court should hold unlawful and set aside the Final Rule, and especially the portion of the Final Rule that pertains to categorization of proxy votes in mandated public reports to the SEC on Form N-PX. The Final Rule is arbitrary and capricious for at least three reasons. First, the Rule promotes the interests of corporate activists who are not the objects of protection by the 1940 Act or other federal securities laws

---

of Largest Exchange Traded Funds (ETFs) Worldwide as of January 16, 2023, Statista (accessed Sept. 5, 2023) https://www.statista.com/statistics/1181252/largest-etfs/market-cap-global/.

and does so at the expense of the investors who are intended to be protected by those laws and the SEC Rules promulgated thereunder. Second, the SEC acted arbitrarily and capriciously when it selected a single and highly atypical year, 2020, as the basis for selecting proxy vote categories. It failed to explain this "myopic" choice; to consider the adverse consequences it makes likely; or to consider other more rational alternatives, such as using the most common categories that secured substantial percentages of votes in the last five or ten years prior to promulgation of the Final Rule, or explain why it rejected such apparently preferable alternatives. Third, the SEC acted arbitrarily and capriciously by failing to consider whether and to what extent the Final Rule will cause fund managers to act contrary to their fiduciary duties to fund investors under the 1940 Act by casting proxy votes for motives other than fund investors' financial interests or by avoiding ownership of securities in industries that are frequent targets of ESG corporate activists.

## A.  The SEC failed to show evidence of broad fund investor demand for the categorization mandate or conduct any rational cost-benefit analysis.

The substantial costs of advancing the corporate activists' ESG agenda –– shared by the SEC and the current Administration -- will be passed on to the vast majority of fund shareholders like the States. These investors' goals are not to advance social or political agendas, but simply to maximize the lawful return on their investments. Most fund investors simply seek the best possible financial future for themselves, and the States seek to fulfill their duties to act in the best interests of their taxpayers

31

and the millions of teachers, state government employees, and retirees who depend on those investment returns.

The SEC attempted to justify its decision to require categorization of fund proxy votes by citing alleged "investor demand" for such categorization. But it adduced little or no data to support that there is a widespread demand for any categorization by the broad body of fund investors, as opposed to corporate ESG activists and those who invest in specialized ESG-related funds. As SEC Commissioner Peirce and many public commenters pointed out, the "real interest" for detailed categorization of proxy votes comes not from the great majority of fund investors, but from "activists and the ever-expanding population of 'stakeholders,' for whom proxy voting seems to be the fund's highest purpose." Peirce, *supra*.

In arriving at the Final Rule, the SEC did not provide any evidence of actual fund investor demand for detailed proxy vote consideration or substantively respond to Commissioner Peirce or public comments that asked these fundamental questions: What is the actual demand for these costly changes the SEC is considering? And are these changes in the interests of the vast majority of fund investors who did not ask for them and don't want them, but will be forced to pay for them?

A rational and familiar way to answer the second of those questions is to perform a reasonable cost-benefit analysis. The SEC could have made an honest effort to quantify and assess the benefits of its proposed proxy vote categorization mandates and compare them to the acknowledged (but never quantified) ongoing costs of the mandate to fund investors. The Final Rule contains no serious cost-benefit analysis.

Here, the SEC simply included a set of broad assertions of possible benefits of the Final Rule as a whole,[12] backed by no data. Examples were claims that the Rule (a) would help investors "more easily collect and analyze proxy voting information, resulting in lower costs of gathering and understanding this information." 87 Fed. Reg. 78792; (b) "may' provide an incentive for fund managers to devote additional time and resources to proxy voting, *id*. at 78794; and (c) "may" help "deter fund voting decisions motivated by conflicts of interest", *id*. at 78794-95. The latter claim is based on speculation that "transparency" will "provide investors with information to help align funds' voting decisions with investors' expectations", which "by definition mitigates risks of conflicts of interest." *Id*.

These speculative "benefits" all depend on assumptions that were never substantiated by the SEC, and seem implausible: that (1) there is in fact broad fund investor demand for fund proxy vote information, and that (2) such fund investor demand was not satisfied by the existing Form N-PX, without the categorization in the Rule. Here, as in *Mexican Gulf Fishing Co. v. United States DOC*, 60 F.4th 956 (5th Cir. 2023), there is no basis to conclude that, as to this categorization, "its benefits reasonably outweigh its costs." *Id*. at 965; *see National Grain & Feed Ass'n v. OSHA*, 866 F.2d 717, 733 (5th Cir. 1988); *Texas Independent Ginners v. Marshall*, 630 F.2d 398, 411 n. 44 (5th Cir. 1980).

---

[12] Aspects of the Final Rule not challenged in this case, such as requiring information to be provided in a structured data language format; requiring information to be provided on fund websites; and requiring information as to the number of shares voted and the number of shares loaned but not recalled, 87 Fed. Reg. 78792-93, were discussed by the SEC and commenters as providing benefits, but those are not relevant here.

That is especially so because the SEC did not even consider the non-financial costs as required by this Court. *Id.* at 966, *quoting Michigan v. EPA*, 576 U. S. 743, 752 (2015). In addition to the financial cost of compliance with the Rule, which the SEC downplayed, 87 Fed. Reg. at 78796, the Rule imposes significant non-financial costs. As discussed more fully in C below, the Rule will empower ESG activists to use pressure and negative publicity to cause fund managers to breach their fiduciary duties of loyalty to act in the sole interests of fund investors. Yet despite Commissioners and public comments flagging these non-financial costs, the SEC fails to assess them in the Final Rule. The failure to address significant public comments and to reasonably conclude benefits outweigh costs of the Rule compels the conclusion that it must be set aside as arbitrary and capricious. *Mexican Gulf Fishing*, 60 F. 4th at 956; *Carlson v. Postal Reg. Comm'n*, 938 F.3d 377, 344 (D. C. Cir. 2019).

The reason the SEC undertook no serious analysis of costs and benefits of the Rule is unspoken but apparent. This SEC categorization mandate was not driven by honest assessment of the needs or interests of fund investors, or any rational and objective assessment of the costs and utility of the mandate. And it certainly was not the result of any claimed agency "expertise" that somehow suddenly found its voice when a new Administration took power at the SEC with an avowed ESG agenda.

Instead, the SEC proxy vote categorization mandate is simply part of a broader political effort to enact into law a wide variety of ESG-driven rules that have never been enacted by Congress, and that could not possibly be approved by the closely

divided Congress that today reflects the will of the American people. *See* fn. 4 (2023 Congressional passage of legislation to block ESG Rule on ERISA investing).  In a democratic republic, the rules imposed by government—including the SEC—should reflect the will of the people as expressed through their elected representatives. The SEC proxy vote categorization portion of the Final Rule simply does not. It is arbitrary and capricious, and should be set aside.

### B.   The SEC arbitrarily and capriciously chose a single, highly atypical year as the basis for its proxy vote categorization mandate.

The year 2020 was a unique one in American history for many reasons. In March of 2020, the country's businesses and governments were ordered to shut down all but their most essential functions by reason of a deadly and unprecedented Covid-19 pandemic. Over 1.1 million Americans have died from that disease. [13]

The widespread Covid disaster declarations at the federal, state, and local levels in 2020 happened to largely coincide with the 2020 proxy vote season. That is the portion of each year when (a) public corporations determine what matters will be presented for shareholder vote; (b) the corporations prepare and send out detailed proxy materials to shareholders, including fund managers; and (c) shareholders, including public corporations, including fund managers, review the proxy materials and vote on the matters submitted to them.

---

[13]   Centers for Disease Control and Prevention, *Covid Data Tracker* (Aug. 31, 2023) https://covid.cdc.gov/covid-data-tracker/#datatracker-home (accessed Sept. 5, 2023).

In 2020, those annual corporate functions took place at a time when a large percentage of Americans were huddled in their homes, trying to cope with fear that they or their loved ones would be infected with a deadly disease or with grief over those who had already been lost to Covid. 2020 was also extraordinary in that it was the year of the death of George Floyd, when protests that sometimes turned into riots swept man major cities of the nation. And of course, 2020 was the year of one of the most bitter and highly contested presidential campaigns and elections in American history.

It was a highly atypical year that most of us are happy to have survived and to have behind us. Yet it was 2020—and 2020 alone—that the SEC chose as the single year on which to base its selection of the categories to use for the proxy vote categorization portion of the Final Rule. The SEC staff supposedly compiled a list[14] of the most common categories of matters submitted for shareholder votes in that year of extraordinary turmoil and political activism and used the most common categories as the basis for the Final Rule's provisions.

The SEC could have chosen a less extraordinary year as the basis for its categories. Or it could have chosen them based on the categories of proxy votes in an average of the previous three, five, or ten years. Why did it ignore these apparently more rational alternatives?

---

[14] The underlying data or its tabulation was not made available to the public or even the SEC Commissioners, which led Commissioner Roisman to refer to the basis for the categories in the Final Rule as a "mystery". Roisman, *supra*.

Curiously, the SEC offered no explanation whatever, even after many public commenters and SEC Commissioner Roisman questioned the puzzling choice. As Commissioner Roisman stated:

> But the process by which we have devised this framework does not appear based on rigorous analysis. Rather than grounding it on a review of proxy voting matters from several prior years, we focused only on the most recent proxy season for which information was available – 2020 – and started sorting from there. Moreover, we did not tabulate even those 2020 votes into our proposed categories, and it remains a mystery to me whether some of these categories and subcategories include matters voted upon at hundreds of companies' meeting or merely one or two.

Roisman, *supra*. Here, as in *Bloomberg, L. P. v. SEC*, 45 F. 4th 462 (D .C. Cir. (D. C. Cir. 2022), Relevant concerns were raised, "but the Commission brushed them aside." *Id*. at 476.

It therefore is difficult to avoid the suspicion that the SEC's unexplained choice of the single, highly unusual year of 2020 on which to base its proxy vote categories was a results-driven selection designed to maximize the ESG categories that appear in the Final Rule. Although only time will tell for sure, ESG publicity and angst appeared to reach a peak in or near 2020.

This was not lost on Commissioner Roisman:

> The proposal's myopic focus on the year 2020 has substantive policy implications as well. The most obvious example is our proposed "ESG" categories and subcategories. In the year 2020, ESG investment strategies proliferated for myriad reasons. Whether they have staying power in their current form remains to be seen, but by permanently memorializing their interests into our reporting of votes, we seem to be underscoring the importance of these issues to all investors for years to come.

*Id.*

Time has already proven Commissioner Roisman prescient. Since 2020, broad interest in ESG investing has declined. E.g., Grace O'Donnell, *U. S. Sustainable Fund Flows Drop to Lowest Levels in 7 Years: Morningstar Report*, Yahoo! Finance (Feb. 25, 2023) http://tinyurl.com/26zyzsmr-13122831.html; Wilkes & Murugaboopathy, *ESG Equity Funds Suffer Big Outflows, Buffeted by Market Jitters and U. S. Backlash, Reuters* (July 6, 2023) http://tinyurl.com/4ar7w9rs;; Gooding, *The Responsible Investing Boom is Over: Can Anything Replace ESG*? CNN (July 26, 2023) , http://tinyurl.com/2p8p7fz4.. The same substantial decline has been seen for ESG proxy vote proposals. Pensions & Investments, *ESG Support Falters This Proxy Season* Pensions and Investments (June 26, 2023) www.pionline.com/esg/esg-support-falters-proxy-season. Despite this change in the relevant data, the SEC indicated no intention to reexamine its choice of 2020 as the sole year on which to base is categorization. The Rule includes no mechanism to adjust categories based on changing investor interest or demand. They are frozen in time.

Accordingly, the SEC's failure to respond adequately to public comments and rationally explain its choice of 2020 as the one and only year on which the SEC based its categories in the Final Rule was arbitrary and capricious, and the Rule should be set aside.

**C.   The SEC acted arbitrarily and capriciously by failing to consider whether and to what extent the categories it chose will cause fund managers to act contrary to their fiduciary duties or cause disinvestment in industries disfavored by ESG activists.**

Fund managers owe fiduciary duties of loyalty to the fund investors to place the financial interests of those investors over the managers' own interests or other motives. This duty, which is part of their obligations under the 1940 Act, includes not only subordinating the managers' personal financial interests, but also their own social or political preferences, to their investors' financial interests. Restatement (Third) of the Law of Trusts § 90 & cmt. c (Am. L. Inst. 2007).[15] Schanzenbach & Sitkoff, *Reconciling Fiduciary Duty and Social Conscience: The Law and Economics of ESG Investing, by Trusts*", 72 Stan. L. Rev. 381, 411 (2020). If the best interests of their investors require them to invest in companies or industries that are disfavored by ESG activists or are inconsistent with their own social or political beliefs, it is the fiduciary obligation of an investment adviser to do so. See *id.* at 411-12, discussing *Estate of Rothko*, 372 N.E. 2d 291, 296 (N. Y. 1977) (trustee breaches fiduciary duty if personal interests or those of third parties "may" conflict with interests of beneficiaries); *Conway v. Emeny*, 96 A.2d 221, 225 (Conn. 1953) (trustee breached duty of loyalty, though he did not act for personal advantage but for a worthy purpose).[16]

---

[15] There is an exception, not applicable here, for instances in which the terms of the trust include provisions expressly allowing consideration of social or political investing goals (e.g., ESG funds) or where the trust beneficiaries consent. *Id.*

[16] *See also Tittle v. Enron Corp.*, 284 F. Supp. 2d 511, 546-47 (S. D. Tex. 2003) (ERISA fiduciaries' most fundamental duty is duty of complete loyalty to act solely in beneficiaries interest and to "exclude all selfish interest and . . . the interests of third persons"); *Uzyel v. Kadisha*, 116

Those strict fiduciary duties of fund managers to act solely in the interests of the fund investors include not only decisions as to investment or disinvestment in securities to be owned by the fund, but also the exercise of all shareholder rights. As the SEC acknowledges, see 87 Fed. Reg. at 78795, such rights include the right to cast proxy votes on matters submitted for shareholder vote by companies whose shares are owned by the fund. On such proxy votes, too, the fiduciary duties of fund managers require them to act in the sole best financial interests of investors, and not to advance the interests of third parties or their personal social or political beliefs.

Yet the proxy categories chosen by the SEC unduly emphasize ESG issues, and thus increase the leverage of ESG activists on fund managers. This likely result was plainly voiced to the SEC majority both by Commissioners and commenters, but they failed to discuss it at all in the Final Rule.

> As noted by SEC Commissioner Peirce and many public commenters:
>
> So while fund shareholders may not be interested in this information, activists of every stripe can use the fact that funds have to publish their votes to increase their leverage through intimidation and negative publicity. . . .
>
> An investor is motivated by a desire to see a positive return on her fund investment, and as the nation's capital markets regulator, *her* interests should be our concern, not the interests of those seeking to use her fund to further their own interests.

Peirce, *supra*.

Managers of funds are human, and their own business success involves attracting and retaining investments in their funds. They cannot be presumed to be

---

Cal. Rptr. 244, 276, 118 Cal. App. 4th 866 (Cal. App. 2010) (trustee strictly prohibited from acting with motives other than interests of serving beneficiaries).

immune to criticism and negative publicity about their proxy votes on ESG issues from corporate ESG activists. Thus, the threat that the categories in the Final Rule will induce fund managers to cast proxy votes in favor of ESG issues that are not in furtherance of their fund investors' financial interests is very real. Just as real is the possibility that the Final Rule will cause their funds to disinvest in securities of companies that are frequently under attack from ESG activists. If they do so, they will not thereafter even have to cast votes on ESG issues that activists can use to demonize those companies, and the fund managers who invest in them.

Though these thorny fiduciary duty issues were clearly highlighted by SEC Commissioners and in public comments, the SEC apparently found them too inconvenient to consider. The administrative record is devoid of any discussion or even mention of them. "The opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Mexican Gulf Fishing*, 60 F.4th at 972, *quoting Texas v. Biden*, 10 F.4th 538, 554 n.4 (5th Cir. 2021). There simply is no explanation of any reasons the SEC concluded in the Final Rule that the likely breaches of fiduciary duty that would result from the proxy vote categorization provisions of the Rule were insufficient to warrant any deviation from their ESG agenda.

Similarly, the SEC failed to consider or discuss the possibility that their prioritization of ESG categories in the Final Rule would result in disinvestment by funds in the fossil fuel industry and other industries disfavored by ESG activists and targeted by them. Had they done so, the SEC might have had to confront a reality they preferred to avoid. That reality is that the Final Rule was intended to further

the SEC and Administration's ESG policy goals: to promote certain companies and industries and disfavor others. It was not intended for the pretextual purpose of simply providing information investors allegedly needed and demanded. Because the SEC and the Final Rule are silent on these additional important considerations, the conclusion that the SEC acted arbitrarily and capriciously in the Final Rule is unavoidable.

## Conclusion

For the foregoing reasons, the SEC proxy vote categorization provisions of the Final Rule are in excess of the SEC's authority, arbitrary and capricious, and an abuse of discretion. The States ask that these provisions be held unlawful and set aside under the Administrative Procedure Act.

Respectfully submitted.

ANGELA COLMENERO
Provisional Attorney General

BRENT WEBSTER
First Assistant Attorney
General

GRANT DORFMAN
Deputy First Assistant Attorney
General

RALPH MOLINA
Deputy Attorney General

/s/ David Bryant
DAVID BRYANT
Special Counsel
David.Bryant@oag.texas.gov
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697
*Counsel for the State of Texas*

SEAN REYES
Attorney General

MELISSA HOLYOAK
Solicitor General

Office of the Attorney General of Utah
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
(801)538-9600
melissaholyoak@agutah.gov

*Counsel for the State of Utah*

Jeff Landry
JEFF LANDRY
Attorney General

ELIZABETH B. MURRILL
Solicitor General

JOSEPH SCOTT ST. JOHN
Deputy Solicitor General

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
(225) 326-6766
murrille@ag.louisiana.gov

*Counsel for the State of Louisiana*

PATRICK MORRISEY
Attorney General

LINDSAY SEE
Solicitor General

MICHAEL R. WILLIAMS
Senior Deputy Solicitor General

Office of the Attorney General of
West Virginia
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Counsel for the State of West Virginia*

## CERTIFICATE OF SERVICE

On September 5, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ David Bryant
DAVID BRYANT

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12, 687 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ David Bryant
DAVID BRYANT