No. 23-60079

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

STATE OF TEXAS, STATE OF LOUISIANA,
STATE OF UTAH, STATE OF WEST VIRGINIA,

*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*.

On Petition for Review of an Order of the Securities and Exchange Commission

**BRIEF FOR RESPONDENT
SECURITIES AND EXCHANGE COMMISSION**

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
Assistant General Counsel

DANIEL STAROSELSKY
Senior Appellate Counsel

JOHN R. RADY
Appellate Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4997 (Rady)

## CERTIFICATE OF INTERESTED PERSONS

*State of Texas et al. v. SEC*, No. 23-60079

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  The Securities and Exchange Commission is a federal agency.

2.  The States of Texas, Louisiana, Utah, and West Virginia.

3.  Megan Barbero, Michael A. Conley, Tracey A. Hardin, Daniel Staroselsky, and John R. Rady—*Counsel for Respondent Securities and Exchange Commission.*

4.  Ken Paxton, Angela Colmenero, Brent Webster, Judd E. Stone II, Grant Dorfman, Ralph Molina, Joseph Mazzara, and Monroe David Bryant Jr.—*Counsel for Petitioner State of Texas.*

5.  Jeff Landry, Elizabeth B. Murrill, and Joseph Scott St. John—*Counsel for Petitioner State of Louisiana.*

6.  Sean Reyes and Melissa Holyoak—*Counsel for Petitioner State of Utah.*

7.  Patrick Morrisey, Lindsay See, and Michael R. Williams—*Counsel for Petitioner State of West Virginia.*

/s/ John R. Rady

*Attorney of Record for Respondent Securities and Exchange Commission*

i

## STATEMENT REGARDING ORAL ARGUMENT

The Securities and Exchange Commission is prepared to present oral argument if argument would assist the Court in resolving the petition for review.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF AUTHORITIES ..................................................................................v

INTRODUCTION ....................................................................................................1

COUNTERSTATEMENT OF JURISDICTION ......................................................4

COUNTERSTATEMENT OF THE ISSUES............................................................5

COUNTERSTATEMENT OF THE CASE...............................................................6

      A.    Market overview ............................................................................6

      B.    Statutory and regulatory background...........................................7

            1.    Statutory authority...........................................................7

            2.    The Commission promulgated Form N–PX in 2003.................9

      C.    Proceedings before the Commission ..................................................12

            1.    The Commission proposed amendments to Form N–PX to improve its usefulness..............................................................12

            2.    Commenters requested modifications to the proposals. ...........14

            3.    The Commission adopted the Final Rule with modifications based on input from commenters, and analyzed the rule's economic effects. ...................................................................15

STANDARD OF REVIEW .....................................................................................21

SUMMARY OF ARGUMENT ...............................................................................22

ARGUMENT ..........................................................................................................25

I.    Petitioners fail to demonstrate standing. ........................................................25

      A.    Texas has not demonstrated any injury that is fairly traceable to the categorization requirement.................................26

B.      Petitioners do not have *parens patriae* standing. ................................31

      1.     States may not bring *parens patriae* actions
           against the federal government. ................................................32

      2.     Regardless, petitioners' *parens patriae*
           standing theories fail. ...............................................................35

           a.     Petitioners fail to submit evidence of injury. .................35

           b.     Petitioners do not articulate an injury separate
                from in-state residents who invest in funds. ...................37

II.    The categorization requirement is within
the Commission's statutory authority. ...........................................38

    A.      The Commission amended Form N–PX to increase
         its utility for all investors. ...................................................39

    B.      To the extent petitioners contest the Commission's statutory
         authority to require categorization for its stated purposes,
         such a challenge is not properly before the Court and,
         in any event, is meritless. ...................................................41

III.   The categorization requirement is reasonable
and reasonably explained. ...............................................................45

    A.      The Commission reasonably explained and analyzed the
         economic implications of the categorization requirement. .................45

    B.      The Commission's choice of categories was reasonable
         and reasonably explained. ...................................................51

    C.      The Commission reasonably addressed the concern that the
         categorization requirement could cause fund managers and
         investment advisers to act contrary to their fiduciary duties. ............53

CONCLUSION ....................................................................................58

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
 458 U.S. 592 (1982)..............................................................31, 32, 34

*All. for Fair Bd. Recruitment v. SEC*,
 85 F.4th 226 (5th Cir. 2023) ......................................26, 46, 47, 50

*Biden v. Texas*,
 142 S. Ct. 2528 (2022)....................................................................40

*Biestek v. Berryhill*,
 139 S. Ct. 1148 (2019)....................................................................21

*Boeta v. FAA*,
 831 F.3d 636 (5th Cir. 2016) .........................................................21

*BP Am., Inc. v. FERC*,
 52 F.4th 204 (5th Cir. 2022) ..........................................................41

*Bus. Roundtable v. SEC*,
 905 F.2d 406 (D.C. Cir. 1990).......................................................43

*Chamber of Commerce v. SEC*,
 2023 WL 7147273 (5th Cir. 2023) ..........................45, 46, 49, 50, 55, 57–58

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013)................................................................. 25, 26

*Clean Water Action v. EPA*,
 936 F.3d 308 (5th Cir. 2019) .........................................................21

*Crane v. Johnson*,
 783 F.3d 244 (5th Cir. 2015) .........................................................30

*Ctr. for Biological Diversity v. EPA*,
 937 F.3d 533 (5th Cir. 2019) ................................................... 26, 30

*Dep't of Com. v. New York*,
 139 S. Ct. 2551 (2019).......................................................... 39, 40

*Ecee, Inc. v. FERC,*
  611 F.2d 554 (5th Cir. 1980) ............................................................5

*FCC v. Prometheus Radio Project,*
  141 S. Ct. 1150 (2021)........................................ 21, 45, 46, 52, 55

*Gann v. SEC,*
  361 F. App'x 556 (5th Cir. 2010) (unpublished) .........................42

*Gov't of Manitoba v. Bernhardt,*
  923 F.3d 173 (D.C. Cir. 2019)................................................. 32, 33

*Haaland v. Brackeen,*
  599 U.S. 255 (2023)................................................................. 32, 34

*Harrison v. Jefferson Par. Sch. Bd.,*
  78 F.4th 765 (5th Cir. 2023) ................................................... 35, 37

*Herpich v. Wallace,*
  430 F.2d 792 (5th Cir. 1970) ..........................................................44

*Huawei Techs. USA, Inc. v. FCC,*
  2 F.4th 421 (5th Cir. 2021) ......................................... 43, 46, 49, 51

*Jones v. Harris Assocs. L.P.,*
  559 U.S. 335 (2010)........................................................... 7, 9, 44

*K Mart Corp. v. Cartier, Inc.,*
  486 U.S. 281 (1988)......................................................................57

*Kamen v. Kemper Fin. Servs., Inc.,*
  500 U.S. 90 (1991)........................................................................44

*La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.,*
  70 F.4th 872 (5th Cir. 2023) ......................... 29, 30, 34, 35, 36, 37

*Legacy Cmty. Health Servs., Inc. v. Smith,*
  881 F.3d 358 (5th Cir. 2018) ........................................................29

*Lewis v. Casey,*
  518 U.S. 343 (1996)......................................................................29

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992).......................................................... 25, 26, 27

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)................................................................ 32, 33

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923)......................................................................32

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
    60 F.4th 956 (5th Cir. 2023) ...................................... 45–46, 49, 51

*Missouri ex rel. Koster v. Harris,*
    847 F.3d 646 (9th Cir. 2017) .........................................................37

*Missouri v. Biden,*
    83 F.4th 350 (5th Cir. 2023) (per curiam) ...................................34

*Missouri v. Biden,*
    2023 WL 4335270 (W.D. La. July 4, 2023),
    *aff'd in part, rev'd in part,*
    80 F.4th 641 (5th Cir. 2023) (per curiam),
    *opinion withdrawn and superseded on reh'g,*
    83 F.4th 350 (5th Cir. 2023) (per curiam),
    *cert. granted sub nom. Murthy v. Missouri,*
    2023 WL 6935337 (U.S. Oct. 20, 2023) ......................................34

*N.Y. Republican State Comm. v. SEC,*
    799 F.3d 1126 (D.C. Cir. 2015).......................................................5

*Nat'l Ass'n for Surface Finishing v. EPA,*
    795 F.3d 1 (D.C. Cir. 2015)..........................................................50

*SEC v. Cap. Gains Rsch. Bureau, Inc.,*
    375 U.S. 180 (1963)......................................................................44

*Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality,*
    968 F.3d 419 (5th Cir. 2020) (per curiam) ............................. 25, 26

*Sw. Elec. Power Co. v. EPA,*
    920 F.3d 999 (5th Cir. 2019) .......................................................57

*Tenneco Oil Co. v. FERC*,
  571 F.2d 834 (5th Cir. 1978) ................................................................. 41–42

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ...........................................................................33

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015),
  *aff'd by an equally divided court*,
  579 U.S. 547 (2016) (mem.) ...........................................................................33

*Twin Rivers Paper Co. v. SEC*,
  934 F.3d 607 (D.C. Cir. 2019) .........................................................................5

*Utah v. Walsh*,
  2023 WL 6205926 (N.D. Tex. Sept. 21, 2023) .............................................55

*VanDerStok v. Garland*,
  2023 WL 4945360 (5th Cir. July 24, 2023) (unpublished) ...........................57

*XY Plan. Network, LLC v. SEC*,
  963 F.3d 244 (2d Cir. 2020) ................................................................... 30, 55

*Zacharias v. SEC*,
  569 F.3d 458 (D.C. Cir. 2009) (per curiam) ................................................41

**Statutes**

5 U.S.C. 706(2) ................................................................................................21

Securities Act of 1933, 15 U.S.C. 77a, *et seq.*

  15 U.S.C. 77i(a) ................................................................... 5, 21, 41, 56

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.*

  15 U.S.C. 78m(a) ................................................................... 8, 38, 42
  15 U.S.C. 78n-1(d) .............................................................................15
  15 U.S.C. 78y(a)(4) .............................................................................21
  15 U.S.C. 78y(b)(1) ..............................................................................5

Investment Company Act of 1940, 15 U.S.C. 80a-1, *et seq.*

 15 U.S.C. 80a-1(a) ............................................................................9
 15 U.S.C. 80a-1(b) ...................................................................... 9, 44
 15 U.S.C. 80a-8 ..............................................................................7
 15 U.S.C. 80a-24 ............................................................................7
 15 U.S.C. 80a-29 ............................................................................7
 15 U.S.C. 80a-29(a) .............................................................. 7, 38, 42
 15 U.S.C. 80a-29(b) ................................................................ 8, 38
 15 U.S.C. 80a-29(c) ............................................................ 8, 38, 43
 15 U.S.C. 80a-29(d) .................................................................. 38, 42
 15 U.S.C. 80a-29(e) ........................................................................8
 15 U.S.C. 80a-29(f) ............................................................ 8, 38, 43
 15 U.S.C. 80a-30 ............................................................................7
 15 U.S.C. 80a-37(a) ........................................................................8
 15 U.S.C. 80a-42(a) ...................................................... 5, 21, 41, 55–56

Investment Advisers Act of 1940, 15 U.S.C. 80b-1, *et seq.*

 15 U.S.C. 80b-13(a) ...................................................... 5, 21, 41, 56

**Commission Releases**

*Commission Guidance Regarding Proxy Voting Responsibilities*
 *of Investment Advisers*,
 84 Fed. Reg. 47,420 (Sept. 10, 2019) ............................................11

*Concept Release on the U.S. Proxy System*,
 75 Fed. Reg. 42,982 (July 22, 2010) ....................................... 7, 12

*Disclosure of Proxy Voting Policies and Proxy Voting Records*
 *by Registered Management Investment Companies*,
 67 Fed. Reg. 60,828 (proposed Sept. 26, 2002) .................................... 10, 43

*Disclosure of Proxy Voting Policies and Proxy Voting Records*
 *by Registered Management Investment Companies*,
 68 Fed. Reg. 6564 (Feb. 7, 2003) ......................................... 9, 10, 11, 43, 44

*Reporting of Proxy Votes on Executive Compensation and Other Matters*,
 75 Fed. Reg. 66,622 (proposed Oct. 28, 2010)..............................................12

*Statement on Enhanced Reporting of Proxy Votes by Registered Management Investment Companies; Reporting of Executive Compensation Votes by Institutional Investment Managers* (Sept. 29, 2021), https://www.sec.gov/news/public-statement/peirce-open-meeting-2021-09-29 ............................................................40

*Statement on Proposed Changes to Asset Managers' Proxy Voting Disclosures* (Sept. 29, 2021), https://www.sec.gov/news/public-statement/roisman-open-meeting-2021-09-29 ............................................40

## Other Authorities

*2023 AGM Season*, Georgeson (June 13, 2023), https://www.georgeson.com/us/insights/2023-agm-season-new-record-for-esg-shareholder-proposals ......................................53

Employees Retirement System of Texas, *Annual Comprehensive Financial Report—2022*, https://tinyurl.com/ersreport2022 ..................................................28

ERS of Texas Trust Funds, *Holdings of Listed Securities*, https://www.ers.texas.gov/about-ers/ers-investments-overview/investments-division/ers-holdings-listed-securities ......................................28

Hazel Bradford, *ESG Support Falters This Proxy Season*, Pensions & Invs. (June 26, 2023), https://www.pionline.com/esg/esg-support-falters-proxy-season ...........................................52

Ronald Mueller et al., *Shareholder Proposal Developments During the 2023 Proxy Season*, Harv. L. Sch. F. Corp. Governance (Aug. 3, 2023), https://corpgov.law.harvard.edu/2023/08/03/shareholder-proposal-developments-during-the-2023-proxy-season ................................................53

Teacher Retirement System of Texas, *Annual Comprehensive Financial Report* (2022), https://tinyurl.com/trsreport2022 ..................................................28

Texas Treasury Safekeeping Trust Company, *Annual Financial Report* (2022), https://tinyurl.com/ttstcfinancialreport2022 ..................................27

No. 23-60079

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

STATE OF TEXAS, STATE OF LOUISIANA,
STATE OF UTAH, STATE OF WEST VIRGINIA,
*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,
*Respondent*.

On Petition for Review of an Order of the Securities and Exchange Commission

**BRIEF FOR RESPONDENT
SECURITIES AND EXCHANGE COMMISSION**

## INTRODUCTION

Mutual funds, exchange-traded funds, and other registered management investment companies (collectively "funds") own roughly one-third of all U.S.-issued equities and, as a result, they are able to influence the outcome of many shareholder votes. In 2003, the Securities and Exchange Commission ("Commission" or "SEC")—recognizing the impact a fund's voting decisions can have on the value of its investments—adopted a rule requiring funds to disclose on Form N–PX basic information about matters voted at shareholder meetings, such as the issuer of the security, a brief description of the matter, and how the fund

voted.  This increased transparency has assisted fund investors in monitoring their fund's involvement in the governance activities of portfolio companies and the impact on the fund's value.

While Form N–PX has increased transparency into fund proxy voting, its original design, and the volume of information disclosed, made it difficult for investors to use that information to identify particular voting matters (or categories of similar voting matters), or compare funds' voting records.  To improve Form N–PX's utility to investors, the Commission adopted a number of common-sense amendments in 2022, which included requiring funds to tie their description of voting matters to the issuer's description in its form of proxy, to report information in a searchable, structured data language, to disclose the number of shares voted as well as the number of shares the fund had loaned out and not recalled in order to vote, and to categorize voting matters by selecting from a standardized list of categories designed to cover matters on which funds frequently vote.  By standardizing and categorizing the information disclosed on the form, as well as making it searchable, these amendments make that information more accessible to investors and more easily analyzed.

Petitioners—a group of four states that are not regulated by the rule— challenge only the requirement to categorize voting matters.  And they do so on an invented theory that the Commission's rule was improperly motivated by a desire

to empower certain corporate activists to pressure funds to achieve the activists'
desired outcomes on environmental, social, or governance ("ESG") matters.

The Court need not reach the merits of petitioners' claims because they lack
standing.  Petitioners are states, not funds, and the rule does not require them to do
(or abstain from doing) anything.  In such cases, the Supreme Court has instructed
that "much more is needed" to establish standing than what petitioners offer here.
Only one petitioner—Texas—even attempts to establish a direct injury, and it does
so based on wholly inadequate speculation about possible decisions by third
parties.  The other petitioners fail to do even that much, resting solely on
unsupported *parens patriae* claims that are barred by Supreme Court precedent.

Petitioners fare no better on the merits.  The amendments to Form N–PX are
squarely within the Commission's authority under the Investment Company Act of
1940.  The Commission reasonably concluded that the amendments to Form
N–PX—including the categorization requirement—would facilitate investors'
ability to access information important to investment decisions and mitigate
conflicts of interest.  In arguing that the Commission exceeded its statutory
authority, petitioners invent a different rationale for the rule, insisting that the
Commission acted with the objective of taking sides on disputes about ESG
matters, and then attack this straw man.  But there is no support in the record for
petitioners' invented rationale.  To the contrary, the Commission explained that the

3

categorization requirement made it easier for investors to identify information important to them and to compare information across funds. And it included categories related to ESG matters because they—like the other categories—reflect matters on which funds are voting. These articulated reasons are squarely aligned with the Commission's statutory authority.

The Commission also complied with the requirements of the Administrative Procedure Act ("APA"). The Commission reasonably considered and explained the costs and benefits of the categorization requirement, reasonably selected the categories and explained its choice, and reasonably addressed concerns that this requirement could cause fund advisers to act contrary to their fiduciary duties.

At its core, petitioners' challenge reflects a policy disagreement by a group of unregulated states. They offer no sound basis to overturn the Commission's reasonable, and reasonably explained, amendments to the form.

## COUNTERSTATEMENT OF JURISDICTION

The Commission issued the rule on review (the "Final Rule") on November 2, 2022, and it was published in the Federal Register on December 22, 2022. AR-2, at 78,770, 78,811.[1] The petition for review was received by the clerk on February 21, 2023. To the extent publication in the Federal Register is the "entry

---

[1] Citations to the administrative record are noted as "AR-__," referring to the document number listed in the Certified List, Dkt. 21.

of such order,"[2] the petition is timely.  15 U.S.C. 80a-42(a); *see* 77i(a), 80b-13(a).[3]

Even so, this Court lacks jurisdiction because petitioners lack standing to challenge

the categorization requirement.  Section I, *infra*.[4]

## COUNTERSTATEMENT OF THE ISSUES

1.      Whether the petition for review should be dismissed because Texas

failed to meet its burden to establish direct standing and petitioners' assertion of

*parens patriae* standing is barred by Supreme Court precedent.

2.      Whether the Investment Company Act authorizes the Commission to

adopt amendments to Form N–PX that make it easier for investors to access and

analyze important information and mitigate potential conflicts of interest.

---

[2] As used in the Investment Company Act, Securities Act of 1933, and Investment Advisers Act of 1940, "order" encompasses the Final Rule.  *See Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 617 n.1 (D.C. Cir. 2019); *N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1134 (D.C. Cir. 2015); *Ecee, Inc. v. FERC*, 611 F.2d 554, 559, 564 n.20 (5th Cir. 1980).

[3] Petitioners cite 15 U.S.C. 78y(b)(1) as a basis for jurisdiction.  Br. 3.  That section provides for review of Commission rules adopted under specific sections of the Securities Exchange Act of 1934—none of which provided a basis for Final Rule.  *Compare* 15 U.S.C. 78y(b)(1), *with* AR-2, at 78,807.

[4] The Commission previously moved to transfer the petition to the D.C. Circuit or in the alternative to dismiss Utah and West Virginia as petitioners because venue is not proper for those petitioners and the applicable statutory provisions require each petitioner to be properly venued.  Dkt. 24.  This Court denied the Commission's motion.  Dkt. 47.

3.     Whether the Commission acted reasonably in considering the economic effects of the categorization requirement, creating broad categories that are less likely to change over time, and concluding that additional transparency into fund voting would help mitigate the potential for fund advisers to act contrary to their fiduciary duties.

## COUNTERSTATEMENT OF THE CASE

### A.     Market overview

Funds pool the assets of multiple investors and invest them in stocks, bonds, and other assets according to the fund's investment objectives and strategies.  In 2022, funds owned roughly 32% of the market capitalization of all U.S.-issued equities.  AR-2, at 78,770.  And as of May 2022, funds that were required to file reports on Form N–PX[5] held approximately $35.1 trillion in total net assets.  *Id.* at 78,791.

Shareholders of public companies—including funds—generally have a right under state law to vote at shareholder meetings.  At these meetings, public companies elect directors, approve executive compensation, and consider other management and shareholder proposals.  Most funds, like most shareholders, do not attend shareholder meetings in person; they vote through the use of proxies that

---

[5] Small business investment companies are not required to file Form N–PX. *Id.* n.1.

authorize management or another soliciting party to vote on their behalf. *See Concept Release on the U.S. Proxy System*, 75 Fed. Reg. 42,982, 42,982–84 (July 22, 2010). As a result of funds' holdings, they "can influence the outcome of a wide variety of matters that companies submit to a shareholder vote, including matters related to governance, corporate actions, and shareholder proposals," through their proxy voting. AR-2, at 78,770.

### B. Statutory and regulatory background

#### 1. Statutory authority

In the Investment Company Act of 1940, Congress directed the Commission to regulate funds, as well as advisers to such funds, because of Congress's "concern with the potential for abuse inherent in the structure of investment companies." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 338 (2010) (quotation omitted). To carry out this purpose, among other things, the Act requires funds to register with the Commission (15 U.S.C. 80a-8; *see also id.* 80a-24 (registration under the Securities Act)), maintain certain records (*id.* 80a-30), and provide reports to fund investors and file reports with the Commission (*id.* 80a-8, -24, -29).

In furtherance of these requirements, the Commission is authorized to require all funds to annually file the information that the Commission requires funds having registered securities to file under section 13(a) of the Exchange Act, 15 U.S.C. 80a-29(a). Section 13(a), in turn, authorizes the Commission, "as

7

necessary or appropriate for the proper protection of investors and to insure fair

dealing in the security," to adopt rules requiring certain issuers to file information

in order to keep the information in registration statements regarding their securities

reasonably current, and to file such annual and quarterly reports "as the

Commission may prescribe." *Id*. 78m(a).

Funds must also transmit semiannual reports to investors and file those

reports with the Commission.  Those reports must contain specified items—such as

information about the fund's balance sheet, securities holdings and transactions,

income, and remuneration paid to certain individuals (15 U.S.C. 80a-29(e))—as

well as "such other information as the Commission deems necessary or appropriate

in the public interest or for the protection of investors." *Id*. 80a-29(f); *see also id.*

80a-29(c).  In addition, the Commission may require the filing of additional

information to keep "reasonably current" the information contained in a fund's

registration statement. *Id.* 80a-29(b).  Moreover, the Investment Company Act

broadly authorizes the Commission to issue rules and orders "as are necessary or

appropriate to the exercise of the powers conferred upon the Commission

elsewhere in" the Act. *Id.* 80a-37(a).

Congress also declared that the provisions of the Act should be interpreted in

accordance with the purpose of mitigating and eliminating certain practices that it

found adversely affected the "national public interest" in investment companies.

8

15 U.S.C. 80a-1(a)–(b).  Among those practices are (1) the failure to provide

investors with "adequate, accurate, and explicit information, fairly presented,

concerning the character of such securities and the circumstances, policies, and

financial responsibility of such companies and their management," and (2) funds

that are "organized, operated, managed, or their portfolio securities are selected" in

the interest of actors other than the companies' security holders.  *Id.* 80a-1(b); *see*

*Jones*, 559 U.S. at 338–40.

### 2.    The Commission promulgated Form N–PX in 2003.

In 2003, the Commission first required funds to disclose on Form N–PX

how they voted securities held in their portfolios.  *Disclosure of Proxy Voting*

*Policies and Proxy Voting Records by Registered Management Investment*

*Companies*, 68 Fed. Reg. 6564 (Feb. 7, 2003).  As the Commission explained at

the time, there had been a dramatic increase in funds' ownership of the securities

of public companies,  certain funds were becoming "more assertive in exercising

their proxy voting responsibilities," and then-recent "corporate scandals" created

new investor interest in corporate governance issues.  *Id.* at 6564–65.

Given these changes in the market, and the fact that "the interests of a

mutual fund's shareholders may conflict with those of its investment adviser with

respect to proxy voting," the Commission concluded that it was appropriate to

"require mutual funds to disclose their proxy voting policies and procedures, and

their actual voting records." *Id.* at 6565–66.  As the Commission stressed, investors in mutual funds "have a fundamental right to know how the fund casts proxy votes on shareholders' behalf." *Id.* at 6566; *see also id.* 6565 n.10; 67 Fed. Reg. 60,828, 60,830 n.23 (proposed Sept. 26, 2002) (highlighting previous Commission studies of the role of institutional investors—including funds—in the proxy voting process and their impact on portfolio companies).

The Commission required a fund's proxy voting record to be filed annually on newly created Form N–PX.  For each voting matter, the Commission required the following information:

- The name of the issuer;

- The exchange ticker symbol and certain other identifying numbers if available through reasonably practicable means;

- The shareholder meeting date;

- A brief identification of the matter voted on;

- Whether the matter was proposed by the issuer or by a security holder; and

- Whether and how the fund cast its vote.

68 Fed. Reg. at 6569.[6]

The Commission emphasized that funds are formed as corporations or business trusts under state law and therefore they "must be operated for the benefit

---

[6] Form N–PX filings are available at https://www.sec.gov/edgar/searchedgar/n-px.

of their shareholders." *Id.* at 6565. The fund's board of directors, acting on the fund's behalf, typically delegates proxy voting functions to the fund's investment adviser, subject to the board's oversight. In turn, the investment adviser's fiduciary duties to the fund extend to "the voting of proxies relating to the fund's portfolio securities." *Id.* As a result, investment advisers voting proxies on a fund's behalf "must do so in a manner consistent with the best interests of the fund and its shareholders." *Id.*; *see Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers*, 84 Fed. Reg. 47,420 (Sept. 10, 2019).

In addition to disclosing a fund's proxy votes, the Commission required funds to disclose in other forms "the policies and procedures that they use to determine how to vote proxies." 68 Fed. Reg. at 6566. The Commission considered—and rejected—comments arguing that the Commission should prescribe specific guidelines governing funds' policies and procedures. As the Commission explained, the "intent of our proposal is to promote transparency with respect to proxy voting information, and not to mandate the content of a fund's policies or procedures." *Id.* at 6567.

No party challenged the 2003 rule, and petitioners recognize that, "[b]y and large," it "has not been controversial." Br. 7.

11

### C.    Proceedings before the Commission

#### 1.    The Commission proposed amendments to Form N–PX to improve its usefulness.

In two releases in 2010, the Commission requested comments on aspects of Form N–PX and proposed amendments to the form.  First, it requested comment on whether it should require disclosure of the actual number of shares voted and the number of shares a fund did not vote because they were on loan, and whether it should require funds to provide proxy voting information in an interactive data format.  75 Fed. Reg. at 42,994–95, 43,006–08.  Second, the Commission proposed amendments that would have required information to be presented in a standardized order and required disclosure of the number of shares a fund was entitled to vote, the number of shares voted, and how the shares were voted. *Reporting of Proxy Votes on Executive Compensation and Other Matters*, 75 Fed. Reg. 66,622, 66,628 (proposed Oct. 28, 2010).  These proposals were not adopted at the time, but some commenters agreed these changes would make Form N–PX more useful.  AR-1, at 57,487, 90, 95–96.

In 2021, the Commission again proposed amendments to Form N–PX, in order "[t]o improve the utility" of the form for investors. *Id.* at 57,480.  The Commission explained that investors faced difficulties accessing and analyzing the data on Form N–PX to "find a particular fund's voting record, find a specific vote or type of vote that is of interest, or compare funds' voting records." *Id.*  And

12

certain "gaps in the required disclosure" could result in an incomplete picture of a fund's proxy voting practices. *Id*. at 57,480.

The Commission proposed amendments to "enhance the information" on the form and to "make that information easier to analyze." *Id.* These proposals included requiring funds to tie their description of the voting matters to the issuer's description in its form of proxy, report information in a standardized order and require disclosure separately by series of shares, categorize voting matters by type, report information in a searchable, structured data language, and disclose that their proxy voting records are available through their websites and by request. In addition, the Commission proposed to require disclosure of the number of shares a fund voted or instructed to be voted, as well as the number of shares owned by the fund that had been loaned out and the fund did not to recall in order to vote. *Id.* at 57,485–92, 95–97, 99.

With respect to the requirement to categorize voting matters, for each proxy voting item reported, the Commission proposed that funds would select from 17 standardized categories and approximately 90 subcategories to identify the subject matter of the proxy vote. *Id.* at 57,486–87. The categories and subcategories were "designed to cover matters on which funds frequently vote, based on [Commission] staff's experience and review of the matters on which funds voted in 2020." *Id.* at 57,486. As the Commission explained, "requiring reporting persons

to categorize their proxy votes would help investors understand how funds and managers are voting by helping them readily identify votes on matters that are important to them. It also would allow investors to compare how different managers or funds voted on specific types of matters." *Id.* at 57,487.

### 2. Commenters requested modifications to the proposals.

Some commenters agreed that the proposed categorization requirement "would provide benefits to users of the form," make it "easier for investors to focus on topics they find important," "lower[] the costs of consumption of the data," and signal to investors the fund's investment criteria and goals. AR-2, at 78,777 (citing AR-25, 26, 32, 47); *see also id.* at 78,792 & n.260 (citing AR-25, 32).

Other commenters, however, expressed concerns that the proposed requirement would be "burdensome" and "not provide useful information." *Id.* at 78,777; *see id.* at 78,793 & n.261 (citing AR-29, 57). Some argued that the number of categories and subcategories "could complicate investors' ability to compare different filings to locate matters relating to particular categories," *id.* at 78,777 (citing AR-29), and "would result in numerous judgments as to the category or subcategory in which a matter belonged," *id.* (citing AR-42). And some suggested that the Commission instead adopt fewer, broader categories, and remove the subcategories. *Id.* (citing AR-29, 32, 34). Others expressed concerns that the particular categories and subcategories "might not be representative of

voting matters in future years." *Id.* (citing AR-22, 27, 43, 57).  Finally, Utah

suggested that activists instead of fund investors would use the information

required by the categorization requirement "to try to influence how funds vote."

*Id.* n.95 (citing AR-57); *see id.* at 78,798 & n.331.

> ### 3.    The Commission adopted the Final Rule with modifications based on input from commenters, and analyzed the rule's economic effects.

After considering comments, the Commission adopted the amendments with

certain modifications to reduce burdens and respond to commenter concerns.  As in

the proposal, the Final Rule requires funds to disclose the number of shares voted

(or instructed to be voted), how they were voted, and the number of shares a fund

loaned but did not recall.  *Id.* at 78,778–81.  It also requires funds to identify

certain proxy voting matters using the same language and order as in the issuer's

form of proxy and to report information in a custom structured data language.  *Id.*

at 78,775–76, 85–86.  Further, the rule requires funds that have multiple series of

shares to provide disclosure separately by series and it amends other forms to

require funds to disclose that their proxy voting records are publicly available and

free of charge.  *Id.* at 78,781, 88.  The Commission also adopted amendments

pursuant to a mandate in section 951 of the Dodd-Frank Wall Street Reform and

Consumer Protection Act, 15 U.S.C. 78n-1(d), to require certain institutional

investment managers to annually report how they voted proxies relating to

shareholder advisory votes on executive compensation.  AR-2, at 78,772–75.
Petitioners do not challenge any of these requirements.  Br. 11 & n.5.

The Final Rule also requires funds to categorize matters voted on by type—
the only aspect of the amendments petitioners challenge.  *Id.*  Responding to
commenter concerns, the Commission modified the proposed categorization
requirement "to reduce the burden and the level of uncertainty among potentially
overlapping categories for reporting persons while enhancing the usefulness of
categorization to investors."  AR-2, at 78,777.  The Commission "streamlined the
list of categories, including combining certain categories that were particularly
likely to overlap and thus could cause confusion on how to categorize."  *Id.*  It also
removed the subcategorization requirement entirely, instead using the proposed
subcategories as "examples of matters that would be included within each
category."  *Id.*

The Commission further explained that, "[w]hile any chosen list of
categories may not perfectly capture unanticipated trends that arise in the future,
the use of broader categories that are less likely to change helps to address
concerns that the chosen categories are based on a proxy season that some
commenters asserted was not representative."  *Id.* n.94 (citing AR-22, 43).  And,
with respect to concerns about the use of the information by activists, the
Commission emphasized that "fund advisers are subject to fiduciary duties and

thus must make voting determinations in the best interest of the fund and its

shareholders," and that the amendments to Form N–PX "may also help deter fund

voting decisions motivated by conflicts of interest." *Id.* at 78,777–78 n.95 (citing

AR-57).

As adopted, funds select from 14 specified, standardized (but non-exclusive)

categories "to identify the subject matter of each reported proxy voting item." *Id.*

at 78,776.  Those categories are:

(A)     Director elections;

(B)     Section 14A say-on-pay votes;

(C)     Audit-related;

(D)     Investment company matters;

(E)     Shareholder rights and defenses;

(F)     Extraordinary transactions;

(G)     Capital structure;

(H)     Compensation;

(I)     Corporate governance;

(J)     Environment or climate;

(K)     Human rights or human capital/workforce;

(L)     Diversity, equity, and inclusion;

(M)     Other social issues; or

(N)     Other (along with a brief description).

17

*Id.* at 78,817–18; *see* Form N–PX, Item 1(g).[7]

Overall, the Commission concluded that "the modifications to the proposal balance the concerns raised by commenters on the proposed categorization requirement with the benefits provided by voting matter classifications." AR-2, at 78,778.

The Commission also examined the economic effects, including the costs and benefits (*id.* at 78,792–98, 802–05) imposed by the Final Rule, as well as the effects on efficiency, competition, and capital formation (78,800–01). Where practicable, the Commission quantified these effects. Otherwise, the Commission performed a qualitative analysis. *Id.* at 78,790–91.

The Commission explained that the amendments to Form N–PX, including the categorization requirement, were designed to "broaden the scope of the benefits" it identified in 2003: (1) "provide better information to investors who wish to determine to which fund managers they should allocate their capital, and whether their existing fund managers are adequately maximizing the value of their shares," (2) "deter fund voting decisions that are motivated by considerations of the interests of a fund's adviser rather than the interests of the fund's investors," and (3) "provide stronger incentives for fund managers to vote their proxies carefully." *Id.* at 78,792.

---

[7] https://www.sec.gov/files/formnpx.pdf.

The Commission expected the form amendments to "benefit fund investors" and other parties by "enhancing" the existing information funds disclose and making it "easier to collect and analyze," which would lower the "costs of gathering and understanding this information" and "facilitate comparisons of voting patterns." *Id.* As such, investors who "choose among funds based on their proxy voting policies and records, in addition to other factors…will be able to select funds that suit their preferences more efficiently." *Id.*

Further, the Commission stated that these amendments "may also help deter fund voting decisions motivated by conflicts of interest." *Id.* at 78,794. Although fund managers are fiduciaries, "their proxy voting decisions may be driven by their economic interest in attracting more investments into the fund or more investment opportunities," and "[a]ligning funds' voting decisions with investors' expectations and improving investors' oversight over voting by definition mitigates risks of conflicts of interest." *Id.* 78,794–95.

Additionally, the Commission recognized that the amendments will increase transparency into fund voting, which "may also provide an incentive for fund managers to devote additional time and resources to their participation in voting proxies, which can lead to an improvement in the performance of corporate issuers and enhance shareholder wealth." *Id.* at 78,794.

The Commission also stated that the changes to the categorization requirement from the proposal "should increase the usefulness of the categories," and it anticipated that this requirement may "enable investors to have more information about reporting persons' proxy voting records which may aid them in their investment decisions." *Id.* at 78,793.

Turning to the costs of the Final Rule, the Commission observed that the collective amendments to Form N–PX and other forms would lead to "some additional costs for funds," and that "[a]ny portion of these costs that is not borne by a fund's adviser or other sponsor will ultimately be borne by the fund's shareholders." *Id.* at 78,795. For funds holding equity securities, the Commission estimated that the initial burden to accommodate the Form N–PX amendments would be $4,688, with ongoing annual additional costs of $5,188, plus an estimated $136 related to the website availability requirement. *Id.* at 78,804.

With respect to the categorization requirement, the Commission stated that streamlining the categories and eliminating subcategories would "reduce costs compared to the proposal." *Id.* at 78,795; *see also id.* at 78,777–78, 803, 806. And in response to Utah, which stated that activists would use the categorization requirement "to sway funds towards voting outcomes that are not for the benefit of fund shareholders," the Commission stated that it believed "this is less likely if a fund's adviser follows its fiduciary duty obligations." *Id.* at 78,798 (citing AR-57).

20

And it found that improving investor oversight of voting decisions "by definition"
mitigates the risks of conflicts of interest, *id*. at 78,795, and that the amendments to
the form "may also help deter fund voting decisions motivated by conflicts of
interest." *Id.* 78,777 n.95.

## STANDARD OF REVIEW

Agency action may be set aside under the Administrative Procedure Act if it
is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance
with law" or in "excess of statutory…authority." 5 U.S.C. 706(2)(A), (C). Review
under the APA's arbitrary-and-capricious standard is "deferential," and "[a] court
simply ensures that the agency…has reasonably considered the relevant issues and
reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct.
1150, 1158 (2021); *see also Clean Water Action v. EPA*, 936 F.3d 308, 312 (5th
Cir. 2019).

"The findings of the Commission as to the facts, if supported by substantial
evidence, shall be conclusive." 15 U.S.C. 80a-42(a); *see also* 77i(a), 78y(a)(4),
80b-13(a). This evidentiary threshold "is not high." *Biestek v. Berryhill*, 139 S.
Ct. 1148, 1154 (2019). Substantial evidence is "more than a scintilla, less than a
preponderance, and is such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." *Boeta v. FAA*, 831 F.3d 636, 641 (5th Cir.
2016) (quotation omitted).

21

## SUMMARY OF ARGUMENT

1.     Petitioners lack standing to challenge the categorization requirement. Because petitioners are not regulated entities, it is substantially more difficult for them to establish standing. And their speculative theories fall far short of making the requisite showing.

Only Texas asserts direct standing, claiming that state entities invest in funds subject to the Final Rule, that the Final Rule increases costs for funds, and that these costs will be passed on to the state entities. But these assertions are based only on the guess that Texas "may" incur additional expenses because fund managers are "generally inclined" to pass on fund expenses to the fund's investors. Such speculation fails to adequately connect any increased costs and an injury to Texas from the categorization requirement.

Petitioners next assert they have *parens patriae* standing based on purported injuries to in-state residents who invest in funds and speculation that the categorization requirement will lead to decreased investment in the fossil-fuel industry. But states may not bring *parens patriae* suits against the federal government. And even if this theory were not barred by Supreme Court precedent, petitioners again fail to support their claims of injury with any evidence. Moreover, the assertion of standing based on in-state residents who invest in

22

mutual funds fails because petitioners do not articulate any interest apart from such private parties.

2.    The Commission acted well within its statutory authority in adopting the categorization requirement.  Regulation to provide adequate and accurate information to prospective and current investors in funds, and to ensure that funds are managed in the best interest of shareholders, fits comfortably within the authority granted in the Investment Company Act.  And the Commission created (and amended) Form N–PX to do just that.  Given funds' concentrated ownership of securities and ability to influence corporate action through proxy voting—which, in turn, impacts the value of a fund's investments—the Commission reasonably required disclosure of information about such voting to be provided in a more accessible form.  And the Commission reasonably concluded that this disclosure could mitigate conflicts of interest and incentivize fund managers to vote proxies carefully.

Petitioners attempt to recast the Commission's stated aims, claiming without support that the Commission in fact intended to further the interests of ESG activists in advancing specific causes.  But there is no evidence in the record to support petitioners' unfounded critique.  Indeed, the amendments provide useful information to investors on both sides of any given issue—including the ESG issues petitioners reference.  And, despite petitioners' meritless assertions, the

23

Commission justified its stated basis for the categorization requirement.

Moreover, even if petitioners' claims to the contrary—fundamentally an APA

argument—could be construed as an argument that the Commission exceeded its

interpretive authority under the Investment Company Act, such an argument is

barred and, in any event, is meritless.

3.    The Commission also satisfied its obligations under the APA.  It

reasonably analyzed and explained the economic effects of the categorization

requirement—quantifying where it could and otherwise providing a thorough

analysis and explanation of the relevant issues.  And, contrary to petitioners'

contention that more quantitative data was needed, this Court recently confirmed

that the federal securities laws and the APA allow the Commission to conduct a

qualitative analysis of a rule's likely economic consequences.  Nor do petitioners

point to any data the Commission overlooked.

The Commission's choice of categories was also reasonable and reasonably

explained.  Petitioners claim that this choice was based on a "highly unusual"

proxy season and therefore the categories may not be representative of future

years.  But they entirely ignore the changes the Commission made to its original

proposal in response to these concerns, choosing broader categories that are less

likely to change.  The Commission also addressed the concern that the

categorization requirement could cause fund advisers to act contrary to their

acknowledged fiduciary duties at the behest of activists, reasonably concluding that the increased transparency provided by the form amendments could mitigate these conflicts of interest by allowing shareholders to better monitor funds' proxy voting activities. At bottom, petitioners have a policy disagreement with the categorization requirement—not an APA claim.

## ARGUMENT

### I. Petitioners fail to demonstrate standing.

None of the petitioners has standing. Texas alone attempts to establish a direct injury, but it has failed to do so. And all of the petitioners' assertion of *parens patriae* standing is barred by binding precedent and, in any event, fails.

Article III standing requires a party to demonstrate "(1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the respondent, and (3) that is likely to be redressed by a favorable judicial decision." *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 424 (5th Cir. 2020) (per curiam). An injury in fact requires "an invasion of a legally protected interest" that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotations omitted). A threatened injury "must be *certainly impending* to constitute injury in fact, and…[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotations omitted).

25

Additionally, when a petitioner is not "the object of the government action" and the "asserted injury arises from the government's allegedly unlawful regulation" of a third party, standing is "substantially more difficult" to establish. *Lujan*, 504 U.S. at 562 (quotation omitted). In this circumstance, "much more is needed" to prove standing, *id*., and courts do not accept "standing theories that rest on speculation about the decisions of independent actors," *Clapper*, 568 U.S. at 414.

Petitioners "bear[] the burden of establishing standing" with "specific facts" supported by "affidavit or other evidence." *Id.* at 412 (quotations omitted). They carry "a burden of production with respect to standing that is similar to that required at summary judgment," *Shrimpers*, 968 F.3d at 423 (quotation omitted), and are generally required to meet this burden in their opening brief. *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019).[8]

### A.    Texas has not demonstrated any injury that is fairly traceable to the categorization requirement.

Only Texas claims, and submits any evidence in an attempt to establish, direct standing to challenge the categorization requirement. *See* Br. 21–25. Like

---

[8] Petitioners lack any plausible basis for the "good-faith (though mistaken) belief that standing would be both undisputed and easy to resolve" needed to justify submission of evidence for standing in reply. *All. for Fair Bd. Recruitment v. SEC* ("*AFBR*"), 85 F.4th 226, 239 n.5 (5th Cir. 2023) (quoting *Ctr. for Biological Diversity*, 937 F.3d at 542 n.4).

all of the petitioners, Texas is not the "object of" the Final Rule, *Lujan*, 504 U.S. at 561; instead, it attempts to show standing on the theory that state entities invest in funds subject to the Final Rule, that the Final Rule will increase costs for these funds, and that these costs will be passed on to investors like Texas. Br. 20–21. But Texas fails to substantiate several links in this chain.

To start, Texas has not provided sufficient evidence that the Texas Treasury Safekeeping Trust Company ("Trust Company") invests in any specific fund that will bear increased costs from the Final Rule or that any fund will pass on any of these costs to shareholders. Petitioners reference (Br. 23) a financial report of the Trust Company, but it does not identify any specific mutual fund, instead generally identifying overall holdings in mutual funds holding global equities. Annual Financial Report 28, 31 (2022).[9] And the related declaration petitioners submit offers no more than speculation that the Trust Company will bear any costs from the Final Rule—stating that "*[s]ome or all* of these mutual funds will be subject to" the Final Rule, and that the Trust Company "*may* incur additional expenses…, as the managers of such mutual funds are *generally inclined* to pass such expenses on to the fund's investors." Reissig Decl., Dkt. 76, ¶¶ 3–4 (emphases added).

The other entities petitioners highlight—the Employees Retirement System of Texas ("ERS") and the Teacher Retirement System of Texas ("TRS")—

---

[9] https://tinyurl.com/ttstcfinancialreport2022.

similarly fail to demonstrate that any fund they invest in will pass on any costs of the Final Rule to shareholders. Although petitioners' brief and associated declarations at least identify a specific exchange-traded fund ("ETF") that these entities invest in, *see* Br. 23–25; ERS, *Annual Comprehensive Financial Report— 2022*, at 108;[10] TRS, *Annual Comprehensive Financial Report* 116 (2022),[11] the declarations do not claim that those funds will pass costs on to shareholders. Indeed, unlike the Trust Company declaration, they do not even make the insufficient claim that fund advisers are generally inclined to pass on costs to shareholders. Veal and Auby Decls., Dkts. 76 & 77.

Nor does Texas even attempt to show that the costs they allege will be borne by these entities are traceable to the categorization requirement. Even if Texas's general conjecture about the inclinations of unspecified fund managers (Reissig Decl., Dkt. 76, ¶ 4) were sufficient to establish a concrete injury (and it is not), that would still not establish that any additional costs are traceable to this specific

---

[10] https://tinyurl.com/ersreport2022. The links provided by petitioners to establish that ERS invests in other ETFs (Br. 24; Veal Decl., Dkt. 76, ¶ 2) either do not work or do not support this claim. The ERS website, however, contains a list of "Holdings of Listed Securities" that identifies holdings in ETFs. https://www.ers. texas.gov/about-ers/ers-investments-overview/investments-division/ers-holdings-listed-securities.

[11] https://tinyurl.com/trsreport2022.

requirement.[12]  Because Texas challenges only this portion of the Final Rule, Br.

11 & n.5, it bears the burden of showing that its alleged injury is traceable to this

requirement.  *See Lewis v. Casey*, 518 U.S. 343, 357–58 & n.6 (1996); *Legacy*

*Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir. 2018) (party "must

show standing to challenge each alleged deficiency in [government's] remedial

scheme").

In *Louisiana Department of Wildlife & Fisheries v. National Oceanic &*

*Atmospheric Administration*, this Court rejected a similar attempt to demonstrate

standing.  There, a federal regulation required certain shrimping vessels to use

additional equipment, and Louisiana claimed standing based on the harm to its

marine resources.  *See* 70 F.4th 872, 875–76 (5th Cir. 2023).  The Court found that

Louisiana did not submit "competent summary judgment evidence that

substantiates any alleged injury." *Id.* at 880.  Although the rule "forecast[ed] the

impact on shrimp harvests Gulf-wide, the State offer[ed] no evidence specific to *its*

*own* shrimp harvests, in its own waters, much less an injury to its resources." *Id.*

Likewise, while Louisiana claimed the rule would interfere with enforcement of its

---

[12] Petitioners' Statement of the Case states that some commenters "decried the costs of the [categorization requirement]," which "surely would be passed on" to fund investors, citing a letter from the U.S. Chamber of Commerce.  Br. 15–16. But that letter says nothing about whether any increased costs to funds would be passed on to investors, nor for that matter does it provide any information specific to the funds Texas invests in.  AR-43.

wildlife and fisheries laws, the Court stated that the sole declaration to support this claim was "couched in speculative, general language" and did not "'connect the dots' so as to create a genuine issue of material fact." *Id.* at 881; *see id.* at 883 (declaration "is speculative on the material points, merely describing what 'could' happen, and is thus insufficient by itself to forestall summary judgment").

Similarly, petitioners' declarations use "speculative, general language," and do not "connect the dots" from any increased costs of the Final Rule as a whole to a concrete injury to Texas from the categorization requirement. *Id.* at 881. "Article III demands more than such conclusory assertions," *Ctr. for Biological Diversity*, 937 F.3d at 545, and Texas has failed to demonstrate both that it will suffer any injury and that any injury is fairly traceable to the categorization requirement. *See Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (state failed to provide "concrete evidence that [its] costs had increased or will increase as a result of" the challenged action); *see also XY Plan. Network, LLC v. SEC*, 963 F.3d 244, 252–53 (2d Cir. 2020) (states did not show "a direct link between [the rule] and their tax revenues" and instead relied "on a causal chain that is too attenuated and speculative to support standing").

In lieu of the required evidence, petitioners claim that the Commission "effectively has conceded that costs caused [by] the [Final] Rule will be passed on to fund investors." Br. 22. But this too fails. While the Commission stated that

"[a]ny portion of these costs that is not borne by a fund's adviser or other sponsor will ultimately be borne by the fund's shareholders," AR-2, at 78,795, it did not opine on the likelihood that costs would not be borne by a fund's adviser or other sponsor, let alone whether, or to what extent, any costs of the Final Rule would be borne by shareholders in any specific fund.

### B.    Petitioners do not have *parens patriae* standing.

All petitioners assert *parens patriae* standing.  In a *parens patriae* —"parent of the country"—action, a state "must assert an injury to what has been characterized as a 'quasi-sovereign' interest." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982).  Although this interest "does not lend itself to a simple or exact definition," "a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general," which requires a state to show an "injury to a sufficiently substantial segment of its population." *Id.* at 601, 607.

Petitioners posit two such interests, which they acknowledge (Br. 26) are quasi-sovereign as described in *Snapp*:  First, that state residents invest in funds and will be "forced to shoulder their portion of the increased costs of the Final Rule."  Br. 26.  Second, that the Final Rule will cause "widespread economic damage by pressuring fund managers to promote social and political aims over financial returns to investors," which will lead to "reduced investment in the fossil-

fuel industry," negatively affecting their economies. Br. 26–27. Both claims are barred by Supreme Court precedent. And, in any event, they fail by their own terms.

> ### 1.    States may not bring *parens patriae* actions against the federal government.

The Supreme Court has held that states do "not have standing as *parens patriae* to bring an action against the Federal Government." *Snapp*, 458 U.S. at 610 n.16; *see also Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (same). As the Court has explained, "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as *parens patriae*." *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923). That should be the end of the matter. *Brackeen*, 599 U.S. at 295.

Petitioners attempt to escape this conclusion by reference (Br. 26) to *Massachusetts v. EPA*, 549 U.S. 497 (2007). But that case does not change the analysis. As the D.C. Circuit explained in *Government of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019), "the Supreme Court had no need to carve out an exception to" the rule in *Mellon* (the "*Mellon* bar") in *Massachusetts v. EPA* "because Massachusetts did not sue in its *parens patriae* capacity." *Id.* at 182. Rather, as the Supreme Court "expressly recognize[d]," "Massachusetts asserted its own statutory right and alleged its own harm to establish an injury-in-

fact." *Id.* (citing 549 U.S. at 520 n.17).  Indeed, the Court in *Massachusetts*

distinguished that case from *Mellon*, explaining that "there is a critical difference

between allowing a State to protect her citizens from the operation of federal

statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights

under federal law (which it has standing to do)."  549 U.S. at 520 n.17 (quotation

omitted).  As a result, the relevant distinction is not "between two types of *parens*

*patriae* lawsuits, one permissible and one not.  It is between a *parens patriae*

lawsuit (what *Mellon* prohibits) and a State suing based on 'its rights under federal

law' (not a *parens patriae* lawsuit at all)."  *Bernhardt*, 923 F.3d at 182.

Although *Massachusetts* included some discussion of "quasi-sovereign"

interests, that discussion was not related to whether Massachusetts may bring a

*parens patriae* suit, but instead to the separate doctrine under which states can be

afforded "special solicitude in [the] standing analysis."  *Id.* (quoting 549 U.S. at

520).  Thus, that case does not carve out any portions of the *Mellon* bar as

expressed in *Snapp*.[13]  And if there were any doubt whether the Court intended to

carve out an exception in *Massachusetts*, it eliminated such doubt in *Brackeen*,

---

[13] This Court's decisions in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016) (mem.), and *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022), are consistent with this approach.  Both cases address direct, rather than *parens patriae*, standing, and discuss whether Texas was entitled to "special solicitude" in the direct standing analysis.  *See* 50 F.4th at 514–20; 809 F.3d at 150–56.

reaffirming that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government."  599 U.S. at 295 (quoting *Snapp*, 458 U.S. at 610 n.16).

Finally, citing a district court decision that has been stayed, petitioners claim that the *Mellon* bar applies only to "third-party *parens patriae*" suits, not those based on "quasi-sovereign interests," which they contend includes a state's interest in the health and well-being of its residents.  Br. 26; *see Missouri v. Biden*, 2023 WL 4335270, at *57 (W.D. La. July 4, 2023) (citing *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022)).[14]  But that position contradicts *Snapp*, which explained that a state "*must assert*" a quasi-sovereign interest to bring a *parens patriae* suit.  458 U.S. at 601 (emphasis added).  Indeed, accepting petitioners' argument would eviscerate the *Mellon* bar.  As explained in *Snapp*, states' interests "in the health and well-being—both physical and economic—of its residents in general" was one of the two "general categories" of quasi-sovereign interests.  *Id.* at 607.

Nor has this Court ever agreed with petitioners' position.  To the contrary, in *Louisiana Department of Wildlife & Fisheries*, the Court found the analysis in *Bernhardt* persuasive, concluding it was "dubious" that Louisiana "may maintain its *parens patriae* suit against the federal government at all."  70 F.4th at 882 n.5.

---

[14] On appeal, this Court did not address the states' "alternative argument" that they had *parens patriae* standing. 83 F.4th 350, 371 n.6 (5th Cir. 2023) (per curiam), *cert. granted*, No. 23A243, 2023 WL 6935337 (U.S. Oct. 20, 2023) (mem.).

But because the parties did not brief the *Mellon* bar in any detail and Louisiana failed to support this theory with evidence in any event, the Court declined to determine the issue. *Id.*; *see also Harrison v. Jefferson Par. Sch. Bd.*, 78 F.4th 765, 769 (5th Cir. 2023).

### 2.    Regardless, petitioners' *parens patriae* standing theories fail.

### a.    Petitioners fail to submit evidence of injury.

Even if petitioners could bring a *parens patriae* suit, they have failed to properly do so. They assert *parens patriae* interests based on in-state residents who invest in funds, Br. 26, and on their speculation that the Final Rule will "reduce[] investment in the fossil-fuel industry," leading to harm to their economies, Br. 27. But these claims fail for the independent reason that petitioners do not provide any evidence that the categorization requirement will cause these injuries to "a sufficiently substantial segment of [their] population[s]." *La. Dep't of Wildlife & Fisheries*, 70 F.4th at 881 (quoting *Snapp*, 458 U.S. at 607); *see id.* at 881–82 & n.5 (lack of evidence a sufficient reason to reject *parens patriae* claim).

Petitioners' claims with respect to in-state residents who invest in funds, like their direct standing arguments, fail because the alleged injuries are speculative. *See supra* Section I.A. And petitioners have failed to produce *any* evidence that the categorization requirement would in fact result in "reduced investment in the fossil-fuel industry." Br. 27. They devote only two sentences in their brief to the

35

claim that the rule will injure their economies by affecting such investment, citing only to a comment letter submitted by Utah.  Br. 26–27.  But that letter neither claims that the categorization requirement will reduce investment in the fossil-fuel industry nor provides any evidence.  *See* AR-57.

Again, this Court's opinion in *Louisiana Department of Wildlife & Fisheries* is instructive.  In that case, Louisiana asserted standing based on claimed adverse impacts to its shrimping industry, "a significant component of the State's economy."  70 F.4th at 881.  Although the rule stated it "would adversely affect the shrimping industry across the Gulf of Mexico," the Court concluded that "Louisiana failed to provide evidence particularly substantiating the rule's impact on *its* shrimping industry or, ergo, a sufficiently substantial segment of its population."  *Id.* (quotation omitted).  Similarly, petitioners have failed to provide any evidence that the categorization requirement will decrease investment in the fossil-fuel industry in any of their states, or to show how any decrease in investment would impact their state economies.

In addition, petitioners' assertion that their *parens patriae* standing arguments are entitled to "special solicitude" is misguided.  Br. 28.  "Special solicitude merely changes the normal standards for redressability and immediacy," and "countenances some uncertainty as to both the efficacy of a judicial remedy and the *timing* of the injury alleged by a State."  It "does not absolve States from

substantiating a cognizable injury, and neither the Supreme Court nor this court has held that it alters the requirements that the injury must be concrete and particularized." 70 F.4th at 882 (quotation omitted). In other words, "it is not a standing shortcut when standing is otherwise lacking," *id.*, and it does not affect the analysis of any of the issues here.

> **b.     Petitioners do not articulate an injury separate from in-state residents who invest in funds.**

Finally, petitioners' *parens patriae* theory based on their residents' fund ownership also fail because they do not articulate any interest apart from those of private parties. To maintain a *parens patriae* claim, a state must "allege injury to its citizens health or economic well-being in a way that also implicates its own interests." *Harrison*, 78 F.4th at 773. But petitioners assert precisely the same *parens patriae* interest that they raise directly and that their residents could themselves raise directly—that their residents "will be forced to shoulder their portion of the increased costs of the Final Rule." Br. 26. Just as in *Harrison*, petitioners' asserted interests are "wholly derivative of the interests of" these residents, who could "sue to get relief," 78 F.4th at 773, and the states have pointed to no additional barriers to any of their residents to bring suit based on their ownership of fund shares. *See Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 652 (9th Cir. 2017).

## II.     The categorization requirement is within the Commission's statutory authority.

The Commission validly adopted the categorization requirement pursuant to the authority Congress granted it in the Investment Company Act.  Under the Act, the Commission may require funds to file annual reports with information that is necessary or appropriate for the proper protection of investors and to insure fair dealing in the security, 15 U.S.C. 80a-29(a); *see id.* 78m(a), 80a-29(d), and the Commission may also require funds to transmit to shareholders and file with the Commission semiannual reports containing information that is necessary or appropriate in the public interest or for the protection of investors.  *Id.* 80a-29(f); *see id.* 80a-29(b)(2), (c).

Petitioners do not dispute that if the Commission acted reasonably and for its stated reasons, the categorization requirement falls within this authority.  Nor do they challenge the vast majority of the Commission's amendments to Form N–PX in the Final Rule or argue that the categorization requirement exceeds the Commission's authority under the language of the Investment Company Act.  Petitioners' arguments are instead based on the unsupported speculation about the Commission's motives and, even if petitioners can be understood to be raising a statutory interpretation argument, that claim is both barred and meritless.

**A.    The Commission amended Form N–PX to increase its utility for all investors.**

The Commission created Form N–PX in 2003 to provide useful information to investors about a fund's proxy voting, to mitigate conflicts of interest, and to incentivize fund managers to vote proxies carefully.  Petitioners do not dispute that this was an appropriate exercise of the Commission's authority under the Act.  In amending the form in 2022 to, among other things, add the categorization requirement, the Commission acted to "broaden the scope" of these benefits by increasing the usefulness of the form.  AR-2, at 78,792.  By making the information provided on Form N–PX more accessible and easier to analyze, the amendments increase the form's utility to all investors, regardless of their views on any given issue.  *Id.*

Petitioners disbelieve this rationale, insisting instead that the Commission acted for the unstated purpose of "advanc[ing] the interests of corporate activists and to increase the pressure and leverage they can bring to bear on fund managers in the service of their pet ESG causes."  Br. 28.  But "in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019).  Petitioners offer no evidence that the Commission acted for any reasons other than those it expressly set out in the adopting release—and they certainly have not made a "strong showing of bad faith or improper behavior."

39

*Id.* at 2574 (quotation omitted); *see Biden v. Texas*, 142 S. Ct. 2528, 2546–47

(2022).  Moreover, petitioners myopic focus on ESG issues ignores that they are

implicated in only a fraction of the categories adopted and that the categorization

requirement itself is only one part of a broader package of amendments, all of

which were adopted with the same goals.[15]

---

[15] In other sections of their brief, petitioners cite statements made by two
Commissioners (one of whom voted in favor of the proposal) when the
amendments were proposed.  But neither statement suggests that the Commission
proposed or adopted the categorization requirement for any reason other than those
it stated.  Indeed, one of the Commissioners expressed agreement with
"components of this proposal aimed at making Forms N–PX more useful for
investors," and found it "frustrating to see funds list their votes on agenda items
opaquely labeled as 'Miscellaneous' and have to look up the relevant issuer's
proxy statement in order to understand what matters the funds were considering."
*Statement on Proposed Changes to Asset Managers' Proxy Voting Disclosures*
(Sept. 29, 2021), https://www.sec.gov/news/public-statement/roisman-open-
meeting-2021-09-29.  And, as explained below, *supra* Sections III.B & C, the
Commission reasonably responded to both the concerns expressed about the
"longevity" of the categories and the concerns of another Commissioner that
activists could use information on Form N–PX.  *Statement on Enhanced Reporting
of Proxy Votes by Registered Management Investment Companies; Reporting of
Executive Compensation Votes by Institutional Investment Managers* (Sept. 29,
2021), https://www.sec.gov/news/public-statement/peirce-open-meeting-2021-09-
29.  Petitioners also cite Executive Orders and rules from other agencies, as well as
separate proposals by the Commission, Br. 8–11, but never explain how any of
these actions relate to the Final Rule.

**B.    To the extent petitioners contest the Commission's statutory authority to require categorization for its stated purposes, such a challenge is not properly before the Court and, in any event, is meritless.**

Petitioners' repeated, unsupported assertions that "the administrative record does not substantiate" the Commission's basis for acting (Br. 29) are, at bottom, more of an APA challenge than an argument that the language of the Investment Company Act cannot be interpreted to authorize this rule.  But, to the extent petitioners do contend that a properly justified rule would nonetheless exceed the Commission's statutory authority, such an argument is barred and meritless.

No commenter raised such an argument below and, therefore, petitioners are precluded from raising it here.  15 U.S.C. 80a-42(a) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission or unless there were reasonable grounds for failure so to do."); *see also id.* 77i(a), 80b-13(a) (Securities Act and Advisers Act); *BP Am., Inc. v. FERC*, 52 F.4th 204, 224–25 (5th Cir. 2022); *Zacharias v. SEC*, 569 F.3d 458, 472 & n.3 (D.C. Cir. 2009) (per curiam); *Tenneco Oil Co. v. FERC*, 571 F.2d 834, 840 (5th Cir. 1978) (similar statutory requirement applied in review

of rulemaking); *Gann v. SEC*, 361 F. App'x 556, 560 (5th Cir. 2010) (unpublished).[16]

Regardless, Form N–PX, titled "Annual Report of Proxy Voting Record," fits squarely within the Commission's statutory authority. Section 30(a) of the Act requires every registered investment company to file annually with the Commission "such information, documents, and reports as investment companies having securities registered on a national securities exchange" are required to file annually under section 13(a) of the Exchange Act. 15 U.S.C. 80a-29(a); *see also id.* 80a-29(d) (Commission shall issue rules permitting funds to file reports required under section 30(a) instead of reports required under section 13 of the Exchange Act). Section 13(a), in turn, authorizes the Commission to promulgate rules requiring certain issuers to file, "as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security," such annual and quarterly reports "as the Commission may prescribe." *Id.* 78m(a). In short, these provisions authorize the Commission to require funds to file annual reports

---

[16] Two commenters purported to challenge the Commission's statutory authority. Like petitioners, they asserted that instead of protecting investors, "the rule would harm shareholders with increased costs and risk," AR-57, at 6, and that the "proposed rule asserts appropriate intentions—but then in fact does the opposite," AR-22, at 11.

(including Form N–PX) with information "as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security."

Moreover, section 30(f) of the Act—which petitioners concede applies to the amendments at issue here, *see* Br. 1—authorizes the Commission, "by rule," to require semiannual reports to shareholders to contain "such other information" as it "deems necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. 80a-29(f).[17]

This Court has recognized that similar statutory grants of authority, such as those to regulate in the "public interest," "take meaning from the purposes of the regulatory legislation."  *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 437, 439 (5th Cir. 2021) (quotation omitted); *see also Bus. Roundtable v. SEC*, 905 F.2d 406, 410, 413 (D.C. Cir. 1990).  And the Investment Company Act states that its provisions are to be interpreted consistent with the "policy and purposes" of eliminating certain practices, including (1) the failure to provide "adequate, accurate, and explicit information, fairly presented, concerning the character of

---

[17] The Commission originally proposed to require funds to file proxy voting information in their semiannual reports on Form N–CSR, 67 Fed. Reg. at 60,831, but modified its approach in response to commenter concerns that such disclosure could impose substantial costs for fund complexes that have funds with staggered fiscal years.  68 Fed. Reg. at 6569 & n.41; *see generally* 15 U.S.C. 80a-29(c) (directing the Commission to consider actions "to avoid unnecessary reporting by, and minimize the compliance burdens on," funds when exercising its authority under section 30(f)).

such securities and the circumstances, policies, and financial responsibility of such

companies and their management" and (2) funds that are "organized, operated,

managed, or their portfolio securities are selected," in the interest of actors other

than the funds' shareholders. 15 U.S.C. 80a-1(b); *see Jones*, 559 U.S. at 338–40;

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 93 (1991) (Act "seeks to arrest the

potential conflicts of interest inherent" in typical fund arrangements); *SEC v. Cap.

Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963) ("fundamental purpose" of the

federal securities laws is to "substitute a philosophy of full disclosure for the

philosophy of caveat emptor and thus to achieve a high standard of business ethics

in the securities industry"); *Herpich v. Wallace*, 430 F.2d 792, 815–16 (5th Cir.

1970).

The Commission reasonably concluded that the categorization requirement

comports with these purposes.  As the Commission stated when it adopted Form

N–PX in 2003, millions of Americans rely on mutual funds, proxy voting decisions

"can play an important role in maximizing the value of the funds' investments,"

and greater transparency around proxy voting "could illuminate potential conflicts

of interest and discourage voting that is inconsistent with fund shareholders' best

interests," as well as incentivize fund managers to "vote their proxies carefully."

68 Fed. Reg. at 6564–66, 75.  The amendments in the Final Rule—including the

categorization requirement—were intended "[t]o improve the utility of Form N–

PX information for investors," and "help investors understand how funds and managers are voting by helping them readily identify votes on matters that are important to them," as well as allow them "to compare how different managers or funds voted on specific types of matters." AR-1, at 57,480, 87. And the Commission reasonably concluded that the categorization requirement may aid investors "in their investment decisions," AR-2, at 78,793, and that the amendments "may also help deter fund voting decisions motivated by conflicts of interest," *id.* at 78,777 n.95 & 78,794.

## III.    The categorization requirement is reasonable and reasonably explained.

The Commission's analysis of the categorization requirement in the Final Rule readily satisfies APA standards, which require that it reasonably consider the relevant issues and reasonably explain its decision. *Prometheus Radio Project*, 141 S. Ct. at 1158. Petitioners' challenges to the rationality of the categorization requirement both distort the applicable requirements and ignore key portions of the Commission's analysis.

### A.    The Commission reasonably explained and analyzed the economic implications of the categorization requirement.

The Commission satisfied its burden to "determine as best it can the economic implications of the rule." *Chamber of Commerce v. SEC*, 2023 WL 7147273, at *7 (5th Cir. 2023) (quotation omitted); *contra Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 966 (5th Cir. 2023) (benefits of rule did

not bear reasonable relationship to costs). It considered the economic baseline and affected parties (AR-2, at 78,791–92); the benefits of the Final Rule (78,792–95); its costs (78,795–98, 802–05); and its impact on efficiency, competition, and capital formation (78,800–01). The Commission attempted to quantify these effects where practicable (78,790–91) and otherwise provided a qualitative analysis. And the Commission reasonably concluded, as relevant here, that "the modifications to the proposal balance the concerns raised by commenters…with the benefits provided by voting matter classifications." *Id.* at 78,778. This was all that was required. *Chamber of Com.*, 2023 WL 7147273, at \*6–7; *see Prometheus Radio Project*, 141 S. Ct. at 1158–60; *AFBR*, 85 F.4th 263–64; *Huawei Techs.*, 2 F.4th at 454–55.

Contrary to petitioners' assertions (Br. 32–33), the Commission discussed investor demand for proxy voting information and explained how the amendments, including the categorization requirement, would address shortcomings in the existing form and improve investors' ability to use Form N–PX information. As it concluded in 2003, the Commission found that, because of funds' "significant voting power" and the ways their voting practices can affect the value of issuers' securities, "investors have an interest in how funds vote." AR-2, at 78,770. And, as confirmed by comments, the information on Form N–PX is "used by fund investors, other market participants, corporate issuers," as well as "service

providers" that collect and analyze this information or provide advice using it, such

as "proxy voting advisers, proxy data providers and analysts, and equity analysts,"

*id.* at 78,792; *see id.* at 78,771, 77, 92–93 & nn.13, 81–83, 255–57, 260 (citing AR-

12–13, 24–26, 32, 37, 39, 47, 49, 56).

Petitioners question how widespread this investor demand is (Br. 29, 32),

but the rule is not premised on the notion that all investors will use this information

or that only those investors interested in proxy voting information would bear the

costs of the amendments.  AR-2, at 78,795 (acknowledging requirements would

"subsidize some fund investors and other interested parties relative to other fund

investors").  The Commission acknowledged that some commenters "questioned

the importance of proxy voting information for investors' decisions," but it

"anticipate[d] that some investors will find this information valuable in making

their investment decisions," *id.* at 78,793, and cited a number of commenters who

stated the amendments "would facilitate investors' acquisition and use of

information about proxy votes that funds disclose."  *Id.* at 78,792 (citing AR-12,

13, 25–26, 32); *see AFBR*, 85 F.4th 249–50, 53 (evidence in record describing

investor demand for information provided substantial evidence of such demand).

Likewise, the Commission recognized that "many retail investors may not make

direct use of Form N–PX" but stated that investors "that rely on third parties such

as research analysts to access and evaluate proxy voting information will benefit

indirectly" because those third parties will have lower costs in using Form N–PX data.  AR-2, at 78,793.

The Commission also explained the difficulties with the existing form that are addressed by the amendments, and therefore are benefits of the amendments, *contra* Br. 33.  The Commission explained that, because of the length and format of the existing Form N–PX, investors "may have difficulty finding a particular fund's voting history," and it may be "difficult for investors to identify a particular voting matter or category of similar voting matters, and to compare funds' voting records."  AR-2, at 78,791.  The addition of the categorization requirement would help address this and "enable investors to have more information about reporting persons' proxy voting records which may aid them in their investment decisions." *Id.* at 78,793.

As the Commission outlined, categorization makes the information "more searchable, which makes it easier for investors to focus on topics they find important," "significantly lowers the costs of consumption of the data," signals a fund's "investment criteria and overarching goals," and "facilitate[s] the comparison of voting patterns across funds."  *Id.* at 78,777, 78,793 (citing AR-25, 26, 32, 47).  And the modifications the Commission made to the categorization requirement at adoption were consistent with the recommendations of commenters. *Id.* at 78,777–78, 93.  Together, the amendments to the form would "help investors

and other data users more easily collect and analyze proxy voting information, resulting in lower costs of gathering and understanding this information," *id.* at 78,792. And they "broaden the scope" of the benefits of Form N–PX by providing information to investors relevant to their investment decisions, deterring fund voting decisions that are motivated by conflicts of interest, and providing stronger incentives for fund managers to vote their proxies carefully. *Id.*

The Commission's analysis stands in stark contrast to *Mexican Gulf Fishing Co.*, relied on by petitioners (Br. 33–34). There, the Court faulted the agency for providing virtually no evidence of any benefits from the rule, 60 F.4th at 966, and "no evidence that the preexisting reporting is inaccurate," *id.* at 973. The Commission here reasonably analyzed and explained how the Final Rule, including the categorization requirement, would "improve the utility of Form N–PX information for investors." AR-2, at 78,771. And the Commission's conclusions were supported by evidence from commenters. *See* pp. 14, 46–49, *supra*.

Petitioners' assertions (Br. 32–33) that more quantitative data was needed misstate what is required. The Commission does not need to "conduct a rigorous, quantitative economic analysis" of every cost and benefit, *Chamber of Com.*, 2023 WL 7147273, at *7 n.10 (quotation omitted), nor must it "support its analysis with hard data where it reasonably relied on difficult-to-quantify, intangible benefits," *Huawei Techs.*, 2 F.4th at 454. As this Court recently held, neither the APA nor

the relevant provisions of the securities laws require the Commission to "undertake a quantitative analysis to determine a proposed rule's economic implications," and there is "no textual basis to conclude that the [Commission] must analyze economic impacts using quantitative methods whenever it is feasible." *Chamber of Com.*, 2023 WL 7147273, at *6–7. Rather, a "discussion of unquantifiable benefits is sufficient" so long as the Commission "articulates a satisfactory explanation for its analysis, including a rational connection between the facts found and the choice made." *AFBR*, 85 F.4th at 263 (quotations omitted); *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 12 (D.C. Cir. 2015) ("simply criticiz[ing] [an] agency for not obtaining and evaluating more data" does not demonstrate its analysis was unreasonable).

As discussed above, *supra* pp. 18–21, 46–49, the Commission engaged in a thorough analysis of the costs and benefits of the rule, and the petitioners do not identify any data the Commission failed to consider or any commenter who explained "how the agency could quantify the proposed rule's effects." *Contra Chamber of Com.*, 2023 WL 7147273, at *8. None of the comments petitioners cite offered such suggestions either. *See* Br. 15–16 (citing AR-22, 29, 34, 43, 46, 57).[18]

---

[18] Indeed, some of these same commenters suggested changes the Commission ultimately adopted—*e.g.*, broadening the categories. AR-29, at 2–3; AR-34, at 4; AR-46, at 2.

As discussed below, the Commission also directly identified and considered the potential "non-financial costs" from the categorization requirement (*contra* Br. 34), including the argument that it would lead to pressure on fund managers to breach their fiduciary duties.  *See* Section III.C, *infra*; *contra Mexican Gulf Fishing Co.*, 60 F.4th at 973 (agency's analysis of personal privacy issues was inadequate because it "did not address the issue at all").

**B.     The Commission's choice of categories was reasonable and reasonably explained.**

Next, petitioners argue that the Commission's selection of categories was arbitrary and capricious because it was based on topics voted on during what they characterize as a "a single, highly atypical year."  Br. 35–38.  But the Commission "clearly thought about" this specific objection and "offered [a] reasoned repl[y]." *Huawei Techs.*, 2 F.4th at 450 (quotations omitted).

The concerns petitioners cite were raised in the context of the proposal, which contemplated 17 categories and approximately 90 subcategories that were "based on [Commission] staff's experience and review of the matters on which funds voted in 2020."  AR-1, at 57,486.  Some commenters asserted these proposed categories were "based on a proxy season that…was not representative." AR-2, at 78,777 n.94 (citing AR-22, 43).  The Commission responded to this concern by reducing the number of categories and eliminating the subcategories entirely.

51

The Commission explained these changes would reduce the "burden" of the proposal, decrease uncertainty about how to categorize specific matters, and "enhanc[e] the usefulness of categorization to investors." *Id.* at 78,777. The Commission acknowledged the risk that "any chosen list of categories may not perfectly capture unanticipated trends that arise in the future" but concluded that "the use of broader categories that are less likely to change helps to address concerns that the chosen categories are based on a proxy season that some commenters asserted was not representative." *Id.* n.94. The Commission thus satisfied its burden to "reasonably consider[] the relevant issues and reasonably explain[] the decision." *Prometheus Radio Project*, 141 S. Ct. at 1158.

In any event, petitioners' purported fears that some of these categories are already outdated (Br. 38) are misguided. Only one of the extra-record sources petitioners cite addresses proxy voting at all, and that source discusses the voting support for various types of shareholder proposals—not the number of shareholder proposals brought, which is the more relevant metric here.[19] And, in fact, the number of shareholder proposals brought related to "social" and "environmental" issues increased from 2022 to 2023—with these categories representing over 50%

---

[19] Hazel Bradford, *ESG Support Falters This Proxy Season*, Pensions & Invs. (June 26, 2023), https://www.pionline.com/esg/esg-support-falters-proxy-season.

of all proposals submitted.[20]  Moreover, petitioners articulate no harm even if the

number of voting items under some of the categories were to decrease over time—

funds would simply not check the box for those categories.

### C.    The Commission reasonably addressed the concern that the categorization requirement could cause fund managers and investment advisers to act contrary to their fiduciary duties.

Contrary to petitioners' erroneous claim, Br. 39–41, the Commission

discussed whether and to what extent the categories it chose will cause fund

managers to act contrary to their fiduciary duties, recognizing that "although fund

managers are fiduciaries that owe duties of care and loyalty to each client, their

proxy voting decisions may be driven by their economic interest in attracting more

investments into the fund or more investment opportunities."  AR-2, at 78,794.  It

further explained the possibility that "[a] fund's proxy voting also may be affected

by the fund manager's personal preferences that may not align with the best

interests of the fund's investors."  *Id.* at 78,794–95.

The Commission also acknowledged commenters' "differing views as to the

likely effectiveness of the proposed amendments at deterring votes from being

---

[20] Ronald Mueller et al., *Shareholder Proposal Developments During the 2023 Proxy Season*, Harv. L. Sch. F. Corp. Governance (Aug. 3, 2023), https://corpgov. law.harvard.edu/2023/08/03/shareholder-proposal-developments-during-the-2023-proxy-season; *2023 AGM Season*, Georgeson (June 13, 2023), https://www. georgeson.com/us/insights/2023-agm-season-new-record-for-esg-shareholder-proposals (noting that the number of ESG-related proposals "has increased for the fourth consecutive year").

driven by a conflict of interest." *Id.* at 78,795. This included commenters who expressed a view "that the transparency provided by the proposed amendments will provide investors with information to help align funds' voting decisions with investors' expectations and improve investors' oversight over funds' proxy voting," as well as those who disagreed with that view. *Id.* And the Commission specifically acknowledged that Utah's comment "suggested that activists, rather than fund investors, would use this information [from the categorization requirement] to try to influence how funds vote." *Id.* at 78,777 n.95 (citing AR-57).

But the Commission reasonably concluded that, instead of exacerbating conflicts of interest, the additional transparency provided by the amendments to the "format and content of Form N–PX"—which includes the categorization requirement—may "help deter fund voting decisions motivated by conflicts of interest." *Id.* As it explained, "[a]ligning funds' voting decisions with investors' expectations and improving investors' oversight over voting by definition mitigates risks of conflicts of interest, in which investors (the principals) and fund managers (the agents) have different preferences and goals." *Id.* at 78,795; *see also id.* at 78,798 (the potential "harm to fund shareholders from a vote" would be "less likely if a fund's adviser follows its fiduciary duty obligations").

Petitioners speculate that the Final Rule would "likely" cause breaches of fiduciary duty, Br. 41, because the ESG-related proxy categories will "increase the leverage of ESG activists on fund managers," Br. 40, and the categories "will induce fund managers to cast proxy votes in favor of ESG issues that are not in furtherance of their fund investors' financial interests," Br. 41.  But they point to nothing in the administrative record that the Commission overlooked in reasonably concluding to the contrary.  *Contra Chamber of Commerce*, 2023 WL 7147273, at *9 (comments "include[d] specific references to readily available data as well as explanations on how the [Commission] could use these data to quantify the [r]ule's effects" (quotation omitted)).

Without more, petitioners' policy disagreement is not a basis to overturn the rule.  *See Prometheus Radio Project*, 141 S. Ct. at 1158; *XY Plan. Network*, 963 F.3d at 255; *Utah v. Walsh*, 2023 WL 6205926, at *6 (N.D. Tex. Sept. 21, 2023) (upholding deletion of part of proposed ERISA rule when agency concluded other provisions of rule already required fiduciaries to act in the economic interests of the plan).

Relatedly, petitioners claim the Commission failed to consider whether the categories it chose will "cause disinvestment in industries disfavored by ESG activists."  Br. 39, 41–42.  As an initial matter, no commenter raised this point and therefore this Court may not consider this newly minted argument.  15 U.S.C. 80a-

42(a); *see also id.* 77i(a), 80b-13(a).  In any event, petitioners' argument fails because petitioners offer nothing but speculation to support their assertion and fail to identify relevant evidence or comments that the Commission overlooked.

Moreover, the Commission addressed similar concerns in its discussion of whether the rule would promote efficiency, competition, and capital formation. The Commission acknowledged the possibility that the "overall allocative efficiency of capital in the economy" could be reduced if the additional information on Form N–PX "leads some investors to accept lower returns (for a given level of risk) in exchange for investing in funds that better align with their political, social, or other preferences."  AR-2, at 78,800–01.  But it also recognized that the amendments may increase efficiency, competition, and capital formation because they can help investors make "better informed investment decisions if they want to take into account funds' voting records," which allows them to "more efficiently express their voting preferences."  *Id.* at 78,800.  Additionally, better proxy voting data may improve competition among funds "to the extent that funds seek to differentiate themselves based on their voting record," increased transparency "may encourage more investors to invest in funds, which may increase capital formation," and funds may make voting decisions that "positively affect corporate issuers' productive use of capital," which "could also enhance capital formation."  *Id.* at 78,801.

***

Petitioners challenge only one aspect of the Final Rule—the categorization requirement.  Br. 11 & n.5.  Their arguments for overturning that requirement fail for the above reasons.  But if this Court holds that petitioners have standing and the categorization requirement exceeds the Commission's statutory authority or violates the APA, the proper remedy would be to sever that requirement—as petitioners appear to recognize.  *See* Br. 42.  The Commission stated that the invalidity of any part of the Final Rule "shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application."  AR-2, at 78,790.  And the remainder of the Final Rule will function sensibly without categorization.  *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988) (severance preferred when doing so "will not impair the function of the [rule] as a whole, and there is no indication that the regulation would not have been passed but for its inclusion"); *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019); *VanDerStok v. Garland*, 2023 WL 4945360 (5th Cir. July 24, 2023) (unpublished).

In addition, if the Court finds the Commission did not adequately consider an issue or explain its decision, remand without vacatur is warranted.  *See Chamber of Com.*, 2023 WL 7147273, at *12 (remanding without vacating Commission repurchases rule because "there is at least a serious possibility that the

agency will be able to substantiate its decision given an opportunity to do so"
(quotation omitted)).

## CONCLUSION

The petition for review should be dismissed for lack of jurisdiction, but
otherwise denied.

Respectfully submitted,

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
Assistant General Counsel

DANIEL STAROSELSKY
Senior Appellate Counsel

/s/ John R. Rady
JOHN R. RADY
Appellate Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
November 2023                        (202) 551-4997 (Rady)

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,996 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface—Times New Roman, 14 point—using Microsoft Word.

/s/ John R. Rady

November 20, 2023                                   John R. Rady