# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS, STATE OF LOUISIANA, STATE OF UTAH, AND STATE OF WEST VIRGINIA,

*Petitioners,*

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

On Petition for Review of a Final Action of the United States Securities and Exchange Commission

## PETITIONER'S REPLY BRIEF

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

Office of the Attorney General of Texas
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

RYAN D. WALTERS
Chief, Special Litigation Division
Ryan.walters@oag.texas.gov

MONROE "DAVID" BRYANT*
Special Counsel
David.Bryant@oag.texas.gov

JACOB E. PRZADA
Special Counsel
Jacob.Przada@oag.texas.gov

*Counsel for Petitioner State of Texas*
*\*Attorney-in-Charge*

Additional Counsel listed in
signature block

# TABLE OF CONTENTS

Table of Contents ................................................................................. ii

Table of Authorities ............................................................................ iii

Argument ............................................................................................. 1

I.   The States Have Standing to Challenge the Final Rule. ................................. 1

   A. Standing Rules Reflect a Practical Approach to Allegations of Future Injury, Which Necessarily Are Present in a Challenge to an Agency Rule Prior to its Effective Date. ............................................................................................. 2

   B. The States Are Entitled to Special Solicitude as to Applicable Standing Requirements. ................................................................................................ 9

II.  The SEC Failed to Provide Adequate Basis for its Decision to Adopt the Proxy Categorization Portion of the Final Rule or any Reasoned Explanation for the Arbitrary and Capricious Aspects of the Final Rule. ......................... 10

   A. The SEC Failed to Carry Its Burden to Show Expected Costs Were Reasonably Related to Benefits of the Proxy Categorization Mandate. ..... 12

   B. The SEC Acted Arbitrarily and Capriciously in Setting the Proxy Voting Categories Based on the Single, Atypical Year of 2020. ............................ 13

Conclusion .......................................................................................... 15

Certificate of Compliance ................................................................... 17

Certificate of Service ........................................................................... 17

# TABLE OF AUTHORITIES

*Cases*                                                                 *Page(s)*

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982)............................................................................................ 9

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023).......................................................................................... 2

*Chamber of Com. of United States v. United States Sec. & Exch. Comm'n*,
    85 F.4th 760 (5th Cir. 2023) ............................................................................... 13

*Collins v. Yellen*,
    141 S. Ct. 1761 (2021)...........................................................................................3

*Consumer Data Indus. Ass'n v. Texas through Paxton*,
    2023 WL 4744918 (5th Cir. 2023) ........................................................................5

*Crawford v. Hinds Cnty. Bd. of Supervisors*,
    1 F.4th 371 (5th Cir. 2021) ...................................................................................5

*Crawford v. Marion Cnty. Election Bd.*,
    472 F.3d 949 (7th Cir. 2007)................................................................................ 8

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017) ..............................................................................................7

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019) ................................................................................ 4, 5, 11

*Hippocratic Med. v. U.S. Food & Drug Admin.*,
    78 F.4th 210 (5th Cir. 2023) ........................................................................ 2, 5, 6

*Kentucky v. Biden*,
    23 F.4th 585 (6th Cir. 2022) ................................................................................ 9

*Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*,
70 F.4th 872 (5th Cir. 2023) ....................................................................6, 7, 9, 10

*Massachusetts v. E.P.A.*,
549 U.S. 497 (2007)............................................................................................10

*McCardell v. U.S. Dep't of Hous. & Urb. Dev.*,
794 F.3d 510 (5th Cir. 2015)..................................................................................5

*Mexican Gulf Fishing Co. v. United States Dep't of Com.*,
60 F.4th 956 (5th Cir. 2023) ...............................................................................12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...............................................................................................13

*OCA-Greater Houston v. Texas*,
867 F.3d 604 (5th Cir. 2017) ................................................................................ 8

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No.*,
*1*, 551 U.S. 701 (2007) ...........................................................................................5

*Rest. L. Ctr. v. United States Dep't of Lab.*,
66 F.4th 593 (5th Cir. 2023)................................................................................. 9

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)...............................................................................................5

*Texas v. United States*,
50 F.4th 498 (5th Cir. 2022) ........................................................................... 7, 10

*United States Telecom Ass'n v. Fed. Commc'ns Comm'n*,
825 F.3d 674 (D.C. Cir. 2016)...........................................................................7, 8

*Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dep't of Health & Hum. Servs.*,
985 F.3d 472 (5th Cir. 2021) ...............................................................................13

## Regulations

*Reporting of Executive Compensation Votes by Institutional Investment Managers*,
87 Fed. Reg 78,788. ............................................................................................. 2

## Other Authorities

Restatement (Third) of Trusts § 90 (2007)............................................................ 12

*What's the Problem?: Why Increased Regulation for Mutual Funds Might Hurt Both
Private Firms and Individual Investors*,
71 Rutgers U.L. Rev. 737 (2019) ........................................................................... 4

Nourmand, *Turmoil and Solutions for the Mutual Fund Industry*, 2004 UCLA J. L. &
Tech. Notes 9 (2004) ........................................................................................... 4

The SEC in its Brief challenges Petitioners' standing to bring this proceeding by arguing that a very high level of proof of injury in fact resulting from the proxy categorization provisions of the Final Rule is required. The standard of proof the SEC advocates is far more demanding that the decisions of the Supreme Court and this Court require in cases like this one. Here, the challenged rule has not yet gone into effect, and Petitioners' injuries necessarily will occur in the future. Petitioners here have shown a high likelihood of pocketbook injury resulting from the proxy categorization provisions of the Final Rule after its effective date in mid-2024, and thus have established standing to seek a decision on the merits in this proceeding.

On the merits, the SEC in its Brief ignores the context of the proxy categorization provisions of the Final Rule: President Biden's "whole of government" ESG Executive Orders and the new SEC Chairman's own avowed ESG agenda. Those policy agendas, rather than the pretextual assertion that the challenged provisions are needed to provide widely demanded information to investors, are the only plausible reasons why the SEC based its proxy categories solely on those most commonly invoked in the highly atypical single year of 2020. The SEC's defense of that choice in its Brief is a non sequitur, and makes it apparent that choice was arbitrary, capricious, and an abuse of discretion.

## I. The States Have Standing to Challenge the Final Rule.

The State of Texas has made more than a sufficient showing to establish its standing to challenge the Securities and Exchange Commission Final Rule challenged in this proceeding. The other Petitioners, the States of Louisiana, Utah,

and West Virginia could also have made similar evidence because they invest state assets in funds to which the challenged Final Rule applies. But the law is clear that that was unnecessary and would only have been redundant. *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) ("If at least one plaintiff has standing, the suit may proceed."); *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 228 (5th Cir. 2023). The SEC does not question the settled law that standing as to one of multiple petitioners or plaintiffs is sufficient to establish standing for all petitioners or plaintiffs. Because Texas established its standing, this challenge can proceed.

### A. Standing Rules Reflect a Practical Approach to Allegations of Future Injury, Which Necessarily Are Present in a Challenge to an Agency Rule Prior to its Effective Date.

This case involves future injuries. The SEC adopted the Final Rule challenged in this proceeding on December 22, 2022. It designated an effective date of July 1, 2024. *Enhanced Reporting of Proxy Votes by Registered Management Investment Companies; Reporting of Executive Compensation Votes by Institutional Investment Managers*, 87 Fed. Reg. 78,788-89. The Rule thus was over fifteen months from becoming effective at the time of the Petitioners' statutory deadline for challenging the Rule in February 2023. The effective date remains well into the future.

The SEC devotes substantial effort in its Brief to arguing for a standard for establishing standing that would be practically impossible to meet in a challenge to agency action like this one that occurs well before the agency action's effective date. The law, however, is more practical. It imposes reasonable but not impossible standards for standing as to future injury. Texas, and therefore all Petitioners, comfortably meet those standards.

2

The SEC can't argue with the reality that this Rule will impose real costs. It at least acknowledges that the challenged Final Rule "will lead to some additional costs for funds" subject to the Rule. 87 Fed. Reg. 78,795. It also acknowledges that all of those costs the Final Rule imposes on funds "*will ultimately be borne by the funds' shareholders*,"—investors like Texas—except to the extent that the funds' advisers or other sponsors choose to bear those added costs themselves. *Id.* (emphasis added). And the SEC acknowledges that those costs that "are borne by funds will be borne equally by all of their investors." *Id.*

The SEC does not dispute that Texas, through its Treasury Safekeeping Trust Company; its Employees Retirement System; and its Teacher Retirement System own large investments subject to the Final Rule; nor does it dispute that funds are "generally inclined" to pass on to investors like Texas costs like those that the Final Rule will cause those funds to bear; and the SEC does not dispute, nor could it, that pocketbook injury of this sort is an actual injury for purposes of standing. *E.g., Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021).

The SEC also acknowledges the expressed concerns of commenters as to the costs of the Final Rule to investors; however, the SEC argues that the letter cited "says nothing about whether the increased costs would be passed on to investors." SEC Brief at 29 n.12. However, another commenter stated: "[t]he new categories will lead to increased administrative costs to shareholders. . . . Those reporting costs will be passed along to the investors in the form of higher fees and lower returns on their investments." AR 57 at 5 (Utah Atty. Gen., Treas., and Auditor).

This pocketbook injury is hardly a debatable point. The admitted costs of fund compliance with the Final Rule *will* be passed on to fund investors like Texas *unless* every single fund adviser or sponsor of funds owned by Texas chooses to absorb all of those additional costs indefinitely. Is it theoretically possible that private profit-seeking entities that are entitled to pass on added costs to fund investors will choose not to do so? Yes. Is it remotely likely in the real world? Emphatically no. *See, e.g.*, Clancy, *What's the Problem?: Why Increased Regulation for Mutual Funds Might Hurt Both Private Firms and Individual Investors*, 71 Rutgers U. L. Rev. 737, 759 (2019) (explaining how investment funds tend to pass increased regulatory costs on to investors); Nourmand, *Turmoil and Solutions for the Mutual Fund Industry*, 2004 UCLA J. L. & Tech. Notes 9 (2004) (same).

The SEC insists that Texas lacks standing unless it has already proven[1] that it has suffered or "imminently" will suffer additional costs from the Final Rule *long before the Rule becomes effective and the actual costs from the Rule even exist.* It might be convenient for an agency if standing requirements were such that they would make its actions unreviewable as a practical matter. But they are not.

The Supreme Court has made this issue clear enough. In *Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019), States sued the Department of Commerce to block its plan to include a question on citizenship in the 2020 Census. *See id.* The Supreme Court, in examining the States' standing, noted that they relied on injuries that might result from inclusion of such, based on the possibility that such

---

[1] Technically, a plaintiff must show it had standing at the time of the initiation of the proceed, here in February 21, 2023. This was within 60 days of the publication of the Final Rule on December 22, 2022, and over fifteen months after it was to become effective.

a citizenship question might deter non-citizens from completing their required census forms. *Id.* at 2565. These possible injuries to the States included loss of federal funds and diminishment of political representation. *See id.* The Court affirmed a finding of standing, agreeing that the States had standing even though their injuries were "primarily future injuries":

> These are primarily future injuries, which may suffice if the threatened injury is certainly impending or if there is a substantial risk the harm will occur.

*Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). At the same time, the Court rejected an argument that the harm was speculative because it depended independent actions of third parties (the non-citizens) "choosing to violate their legal duty to respond to the census" and doing so "based on unfounded fears that the Federal Government will itself break the law by using noncitizens' answers for law enforcement purposes." The Court found that the States had carried their burden of "showing that third parties will likely act in predictable ways." *Id.* at 2566; *see also Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (rejecting argument that parents lacked standing because it is "possible children of group members might not be denied admission.").

And this Court has notably applied these principles in multiple cases, when addressing standing. *E.g., All. For Hippocratic Medicine*, 78 F.4th at 227–28*; Consumer Data Indus. Ass'n v. Texas*, 2023 WL 4744918 (5th Cir. 2023); *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 376 (5th Cir. 2021); *McCardell v. U.S. Dep't of Hous. & Urb. Dev.*, 794 F.3d 510, 520 (5th Cir. 2015). The cases require only "a realistic danger" of sustaining a direct injury; "a credible threat"; or a

5

"sufficiently high degree of likelihood" of injury. *Alliance for Hippocratic Medicine*, 78 F.4th at 228. "[A] plaintiff seeking prospective relief need only show that the future injury is at least 'fairly likely.'" *Id.*

Texas certainly made such a showing. It consistently invests in funds and ETFs undeniably subject to the Final Rule. The Rule undeniably will impose costs on all such funds and ETFs. The funds and ETFs will almost certainly pass on at least some of such costs to their investors. This chain of causation makes injury to Texas far more than "fairly likely." It stands in sharp contrast to attenuated and uncertain chains of causation found insufficient to establish standing in other cases.

The SEC relies in its Brief on one of those attenuated and uncertain injury cases—this Court's recent decision in *Louisiana State v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872 (5th Cir. 2023). That case is distinguishable for many reasons. First, *Louisiana State* was not a petition for review before the effective date of a rule, but a district court action brought to enjoin a rule *after* it had gone into effect. Even *Louisiana State* acknowledged that "State[s] may have proprietary interests sufficient to confer standing, much like a private litigant." *Id.* at 878.

The Court rejected Louisiana's standing argument as to its proprietary interests based on a straightforward failure of proof. *Id.* at 882-84. Louisiana argued that the federal rule at issue could lead to "significant noncompliance"; that Louisiana could then be required to divert its law enforcement effort from enforcing its own laws to respond to such noncompliance with the new federal rule; and that Louisiana did not expect additional funding from federal sources to cover its increased costs. *See id.* The Court pointed out that (a) no evidence established that

Louisiana actually was required to enforce the new federal rule and (b) some evidence indicated that the federal agency would offset any costs incurred by Louisiana in enforcing the new rule. *Id.* at 883-84.

Thus, though the rule at issue on the *Louisiana State* case had already gone into effect, evidence tended to disprove the uncertain chain of causation relied on to show injury. Here, Texas has presented the best evidence of likely injury reasonably possible for the high likelihood of actual injury to its proprietary interests when (and if) the Final Rule goes into effect in the middle of next year. It is only then that the many funds in which Texas invests hundreds of millions of dollars will incur the full costs imposed on them by the Final Rule, passing all or at least some of those costs to Texas through fees. *Cf. United States Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 739 (D.C. Cir. 2016) (difficulty of proving injury prior to enforcement).

Texas' burden, which it has shouldered through multiple declarations, is to show that Texas likely will suffer injury traceable to the Final Rule after that Final Rule goes into effect. The quantum of that likely injury is irrelevant to standing and need not be proven. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017) (for standing purposes, "a loss of even a small amount of money is ordinarily an injury."); *Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022). The SEC has offered no evidence to rebut that presented by Texas, or to refute the common-sense evidence in the record that at least some additional costs that will be incurred as a result of the Final Rule will very likely be passed by funds to investors and will not be absorbed one hundred percent (forever) by fund advisers or sponsors. *See* AR 57 at 5, Decl. of Mike Roussig, Appendix). The costs at issue are not one-time costs; they will recur

7

again and again, as long as the Final Rule is in effect. Even if funds do not immediately pass them on to investors, they can do so whenever in the future.

The SEC in its Brief demands an impossible level of specificity again and again. It complains that multiple changes in the Final Rule will impose costs on funds that likely will be passed on to investors, and that Texas has not proven the specific portion attributable to the proxy categorization changes in that Final Rule challenged by Texas. SEC Brief at 28-29. Similarly, the SEC demands that Texas prove the dollar-by-dollar *amounts* of the increased costs "specific to the funds Texas invests in." SEC Brief at 29 n.12. But "the injury in fact requirement under Article III is qualitative, not quantitative, in nature." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017). "The fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." *Crawford v. Marion Cnty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007).

The information as to the costs anticipated by the SEC as to each of the individual proposed changes in the Final Rule is, of course, available only to the SEC. The SEC chose not to disclose that, and it is unreasonable for the SEC to demand that Texas (with no discovery processes available) prove such costs with precision. Similarly, information as to costs to Texas that will result from each of the several proposed changes included in the Final Rule is inherently impossible to identify with specificity until after the Rule goes into effect. The information the SEC demands as to the increased costs from the Final Rule to the various funds with which Texas invests cannot be proven until after the rule takes effect. *See* 825 F.3d at 739.

The law does not require such impossible specificity, because it would effectively immunize unlawful acts of the SEC and other agencies from challenge, and utterly frustrate justice. This Court does not impose such a high burden of proof even when a plaintiff asks for extraordinary relief. *See Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 600 (5th Cir. 2023) ("[s]tringently insisting on a precise dollar figure reflects an exactitude our law does not require."). Congress made it clear in the APA that there is a strong presumption that actions of federal agencies are to be subject to judicial review at the instance of those aggrieved by their actions. Texas and the other Petitioners are such aggrieved parties and have standing.

## B. The States Are Entitled to Special Solicitude as to Applicable Standing Requirements.

Although Texas has standing based on pocketbook injury alone, the Petitioners also have *parens patriae* standing to bring this proceeding on behalf of their citizens who will be adversely affected if the Final Rule goes into effect. The SEC argues to the contrary that *parens patriae* standing simply does not exist in any action by a state against the "Federal Government." *Contra, Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022). That argument goes farther than the cases do in the Fifth Circuit. The Court in *Louisiana State v. NOAA* confirmed that Louisiana had a quasi-sovereign interest in the general economic well-being of its residents. 70 F.4th 872, 881 (5th Cir. 2023). But the Court found that – at the summary judgment stage – the State had not shown that the challenged rule's impact on the State's shrimping industry would result in economic impact on "a sufficiently substantial segment of its population." *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex*

*rel., Barez*, 458 U.S. 592, 607 (1982)).[2] Here, the SEC admits that the economic impacts of the Final Rule will be much more widespread. *See* SEC Brief at 26-28.

Because Texas and the other Petitioners have quasi-sovereign interests at stake and a procedural right to challenge the action under the APA, they are entitled to "special solicitude" pursuant to *Massachusetts v. E.P.A.*, 549 U.S. 497, 519, 520 (2007) and *Texas*, 50 F.4th at 514. As this Court recently noted in *Louisiana*, special solicitude relaxes the normal standards for establishing standing. 70 F.4th at 882. As it affects this case, special solicitude at a minimum entitles the Petitioners to a less stringent standard with respect to the immediacy or timing of the future injury they likely will suffer as a result of the Final Rule. *Id.* Because Texas is very likely to suffer future pocketbook injury from the Final Rule, Petitioners have standing.

## II. The SEC Failed to Provide Adequate Basis for its Decision to Adopt the Proxy Categorization Portion of the Final Rule or any Reasoned Explanation for the Arbitrary and Capricious Aspects of the Final Rule.

The SEC attempts to defend its proxy categorization choices in the Final Rule, first, by setting up strawmen. The SEC suggests inaccurately Petitioners are attacking the SEC's authority under applicable statutes to require reasonable disclosure of proxy voting by funds, SEC Brief at 9-12, or to require funds to categorize their proxy votes. SEC Brief at 38. Neither is the case.

Instead, Petitioners demonstrated that the SEC proxy categorization provisions of the Final Rule were driven not by the claimed goals of simply providing useful information to investors, but instead by Administration-wide political

---

[2]     The Court's opinion stated in fn. 5 that it was "dubious" that Louisiana could maintain *parens patri*ae standing in a suit against the federal government. 70 F.4th at 882 n.5. But that was not a holding of this Court, nor has there been such a holding.

priorities of advancing the ESG agenda. *See* Pet. Brief at 21-27. The SEC responds that the Court must blind itself to that reality. But their own authorities are to the contrary: "[a]ccepting contrived reasons would defeat the purpose of the enterprise." *Department of Commerce*, 139 S. Ct. at 2576. The half-hearted way in which the SEC has tried to justify its proxy categorization work shows that contrived reasons are what the Court has before it.

This motivation was exemplified by the SEC's failure (despite misgivings by both SEC Commissioners and commenters) to seriously grapple with the costs of this feature of the Final Rule to all fund investors—while benefitting only the tiny minority of fund investors focused on analyzing and influencing fund proxy voting for ideological or policy reasons. *See* Pet. Brief at 11-16. The SEC stated in adopting the Final Rule and now states in its Brief that it carefully considered all comments and objections, but it failed in its duty to explain reasonably why it rejected them and proceeded as it did. *See* SEC Brief at 51.

Moreover, both commenters and SEC Commissioners pointed out that using the single and highly atypical year 2020 as the sole basis for determining the proxy vote categories was an arbitrary choice that overly emphasized ESG proxy votes; the SEC never reasonably responded to those comments in promulgating the Final Rule, nor does the SEC offer any rational explanation for that strange choice in its Brief. *See* SEC Brief at 51-52. Instead, the SEC implausibly argues that its decision to eliminate the originally proposed 90 subcategories and to consolidate a couple of the categories somehow explains away the irrationality of using only the atypical year of 2020 to set those categories. SEC Brief at 51. It does not.

## A. The SEC Failed to Carry Its Burden to Show Expected Costs Were Reasonably Related to Benefits of the Proxy Categorization Mandate.

Numerous commenters as well as Commissioners asserted that the costs of the SEC's proposed proxy categorization scheme – which would be passed on by the funds to the great number of fund investors who have little or no interest in their funds proxy votes – outweigh the benefits of the small minority who have interest in such information, whether for ideological or investment reasons. *See e.g.*, AR 43 at 2 (Quaadman, U. S. Chamber of Commerce). The SEC claims it "satisfied its burden to determine as best it can the economic implications of the rule." SEC Brief at 45. However, it simply failed to do so or to reasonably explain its reasoning.

The SEC acknowledges by its use of the "*Contra*" signal on pages 45-46 that its argument is inconsistent with the decision of this Court in 2023 in *Mexican Gulf Fishing Co. v. United States Dep't of Com.*, 60 F.4th 956, 966 (5th Cir. 2023). It asserts that the SEC's "analysis stands in stark contrast to *Mexican Gulf Fishing Co.*" SEC Brief at 49. It is true that the SEC here did *not* do what *Mexican Gulf Fishing Co.* requires: make a serious attempt to assess the financial and non-financial costs of the proposed proxy categorization scheme, compare them with the limited benefits of that scheme for a minority of investors who make fund proxy voting a significant focus[3], and show the expected costs are reasonably related to the expected benefits. *Mexican Gulf Fishing Company*, 60 F.4th at 965-66. And this is no small thing, as the

---

[3]    The non-financial costs not analyzed by the SEC include those identified by Petitioners in their Brief: the Rule's tendency to cause fund managers to focus on avoiding the disapproval of ESG activists rather than focusing on their fiduciary duties to maximize financial returns to their investors, and the Rule's potential to pressure fund manager to disinvest from industries and companies that are targets of ESG activists, even though those investments are in their investors' financial interests. *Cf.* Restatement (Third) of Trusts § 90 (2007) & cmt. c (Am. L. Inst. 2007) (discussing fiduciary obligations).

non-financial costs in particular that were not analyzed by the SEC include the Rule's tendency to cause fund managers to (a) focus on avoiding disapproval of SEC activists and negative publicity rather than focusing on their fiduciary duties to maximize financial returns to their investors, and (b) to disinvest from industries and companies that are targets of ESG activists even though those investments are in their investors' financial interests.

Petitioners do not argue that the SEC was required to conduct a "rigorous quantitative economic analysis." *See Chamber of Com. of United States v. United States Sec. & Exch. Comm'n*, 85 F.4th 760 (5th Cir. 2023). But here the SEC did no serious analysis and simply announced its conclusion that the benefits of its intended action outweighed the costs. SEC Brief at 51-52. The SEC's underlying (and unsupported) assumption appears to be that mandating more disclosures will always outweigh the resulting costs. But there is no empirical evidence that bears that out, either in general or in this instance. And apart from that, the SEC does not explain why it decided to draw the line where it did in the Final Rule. It simply *announced* it. That is not sufficient under *Mexican Gulf Fishing Co.*

## B. The SEC Acted Arbitrarily and Capriciously in Setting the Proxy Voting Categories Based on the Single, Atypical Year of 2020.

Generally, a court must set aside agency action as arbitrary and capricious that is premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment. *Univ. of Texas M.D. Anderson Cancer Ctr. v. United States Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, Petitioners (and many commenters and Commissioners) pointed out the admitted fact that the SEC based the selection of proxy categories used in the Final Rule solely on its assessment of those most commonly used in the single, atypical year of 2020.[4] That choice skewed the categories toward ESG issues, as compared with using previous years or an average that included previous years – a skew that coincided with the policy agenda of the President and new SEC Chairman. As commenters also noted, the use of a single year also inherently increased the chances that the categories chosen would disproportionally reflect short-lived "issues of the day" and would not be "evergreen" requiring more frequent revision.

The SEC's Brief fails to explain why it chose to use the atypical year of 2020 alone as the basis for the proxy categories, as opposed to an average of three or five years. Indeed, the SEC articulated no rationale at all for this choice. SEC Brief at 51-52. Instead, the SEC simply attempted to change the subject. It noted that the original proposal included 17 categories and around 90 subcategories, and the Final Rule reduced the number of categories and eliminated the subcategories. SEC Brief at 51. While that change may have reduced confusion, complexity, and costs of fund compliance, the remaining categories were still irrationally based on 2020 alone. The SEC's "explanation" regarding its selection of 2020 is a non sequitur. Reducing the difficulty and cost of an irrational choice does not make that choice rational.

This change did nothing to make the categories in the Final Rule more broadly representative of many years. And it did nothing to reduce the skewing effect of the

---

[4] Comm. Elad Roisman, *Statement on Proposed Changes to Asset Managers' Proxy Voting Disclosures* (Sept. 29, 2021) https://www.sec.gov/news/public-statement/roisman-open-meeting-2021-09-29.

Final Rule toward ESG issues. Thus, the SEC simply has failed to carry its burden to articulate a reasoned explanation for this critical proxy categorization choice that it made in the Final Rule. *See* SEC Brief at 51-52. Its action therefore was arbitrary and capricious as well as an abuse of the SEC's discretion. The proxy categorization portion of the Final Rule thus violates the APA and must be set aside.

## CONCLUSION

The SEC argues that the proper remedy is to sever the proxy categorization portion of the Final Rule from the portions of the Final Rule that Petitioners have not challenged. SEC Brief at 57. Petitioners do not object to that remedy, but object to the SEC's alternate suggestion that this Court remand the proxy categorization portion of the Final Rule without vacatur or setting it aside. SEC Brief at 57-58. Here, the SEC had multiple opportunities to substantiate its choice to use the single, atypical year of 2020 as the basis of its proxy categories, and failed to do so.

Petitioners believe that has been so because that choice cannot be rationally justified. Moreover, any new "substantiation" at this point likely would be pretextual, driven by the SEC's ESG policy agenda. There is no "serious possibility [the SEC] will be able to substantiate its decision" on remand. Accordingly, it is necessary to set aside the proxy solicitation provisions of the Final Rule.

Dated: December 11, 2023.

Respectfully submitted.

| | |
|---|---|
| Ken Paxton<br>Attorney General | Jeff Landry<br>Attorney General |
| Brent Webster<br>First Assistant Attorney General | Elizabeth B. Murrill<br>Solicitor General |
| Grant Dorfman<br>Deputy First Assistant Attorney General | /s/ Joseph Scott St. John-by permission<br>Joseph Scott St. John<br>Deputy Solicitor General |
| Ralph Molina<br>Deputy Attorney General | Louisiana Department of Justice<br>1885 N. Third Street |
| Ryan Walters<br>Chief, Special Litigation Division | Baton Rouge, LA 70804<br>(225) 326-6766<br>murrille@ag.louisiana.gov |
| /s/ *David Bryant*<br>Monroe "David" Bryant<br>Special Counsel<br>Jacob E. Przada<br>Special Counsel | ***Counsel for the State of Louisiana***<br><br>Patrick Morrisey<br>Attorney General |
| Office of the Attorney General<br>P.O. Box 12548 (MC 059)<br>Austin, Texas 78711-2548<br>Tel.: (512) 936-1700<br>Fax: (512) 474-2697<br>David.Bryant@oag.texas.gov<br>Jacob.Przada@oag.texas.gov | Lindsay See<br>Solicitor General<br><br>/s/ Michael R. Williams-by permission<br>Michael R. Williams<br>Senior Deputy Solicitor General<br><br>Office of Att'y Gen. of West Virginia |
| ***Counsel for Petitioner State of Texas*** | State Capitol, Bldg 1, Room E-26<br>Charleston, WV 25305 |
| Sean Reyes<br>Attorney General | (681) 313-4550<br>Lindsay.S.See@wvago.gov<br>Michael.R.Williams@wvago.gov |
| /s/Melissa Holyoak-by permission<br>Melissa Holyoak<br>Solicitor General | ***Counsel for the State of West Virginia*** |
| Office of the Attorney General of Utah<br>350 N. State Street, Suite 230<br>P.O. Box 142320<br>Salt Lake City, UT 84114-2320<br>(801) 538-9600<br>melissaholyoak@agutah.gov<br>***Counsel for the State of Utah*** | |

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5424 words, excluding the parts of the brief exempted by Rule 3(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ David Bryant
DAVID BRYANT

## CERTIFICATE OF SERVICE

On December 13, 2023, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ David Bryant
DAVID BRYANT